1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7    CARMEN ARACELY PABLO SEQUEN,
     et al.,

Case No.  25-cv-06487-PCP

8                      Plaintiffs,

**ORDER GRANTING PRELIMINARY
INJUNCTION**

9            v.

10   SERGIO ALBARRAN, et al.,

Re: Dkt. No. 34

11                     Defendants.

12
13        Ligia Garcia and Yulisa Alvarado Ambrocio ("petitioners") are asylum-seekers who each

14   arrived in the United States in 2024 and have lived in California for more than a year. On

15   September 18, 2025—as part of a now-familiar practice that courts in this district have

16   consistently held is likely unconstitutional—agents of Immigration and Customs Enforcement

17   (ICE) arrested Ms. Garcia as she was leaving the immigration court in San Francisco and detained

18   her without a hearing. ICE agents attempted to arrest and detain Ms. Alvarado Ambrocio under

19   similar circumstances on September 11, 2025, but they refrained from doing so because Ms.

20   Alvarado Ambrocio's nursing infant was with her. Petitioners filed a writ of habeas corpus,

21   claiming that ICE's conduct violated their procedural and substantive due-process rights under the

22   Fifth Amendment. On September 18, 2025, this Court issued a temporary restraining order

23   requiring the government to release Ms. Garcia and enjoining it from re-detaining her without

24   notice and a pre-arrest hearing before a neutral decisionmaker. Now before the Court is

25   petitioners' request to convert that temporary restraining order into a preliminary injunction that

26   prohibits the detention of either Ms. Garcia or Ms. Alvarado Ambrocio without notice and a pre-

27   deprivation hearing. For the reasons set forth below, the Court grants petitioners' requested

28   preliminary injunction.

United States District Court
Northern District of California

**STATUTORY FRAMEWORK**

Two statutes—8 U.S.C. §§ 1225 and 1226—provide for the detention of noncitizens (or "aliens") pending removal proceedings.

Under § 1225, a noncitizen "who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018) (quoting 8 U.S.C. § 1225(a)(1)). All noncitizens "who are applicants for admission," or who are "otherwise seeking admission or readmission to or transit through the United States[,] shall be inspected by immigration officers" to assess whether they may be admitted into the country. 8 U.S.C. § 1225(a)(3). An inspecting officer must then determine whether an applicant for admission is covered by either § 1225(b)(1) or § 1225(b)(2). *See Jennings*, 583 U.S. at 287. Section 1225(b)(1) applies to noncitizens who, upon arriving, are initially deemed inadmissible under 8 U.S.C. § 1182(a)(6)(C) or (a)(7) due to fraud, misrepresentation, or lack of valid documentation. *See* 8 U.S.C. § 1225(b)(1)(A)(i). It also applies to certain noncitizens designated by the Attorney General who are later determined to be inadmissible under § 1182(a)(6)(C) or (a)(7) and were not continuously present in the United States for the two-year period prior to that determination. *See id.* § 1225(b)(1)(A)(iii). Section 1225(b)(2) covers all other "applicant[s] for admission" who are "seeking admission," with limited exceptions not applicable here. *See id.* § 1225(b)(2)(A), (B).

Subsections (b)(1) and (b)(2) both authorize detention pending removal proceedings in certain circumstances. Noncitizens covered by § 1225(b)(1) are subject to an expedited removal process and will be "removed from the United States without further hearing or review" unless they claim a right to asylum. *Id.* § 1225(b)(1)(A)(i)–(ii). If a noncitizen states an intent to apply for asylum and an immigration officer determines that there is a credible fear of persecution, the noncitizen "shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). Noncitizens covered by § 1225(b)(2) are not subject to expedited removal. Instead, they are placed in standard removal proceedings under § 1229a, which include an evidentiary hearing before an immigration judge, the right to counsel, and the right to seek review by the Board of Immigration Appeals (BIA) and a federal court of appeals. *Id.* § 1225(b)(2)(A);

United States District Court
Northern District of California

*Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2018); *see also Valencia Zapata v. Kaiser*, No. 25-CV-07492-RFL, 2025 WL 2741654, at *1 (N.D. Cal. Sept. 26, 2025) (describing the greater procedural protections available to noncitizens in standard removal proceedings). Section 1225(b)(2) mandates that noncitizens "shall be detained" pending such proceedings unless they are "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). "In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending." *Salcedo Aceros v. Kaiser*, No. 25-cv-06924-EMC, 2025 WL 2637503, at *3 (N.D. Cal. Sept. 12, 2025). The government may release noncitizens detained under either § 1225(b)(1) or (b)(2) only on temporary parole "for urgent humanitarian reasons or significant public benefit." *Jennings*, 583 U.S. at 300; *see* 8 U.S.C. § 1182(d)(5)(A).

    For noncitizens who are "already in the country," § 1226 permits detention "pending the outcome of removal proceedings" in certain circumstances. *Jennings*, 583 U.S. at 289. Unlike § 1225(b)(1) and (b)(2), § 1226 affords the government significant discretion. After arresting a noncitizen "[o]n a warrant issued by the Attorney General," the government "may continue to detain the arreste[e]" until a final removal decision is made or "may release" them on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(1)–(2). "Conditional parole" may also be called "release on recognizance." *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115 (9th Cir. 2007). Section 1226 prohibits the release of a detained noncitizen, whether on bond or conditional parole, unless the noncitizen "satisfies [the government] that [she] will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(a)(4); *see also* 8 C.F.R. § 1236.1(c)(8). If a noncitizen wishes to contest the initial custody determination—i.e., the denial or amount of bond—she has a right to do so before an immigration judge. 8 C.F.R. § 1236.1(d)(1). "The noncitizen's bond or parole can be revoked at any time, even if the noncitizen was previously released; however, if an [immigration judge] has determined the noncitizen 'should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance.'" *Valencia Zapata*, 2025 WL 2741654, at *2 (quoting *Salcedo Aceros*, 2025 WL 2637503, at *1).

In a handful of circumstances, § 1226 departs from its discretionary framework to mandate detention. *See* 8 U.S.C. § 1226(c). The government "shall take into custody" noncitizens who are inadmissible or deportable because they committed certain criminal offenses, *id.* § 1226(c)(1)(A)– (C); are inadmissible based on terrorist affiliations or other security concerns, *id.* § 1226(c)(1)(D); or are inadmissible on certain bases and have been charged, arrested, or convicted for specified crimes, including burglary and shoplifting, *id.* § 1226(c)(E).

## FACTUAL BACKGROUND

Ms. Garcia is a 54-year-old asylum-seeker from Colombia. After Ms. Garcia entered the United States from Mexico, an agent of the Department of Homeland Security (DHS) arrested her and transported her to a nearby facility for processing. Shortly thereafter, around March 12, 2024, DHS charged Ms. Garcia with inadmissibility under 8 U.S.C. § 1182(a)(6)(A)(i) and released Ms. Garcia on her own recognizance. DHS records from the time of Ms. Garcia's release state that she "has no criminal history" and "does not appear to be a threat to national security, border security, or public safety." When releasing Ms. Garcia, DHS served her with a notice to appear and placed her in full removal proceedings in immigration court.

Following her release, Ms. Garcia moved to Santa Clara, where she has remained for the past 19 months. She currently lives with her niece. After applying for asylum in February 2025, Ms. Garcia received work authorization and has since been lawfully employed with a staffing agency, through which she works as a dishwasher and in restaurant kitchens. Outside of work, Ms. Garcia has become an active member of her church community and provides regular care for her friends' special-needs child.

On September 18, 2025, Ms. Garcia appeared at the immigration court in San Francisco for a master hearing. She was unrepresented. During the hearing, the government moved to dismiss Ms. Garcia's pending removal proceedings with the intent to pursue expedited removal under § 1225(b)(1). The immigration judge continued the hearing to allow Ms. Garcia to seek legal counsel and respond to the motion. As Ms. Garcia exited the courtroom, ICE agents arrested her and took her to a holding area elsewhere in the building. ICE records from the time of Ms. Garcia's second arrest again noted that she had no criminal history.

Ms. Alvarado Ambrocio is a 24-year-old asylum seeker from Guatemala. After she entered the United States in April 2024, Ms. Alvarado Ambrocio—who was pregnant at the time—was arrested by DHS agents and placed in a detention center for two days. DHS then released Ms. Alvarado Ambrocio on her own recognizance pursuant to its authority under 8 U.S.C. § 1226 and served her with a notice to appear in immigration court.

In the year and a half since her release, Ms. Alvarado Ambrocio has lived in San Francisco with her partner and other members of his family. She gave birth to a daughter, her and her partner's first child, in December 2024. Ms. Alvarado Ambrocio spends much of her time caring for her now-11-month-old daughter, who is still breastfeeding. Their family also attends church each week in San Francisco, and Ms. Alvarado Ambrocio expects to seek work authorization after filing an application for asylum, which she is currently preparing.

On September 11, 2025, Ms. Alvarado Ambrocio appeared at the San Francisco Immigration Court with her breastfeeding infant for a routine hearing. During the hearing, the government moved to dismiss Ms. Alvarado Ambrocio's case. The immigration judge continued the hearing for ten days to allow Ms. Alvarado Ambrocio to file a response. Before Ms. Alvarado Ambrocio exited the courtroom, two attorneys warned her that ICE agents were waiting outside to arrest her. With Ms. Alvarado Ambrocio's consent, the attorneys negotiated with ICE on her behalf, securing an agreement that ICE would not detain her that day. Instead, ICE imposed monitoring requirements on Ms. Alvardo Ambrocio, requiring that she present in person every six months. While the ICE agents permitted Ms. Alvarado Ambrocio to leave the immigration court, they did not state whether they would arrest her after her next immigration-court hearing on October 16, 2025. Ms. Alvarado Ambrocio fears that she will be detained when she next appears in immigration court.

On September 18, 2025, the same day that ICE detained Ms. Garcia, petitioners filed a petition for a writ of habeas corpus. Rather than assert their habeas claims in a new case, petitioners joined the amended complaint and petition of Carmen Aracely Pablo Sequen, an asylum-seeker from Guatemala who initiated this action to challenge her earlier arrest and detention by ICE. The Court previously granted Ms. Pablo Sequen's request for a preliminary

injunction requiring ICE to release her from custody and enjoining ICE from re-detaining her without notice and a pre-arrest hearing. The amended complaint and petition in this case asserts individual habeas claims on behalf of Ms. Pablo Sequen, Ms. Alvarado Ambrocio, and Ms. Garcia. It also asserts individual and class claims under the Administrative Procedure Act, 5 U.S.C. § 706, and the U.S. Constitution challenging various policies of ICE and the Executive Office for Immigration Review, as well as the conditions of confinement at ICE's detention facility at 630 Sansome Street in San Francisco.

Concurrent with their habeas petition, Ms. Alvarado Ambrocio and Ms. Garcia filed an *ex parte* application for a temporary restraining order. The next day, on September 19, 2025, the Court issued a temporary restraining order requiring the government to release Ms. Garcia and enjoining it from re-detaining her without notice and a pre-detention hearing before a neutral decisionmaker. In compliance with the order, the government released Ms. Garcia from detention that same evening. The Court denied Ms. Alvarado Ambrocio's request for a temporary restraining order because she had not established a sufficiently imminent risk of detention. The government does not dispute that, absent judicial relief, Ms. Alvarado Ambrocio faces a likely risk of detention by ICE following her October 16, 2025 hearing.

The Court's temporary restraining order was originally set to expire at 5:00pm on October 2, 2025. After the hearing on this matter, the Court extended the temporary restraining order until 5:00pm on October 16, 2025 to enable the parties to file supplemental briefs and evidence concerning petitioners' request for a preliminary injunction.

## LEGAL STANDARDS

To obtain a preliminary injunction, Ms. Alvarado Ambrocio and Ms. Garcia must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are

satisfied.'" *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). "Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—merge." *Hubbard v. City of San Diego*, 139 F.4th 843, 854 (9th Cir. 2025) (citation modified).

## ANALYSIS

Ms. Alvarado Ambrocio and Ms. Garcia request that the Court grant a preliminary injunction prohibiting the government from detaining them without notice and a bond hearing before a neutral decisionmaker. Ordinarily, the Court would evaluate that request based only on the *Winter* factors. Here, however, the government has raised several threshold issues that the Court must consider before reaching the *Winter* analysis.

First, the government argues that the Court's prior order granting Ms. Pablo Sequen's request for a preliminary injunction provided all the relief Ms. Pablo Sequen sought. As a result, the government contends, this case became moot before the filing of the amended complaint, such that the Court lacks subject-matter jurisdiction over Ms. Alvarado Ambrocio and Ms. Garcia's newly-added habeas claims. But the Court's prior order did not provide all the relief requested by Ms. Pablo Sequen. Her original complaint sought, among other things, a declaration that her detention without prior notice and a hearing violated the Fifth Amendment and a permanent injunction prohibiting her re-detention without such process. The Court's order declared only that Ms. Pablo Sequen's detention without a prior hearing *likely* violated the Fifth Amendment and enjoined the government from re-detaining her only "during the pendency of these proceedings." *Pablo Sequen*, 2025 WL 2650637, at *10. The Court thus did not fully adjudicate Ms. Pablo Sequen's claims, and it retains jurisdiction over her claims. *Cf. Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) ("Preliminary injunctions … do not conclusively resolve legal disputes."). In any event, there is no question that Ms. Alvarado Ambrocio and Ms. Garcia's habeas claims present a live case or controversy within the scope of this Court's Article III jurisdiction. Whether or not it was procedurally proper for those claims to be added to Ms. Pablo Sequen's amended complaint does not affect this Court's subject-matter jurisdiction.

United States District Court
Northern District of California

Second, the government argues that because habeas claims may challenge only the fact or duration of a petitioner's confinement, and not its conditions, the Court must dismiss from the amended complaint petitioners' new claims concerning the conditions of confinement at 630 Sansome. *See Pinson v. Carvajal*, 69 F.4th 1059, 1066–69 (9th Cir. 2023). Even if that were true, however, it has no bearing on Ms. Alvarado Ambrocio and Ms. Garcia's request for a preliminary injunction, which does not concern conditions of confinement. And in any event, petitioners' conditions-of-confinement claims do not invoke this Court's habeas jurisdiction. Instead, they invoke the Court's jurisdiction to adjudicate claims arising under the U.S. Constitution and the Administrative Procedure Act, *see* 28 U.S.C. § 1331; 5 U.S.C. § 702, and the Court's equitable authority to restrain unlawful executive action, *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019). The government has not argued or cited any authority holding that petitioners may not assert habeas and non-habeas claims together in a single complaint. *See Zepeda Rivas v. Jennings*, 465 F. Supp. 3d 1028, 1036 (N.D. Cal. 2020) (allowing conditions-of-confinement claims asserted in a habeas petition to proceed pursuant to the Court's non-habeas equitable authority); *see also* Fed. R. Civ. P. 18(a) ("A party asserting a claim, counterclaim, crossclaim, or third-party claim may join, as independent or alternative claims, as many claims as it has against an opposing party.").

Finally, the government argues that joinder of multiple habeas petitioners in a single case is improper due to the factual specificity of habeas claims and that Ms. Alvarado Ambrocio and Ms. Garcia's claims must therefore be severed from Ms. Pablo Sequen's petition. District courts in California take differing views on the propriety of joinder in habeas cases. *Compare, e.g.*, *Acord v. California*, No. 17-cv-01089-MJS, 2018 WL 347770, at *1 (E.D. Cal. Jan. 10, 2018) (noting that "permitting multiple petitioners to file a single habeas petition … generally is not permitted") *with Espinoza v. Kaiser*, No. 1:25-CV-01101-JLT-SKO, 2025 WL 2581585, at *9 (E.D. Cal. Sept. 5, 2025) (explaining that "it is not unprecedented for a district court to issue injunctive relief to multiple immigration detainees joined into one habeas Petition" and that doing so may be proper where "the allegations in [a] habeas case involve a 'systemic pattern of events' that is common to all Petitioners"). The Court need not resolve this issue to address the instant request for a

preliminary injunction. Even if the Court were to sever Ms. Alvarado Ambrocio and Ms. Garcia's habeas claims from Ms. Pablo Sequen's habeas petition, the Court would retain jurisdiction over their claims and authority to grant injunctive relief based thereon. The government conceded at the hearing that the issue of joinder does not bear on either moving party's entitlement to preliminary injunctive relief. The Court will defer consideration of the government's joinder arguments until the government formally moves to sever the new petitioners' habeas claims from Ms. Pablo Sequen's petition.

Because none of the government's threshold arguments impact the propriety of the preliminary injunctive relief requested by Ms. Alvarado Ambrocio and Ms. Garcia, the Court turns to the *Winter* factors. For the reasons set forth below, the Court concludes petitioners are likely to succeed on the merits of their due-process claim, are likely to suffer irreparable harm absent an injunction, and have established that both the balance of equities and public interest favor granting injunctive relief. The Court therefore grants petitioners' requested preliminary injunction.

## I.    Petitioners are likely to succeed on the merits of their claim.

Ms. Alvarado Ambrocio and Ms. Garcia have demonstrated a likelihood of success on the merits of their claim that the Due Process Clause of the Fifth Amendment entitles them to a hearing before ICE may re-detain them.[1]

The Due Process Clause protects all persons in the United States, including noncitizens, from deprivations "of life, liberty, or property" by the federal government "without due process of law[.]" U.S. Const. amend V; *see also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—

---

[1] Ms. Alvarado Ambrocio and Ms. Garcia ask the Court to prohibit their detention under any circumstances, contending that the government has no valid interest to justify their detention. Because the relief granted herein obviates any immediate need for the Court to address this substantive due-process issue, the Court declines to do so at this time. And while petitioners also ask the Court to order that they remain within the Northern District of California in order to preserve this Court's jurisdiction over their petition, it is well-established that "when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004).

lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. Even when the government has discretion to detain an individual, its subsequent decision to release the individual creates "an implicit promise" that she will be re-detained only if she violates the conditions of her release. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). Conditional release "is valuable and must be seen as within the protection of the [Due Process Clause]." *Id.* at 482. Courts in this district thus consistently hold that if DHS has released a noncitizen pending civil removal proceedings, the noncitizen has a protected liberty interest in remaining out of immigration custody. *See, e.g.*, *Roa v. Albarran*, No. 25-cv-07802-RS, 2025 WL 2732923, at *5 (N.D. Cal. Sept. 25, 2025); *Ramirez Clavijo v. Kaiser*, No. 25-cv-06248-BLF, 2025 WL 2419263, at 6 (N.D. Cal. Aug. 21, 2025); *Guillermo M. R. v. Kaiser*, No. 25-cv-05436-RFL, 2025 WL 1983677, at *4 (N.D. Cal. July 17, 2025). Here, after briefly detaining Ms. Garcia and Ms. Alvarado Ambrocio in March and April 2024, respectively, DHS released them on their own recognizance subject to certain conditions. Petitioners are therefore entitled to due process under the Fifth Amendment with respect to their protected liberty interest in remaining out of immigration custody.

To determine what procedures are constitutionally sufficient to protect petitioners' liberty interest, the Court applies the test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976).[2] That test calls for balancing the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. Each of these factors supports petitioners' constitutional right to a hearing before a

---

[2] The government argues that neither the Supreme Court nor the Ninth Circuit have held that the *Mathews* test applies to due-process challenges to immigration detention. In *Rodriguez Diaz v. Garland*, however, the Ninth Circuit "assume[d] without deciding" that *Mathews* applies in this context, 53 F.4th 1189, 1206–07 (9th Cir. 2022), and both the Ninth Circuit and other federal courts of appeal regularly apply *Mathews* to due-process claims involving removal proceedings, *see Garro Pinchi v. Noem*, No. 25-cv-05632-PCP, 2025 WL 2084921, at *3 n.2 (N.D. Cal. July 24, 2025) (collecting cases).

United States District Court
Northern District of California

1   neutral decisionmaker prior to any future detention.

2        **A.**    **Petitioners' private interest is substantial.**

3        As explained above, Ms. Alvarado Ambrocio and Ms. Garcia have substantial private

4   interests in remaining out of custody. The liberty of a noncitizen released pending removal

5   proceedings, "although indeterminate, includes many of the core values of unqualified liberty[.]"

6   *Morrissey*, 408 U.S. at 482. Subject to the conditions of their release, petitioners "can be gainfully

7   employed and [are] free to be with family and friends and to form the other enduring attachments

8   of normal life." *Id.* The termination of that liberty would "inflict[] a 'grievous loss'" both on

9   petitioners and their loved ones. *Id.*; *see also Cordero Pelico v. Kaiser*, No. 25-cv-07286-EMC,

10   2025 WL 2822876, at *6–7 (N.D. Cal. Oct. 3, 2025); *Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL

11   1676854, at *3 (N.D. Cal. June 14, 2025).

12        The government argues that, while some noncitizens may have a constitutionally

13   cognizable interest in remaining out of custody, Ms. Alvarado Ambrocio and Ms. Garcia have no

14   such interest because DHS initially detained them soon after they each arrived in the United

15   States. As a result, the government contends, the Due Process Clause affords them no rights

16   beyond those provided by statute. And the government argues that the applicable statute here is

17   § 1225(b), which mandates detention without providing any process to challenge that detention.

18   The government therefore insists that Ms. Alvarado Ambrocio and Ms. Garcia have no protected

19   interest in remaining out of custody.

20        The government's constitutional and statutory arguments both fail. The cases cited by the

21   government in arguing that the Fifth Amendment offers no protection to Ms. Alvarado

22   Ambrocio's and Ms. Garcia's interest in challenging their loss of liberty concern due-process

23   rights regarding admission into the country. *See, e.g.*, *Thuraissigiam*, 591 U.S. at 140 (holding that

24   "an alien in respondent's position has only those rights regarding admission that Congress has

25   provided by statute"); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (discussing "an alien seeking

26   initial admission" and his "constitutional rights regarding his application"); *United States ex rel.*

27   *Knauff v. Shaughnessy*, 338 U.S. 537, 539–40, 544 (1950) (holding that "an alien who seeks

28   admission to this country may not do so under any claim of right" and thus that the procedures

United States District Court
Northern District of California

prescribed by Congress are "due process as far as an alien denied entry is concerned"). "Petitioners are challenging their detentions, not the processes by which applications for admission are decided. As such, the cases limiting the due process rights of noncitizens to challenge how applications for admission are decided are inapplicable." *Valencia Zapata*, 2025 WL 2741654, at \*7; *see also Salcedo Aceros*, 2025 WL 2637503, at \*6; *Aviles-Mena v. Kaiser*, No. 25-cv-06783-RFL, 2025 WL 2578215, at \*4 (N.D. Cal. Sept. 5, 2025).

Further, while the government argues that petitioners have "only those rights ... that Congress has provided by statute," the cited cases apply narrowly to noncitizens "seeking initial entry" who are "on the threshold" of entering the country. *Thuraissigiam*, 591 U.S. at 139–40 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). These cases make clear that noncitizens "who have once passed through our gates, even illegally," are entitled to "proceedings conforming to traditional standards of fairness encompassed in due process of law." *Mezei*, 345 U.S. at 212; *see also Zadvydas*, 533 U.S. at 693. Although merely "set[ting] foot on U.S. soil" may not be sufficient to "effect[] an entry" and trigger due-process protections for admissions decisions if a noncitizen is detained shortly thereafter, *Thuraissigiam*, 591 U.S. at 139–40, if a noncitizen "gain[s a] foothold in the United States," *Kaplan v. Tod*, 267 U.S. 228, 230 (1925), or "begins to develop ... ties" in this country, "h[er] constitutional status changes accordingly," and she "has a right to due process." *Plasencia*, 459 U.S. 21, 32–33 (1982); *see also Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (distinguishing noncitizens entitled to due process from those "who ha[ve] been here for too brief a period to have become, in any real sense, a part of our population"). Put another way, "aliens who have established connections in this country have due process rights in deportation proceedings[.]" *Thuraissigiam*, 591 U.S. 103, 107 (2020).

Here, both Ms. Alvarado Ambrocio and Ms. Garcia have unquestionably gained a foothold in this country and developed the connection needed to become "a part of our population." *Yamataya*, 189 U.S. at 101. Each has built a community in California for more than a year and a half, living with family or romantic partners and becoming active members of their church communities. Ms. Alvarado Ambrocio cares for her own daughter, a U.S. citizen, and is seeking

United States District Court
Northern District of California

1    work authorization. Ms. Garcia cares for friends' special-needs child and works for as a

2    dishwasher and in restaurant kitchens "with the federal government's express authorization."

3    *Pablo Sequen*, 2025 WL 2650637, at *5. While the government insists that noncitizens who have

4    been released into the country on their own recognizance and physically present in the country for

5    over a year nevertheless remain "on the threshold" of entrance and lack due-process protections,

6    "the government cites no authority requiring the Court to accept th[at] legal fiction … [n]or does

7    that proposition make practical sense." *Id.* Petitioners' liberty interest in remaining out of custody

8    is therefore cognizable under the Due Process Clause whether or not Congress has provided a

9    statutory process to vindicate that interest.

10    Even if it were true that the statutory framework governing Ms. Alvarado Ambrocio and

11    Ms. Garcia was relevant in evaluating the scope of their constitutionally protected liberty interests,

12    the government errs in contending that the relevant framework is that provided by § 1225(b). To

13    the contrary, petitioners are subject to § 1226(a), which "authorizes the [g]overnment to detain

14    certain aliens already in the country pending the outcome of removal proceedings," *Jennings*, 583

15    U.S. at 289, and permits detention only if a noncitizen "pose[s] a danger to the safety of other

16    persons or of property" or is not "likely to appear for any scheduled proceeding," 8 U.S.C.

17    § 1226(a)(4). Noncitizens subject to § 1226(a) therefore have a statutory as well as constitutional

18    interest in remaining out of custody unless they pose a threat to the public or a flight risk.

19    For more than a year and a half, the government properly treated petitioners as subject to

20    § 1226(a). DHS records show that after petitioners' initial arrests in March and April 2024, DHS

21    conditionally paroled each of them into the United States on an Order of Release on Recognizance

22    issued under § 1226(a). *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115 (9th Cir.

23    2007) ("It is apparent that the [government] used the phrase 'release on recognizance' as another

24    name for 'conditional parole' under § 1226(a)."). In accordance with § 1226(a), both petitioners

25    were placed in standard removal proceedings.

26    Despite its consistent invocation of § 1226(a) until last month, the government now argues

27    that Ms. Alvarado Ambrocio and Ms. Garcia are subject to mandatory detention under

28    § 1225(b)(2), and will be subject to mandatory detention and expedited removal under

1    § 1225(b)(1) once their removal proceedings are dismissed from immigration court. Neither

2    provision applies.

3        Section 1225(b)(1) applies only in two circumstances.

4        First, it applies if a noncitizen is initially determined upon arriving in the United States to

5    be inadmissible under 8 U.S.C. § 1182(a)(6)(C) or (a)(7). *See id.* § 1225(b)(1)(A)(i). That is not

6    the case here. As the government notes in its brief, DHS initially found both Ms. Alvarado

7    Ambrocio and Ms. Garcia inadmissible under a different provision, 8 U.S.C. § 1182(a)(6)(A)(i).

8        Second, that section applies if the noncitizen is later determined to be inadmissible under

9    § 1182(a)(6)(C) or (a)(7); was not continuously present in the United States for the two years prior

10   to that determination; and is in a group designated by the Attorney General. 8 U.S.C.

11   § 1225(b)(1)(A)(iii). That is also not the case here. The government has offered no evidence that

12   an immigration officer has ever determined that Ms. Alvarado Ambrocio or Ms. Garcia are

13   inadmissible under § 1182(a)(6)(C) or (a)(7). The plain language of § 1225(b)(1) thus does not

14   cover them.

15       Section 1225(b)(2) also does not apply to Ms. Alvarado Ambrocio or Ms. Garcia. That

16   provision covers all applicants for admission who are not subject to § 1225(b)(1) and are "seeking

17   admission." 8 U.S.C. § 1225(b)(2). The government argues that a noncitizen who is present in the

18   United States without having been lawfully admitted—that is, an "applicant for admission"—is

19   necessarily "seeking admission," even if the noncitizen has been released into the United States

20   and resided in this country for many years. "In other words, it treats the phrases 'applicant for

21   admission' and 'seeking admission' as synonymous." *Salcedo Aceros*, 2025 WL 2637503, at *8.

22       District courts throughout this district and across the country have rejected that argument,

23   *see id.* (collecting cases), for good reason. The government's reading of "seeking admission"

24   ignores the plain meaning of that phrase, which "necessarily implies some sort of present-tense

25   action." *Martinez v. Hyde*, No. 25-11613-BEM, 2025 WL 2084238, at *6 (D. Mass. July 24,

26   2025); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1011 (9th Cir. 2020) ("[T]he use of the

27   present progressive, like use of the present participle, denotes an ongoing process."). Given the

28   need for present-tense action, "[t]he most natural interpretation of the statutory scheme" is that

14

§ 1225(b)(2) applies only to "those *arriving* and seeking admission … , whereas those simply residing in the country after being deemed inadmissible are subject to the mostly discretionary detention scheme under section 1226." *Valencia Zapata*, 2025 WL 2741654, at *10 (emphasis added); *see also Jennings*, 583 U.S. at 289 (contrasting "aliens seeking admission into the country" subject to § 1225(b) with "aliens already in the country pending the outcome of removal proceedings" subject to § 1226). The government's own regulation implementing § 1225(b)(2) confirms this reading: It refers to the class of noncitizens subject to mandatory detention under § 1225(b)(2) as "arriving alien[s]." 8 C.F.R. § 235.3(c)(1); *see also Martinez*, 2025 WL 2084238, at *6. "Arriving alien" is defined, in relevant part, as "an applicant for admission *coming or attempting to come into the United States at a port-of-entry*." 8 C.F.R. § 1.2 (emphasis added). Both the plain meaning of § 1225(b)(2) and the relevant regulations, then, indicate that § 1225(b)(2) applies only to applicants for admission who are actively "seeking admission" by requesting entry into the United States upon arrival. That does not include Ms. Alvarado Ambrocio and Ms. Garcia.

Further, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Depot U.S.A. v. Jackson*, 587 U.S. 435, 441 (2019) (citation modified). Here, the statutory scheme strongly counsels against reading § 1225(b)(2) to reach all "applicants for admission," including those who are not "seeking admission" upon arrival. As explained above, where § 1225(b)(2) applies, it mandates detention unless a noncitizen is "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Section 1226, by contrast, affords the government significant discretion concerning detention of noncitizens arrested on a warrant, providing that the Attorney General "may" continue to detain noncitizens or "may" release them. 8 U.S.C. § 1226(a)(1)–(2); *see Jennings*, 583 U.S. at 300 (noting that "the word 'may' ... implies discretion" (citation modified)). Section 1226(c) creates several exceptions to this discretionary framework for criminals who are inadmissible due to criminal offenses, but it contains no exception for noncitizens who are subject to mandatory detention under § 1225(b)(2). *See* 8 U.S.C. § 1226(c). "'That express exception' to Section 1226(a)'s discretionary framework 'implies that there are no *other* circumstances under which' detention is mandated for noncitizens

... who are subject to Section 1226(a)." *Gomes v. Hyde*, No. 25-cv-11571, 2025 WL 1869299, at *6 (D. Mass. July 7, 2025) (citation omitted) (quoting *Jennings*, 583 U.S. at 300). Interpreting § 1225(b)(2) to mandate detention for every "applicant for admission" would sweep in a huge portion of noncitizens subject to § 1226(a) and "contravene Congress's intent that Section 1226(a)'s discretionary detention framework apply to all noncitizens arrested on a warrant except those subject to Section 1226(c)'s carve-out." *Id.*

The government's proposed reading would also violate the "core canon of statutory construction" that courts must "construe a statute 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous[.]'" *In re Saldana*, 122 F.4th 333, 342 (9th Cir. 2024) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). If every applicant for admission were necessarily "seeking admission," as the government suggests, the phrase "seeking admission" in § 1225(b)(2) would have no effect. The government's interpretation results in surplusage elsewhere in the statutory scheme as well. Section 1225(b)(2) mandates detention for covered noncitizens who cannot prove to an immigration officer that they are "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Yet § 1226(c) also mandates detention for noncitizens who are "inadmissible" on certain grounds. It is unclear how a noncitizen who is "inadmissible" for the reasons listed in § 1226(c) could ever make the clear showing of admissibility required to avoid detention under § 1225(b)(2). So interpreting § 1225(b)(2) to cover every "applicant for admission," including noncitizens subject to § 1226, would largely nullify § 1226(c), including a subsection added by Congress in 2025. *See* Laken Riley Act, Pub. L. No. 119-1, § 2, 139 Stat. 3, 3 (2025) (adding 8 U.S.C. § 1226(c)(1)(E)). The Court declines to adopt a reading of § 1225(b)(2) that would almost entirely negate another provision of the same statutory scheme enacted just this year. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *In re Saldana*, 122 F.4th at 341 ("When Congress substantively revises a statute's text, 'we presume it intends its amendment to have real and substantial effect.'" (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995))). Instead, § 1225(b)(2) is best read to refer more narrowly to applicants for admission who are "seeking admission" upon their initial arrival in the United States.

The government's arguments to the contrary are unavailing.

16

United States District Court
Northern District of California

First, the government points to a recent decision by the BIA in *Matter of Jonathan Javier Yajure Hurtado*, 29 I & N Dec. 216, 224 (BIA 2025). There, the BIA held that a noncitizen who is an "applicant for admission" is necessarily "seeking admission," such that § 1225(b)(2) covers all "applicants for admission," including those who have been released into and resided in the United States for several years. *See id.* at 221–25. Because "agencies have no special competence in resolving statutory ambiguities," "the BIA decision is entitled to little deference." *Salcedo Aceros*, 2025 WL 2637503, at *9 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)). Instead, the BIA's interpretation is owed deference only to the extent that "the validity of its reasoning" and "its consistency with earlier and later pronouncements" give it "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The BIA's reasoning fails to persuade because, as explained above, its interpretation of § 1225(b)(2) needlessly renders the phrase "seeking admission" superfluous, vitiates the discretionary-detention regime created by § 1226(a), and nullifies much of § 1226(c). Any persuasive power the BIA's decision might have is further undercut by its inconsistency with the BIA's earlier pronouncements, as another court in this district recently explained:

> Prior to its September 5 decision [in *Yajure Hurtado*], the BIA issued three non-precedential decisions taking the *opposite* position. In one decision, the Board even stated that it was "unaware of any precedent" that would support the Government's position. Under *Loper*, the Court has no obligation to defer to the BIA's view, particularly when that view has not "remained consistent over time."

*Salcedo Aceros*, 2025 WL 2637503, at *9 (citations omitted) (first citing *Martinez*, 2025 WL 2084238, at *8; and then quoting *Loper Bright*, 603 U.S. at 386).

Second, the government argues that Congress's use of "applicant for admission" and "seeking admission" in § 1225(a)(3) demonstrates that the former is a subset of the latter. Section 1225(a)(2) states that "[a]ll aliens … who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). In the government's view, "or otherwise" suggests that the phrase preceding that term (i.e., "applicants for admission") is entirely subsumed by the phrase that follows (i.e., noncitizens "seeking admission or readmission to or transit through the United

States"). Not so. "Otherwise" generally means "in a different way or manner" or "in different circumstances." *Otherwise*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 835 (1984). So the use of "or otherwise" in § 1225(a)(3) simply provides that immigration officers must inspect any noncitizen who is "seeking admission or readmission to or transit through the United States," whether the noncitizen is an applicant for admission *or* differently situated.

To be certain, § 1225(a)(3) acknowledges some overlap between the categories of "applicants for admission" and noncitizens "seeking admission," with the latter serving as "a 'catch-all' to describe non-citizens who *must be inspected*." *Cordero Pelico*, 2025 WL 2822876, at *14 (quoting *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1119 (9th Cir. 2025)). But that does not suggest that either category totally subsumes the other. There may still be noncitizens "seeking admission" who are not applicants for admission. "For example, those applying for a visa at a consulate abroad would be seeking admission but not be applicants for admission, since they are neither present in the country nor arriving in it." *Id.* (citing *Matter of Lemus-Losa*, 25 I&N Dec. 734, 741 (BIA 2012)). And there are noncitizens like Ms. Alvarado Ambrocio and Ms. Garcia who are applicants for admission but are not presently "seeking admission" because they have already been released into the United States. Under these circumstances, petitioners are not subject to § 1225(b)(2). Instead, they are subject to the discretionary-detention framework of § 1226(a), which permits detention only of noncitizens who pose a danger to other persons or property or are unlikely to appear for schedule removal proceedings. *See* 8 U.S.C. § 1226(a)(4).

In sum, Ms. Alvarado Ambrocio and Ms. Garcia have substantial interests in remaining out of custody based on the government's implicit promise of continued liberty pursuant to the conditions of their release. Because petitioners are not challenging decisions to deny their admission into the United States and are not "at the threshold" of entry, their liberty interests are cognizable under the Due Process Clause, whether or not they are also protected by statute. The first *Mathews* factor therefore strongly favors petitioners.

**B.    The risk of an erroneous deprivation and probable value of additional procedural safeguards are high.**

For the reasons noted above, Ms. Alvarado Ambrocio and Ms. Garcia are subject to § 1226 and, if re-detained, would be entitled to a post-arrest bond hearing before an immigration judge. Because such a hearing would only be provided after they have been detained and thereby deprived of their liberty, however, there remains a substantial risk that the government will erroneously deprive petitioners of their liberty by re-arresting them without first providing an opportunity for them to demonstrate why their detention is unwarranted.

"[W]here ... the petitioner has not received any bond or custody redetermination hearing," "the risk of an erroneous deprivation of liberty is high." *Singh v. Andrews*, No. 1:25-CV-00801, 2025 WL 1918679, at *7 (E.D. Cal. July 11, 2025) (citation modified). That is because "neither Petitioner[s] nor Respondents had an opportunity to determine whether any valid basis exists for [their] detention." *Oliveros v. Kaiser*, No. 25-cv-07117-BLF, 2025 WL 2677125, at *7 (N.D. Cal. Sept. 18, 2025). There are only two such bases for civil immigration detention: to prevent flight or to protect against danger to the community. *See Zadvydas*, 533 U.S. at 690. The government has not offered any evidence that Ms. Alvarado Ambrocio's or Ms. Garcia's detention would serve either purpose. The record before the Court suggests quite the opposite. Neither petitioner has a criminal record, and both have attended all their scheduled immigration hearings, have strong family ties in San Francisco, and are involved in their church and community, making it unlikely that they will pose a threat or flee. *See Jorge M.F. v. Wilkinson*, No. 21-cv-01424, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021).[3] Indeed, in order to release them on conditional parole in 2024, the government was required to determine that Ms. Alvarado Ambrocio and Ms. Garcia "will not pose a danger to the safety of other persons or of property and [are] likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(a)(4); *see also* 8 C.F.R. § 1236.1(c)(8).

---

[3] In its brief, the government asserts that Ms. Alvarado Ambrocio "failed to report to Enforcement and Removal Operations" on September 11, 2025 "as instructed." Yet the government offers no evidence to support that assertion, and it admits that Ms. Alvarado Ambrocio presented herself in immigration court for her scheduled hearing on September 11, 2025. The government's unexplained and unsupported assertion regarding a single alleged failure to report cannot justify her detention.

Given the absence of any evidence justifying petitioners' detention, there is a significant risk that the deprivation of their liberty in the time between their arrest and a post-arrest bond hearing under § 1226 would be entirely unjustified.[4] Providing them with the procedural safeguard of a pre-detention hearing will have significant value in helping ensure that any future detention has a lawful basis. The second *Mathews* factor therefore also weighs in petitioners' favor.

### C.     The government's countervailing interest in detaining petitioners without a prior hearing is, at most, minimal.

Finally, for the same reasons explained in the Court's prior order granting a preliminary injunction in this case, "the government has only a minimal countervailing interest" in detaining Ms. Alvarado Ambrocio and Ms Garcia "without first providing a hearing." *Pablo Sequen*, 2025 WL 2650637, at *8.

> The government may have "a strong interest" in detaining noncitizens during the pendency of removal proceedings as needed to "protect[] the public from dangerous criminal aliens," or to prevent flight and thereby "increase the chance that ... the aliens will be successfully removed." *Rodriguez Diaz*, 53 F.4th at 1208 (quoting *Demore v. Kim*, 538 U.S. 510, 515 (2003)). Here, however, the government has made no attempt to show that [Ms. Alvarado Ambrocio or Ms. Garcia] is a flight risk or a danger to the community. Nor can the government assert that providing a hearing would impose any financial or administrative burden. Because custody hearings in immigration cost "are routine and impose a minimal cost, ... it is likely that the cost to the government of detaining [petitioners] pending any bond hearing would significantly exceed the cost of providing her with a pre-detention hearing." *Garro Pinchi*, 2025 WL 2084921, at *6 (quoting

---

[4] If the government were correct that Ms. Alvarado Ambrocio and Ms. Garcia are subject to detention under § 1225 and not § 1226, that fact would, if anything, merely strengthen their due-process claim. Section 1225 contains no mechanism whatsoever for an alien to challenge her detention pending removal; instead, the alien must be detained until the completion of immigration proceedings. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1136 (9th Cir. 2013) ("The risk of an erroneous deprivation of liberty in the absence of a hearing before a neutral decisionmaker is substantial."). The risk that petitioners would be deprived of their liberty without any valid government justification would thus be significantly increased by any detention pursuant to § 1225. Subjecting them to expedited removal would further increase the constitutional risk because they would be denied any opportunity to prove their claims for asylum in a full evidentiary hearing or to pursue judicial review of the denial of their application. *See Martinez-de Bojorquez v. Ashcroft*, 365 F.3d 800, 805 (9th Cir. 2004) (holding that "the private liberty interests involved in deportation proceedings are among the most substantial" and that a noncitizen's loss of the right to seek review by the BIA and court of appeals increases the risk of error (citation modified)).

*Singh*, 2025 WL 1918679, at *8).

*Id.* Thus, the third *Mathews* factor also favors petitioners.

Because each of the *Mathews* factors supports Ms. Alvarado Ambrocio and Ms. Garcia's right to a bond hearing before an immigration judge prior to any re-arrest or detention, they have shown a likelihood of success on the merits of their due-process claim.

## II.     Petitioners will likely experience irreparable harm absent an injunction.

Ms. Alvarado Ambrocio and Ms. Garcia are also likely to suffer immediate and irreparable harm without preliminary injunctive relief. ICE has already detained Ms. Garcia once and released her only after this Court issued a temporary restraining order. "Given the government's position that [Ms. Garcia]'s detention is mandated by statute, there is little question that ICE would immediately re-detain her in the absence of an injunction." *Pablo Sequen*, 2025 WL 265037, at *9. While ICE did not detain Ms. Alvarado Ambrocio at her last appearance in immigration court, that was only because Ms. Alvarado Ambrocio's nursing infant was with her and because counsel intervened. The ICE agents who threatened to arrest Ms. Alvarado Ambrocio would not commit to let her attend her next appearance in immigration court on October 16, 2025 without being detained. Far from offering any assurance to that effect, the government expressly conceded at the hearing on this matter that ICE would likely detain Ms. Alvarado Ambrocio after the October 16 hearing absent judicial relief.

The likely unconstitutional deprivation of liberty that Ms. Alvarado Ambrocio and Ms. Garcia face is an immediate and irreparable harm, even if it lasts only until a post-detention bond hearing. "The loss or threatened infringement upon [constitutional] rights for even minimal periods of time unquestionably constitutes irreparable injury." *Cuviello v. City of Vallejo*, 944 F.3d 816, 832 (9th Cir. 2019) (citation modified). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (citation modified). "[I]t follows inexorably from [the Court's] conclusion" that petitioners "will likely be deprived of their physical liberty unconstitutionally in the absence of the injunction ... that [they] have also carried their burden as to irreparable harm." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). Ms. Alvarado

1    Ambrocio's detention would likely also separate her from her still-nursing baby, an additional

2    grave and irreparable injury. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017)

3    (explaining that government action that "separated families" caused "substantial injuries and even

4    irreparable harms"); *Levia-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (identifying

5    "separation from family members" as an "important irreparable harm factor" (citation modified)

6    (quoting *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc)).

7    **III.    The balance of the equities and public interest weigh in favor of granting a
          preliminary injunction.**

8

9        The final two *Winter* factors—the balance of the equities and public interest—merge

10    because the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Once

11    again, these factors weigh heavily in favor of an injunction:

12            "Because public interest concerns are implicated when a
              constitutional right has been violated, all citizens have a stake in
13            upholding the Constitution, meaning it is always in the public interest
              to prevent the violation of a party's constitutional rights." *Baird*, 81
14            F.4th at 1042 (citation modified). Further, "the Ninth Circuit has
              recognized that 'the costs to the public of immigration detention are
15            staggering.'" *Jorge M.F. v. Wilkinson*, No. 21-cv-01424, 2021 WL
              783561, at *3 (N.D. Cal. Mar. 1, 2021) (citation modified) (quoting
16            *Hernandez*, 872 F.3d at 996). "Given the low risk that [petitioners]
              would cause harm to others or flee, in light of [their] strong family
17            ties … and [Ms. Garcia's] work commitments, such government
              expenditure in this case would not greatly serve the interests of the
18            general public." *Id.* (citation modified). And in contrast to the
              irreparable harm that [petitioners] would suffer absent an injunction,
19            the potential harm to the government is minimal—at most, a short
              delay in detaining [petitioners] if it ultimately demonstrates to a
20            neutral decisionmaker that [their] detention is necessary. *See id.*at *3;
              *Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal.
21            June 14, 2025). Moreover, the government "cannot reasonably assert
              that it is harmed in any legally cognizable sense by being enjoined
22            from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th
              Cir. 1983); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th
23            Cir. 2013) (holding that the government "cannot suffer harm from an
              injunction that merely ends an unlawful practice" implicating
24            "constitutional concerns").

25

26

27    *Pablo Sequen*, 2025 WL 2650637, at *9. As in its prior order, the Court "ha[s] little difficulty

28    concluding that the balance of hardships tips decidedly in [petitioners'] favor" because "any

1    additional administrative costs to the government are far outweighed by the considerable harm to

2    [their] constitutional rights." *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d

3    1432, 1437 (9th Cir. 1983)).

4    **IV.    The Parameters of the Pre-Detention Hearing**

5         Prior to any future detention by ICE, Ms. Alvarado Ambrocio and Ms. Garcia are entitled

6    to notice and a pre-deprivation hearing at which a neutral arbiter must determine whether there is

7    any valid basis for their detention—i.e., whether they pose a threat to the community or a flight

8    risk that can only be mitigated through detention. Petitioners argue that, at such a hearing, the

9    government should bear the burden of establishing by clear and convincing evidence that a valid

10   basis exists for their detention. Indeed, in *Singh v. Holder*, the Ninth Circuit held that "the

11   government must prove by clear and convincing evidence that an alien is a flight risk or a danger

12   to the community to justify denial of bond." 638 F.3d 1196, 1203 (9th Cir. 2011).

13        Citing the Ninth Circuit's decision in *Rodriguez Diaz*, the government argues that it should

14   not bear the burden of proof at any bond hearing. *See* 53 F.4th 1189. *Rodriguez Diaz* rejected a

15   habeas petitioner's argument that he was entitled to a second bond hearing after a lengthy period

16   of detention because the government had not had the burden of proof at his initial bond hearing

17   pursuant to § 1226(a). The Ninth Circuit concluded that the Fifth Amendment did not require the

18   government to prove a valid basis for detention by clear and convincing evidence at the initial

19   hearing because, while not imposing such a burden on the government, the statutory framework

20   provided the petitioner with "extensive procedural protections" in other respects, "including

21   several layers of review of the agency's initial custody determination, … the opportunity to be

22   represented by counsel and to present evidence, the right to appeal, and the right to seek a new

23   hearing when circumstances materially change." *Id.* at 1210–12. Notably, however, *Rodriguez

24   Diaz* recognized that even where such statutory protections are available, greater protections may

25   be constitutionally necessary in individual cases where the risk of an erroneous deprivation of

26   liberty is particularly high. *See id.* at 1212–13.

27        *Rodriguez Diaz* addressed circumstances entirely different from those presented here, in

28   which petitioners lack the procedural protections available following a denial of release under

United States District Court
Northern District of California

23

§ 1226(a) and face a high risk of the erroneous deprivation of physical liberty. As a result, the constitutional principles announced in *Singh*, not those considered in *Rodriguez Diaz*, apply here.[5] Under that precedent, the government must establish a valid basis for petitioners' detention by clear and convincing evidence.

### CONCLUSION

For the foregoing reasons, the Court grants Ms. Alvarado Ambrocio and Ms. Garcia's request for a preliminary injunction. The government may not detain Ms. Alvarado Ambrocio, and may not re-detain Ms. Garcia, during the pendency of these proceedings without providing them with pre-detention bond hearings before a neutral immigration judge. The government may detain petitioners only if, at such a bond hearing, the government bears its burden of demonstrating by clear and convincing evidence that Ms. Alvarado Ambrocio or Ms. Garcia are a danger to the community or a flights risk and that no conditions other than detention would be sufficient to prevent such harms.

**IT IS SO ORDERED.**

Dated: October 15, 2025

_____
P. Casey Pitts
United States District Judge

---

[5] To be certain, when *Singh* considered what standard of proof applies in bond hearings, the Ninth Circuit believed that such hearings were required by statute—a conclusion that was subsequently abrogated by *Jennings*, 583 U.S. 281. But *Singh*'s holding on the burden of proof was based on constitutional due process principles rather than any interpretation of the statute. *See Singh*, 638 F.3d at 1204 (first citing *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996); and then citing *Santosky v. Kramer*, 455 U.S. 745, 756 (1982)). Thus, "*Singh*'s constitutional holding ... remains binding law." *Rodriguez Diaz v. Garland*, 83 F.4th 1177, 1179 (9th Cir. 2023) (mem.) (Paez, J., dissenting from denial of rehearing en banc).

United States District Court
Northern District of California