UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CARMEN ARACELY PABLO SEQUEN, et al.,

            Plaintiffs,

       v.

SERGIO ALBARRAN, et al.,

            Defendants.

Case No.  25-cv-06487-PCP

**ORDER PROVISIONALLY CERTIFYING CLASSES, GRANTING PRELIMINARY INJUNCTION, AND DENYING STAY**

Re: Dkt. Nos. 33, 64

In this putative class action, plaintiffs Carmen Aracely Pablo Sequen, Yulisa Alvarado Ambrocio, Martin Hernandez Torres, and Ligia Garcia seek to represent two classes of non-citizens subject to actual or potential arrest and detention by Immigration and Customs Enforcement (ICE). Plaintiffs challenge several recent policies promulgated by ICE and the Department of Justice's Executive Office for Immigration Review (EOIR). The challenged policies authorize widespread arrests of non-citizens at immigration courthouses and permit the detention of such non-citizens in short-term hold rooms for more than 12 hours. Plaintiffs also challenge the conditions under which ICE detains non-citizens in short-term hold rooms at its San Francisco field office, which is located at 630 Sansome Street. Now before the Court are plaintiffs' motions to provisionally certify the two proposed classes, to preliminarily enjoin certain conditions of confinement at 630 Sansome, and to stay ICE's waiver of its prior policy limiting detention in short-term hold rooms to 12 hours. For the reasons below, the Court provisionally certifies both proposed classes, grants the requested preliminary injunction, and denies a stay.

**BACKGROUND**

This case arises from recent changes to ICE and EOIR policies governing civil immigration arrests at courthouses and detention in ICE's short-term hold facilities, as well as

1    resulting changes in the conditions of confinement at 630 Sansome.

2    **I.    ICE and EOIR issue new guidance authorizing widespread civil immigration arrests**
3         **at courthouses.**

4         Prior to 2025, ICE conducted civil immigration arrests in courthouses only in limited

5    circumstances. In 2014, for example, ICE issued internal guidance stating that civil enforcement

6    actions at or near courthouses would be undertaken only against non-citizens who "pose[d] a

7    danger to national security" or "a serious risk to public safety" because they were "engaged in or

8    suspected of terrorism," had been convicted of violent crimes or felonies, "participated in

9    organized criminal gangs," or were "subject to outstanding criminal warrants."[1] ICE issued similar

10   guidance the following year, authorizing courthouse arrests of only non-citizens who endangered

11   national security or had been convicted of felonies or criminal offenses involving "active

12   participation in a criminal street gang."[2] In 2018, an ICE directive again instructed that its

13   "officers and agents should generally avoid enforcement actions in courthouses."[3] But in

14   accordance with the President's 2017 executive order expanding the categories of non-citizens

15   prioritized for removal, *see* Exec. Order No. 13,768, 82 Fed. Reg. 8799, 8800 (Jan. 25, 2017), the

16   directive permitted civil enforcement actions at courthouses "against specific, targeted aliens with

17   criminal convictions, gang members, national security or public safety threats, aliens who have

18   been ordered removed … but have failed to depart, and aliens who have re-entered the country

19   illegally after being removed."[4]

20        After the executive order underlying ICE's 2018 directive was revoked, *see* Exec. Order

21   13,993, 86 Fed. Reg. 7051, 7051 (Jan. 20, 2021), ICE issued new guidance in 2021, explaining

22   that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill

23

24   _____

25   [1] Message from Philip T. Miller, ICE's Assistant Director for Field Operations, on "Enforcement Actions at or Near Courthouses" (Mar. 19, 2014), Dkt. No. 107, at 5.

26   [2] Message from Philip T. Miller, ICE's Assistant Director for Field Operations, on "Guidance Update: Enforcement Actions at or Near Courthouses" (Mar. 19, 2014), Dkt. No. 107, at 7.

27   [3] ICE Directive 11072.1, "Civil Immigration Enforcement Actions Inside Courthourses," at 2 (Jan. 10, 2018), Dkt. No. 107, at 11.

28   [4] ICE Directive 11072.1 at 1, Dkt. No. 107, at 10.

United States District Court
Northern District of California

individuals' access to courthouses and, as a result, impair the fair administration of justice."[5] "[S]o as not to unnecessarily impinge upon the core principle of preserving access to justice," ICE's 2021 guidance permitted such actions only if they involved "a national security threat," "an imminent risk of death, violence, or physical harm"; "hot pursuit" of a person who threatened public safety; "an immediate risk of destruction of [criminal] evidence"; or, subject to advance supervisory approval, if no "safe alternative location" for the arrest existed.[6]

EOIR, which oversees the nation's immigration courts, took a similar approach to civil arrests at its courthouses. In 1996, it concluded that the presence of immigration officers in courtrooms "ha[d] produced a 'chilling' effect on the conduct of" several recent hearings and issued guidance forbidding arrests in immigration courtrooms "except in exigent circumstances."[7] In 2023, EOIR expanded the restriction on civil arrests in its courtrooms to cover all spaces where immigration-court business took place.[8] EOIR's 2023 guidance explained that, in addition to having a "chilling effect," allowing civil-enforcement actions in immigration courthouses "would disincentivize noncitizens from appearing for their hearings" and "may create safety risks for those who may be present" in courthouses, "including children."[9] The 2023 guidance also reasoned that limiting civil immigration arrests at immigration courthouses would "reinforce the separate and distinct roles of [the Department of Homeland Security]," including ICE, "and [EOIR]." *Id.* To guard against these risks, EOIR permitted civil immigration arrests at or near its courthouses only in the exceptional circumstances outlined by ICE's 2021 guidance.[10]

Accordingly, for more than a decade prior to 2025, both ICE and EOIR sharply limited

---

[5] Memorandum from Tae Johnson, Acting Director of ICE & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on "Civil Immigration Enforcement Actions in or near Courthouses," at 1 (Apr. 27, 2021).

[6] *Id.* at 1–2.

[7] Memorandum from Michael J. Creppy, Chief Immigration Judge, on "Arrests by INS Officers In or Near Immigration Court Facilities," at 1, 3 (Sept. 30, 1996).

[8] *See* Memorandum from Sheily McNulty, Chief Immigration Judge, on "Enforcement Actions in or Near OCIJ Space," at 1–2 (Dec. 11, 2023).

[9] *Id.* at 2.

[10] *Id.* at 2–3.

civil arrests at immigration courthouses. That changed earlier this year when the President revoked existing civil immigration-enforcement priorities and instructed federal agencies "to ensure the faithful execution of the immigration laws … against *all* inadmissible and removable aliens." Exec. Order 14,159, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025) (emphasis added). Based on that executive order, ICE issued new interim guidance on civil immigration arrests at courthouses in January, followed by a final version in May.[11] ICE's new courthouse-arrest guidance, which is one of the policies challenged here, acknowledged that "civil immigration enforcement actions in or near courthouses" are generally "against targeted aliens," like those who pose "[n]ational security or public safety threats," have "[s]pecific … criminal convictions," are "gang members," or have remained in or re-entered the United States after being ordered removed.[12] But unlike previous guidance, ICE's 2025 courthouse-arrest guidance stated that courthouse arrests are "not limited" to these groups and that other non-citizens "may be subject to civil immigration enforcement action[s]" at courthouses "on a case-by-case basis considering the totality of the circumstances."[13] Under the guidance, "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses" whenever "credible information … leads them to believe" that the non-citizen they seek to arrest "will be present" at a courthouse.[14] The guidance discusses the benefits of courthouse arrests to the government's enforcement of immigration laws but does not directly address the concerns raised in earlier guidance concerning chilling effects, safety risks, and impacts on hearing attendance.

      EOIR also issued new guidance on courthouse arrests in late January, and that policy remains in effect and is challenged in this action.[15] EOIR's 2025 courthouse-arrest guidance rescinded the office's prior restrictions on ICE's civil enforcement actions in immigration

---

[11] *See* Memorandum from Todd M. Lyons, Acting ICE Director, on "Civil Immigration Enforcement Actions In or Near Courthouses," at 1 (May 27, 2025), Dkt. No. 107, at 25.

[12] *Id.* at 2.

[13] *Id.*

[14] *Id.*

[15] *See* Memorandum from Sirce E. Owen, Acting EOIR Director, on "Cancellation of Operating Policies and Procedures Memorandum 23-01," at 1–3 (Jan. 28, 2025), Dkt. No. 107 at 29.

courthouses.[16] EOIR stated that its earlier policy had primarily stemmed from ICE's since-revoked 2021 guidance and that "the other bases given … were unpersuasive, inconsistent with current Executive Branch policy, pretextual, or unsubstantiated on any systematic basis."[17] EOIR also reasoned that it lacks authority to prohibit ICE from taking lawful enforcement actions.[18] As a result, EOIR's 2025 courthouse-arrest guidance places no independent limits on ICE's civil enforcement actions in immigration courthouses.

In the wake of ICE and EOIR's 2025 courthouse-arrest guidance, ICE has significantly increased its civil enforcement activity at immigration courthouses in northern California.[19] *See Hinestroza v. Kaiser*, No. 25-CV-07559-JD, 2025 WL 2606983, at *2 (N.D. Cal. Sept. 9, 2025) (describing the "tsunami" of recent cases in this district involving such courthouse arrests).

## II.    ICE waives its 12-hour limit on detention in short-term holding facilities.

When ICE arrests an individual for an alleged immigration violation, it generally places the individual in a holding facility in one of its field offices, such as 630 Sansome, while ICE processes the individual for long-term detention elsewhere.[20] Because the hold rooms in such facilities "are primarily used for … short-term confinement," ICE previously required its agents to "ensure that … holding facilities are emptied upon the conclusion of daily operations" and instructed that, "[a]bsent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours."[21] In June, however, ICE waived the decade-old limit on hold-room detentions, allowing the agency to keep detainees in holding facilities "for up to … 72

---

[16] *Id.* at 2.

[17] *Id.* at 1.

[18] *Id.* at 2.

[19] *See* Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶¶ 12–14 (reporting at least 39 civil immigration arrests at the Sacramento immigration court between May 27 and September 19, 2025); Declaration of Nikolas de Bremaeker, Dkt. No. 33-10 ¶¶ 13–14 (reporting at least 35 civil immigration arrests in the Bay Area during the same period)

[20] *See* Declaration of Andrew Kaskanlian, Dkt. No. 110 ¶ 7.

[21] ICE Office of Enforcement and Removal Operations Directive 11087.1, "Operations of ERO Holding Facilities," at 1, 4 (Sept. 22, 2014); *see also* ICE Office of Enforcement and Removal Operations Directive 11087.2, "Operations of ERO Holding Facilities," at 2, 7 (Jan. 31, 2024).

hours" or longer in "exceptional circumstances."[22] The memorandum announcing the waiver explained that it was "a result of increased enforcement efforts" that had "significantly increased" the number individuals in ICE detention and "put additional strain on finding and coordinating transfers of aliens to available beds" in long-term detention facilities within 12 hours.[23] The memo suggested that "holding aliens in holding facilities beyond the 12-hour limit" was the only way to accommodate the increase in detainees because it "no longer ha[d] the option to discretionarily release aliens" or "decline to take aliens into custody" from other agencies.[24] The 12-hour-waiver memo did not address the suitability of short-term hold rooms for overnight or multi-day detention. Nor did the memo discuss any modifications to other policies governing ICE's holding facilities, which "continue to apply" despite the waiver.[25] The waiver went into effect immediately upon issuance of the memo and remains in effect for one year from its issuance.[26]

As a result of the waiver, ICE frequently holds detainees at 630 Sansome for more than 12 hours, including overnight.[27] Some detainees are held for more than 72 hours.[28] Other detainees are held for less than 12 hours.[29] Because the length of an detainee's stay at 630 Sansome depends on the changing availability of beds at long-term detention facilities, they do not know at the

_____

[22] Memorandum from Monica S. Burke, ICE's Assistant Director of Custody Management, on "Nationwide Hold Room Waiver," at 1 (June 24, 2025), Dkt. No. 107, at 33.

[23] *Id.* at 2.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *See* Declaration of Nikolas de Bremaeker, Dkt. No 33-10 ¶ 44 (stating that "at least 20 people … have been detained" at 630 Sansome "in the last four months for longer than 12 hours"); Declaration of Reena Arya, Dkt. No. 67 ¶ 14 (reporting knowledge of two such instances); Declaration of Victoria Sun, Dkt. No. 69 ¶ 7 (documenting conversation with detainee held overnight); Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 9 (recounting declarant's detention for three days); Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶¶ 3–4 (same).

[28] *See* Declaration of Nikolas de Bremaeker, Dkt. No 33-10 ¶ 44 (reporting "at least 5" such instances "in the last four months"); Declaration of Stephanie Quintero, Dkt. No. 68 ¶ 16 (reporting the detention of two individuals at 630 Sansome for four to six days); Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶ 5 (recounting declarant's 97-hour detention).

[29] *See, e.g.*, Declaration of David Rafael Colon Solano, Dkt. No. 71 ¶ 5; Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 4; Declaration of Keymaris Alvarez Miranda, Dkt. No. 76 ¶ 4; Declaration of Yessica Alejandra Malagon Torres, Dkt. No. ¶ 4.

outset how long they will remain in the hold rooms.[30]

### III.  ICE deprives detainees at 630 Sansome of adequate sleep, hygiene, medical care, and access to counsel.

ICE's holding facility at 630 Sansome consists of six large cells with a maximum overnight capacity of ten people and three small cells with a maximum overnight capacity of one person each.[31] Each cell contains one or more metal benches, but no permanent beds, and a single toilet and sink that are separated from the rest of the room by a "mid-height privacy wall."[32] Plaintiffs assert that, in recent months, ICE has created "inhumane" and "dangerous" conditions in these cells that "humiliate and degrade" detainees by treating them like "trash" or "animal[s]."[33] As evidence of these conditions, plaintiffs submitted declarations from sixteen individuals who were detained at 630 Sansome and from five attorneys representing individuals detained there.[34]

---

[30] *See* Declaration of Andrew Kaskanlian, Dkt. No. 110 ¶¶ 15–16.

[31] *Id.* ¶ 9.

[32] *Id.* ¶ 14.

[33] Declaration of Martha Ruch, Dkt. No. 66 ¶ 29; Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶¶ 5, 14; Declaration of David Rafael Colon Solano, Dkt. No. 71 ¶ 14.

[34] The government objects to the Court's consideration of the declarations of attorneys Reena Arya, Stephanie Quintero, Victoria Sun, Marth Ruch, and Dalila Blevins under the Federal Rules of Evidence. But "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024). "Given that the 'purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held,' and 'given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). For that reason, the Ninth Circuit has held that district courts "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Id.* (quoting *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

The Court finds it appropriate to consider the attorneys' declarations here. As the government notes, the declarations contain hearsay because they report other attorneys' observations and the statements of detainees. But "given the haste" required to prepare the motion for preliminary relief, it is understandable that plaintiffs' counsel was not able to procure declarations from each of those other attorneys and noncitizens. And because the hearsay statements offer evidence of allegedly unconstitutional conditions from which plaintiffs seek preliminary relief, considering them "serves the purpose of preventing irreparable harm before trial." *Id.*

The government also objects to the Court's consideration of the declarations of Ammy Vargas Baquedando, Jorge Rivera Larios, and Dalila Blevins because plaintiffs submitted them with their reply brief. Because the declarations are directly responsive to factual assertions made by the government in its opposition to the motion, the government had notice of the declarations prior to

The declarations document consistently inadequate sleeping conditions, unsanitary conditions, lack of basic hygiene resources, substandard medical care, and significant restrictions on attorney-client communications. The government provides little evidence undermining these accounts.

### A.    Plaintiffs' Evidence

#### 1.    Inadequate Sleeping Conditions

The declarations of detainees and their attorneys uniformly report that ICE does not provide detainees at 630 Sansome with beds, pillows, bedsheets, or blankets.[35] At most, ICE gives detainees thin pieces of one- to two-centimeter-thick foam, similar to yoga mats, and a thin sheet of plastic or metal to use for warmth.[36] The mats are "used," often too small for detainees' bodies, and may be "very dirty."[37] Detainees must place the thin mats either on the concrete floor of the cell or on the "angled" metal benches.[38] At least one detainee reported that ICE provided only a single mat and metal sheet for her to share with two other women detained in her cell at 630 Sansome. As a result, two of the women were forced to lay directly on the cell's metal bench or

---

the hearing, and the government had ample opportunity to respond to the declarations at the hearing, the Court exercises its discretion to consider them. *See id.* at 1188–89 (9th Cir. 2024).

[35] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 6; Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 6; Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 14; Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 9; Declaration of Ligia Garcia, Dkt. No. 77 ¶ 15; Declaration of Mayra Mendez, Dkt. No. 79 ¶ 13; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 8; Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶ 6; Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶ 4.

[36] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 7; Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶ 9; Declaration of Ligia Garcia, Dkt. No. 77 ¶ 15; Declaration of Mayra Mendez, Dkt. No. 79 ¶ 13; Declaration of Odtman Alfonso Cardenas Castellanos, Dkt. No. 80 ¶ 8; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 8; Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶ 7; Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶ 4; *see also* Declaration of Stephanie Quintero, Dkt. No. 68 ¶ 9.

[37] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 6; Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶ 9; Declaration of Mayra Mendez, Dkt. No. 79 ¶ 13; Declaration of Odtman Alfonso Cardenas Castellanos, Dkt. No. 80 ¶ 8; Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶ 7.

[38] Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 6; Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 13; Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶ 10; Declaration of Martin Hernandez Torres, Dkt. No. 78 ¶ 10; Declaration of Mayra Mendez, Dkt. No. 79 ¶ 13; Declaration of Odtman Alfonso Cardenas Castellanos, Dkt. No. 80 ¶ 8; Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶ 6; *see also* Declaration of Stephanie Quintero, Dkt. No. 68 ¶ 9.

1  concrete floor with nothing to cover them.[39] Another detainee was not given a metal sheet for

2  warmth until his second day in detention.[40]

3      Temperatures in the cells are "very cold like a freezer."[41] Detainees consistently state that

4  the thin metal sheets provided in lieu of blankets are neither large enough to cover them nor

5  insulative enough to keep them warm.[42] Despite these cold temperatures, ICE has reportedly

6  denied detainees' requests for sweaters or additional metal sheets and took away one detainee's

7  sweater.[43]

8      ICE also keeps bright overhead lights on in the cells at all times throughout the day and

9  night, contributing to detainees' sleep difficulties.[44]

10      As a result of the lack of proper bedding or insulation, cold temperatures, and constant

11  lighting, the declarations state, it is extremely difficult for detainees at 630 Sansome to sleep.[45] For

12

13  [39] Declaration of Ammy Vargas Baquedano, Dkt. No. 118 ¶ 8.

14  [40] Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 15.

15  [41] Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 10; Declaration of Paula Andrea Salcedo
    Aceros, Dkt. No. 81 ¶ 9; *see also* Declaration of Stephanie Quintero, Dkt. No. 68 ¶ 8; Declaration
16  of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 7; Declaration of Jacqueline Karina Mendoza
    Nunez, Dkt. No. 72 ¶ 7; Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 14;
17  Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶ 7; Declaration of Ligia Garcia, Dkt. No.
    77 ¶ 13; Declaration of Mayra Mendez, Dkt. No. 79 ¶ 12; Declaration of Odtman Alfonso
18  Cardenas Castellanos, Dkt. No. 80 ¶ 10; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81
    ¶ 8; Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶ 8; Declaration of Ammy Vargas
19  Baquedano, Dkt. No. 118 ¶ 9; Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶ 6.

20  [42] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 7; Declaration of Jacqueline
    Karina Mendoza Nunez, Dkt. No. 72 ¶ 7; Declaration of Jorge Willy Valera Chuquillanqui, Dkt.
21  No. 73 ¶ 15; Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶ 11; Declaration of Juan
    Edelmar Alva Alva, Dkt. No. 75 ¶ 10; Declaration of Ligia Garcia, Dkt. No. 77 ¶ 15; Declaration
22  of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 9; Declaration of Ismael David Caicedo Ruiz, Dkt.
    No. 92 ¶ 8.

23  [43] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 7; Declaration of Juan Edelmar
    Alva Alva, Dkt. No. 75 ¶ 10; Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶ 4.

24  [44] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 6; Declaration of Jacqueline
    Karina Mendoza Nunez, Dkt. No. 72 ¶ 6; Declaration of Jorge Willy Valera Chuquillanqui, Dkt.
25  No. 73 ¶ 12; Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 9; Declaration of Ligia Garcia,
    Dkt. No. 77 ¶ 14; Declaration of Martin Hernandez Torres, Dkt. No. 78 ¶ 12; Declaration of
26  Mayra Mendez, Dkt. No. 79 ¶ 12; Declaration of Odtman Alfonso Cardenas Castellanos, Dkt. No.
    80 ¶ 11; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 8; Declaration of Ismael
27  David Caicedo Ruiz, Dkt. No. 92 ¶ 10; Declaration of Ammy Vargas Baquedano, Dkt. No. 118 ¶
    9; Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶ 5.

28  [45] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 6; Declaration of Jorge Willy

some detainees, the result is up to three nights without meaningful rest.[46] The sleeping conditions also aggravate some detainees' pre-existing medical conditions or cause new injuries. For example, one detainee who was recovering from a leg injury (the result of a recent car crash) reported that the thin mat ICE provided "felt like nothing between my body and the cold, hard floor."[47] The lack of cushioning caused her to suffer from a "painful … throbbing sensation" in her "injured leg" while attempting to sleep.[48] A detainee with a spinal injury experienced severe pain when attempting to sleep on his cell's metal bench.[49] The cold temperature in the hold rooms exacerbated another detainee's chronic arm pain, yet ICE refused his request for an additional metal sheet to stay warm.[50] And one woman who was detained in shorts and a tank top developed a respiratory infection after being forced to sleep on the floor of her cold cell for two nights without a blanket for warmth.[51]

### 2.    Unsanitary Conditions and Lack of Proper Hygiene

The detainees' declarations describe unsanitary conditions in the hold rooms at 630 Sansome. The open toilet in each cell is separated from the rest of the room only by a three-foot high wall, which provides little privacy.[52] As a result, detainees can see each other using the toilet

---

[46] Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶ 8; Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶ 8.

[47] Declaration of Mayra Mendez, Dkt. No. 79 ¶ 13.

[48] *Id.* ¶ 15.

[49] Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 9.

[50] Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶ 9.

[51] Declaration of Dalia Blevins, Dkt. No. 119 ¶ 6.

[52] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 8; Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 8; Declaration of David Rafael Colon Solano, Dkt. No. 71 ¶ 7; Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 16; Declaration of Ligia Garcia, Dkt. No. 77 ¶ 17; Declaration of Mayra Mendez, Dkt. No. 79 ¶ 14; Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶ 10.

Valera Chuquillanqui, Dkt. No. 73 ¶ 12; Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶ 13; Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 10; Declaration of Ligia Garcia, Dkt. No. 77 ¶ 16; Declaration of Martin Hernandez Torres, Dkt. No. 78 ¶ 14; Declaration of Mayra Mendez, Dkt. No. 79 ¶ 15; Declaration of Odtman Alfonso Cardenas Castellanos, Dkt. No. 80 ¶ 9; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 8.

over the wall.[53] ICE staff rarely, if ever, clean the toilets or the cells.[54] Even detainees kept at 630 Sansome for three or more days report that the toilets were not cleaned during their detention.[55] The toilets consequently become "very dirty" and sometimes fill the hold rooms with odor.[56] Some detainees resort to cleaning the toilets by hand with toilet paper,[57] which they must request because ICE does not leave toilet paper in the hold rooms.[58] When cells become overcrowded, detainees report that they must sleep extremely close together, with less than one foot of space between them, in order to avoid sleeping next to the open toilet.[59] In some cases, it is impossible to avoid doing so.[60]

Though each hold room contains a sink, "the water in the sink [i]s brown and really dirty," and ICE does not provide soap or towels for detainees to wash their hands.[61] Many detainees, including two individuals held at 630 Sansome for three or more days, are never permitted to shower or wash themselves.[62] On occasion, ICE permits detainees to use showers in a different

---

[53] Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 16; Declaration of Mayra Mendez, Dkt. No. 79 ¶ 14.

[54] Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 8; Declaration of Odtman Alfonso Cardenas Castellanos, Dkt. No. 80 ¶ 12; Declaration of Yessica Alejandra Malagon Torres, Dkt. No. 82 ¶ 8.

[55] Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 17; Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 14.

[56] Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶ 14; Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶ 10.

[57] Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 17.

[58] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 8.

[59] Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 13; Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶ 10; Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶ 11; Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶ 7.

[60] Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 13; Declaration of Martin Hernandez Torres, Dkt. No. 78 ¶ 11

[61] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 9; Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 9; Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 11; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 10; Declaration of Yessica Alejandra Malagon Torres, Dkt. No. 82 ¶ 9; Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶ 11.

[62] Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 18; Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶ 11; *see also* Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 9; Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 9;

United States District Court
Northern District of California

area at 630 Sansome, but detainees reportedly receive no more than one opportunity to shower even if they spend multiple days at the facility.[63] ICE does not provide detainees with changes of clothing; instead, detainees remain in the clothing in which ICE arrested them.[64] Some women have been detained overnight in pajamas, at least one without shoes.[65] One detainee reported that she and another woman held overnight, both of whom were menstruating and "spotting," were not given changes of clothing and were forced to stay in "soiled clothes."[66] Multiple declarants stated that ICE detained them at 630 Sansome for three or more days without allowing them to change their clothes or shower.[67]

ICE does not provide toothbrushes or toothpaste in the cells, and many detainees are not able to clean their teeth during their detention.[68] While ICE allows some detainees to brush their teeth during multi-day detentions, ICE officers take away those detainees' toothbrushes and toothpaste immediately afterwards, and many are permitted to brush their teeth only once during multi-day detentions.[69]

### 3.    Inadequate Medical Care

The declarations state that, for most detainees at 630 Sansome, ICE performs no medical

United States District Court
Northern District of California

---

[63] Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 11; Declaration of Odtman Alfonso Cardenas Castellanos, Dkt. No. 80 ¶ 12; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 10.

[64] Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 9; Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 18; Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 13; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 10; Declaration of Dalia Blevins, Dkt. No. 119 ¶¶ 4–6.

[65] Declaration of Dalia Blevins, Dkt. No. 119 ¶¶ 4–6.

[66] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 11.

[67] Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 18; Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶ 12; Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶ 13; *see also* Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 13 (recounting that declarant was not permitted to change his clothes during his two-day detention and observed detainees held for five days without a change of clothes).

[68] Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 9; Declaration of Yessica Alejandra Malagon Torres, Dkt. No. 82 ¶ 9.

[69] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 10; Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 19; Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 12; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 10.

United States District Court
Northern District of California

intakes, evaluations, or screenings, even when a detainee is "visibly unwell."[70] In the few instances where detainees are asked about pre-existing medical conditions upon their arrival at 630 Sansome, they report that ICE officers make no effort to ensure adequate care for their conditions.[71] When Mr. Hernandez Torres told ICE officers that he had high blood pressure and required prescription medication, for example, the officers "did not offer to contact [his] family or help [him] get the medication," "did not give [him] any medical evaluation" or "take [his] blood pressure … while [he] was being processed into the detention space."[72]

Detainees who require regular medication report that ICE refuses to provide it. Ms. Garcia told ICE agents upon her arrival at 630 Sansome that she required twice-daily medication for her high-blood pressure. "The agents said that [she] could ask someone to bring [her] [the] medication," but Ms. Garcia had no friends or family members who were able to do so because she "live[s] far away" from the facility.[73] When another detainee alerted an ICE officer that he required regular pain medication, the officer responded that ICE would not provide medication unless the detainee had his prescription with him, which the detainee did not.[74] At ICE's instruction, one detainee had a member of his church bring the detainee's chronic-pain medication to 630 Sansome, but ICE officers refused to deliver the medication to the detainee's cell.[75] That detainee asked ICE for pain medication three more times during his detention, but "[t]he ICE agents [he] asked did not even respond" to his requests, and he "never received any pain medication the entire time [he] was detained at 630 Sansome."[76] And an attorney for a detained

---

[70] Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶ 5; *see* Declaration of David Rafael Colon Solano, Dkt. No. 71 ¶ 8; Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 10; Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 15; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶ 11; Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶ 12.

[71] *See, e.g.*, Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶¶ 7–8 (noting that "[n]o one followed up" to examine detainee or determine if he needed medication after he told ICE officers that he "get[s] headaches and dizziness").

[72] Declaration of Martin Hernandez Torres, Dkt. No. 78 ¶¶ 4–5.

[73] Declaration of Ligia Garcia, Dkt. No. 77 ¶ 9.

[74] Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶ 9.

[75] Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶¶ 13–14.

[76] *Id.* ¶¶ 15–18.

"older person who has multiple health concerns and had recently survived heart surgery" stated that the individual "was unable to access his prescription medications until after he was transferred to [a long-term] detention facility."[77]

Multiple declarations describe ICE officers ignoring detainees' urgent requests for medical attention, which often arose due to ICE's failure to provide medication. After ICE officers refused to give Ms. Garcia the medication she requires for her high blood pressure, she "started to feel tachycardia" (i.e., an abnormally fast heart rate) and alerted ICE officers. Though the officers stated that they would take her to get medical help, they never did.[78] Another detainee held at 630 Sansome for more than 24 hours requested care for "stomach pain[] and depression," but never received medical attention.[79] Mr. Hernandez Torres twice requested medical attention after ICE denied his requests for medication.[80] ICE failed to provide any medical assistance until, on Mr. Hernandez Torres's second day in detention, his attorney spoke directly with ICE officers.[81] By that point, Mr. Hernandez Torres's blood pressure was "not under control," requiring emergency care due to "symptoms of a stroke" and resulting in an eight-day stay in an emergency room.[82] Upon Mr. Hernandez Torres's release, a physician instructed ICE officers via letter that he "needed to see a neurologist within two weeks," but ICE did not provide any neurological care for Mr. Hernandez Torres at 630 Sansome or at the long-term detention facility where he was transferred prior to his removal from the country.[83]

Detainees who do not speak English report particular difficulty seeking medical attention. For example, one detainee with a history of dangerous medical episodes resulting in temporary paralysis reported that, while at 630 Sansome, he began experiencing difficulty breathing, pain on

---

[77] Declaration of Martha Ruch, Dkt. No. 66 ¶ 20.

[78] Declaration of Ligia Garcia, Dkt. No. 77 ¶ 10.

[79] Declaration of Reena Arya, Dkt. No. 67 ¶ 14.

[80] Declaration of Martin Hernandez Torres, Dkt. No. 78 ¶¶ 7, 15–16.

[81] *Id.* ¶¶ 8, 17–18.

[82] *Id.* ¶¶ 18–24.

[83] *Id.* ¶¶ 24–29.

14

the side of his body, and swelling in his neck, hands, and feet.[84] When he attempted to tell an ICE officer in Spanish that he needed medical assistance, the officer ignored him and did not call an interpreter.[85] Only after the detainee's attorney coached him to request medical help in English did ICE call an ambulance.[86] After the detainee returned from the hospital, he continued to experience pain and again requested medical help, but ICE provided none.[87] Another detainee twice requested medical attention after he "began having medical issues with [his] throat and nose due to the air conditioning system."[88] Because he had seen ICE agents ignore similar requests made in Spanish, the detainee "had to have one of the other detainees translate for [him]" to ensure a response.[89] "ICE agents said they would bring a doctor, but they never did," nor did they offer the detainee any medication.[90]

### 4.    Restrictions on Communication with Counsel

The declarations of attorneys who represent detainees at 630 Sansome describe significant difficulty communicating with their clients. "ICE does not allow attorneys … to enter 630 Sansome … after 3PM on weekdays, limiting access to legal consultations."[91] One attorney reported that ICE removed her client to Mexico prior to her scheduled meeting with him, and ICE forced the attorney to wait for several hours to meet with other clients.[92] When counsel is permitted to speak with a detainee in person, they must do so in "a restricted room where detainees are separated from attorneys by glass and speak through a telephone," which "is difficult to use and has a static recording sound."[93] The meeting room "has signs indicating that the space is being

---

[84] Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 5.

[85] *Id.* ¶ 7.

[86] *Id.* ¶¶ 7–8.

[87] *Id.* ¶ 20.

[88] Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 16.

[89] *Id.* ¶ 17.

[90] *Id.* ¶ 16.

[91] Declaration of Martha Ruch, Dkt. No. 66 ¶ 23.

[92] Declaration of Stephanie Quintero, Dkt. No. 68 ¶¶ 13–14.

[93] Declaration of Martha Ruch, Dkt. No. 66 ¶ 23; *see also* Declaration of Stephanie Quintero, Dkt. No. 68 ¶ 15; Declaration of Reena Arya, Dkt. No. 67 ¶ 15.

15

recorded," forcing attorneys "to advise clients that consultations while they are detained at 630 Sansome … have no guarantee of being confidential."[94] Because the meeting room is also used for non-attorney visits, it is often crowded, and "[t]here is not enough space for attorneys to meet with recently detained individuals."[95] Attorney-client communications over phone calls fare no better: One detainee reported that ICE permitted him only to make "one brief phone call," during which he "had no privacy" because an officer stood next to him during the call.[96]

### B.    The Government's Evidence

The government disputes plaintiffs' assertions concerning the conditions at 630 Sansome. It does so on the basis of a single declaration from Andrew Kaskanlian, a supervisory detention and deportation officer in ICE's San Francisco field office since 2019.[97] Mr. Kaskanlian concedes that "[t]he lights are on continuously" in the hold rooms at 630 Sansome.[98] Mr. Kaskanlian states that "[c]ontinuous lighting supports continuous observation by staff, rapid response in case of emergencies, and incident prevention" and "reduces opportunities for self-harm, assault, harassment, or intimidation under cover of darkness."[99]

Mr. Kaskanlian appears to dispute the remainder of plaintiffs' assertions. He states that ICE "provides mattress pads and blankets for any individuals in the Holding Facility overnight and has done so for more than 10 years."[100] Mr. Kaskanlian also asserts that ICE "provides sweatsuits … , undergarments, [and] sanitary products … upon request or as needed" and "issues individuals a set of toiletries that include a toothbrush [and] toothpaste."[101] According to Mr. Kaskanlian, ICE cleans each hold room daily, "offers a private bathroom with a shower to individuals every morning," and "[i]ndividuals are provided with a bar of soap and shampoo for

---

[94] Declaration of Martha Ruch, Dkt. No. 66 ¶ 23.

[95] Declaration of Stephanie Quintero, Dkt. No. 67 ¶ 15.

[96] Declaration of David Rafael Colon Solano, Dkt. No. 71 ¶ 10.

[97] *See* Declaration of Andrew Kaskanlian, Dkt. No. 110 ¶ 2.

[98] *Id.* ¶ 14.

[99] *Id.* ¶ 14.

[100] *Id.* ¶ 18.

[101] *Id.* ¶¶ 19, 21.

United States District Court
Northern District of California

the shower."[102] He states that detainees are asked about their medical conditions both upon arrest and upon arrival at 630 Sansome, and that ICE "authorizes family members to bring medication to individuals who did not have it with them at the time of arrest."[103] According to Mr. Kaskanlian, "[i]f individuals require medical care or medication during their time" at 630 Sansome, they are taken either to ICE's Golden State Annex facility or to the hospital.[104] And in his view, ICE "makes it a priority not to restrict access to attorneys" and "[a]ttorneys are provided with access to their clients when they arrive" at the facility.[105]

The Court is unable to credit Mr. Kaskanlian's assertions concerning the conditions at 630 Sansome to the extent those assertions conflict with the voluminous evidence submitted by plaintiffs and summarized above. Mr. Kaskanlian does not offer any specific observations to support his statements that ICE provides mattress pads and blankets, changes of clothing, sanitary products, toothbrushes and toothpaste, showers, clean cells, medical screenings, medical care, and easy access to counsel. While Mr. Kaskanlian states that he "is familiar with the ICE Holding Facility at 630 Sansome,"[106] his familiarity with typical conditions at the facility during his seven-year tenure do not directly respond to plaintiff's specific claims concerning the deteriorated conditions in recent months. It is not apparent that any of Mr. Kaskanlian's statements are based on his or others' personal observations of conditions at 630 Sansome during the relevant period (i.e., since May). Instead, as the government noted at the hearing on plaintiffs' motions, Mr. Kaskanlian's statements about the conditions at 630 Sansome appear to be based on ICE policy documents mandating certain conditions in detention facilities, which Mr. Kaskanlian's declaration encloses as exhibits. The fact that ICE policies may provide for certain conditions does not, however, demonstrate that ICE is actually complying with those such policies at 630 Sansome. Certainly, the mere existence of such policies is insufficient to rebut the many

---

[102] *Id.* ¶ 22.

[103] *Id.* ¶¶ 24–25.

[104] *Id.* ¶ 27.

[105] *Id.* ¶ 30.

[106] *Id.* ¶ 6.

United States District Court
Northern District of California

declarations from detainees and attorneys describing present conditions at 630 Sansome. The government and Mr. Kaskanlian also point to "an annual compliance self-assessment" for the facility from March 2025, which found that 630 Sansome was in compliance with applicable ICE policies and procedures.[107] But that assessment took place before ICE began routinely detaining non-citizens at 630 Sansome for longer than 12 hours and before plaintiffs allege that the challenged conditions arose.[108] Accordingly, nothing in Mr. Kaskanlian's declaration effectively rebuts plaintiffs' extensive evidence of the actual day-to-day conditions at 630 Sansome.

**IV.    Plaintiffs challenge ICE and EOIR's courthouse-arrest guidance, ICE's 12-hour-detention waiver, and the conditions of confinement at 630 Sansome.**

Ms. Pablo Sequen, an asylum-seeker from Guatemala, commenced this action by filing a petition for a writ of habeas corpus after ICE arrested her as she was leaving a routine hearing at the San Francisco immigration court and detained her at 630 Sansome. This Court issued a temporary restraining order, followed by a preliminary injunction, requiring Ms. Pablo Sequen's immediate release and enjoining the government from re-detaining her absent prior notice and a hearing before an immigration judge at which the government demonstrated a valid basis for her detention. *Pablo Sequen v. Kaiser*, No. 25-CV-06487-PCP, 2025 WL 2650637, at *10 (N.D. Cal. Sept. 16, 2025) ["*Pablo Sequen I*"].

Ms. Pablo Sequen then amended her complaint, adding Ms. Garcia, Ms. Alvarado Ambrocio, and Mr. Hernandez Torres as plaintiffs. Like Ms. Pablo Sequen, Ms. Garcia and Ms. Alvarado Ambrocio are both asylum-seekers. ICE arrested Ms. Garcia as she was leaving a hearing at the San Francisco immigration court. When plaintiffs filed the amended complaint, Ms. Garcia was detained at 630 Sansome, where she spent roughly 24 hours. ICE agents attempted to arrest and detain Ms. Alvarado Ambrocio under circumstances similar to those encountered by Ms. Pablo Sequen and Ms. Garcia, but they refrained from doing so because Ms. Alvarado Ambrocio's nursing infant was with her. ICE suggested at the time, and the government later

---

[107] *Id.* ¶ 8.

[108] *See* John A. Tamasi, "Weekly Report for SFR HOLD ROOM," at (Mar. 31, 2025), Dkt. No. 110 at 33.

United States District Court
Northern District of California

1  conceded to the Court, that ICE would likely arrest Ms. Alvarado Ambrocio at her next

2  appearance in immigration court. Both Ms. Garcia and Ms. Alvarado Ambrocio sought individual

3  relief through a habeas corpus petition, and the Court issued a temporary restraining order

4  requiring Ms. Garcia's release followed by a preliminary injunction enjoining the government

5  from re-arresting either plaintiff without demonstrating a valid basis for their detention to an

6  immigration judge. *Pablo Sequen v. Albarran*, No. 25-cv-06487, 2025 WL 2935630, at *14 (N.D.

7  Cal. Oct. 15, 2025) ["*Pablo Sequen II*"]. Mr. Hernandez Torres is a non-citizen from Mexico

8  whom ICE arrested after a reasonable-fear interview conducted as part of his removal proceedings,

9  which culminated in a final order of removal. At the time plaintiffs filed the amended complaint,

10  Mr. Hernandez Torres was detained at 630 Sansome, where he was ultimately held for more than

11  20 hours. Mr. Hernandez Torres does not assert an individual habeas claim and did not seek

12  preliminary relief from custody. After the filing of the amended complaint, the government

13  removed him to Mexico.

14      In addition to the individual habeas claims, the amended complaint included seven new

15  claims on behalf of two putative classes.

16      First, Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio seek to represent a

17  "courthouse-arrest class" consisting of "[a]ll persons who have an immigration court hearing in a

18  proceeding on EOIR's non-detained docket in an immigration courthouse in ICE's San Francisco

19  Area of Responsibility." On behalf of the proposed class, plaintiffs challenge ICE and EOIR's

20  2025 courthouse-arrest guidance as arbitrary, capricious, and contrary to law in violation of the

21  Administrative Procedure Act (APA).

22      Second, Ms. Garcia and Mr. Hernandez Torres seek to represent a "detention class"

23  consisting of "[a]ll persons who are now or will be detained in a holding cell in ICE's San

24  Francisco Field Office" at 630 Sansome. On behalf of the detention class, plaintiffs challenge

25  ICE's 12-hour-waiver memo as arbitrary and capricious in violation of the APA and allege that the

26  conditions of confinement at 630 Sansome violate the First and Fifth Amendments and federal

27  immigration law.

28      The government moved to sever the additional claims and plaintiffs added to the amended

1    complaint from Ms. Pablo Sequen's original habeas claims, arguing that joinder was improper.

2    The Court concluded that joinder of all claims and plaintiffs was proper, but exercised its

3    discretion under Federal Rule of Civil Procedure 21 to sever the individual habeas claims from the

4    class claims. Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio's habeas claims are now

5    proceeding in three separate actions. Only the class claims remain in this case.

6        Now before the Court are plaintiffs' motions for provisional certification of the two

7    proposed classes; a preliminary injunction requiring ICE to remedy certain conditions of

8    confinement at 630 Sansome concerning sleep, hygiene, and medical care; and a stay of ICE's 12-

9    hour-waiver memo under § 705 of the APA.

**ANALYSIS**

**I.    The government's threshold arguments are unavailing.**

12        Before reaching the merits of plaintiffs' motions, the Court must address several threshold

13    arguments raised by the government. None of these arguments requires the denial of plaintiffs'

14    motions.[109]

**A.    The Immigration and Nationality Act does not bar the relief plaintiffs seek.**

16        The government argues that two provisions of the Immigration and Nationality Act

17    (INA)—8 U.S.C. §§ 1252(e)(1)(B) and 1252(f)(1)—prohibit the Court from certifying or granting

18    relief to plaintiffs' proposed classes. Neither provision applies here.

**1.    8 U.S.C. § 1252(e)(1)(B)**

20        Section 1252(e)(1)(B) provides that "no court may … certify a class under Rule 23 … in

21    any action for which judicial review is authorized under a subsequent paragraph of this

22    subsection." 8 U.S.C. § 1252(e)(1)(B). The provision applies "[w]ithout regard to the nature of the

23    action or claim and without regard to the identity of the party or parties bringing the action." *Id.*

24    The government argues that this provision applies here because judicial review of plaintiffs'

---

[109] In addition to the arguments addressed below, the government argues that plaintiffs improperly joined their class claims with Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio's individual habeas petitions. Because the Court has already granted the government's motion to sever the individual habeas claims from this action, it need not consider the government's joinder arguments further.

United States District Court
Northern District of California

1    claims is authorized by § 1252(e)(3). Under that paragraph, "[j]udicial review of determinations

2    under section 1225(b) … and its implementation is available in an action instituted in United

3    States District Court for the District of Columbia." 8 U.S.C. § 1225(e)(3).[110] The government

4    contends that because plaintiffs' requested relief would disrupt its implementation of § 1225(b),

5    which provides for mandatory detention and expedited removal of certain non-citizens, plaintiffs'

6    claims are covered by § 1252(e)(3).

7         Contrary to the government's arguments, plaintiffs' class claims do not fall within the

8    narrow scope of § 1252(e)(3). The Ninth Circuit has held that § 1252(e)(3) provides only a

9    "limited grant of jurisdiction to the D.C. district court" to decide challenges to "regulation[s] that

10   [are] 'entirely linked' to the expedited removal process." *Mendoza-Linares v. Garland*, 51 F.4th

11   1146, 1156–57 (9th Cir. 2022) (quoting *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 667

12   (9th Cir. 2021)). The purpose of the provision is "to 'limit all aliens to one bite of the apple with

13   regard to challenging' their removal orders." *East Bay*, 993 F.3d at 667 (quoting *Martinez v.

14   Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012)). But the Ninth Circuit has made clear that

15   § 1252(e)(3) does not cover challenges to policies or regulations that are merely "collateral" to the

16   expedited removal process—i.e., policies that affect both noncitizens subject to expedited removal

17   and those entitled to full removal proceedings. *Id.* For example, in *Mendoza-Linares*, the Ninth

18   Circuit held that a challenge to regulations "that govern asylum … generally and not merely in the

19   expedited removal process … is not within the exclusive jurisdiction conferred on the D.C. district

20   court under" § 1252(e)(3). 51 F.4th at 1157.

21        Here, none of plaintiffs' claims are "entirely linked" to the expedited-removal process, so

22   § 1252(e)(3) does not apply. The claims of the proposed courthouse-arrest class challenge policies

23   permitting widespread arrests of noncitizens at or near courthouses, whether they are subject to

24   expedited removal or entitled to full removal proceedings. In other words, as in *Mendoza-Linares*,

---

[110] Such judicial review is "limited to determinations of … whether [§ 1225(b)], or any regulation issued to implement such section, is constitutional" or "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney general to implement [§ 1225(b)], is not consistent with applicable provisions of [the INA] or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3).

United States District Court
Northern District of California

1   the class will challenge policies that govern courthouse arrests "generally and not merely in the

2   expedited removal process." 41 F.4th at 1157. Similarly, the claims of the proposed detention

3   class challenge conditions of confinement that impact all noncitizens detained at 630 Sansome, not

4   merely those subject to expedited removal. As a result, neither proposed class's claims are subject

5   to § 1252(e)(3). And because § 1252(e)(3) does not govern judicial review of plaintiffs' claims,

6   § 1252(e)(1)(B) does not bar the Court from certifying or granting relief to either proposed class.

7                    **2.    8 U.S.C. § 1252(f)(1)**

8           The government also argues that class certification or relief is improper under § 1252(f)(1).

9   That subsection states:

> Regardless of the nature of the action or claim or of the identity of the
> party or parties bringing the action, no court (other than the Supreme
> Court) shall have jurisdiction or authority to enjoin or restrain the
> operation of the provisions of part IV of this subchapter … , other
> than with respect to the application of such provisions to an individual
> alien against whom proceedings under such part have been initiated.

14  8 U.S.C. § 1252(f)(1). The government argues that plaintiffs' claims seek to enjoin or restrain it

15  from detaining at least some individuals whom the government believes are subject to § 1225(b),

16  which falls within the covered subchapter.[111] As a result, the government contends, § 1252(f)(1)

17  bars the Court from awarding the relief sought as to all class members, making certification

18  inappropriate.

19          Again, the government is wrong. Plaintiffs' courthouse-arrest claims do not seek a form of

20  relief that is barred by § 1252(f)(1). Both the Supreme Court and the Ninth Circuit have explained

21  that § 1252(f)(1) applies narrowly to "injunctive relief." *See Biden v. Texas*, 597 U.S. 785, 798–99

22  (2022); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999); *Immigr. Defs. L.*

23  *Ctr. v. Noem*, 145 F.4th 972, 989–90 (9th Cir. 2025). "[A]n injunction is a judicial process or

24  mandate operating *in personam*"—that is, it "is directed at someone, and governs that party's

---

[111] The Supreme Court has explained that § 1252(f)(1) is not limited to claims challenging the government's operation of covered provisions "as *properly* interpreted." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 552–54 (2022). So if plaintiffs' requested relief would "interfere with the Government's efforts to operate" § 1225(b), the Court would lack jurisdiction to award such relief even if the challenged government actions rested on an erroneous interpretation of § 1225(b). *Id.* at 551.

United States District Court
Northern District of California

conduct." *Immigr. Defs. L. Ctr.*, 145 F.4th at 990 (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)). Here, plaintiffs seek to vacate ICE and EOIR's 2025 courthouse-arrest guidance pursuant to the APA and to stay the guidance pending final resolution of their APA claims. Though vacatur and stays "ha[ve] some functional overlap with an injunction" in that they "can have the practical effect of preventing some action," they "achieve[] this result by … suspending the source of authority to act … not by directing an actor's conduct." *Nken*, 556 U.S. at 428–29. Vacatur or stays under the APA are thus "a less drastic remedy" than injunctions, as they merely "re-establish the status quo absent the … agency action" under challenge. *Immigr. Defs. L. Ctr.*, 145 F.4th at 990 (quoting *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022)). For that reason, the Ninth Circuit has squarely held that "§ 1252(f)(1) does not bar [a] district court's stay pursuant to § 705 of the APA pending further review of the merits of [p]laintiffs' APA challenge." *Id.* It follows that § 1252(f)(1) does not prohibit the Court from granting plaintiffs' ultimate request to permanently vacate the courthouse-arrest guidance. *See Texas*, 40 F.4th at 219–20; *see also Immigr. Defs. L. Ctr.*, 145 F.4th at 990 (expressing agreement with *Texas*).

Plaintiffs' claim challenging ICE's 12-hour-waiver memo likewise seeks relief under the APA and thus is not barred by § 1252(f)(1).

Plaintiffs' remaining claims are constitutional in nature and undisputedly seek injunctive relief requiring the government to ameliorate the allegedly unlawful conditions of confinement at 630 Sansome. The government argues that the relief requested by these claims would "enjoin or restrain the operation of" § 1225(b) by generally interfering with the manner in which the government detains non-citizens subject to that subsection.

The Supreme Court has explained that "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Such an injunction is barred even if a court determines that the Government's "operation" of a covered provision is unlawful or incorrect. *Id.* at 552–54. The Supreme Court thus held in *Aleman Gonzalez* that two district courts could not compel the government to provide bond hearings to noncitizens detained pursuant to § 1231(a)(6), as the

district courts had concluded was required under that provision. *Id.* at 551. Because the injunctions "require[d] officials to take actions that (in the Government's view) [we]re not required by § 1231(a)(6) and to refrain from actions that (again in the Government's view) [we]re allowed by § 1231(a)(6)," the injunctions "interfere[d] with the Government's efforts to operate § 1231(a)(6)" in violation of § 1252(f)(1). *Id.* In effect, the Supreme Court held that § 1252(f)(1) bars lower federal courts from substituting their interpretation of covered statutory provisions for the government's view, at least in cases seeking class-wide injunctive relief. The Ninth Circuit has since held that the inverse is also true: If an injunction does *not* enforce an interpretation of a covered provision, § 1252(f)(1) does not prohibit it. *See Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1125–28 (9th Cir. 2025) (affirming a class-wide injunction prohibiting the government from enforcing asylum-eligibility policies that affected the implementation of a covered provision but were promulgated under non-covered provisions).

Here, none of plaintiffs' conditions-of-confinement claims seek to override the government's interpretation of § 1225(b). Instead, plaintiffs argue that regardless of the statutory authority governing ICE's detention of class members, the conditions at 630 Sansome violate class members' constitutional rights under the First and Fifth Amendments and their statutory right to consult counsel under 8 U.S.C. §§ 1229a and 1362. Because plaintiffs' requested injunctive relief would not require the government to take or refrain from taking any action based on the Court's interpretation of § 1225(b), it would not "enjoin or restrain" the operation of § 1225(b). While an order granting class-wide injunctive relief as to conditions of confinement might have a "one step removed" effect on the government's detention of noncitizens pursuant to § 1225(b), that "d[oes] not bring the injunction within the scope of § 1252(f)(1)." *Al Otro Lado*, 138 F.4th at 1125 (quoting *Gonzalez v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)). "[Section] 1252(f)(1) does not prohibit an injunction simply because of collateral effects on a covered provision." *Id.*

8 U.S.C. § 1252(f)(1) thus does not prohibit class certification or class-wide injunctive relief as to any of plaintiffs' class claims.[112]

---

[112] Even if the class-wide injunctive relief plaintiffs seek concerning conditions of confinement

United States District Court
Northern District of California

**B.      Plaintiffs have standing, and their claims are neither unripe nor moot.**

The government also argues that plaintiffs lack standing and that their claims are unripe and moot. Again, the government is incorrect.

"In a class action, the plaintiff class bears the burden of showing that Article III standing exists." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011). Because "[a] plaintiff must demonstrate standing separately for each form of relief sought … a plaintiff who has standing to seek damages for a past injury … does not necessarily have standing to seek prospective relief." *Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Serv., Inc.*, 528 U.S. 167, 185 (2000)). "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). In a class action, "[s]tanding exists if at least one named plaintiff meets the requirements." *Ellis*, 657 F.3d at 978. And "standing in a Rule 23(b)(2) class is assessed at the time the complaint was filed." *Thakur v. Trump*, 148 F.4th 1096, 1105 (9th Cir. 2025).

Here, at least one named plaintiff had standing to pursue each class claim when the amended complaint was filed.

As to the detention class, both Ms. Garcia and Mr. Hernandez Torres were detained at 630 Sansome when the amended complaint was filed, so they were at that time being subjected to the allegedly unconstitutional conditions. *See* Declaration of Ligia Garcia, Dkt. 33-5 ¶ 3; Declaration of Martin Hernandez Torres, Dkt. 33-7 ¶ 3. For example, both Ms. Garcia and Mr. Hernandez Torres were held overnight and forced to sleep on thin mats in cold temperatures with continuous lighting and only thin metal sheets to cover them. *See* Declaration of Ligia Garcia, Dkt. No. 77 ¶¶ 13–16; Declaration of Martin Hernandez Torres, Dkt. No. 78 ¶¶ 9–12. ICE also ignored both

---

were to run afoul of Section 1252(f)(1), that would not preclude the Court from awarding the class-wide *declaratory* relief they request, because "§ 1252(f)(1) does not 'bar classwide declaratory relief.'" *Al Otro Lado*, 138 F.4th at 1123–24 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010)).

plaintiffs' requests for medication and medical attention.[113] As a result, they each suffered a "concrete and particularized" injury, and because they feared continued detention at the time they filed the amended complaint, additional injury was "imminent." Those injuries are "fairly traceable" to the government's maintenance of the challenged conditions at 630 Sansome and waiver of ICE's 12-hour-waiver memo, and plaintiffs' requested judicial decision would "redress the injury" by ameliorating the unconstitutional conditions and prohibiting extended detention at 630 Sansome.

As to the courthouse-arrest class, Ms. Pablo Sequen and Ms. Garcia had both been arrested at the San Francisco immigration court before the filing of the amended complaint, imposing actual, concrete, and particularized injuries—the loss of their physical liberty.[114] When the amended complaint was filed, Ms. Alvarado Ambrocio had narrowly avoided detention at the courthouse and faced likely detention at her next hearing, which was only a few weeks away.[115] Indeed, at the hearing on the second motion for a preliminary injunction in this case, "the government expressly conceded … that ICE would likely detain Ms. Alvarado Ambrocio after the [next] hearing." *See Pablo Sequen II*, 2025 WL 2935630, at *12. Ms. Alvarado Ambrocio therefore faced an imminent and concrete injury in the form of her likely re-detention. Each of these injuries was directly traceable to the government's challenged policies permitting courthouse arrests, and the requested vacatur of those policies would redress plaintiffs' injuries by removing the threat of re-detention at future immigration-court appearances.

The government does not dispute that the named plaintiffs had standing to bring their class claims when they filed their amended complaint. Instead, the government insists that plaintiffs *no longer* have standing because none of the plaintiffs are currently detained at 630 Sansome or likely to be re-arrested at an immigration courthouse. Indeed, Mr. Hernandez Torres has been removed

---

[113] *See* Declaration of Ligia Garcia, Dkt. No. 77 ¶¶ 9–10; Declaration of Martin Hernandez Torres, Dkt. No. 78 ¶¶ 4–8.

[114] *See* Declaration of Carmen Aracely Pablo Sequen, Dkt. 33-1 ¶ 4; Declaration of Ligia Garcia, Dkt. 33-5 ¶ 3.

[115] Declaration of Yulisa Alvarado Ambrocio, Dkt. 33-11 ¶¶ 5–7.

United States District Court
Northern District of California

to Mexico, and the remaining plaintiffs have been released and have the benefit of preliminary injunctions that prohibit their re-arrest without prior notice and a bond hearing. But that does not bear on plaintiffs' standing to bring their class claims. As the Ninth Circuit recently explained, "because standing in a Rule 23(b)(2) class is assessed at the time the complaint was filed, any future mitigation of [p]laintiffs' injuries is immaterial to the standing analysis." *Thakur*, 148 F.4th at 1105 (citing *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014)). And at the time the complaint was filed, only Ms. Pablo Sequen had received preliminary injunctive relief mandating her release and prohibiting her re-arrest without notice or a hearing, such that she did not face imminent re-detention. Even assuming that this temporary relief destroyed Ms. Pablo Sequen's standing to pursue a permanent class-wide injunction—a proposition for which the government provides no support—the other named plaintiffs still have standing to pursue the proposed class claims. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) (explaining that only one named plaintiff need have standing to pursue injunctive relief).

Plaintiffs' claims are also ripe for review. As the government itself explains, the doctrine of ripeness permits courts to "dispose of matters that are premature for review because the plaintiff's purported injury is too speculative and may never occur." *Changler v. State Farm Mt. Auto Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). Because this inquiry focuses on whether an injury "is real and concrete rather than speculative and hypothetical," it "merges almost completely with standing." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). Plaintiffs' claims are ripe for the same reason they have demonstrated an "injury in fact" sufficient to establish standing. Ms. Garcia and Mr. Hernandez Torres have been subjected to concrete injuries stemming from their detention at 630 Sansome under allegedly unconstitutional conditions. Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio have also been subjected to concrete injuries due to their actual or threatened arrest at immigration courthouses. Their claims thus "present concrete legal issues … in actual cases, not abstractions," so they are "ripe within the meaning of Article III." *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 839 (9th Cir. 2024) (citation modified).

Nor are plaintiffs' claims moot. "Generally, an action is mooted when the issues presented are no longer live and therefore the parties lack a legally cognizable interest for which the courts can grant a remedy." *Dep't of Fish & Game v. Fed. Subsistence Bd.*, 62 F.4th 1177, 1181 (9th Cir. 2023) (quoting *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999)). "Typically, if a district court certifies a class before the class representative's claim becomes moot, 'mooting the putative class representative's claim will not moot the class action.' But where … the plaintiff's claim becomes moot before the district court certifies the class, the class action normally also becomes moot.'" *Washington v. Trump*, 145 F.4th 1013, 1025 (9th Cir. 2025) (first quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011); and then quoting *Slayman*, 765 F.3d at 1048).

The government argues that plaintiffs' individual claims are moot because Mr. Hernandez Torres has been removed to Mexico and the Court has issued preliminary injunctions enjoining the government from re-detaining the remaining plaintiffs without prior notice and a bond hearing during the pendency of this suit. As a result, the government contends, plaintiffs do not face any risk of re-detention and thus have no interest in staying the courthouse-arrest or 12-hour waiver policies or ameliorating the conditions of confinement at 630 Sansome.

The government misunderstands the nature of the Court's preliminary injunctions. The relief granted by this Court is temporary in nature, prohibiting the re-detention of Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio without a pre-detention hearing only "during the pendency of these proceedings." *Pablo Sequen I*, 2025 WL 2650637, at *10; *Pablo Sequen II*, 2025 WL 2935630, at *14. The government acknowledged as much at the hearing on this matter. And the preliminary injunctions permit the government to re-detain Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio if the government first demonstrates at a bond hearing that they present dangers to the community or flight risks and that such harms cannot be prevented through means other than detention. *See Pablo Sequen I*, 2025 WL 2650637, at *10; *Pablo Sequen II*, 2025 WL 2935630, at *14. In that case, as the government conceded at the hearing, Ms. Garcia would again be subject to detention at 630 Sansome and the conditions of confinement there. There thus remains a strong possibility that the government will re-detain one of the plaintiffs

either after a final judgment in the government's favor or after a bond hearing. For that reason, plaintiffs retain a legally cognizable interest in permanently staying the courthouse-arrest and 12-hour waiver policies and enjoining the allegedly unconstitutional conditions of confinement at 630 Sansome.

In any case, even where a court has yet to certify a class, "mooting the putative class representative[s'] claims will not necessarily moot the class action" if the putative class claims "are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative[s'] individual interest expires." *Pitts*, 653 F.3d at 1090 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991)). Here, plaintiffs' claims are "inherently transitory" because they "will certainly repeat as to the [proposed] class." *Id.* The government has not suggested that it plans to reverse the challenged policies or to alter the conditions of confinement at 630 Sansome. So whether or not plaintiffs themselves are again subject to courthouse arrests or confined at 630 Sansome, "'it is certain that other persons similarly situated' will have the same complaint." *Id.* (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 (1975)). And given that 630 Sansome is only a temporary holding location for noncitizens, it is highly unlikely that *anyone* would be detained there long enough for a court to certify class claims challenging the conditions of confinement at the facility. Thus, even were it the case that release mooted plaintiffs' individual conditions-of-confinement claims, that would not moot the class's "inherently transitory" claims. *Id.* The class claims relate back to the filing of the amended complaint—when plaintiffs' claims were undisputably live—"to preserve the merits of the case for judicial resolution." *Id.* (quoting *McLaughlin*, 500 U.S. at 52).

The government's contrary theory would insulate it from legal challenges to even egregiously unlawful conduct in short-term detention facilities. In the government's view, detainees who secure preliminary injunctions ordering their release and prohibiting their re-arrest no longer have a sufficient stake in correcting unlawful conditions at holding facilities, but if detainees remain in custody until they are transferred to long-term detention facilities or removed from the country, their claims are moot because they are unlikely to return to the short-term holding facility. It is precisely to avoid this "spectre of plaintiffs filing lawsuit after lawsuit, only

to see their claims mooted before they can be resolved," that the "inherently transitory" exception to mootness was recognized. *Id.*

In sum, plaintiffs have standing to pursue their class claims, which are ripe for review and not moot. The Court will therefore address the substance of plaintiffs' motions.

## II.    The Court provisionally certifies both proposed classes.

Under Rule 23, plaintiffs seeking to certify a class must first show that they satisfy four "prerequisites":

> (1) the class is so numerous that joinder of all members is impracticable ["numerosity"];
>
> (2) there are questions of law or fact common to the class ["commonality"];
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

Fed. R. Civ. P. 23(a). If these prerequisites are satisfied, plaintiffs must also demonstrate that they satisfy at least one requirement of Rule 23(b). *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). Here, plaintiffs seek provisional certification under Rule 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"Before it can certify a class, a district court must conduct a 'rigorous analysis' to ensure that the[se] requirements are satisfied," and "[p]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 862 (9th Cir. 2025) (first quoting *Olean*, 31 F. 4th at 664; and then quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)). "Courts routinely grant provisional class certification for purposes of entering injunctive relief prior to a final ruling on class certification." The term "'provisional' … signal[s] that the certification will dissolve if the injunction does" but does "*not* suggest the

United States District Court
Northern District of California

1    [Court] undertook less than a full Rule 23 analysis." *Mercado v. Noem*, No. 25-cv-6568, 2025 WL

2    2658779, at \*17 (S.D.N.Y. Sept. 17, 2025) (citation modified). Though the instant motion for a

3    preliminary injunction and stay seeks relief only for the proposed detention class, the Court also

4    addresses provisional certification of the proposed courthouse-arrest class given that plaintiffs'

5    second motion for a stay, Dkt. No. 94, will be heard on December 9, 2025.

6         For the reasons explained below, plaintiffs have demonstrated that the proposed

7    courthouse-arrest and detention classes are sufficiently numerous and share common questions of

8    law or fact, and that Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio are typical and

9    adequate class representatives. Mr. Hernandez Torres, however, has not established that he would

10   be an adequate representative of the detention class. The Court also concludes that plaintiffs have

11   satisfied the requirements of Rule 23(b)(2) for both proposed classes. The Court therefore

12   provisionally certifies the courthouse-arrest class to be represented by Ms. Pablo Sequen, Ms.

13   Garcia, and Ms. Alvarado Ambrocio and the detention class to represented by Ms. Garcia.

14        **A.    Rule 23(a)**

15             **1.    Numerosity**

16        Plaintiffs have demonstrated that both of their proposed classes are "so numerous that

17   joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Determining whether joinder is

18   impracticable "requires examination of the specific facts of each case and imposes no absolute

19   limitations." *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). The Ninth

20   Circuit has held that a proposed class is sufficiently numerous where joinder of all class members

21   "would impose very substantial logistical burdens." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th

22   828, 837 (9th Cir. 2022). The Ninth Circuit has also "recognized that when … a class's

23   membership changes continually over time, that factor weighs in favor of concluding that joinder

24   of all members is impracticable." *Id.* at 838.

25        The proposed courthouse-arrest class is sufficiently numerous because joinder of its

26   membership "would impose very substantial logistical burdens." *A.B.*, 30 F.4th at 837. The

27   proposed class consists of all noncitizens with upcoming immigration hearings on EOIR's non-

28   detained docket at an immigration courthouse in ICE's San Franciso Area of Responsibility,

1    which covers northern California, Hawaii, Guam, and Saipan. That group of noncitizens is

2    presumably large in number and is spread across northern California and several Pacific islands.

3    Joining such a group as individual plaintiffs would clearly be logistically impracticable, and the

4    government has not argued otherwise.

5         The detention class is also sufficiently numerous. That proposed class includes "all persons

6    who are now or will be detained in a holding cell" at 630 Sansome. The membership of the class is

7    both potentially very large in number and, critically, "changes continually over time," which

8    "weighs in favor of concluding that joinder of all members is impracticable." *A.B.*, 30 F.4th at

9    838. Again, the government has not argued otherwise. Plaintiffs therefore satisfy the numerosity

10   requirement.

**2.     Commonality**

12        Plaintiffs have also demonstrated commonality. "Commonality mandates there be a

13   common question of law or fact among the class members where the same evidence will suffice

14   for each member to make a prima facie showing or the issue is susceptible to generalized, class-

15   wide proof." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1198 (9th Cir. 2024)

16   (citation modified). In other words, commonality exists where "the evidence establishes that a

17   common question is capable of class-wide resolution." *Noohi*, 146 F.4th at 863. "To satisfy

18   commonality, even a single common question is enough." *Small*, 122 F.4th at 1198 (citation

19   modified) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)).

20        Each of the proposed courthouse-arrest class's APA claims turns on a common question:

21   whether ICE and EOIR's 2025 courthouse-arrest guidance is arbitrary and capricious. The answer

22   to that question "will resolve an issue that is central to the validity of each one of the [class

23   member's] claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The government argues that the

24   courthouse-arrest class lacks a common question because class members may be arrested pursuant

25   to different statutory provisions and some may not be arrested at all. But these differences do not

26   bear on the "common issue, with a common answer, as to whether a sufficiently reasoned

27   explanation was provided" for the challenged guidance. *Thakur v. Trump*, 787 F. Supp. 3d 955,

28   1003 (N.D. Cal. 2025). "[E]ither each of the policies" is insufficiently reasoned and "is unlawful

32

1    as to every [class member] or it is not. That inquiry does not require [the Court] to determine the

2    effect of those policies … upon any individual class member (or class members) or to undertake

3    any other kind of individualized determination." *Parsons v. Ryan*, 754 F,3d 657, 678 (9th Cir.

4    2014).

5        For the same reasons, there is a common question underlying the proposed detention

6    class's APA claim challenging ICE's 12-hour detention waiver—namely, whether that waiver is

7    sufficiently reasoned or whether it is arbitrary and capricious in violation of the APA.

8        The proposed detention class also shares common questions as to whether the policies and

9    practices governing conditions of confinement at 630 Sansome, to which all members of the class

10   have been or will be subjected, are constitutional. For example, as detailed further below,

11   plaintiffs' claims challenging the conditions at 630 Sansome relating to sleep, hygiene, and

12   medical care turn on a determination of whether those conditions are punitive in nature. That

13   inquiry, in turn, asks whether detainees at 630 Sansome are subject to conditions that are

14   motivated by an intent to punish, are similar to or more restrictive than the conditions imposed

15   upon criminal detainees, and serve legitimate government interests. *See Jones v. Blanas*, 393 F.3d

16   918, 933–34. (9th Cir. 2004). The detention class's conditions-of-confinement claims will thus

17   involve common factual questions concerning the intent and interests underlying ICE's practice of

18   leaving lights in hold cells on at all times and not providing detainees held overnight with mattress

19   pads, pillows, or blankets. The claims also require the resolution of common questions concerning

20   the similarity of such conditions to those in criminal detention settings. "The court's broad …

21   answer to th[ose] question[s] is 'apt to drive the resolution of the litigation' because it determines

22   whether [p]laintiffs' constitutional rights have been violated and whether an injunction directing

23   [the government] to remedy the constitutional violations is appropriate." *Hernandez v. County of

24   Monterey*, 305 F.R.D. 132, 155 (N.D. Cal. 2015) (quoting *Wal-Mart*, 564 U.S. at 350).

25       The government argues that no common question exists concerning the proposed detention

26   class's constitutional conditions-of-confinement claims because "experiences at 630 Sansome vary

27   based on individual circumstances." But "[p]laintiffs challenge the overall conditions in which

28   they were detained … [and] need not prove that every single class member was subjected to every

33

single adverse condition to establish a custom or practice of unconstitutional conditions." *Aichele v. City of Los Angeles*, 314 F.R.D. 478, 490 (C.D. Cal. 2013). "What all members of the putative class … have in common is their alleged exposure" to "specified [ICE] policies and practices that govern the overall conditions of … confinement," and which are unconstitutionally punitive as to all or as to none. *Parsons*, 754 F.3d at 678. Though the challenged conditions "may ultimately result in different future harm for different [detainees] … every [detainee] suffers exactly the same constitutional injury when he is exposed to a single [facility-]wide [ICE] policy or practice that" is punitive in nature or denies access to counsel. *Id.*; *see also Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) ("Differences among the class members with respect to the merits of their actual [experiences] … are simply insufficient to defeat the propriety of class certification"); *Hernandez*, 305 F.R.D. at 156 (finding commonality where "[p]laintiffs have produced adequate evidence of specific system-wide policies and practices exposing inmates to a substantial risk of serious harm, violating their constitutional or statutory rights; and they have clearly defined the class claims").

Plaintiffs have therefore demonstrated commonality for both the proposed courthouse-arrest class and the proposed detention class.

### 3. Typicality

Plaintiffs have established that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under Rule 23's "permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d at 685. "Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class." *Small*, 122 F.4th at 1201–02. "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* at 1202.

Plaintiffs are typical of the proposed classes for the same reasons they share common questions of law and fact with the classes. *See Wal-Mart*, 564 U.S. at 349 n.2 (noting that, in the

context of Rule 23(b)(2) classes, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge"). Each of the plaintiffs declares that, like the members of the proposed classes, they were subject to actual or threatened arrest pursuant to policies that are arbitrary and capricious or were subjected to unconstitutional conditions of confinement resulting from ICE's policies and practices. "The named plaintiffs thus allege the same or a similar injury as the rest of the putative class; they allege that this injury is a result of a course of conduct that is not unique to any of them; and they allege that the injury follows from the course of conduct at the center of the class claims." *Parsons*, 754 F.3d at 685.

The government contends that the existence of some differences among class members and the plaintiffs destroys typicality. The government notes, for example, that Ms. Alvarado Ambrocio has never been arrested at an immigration courthouse yet seeks to represent the courthouse-arrest class. But that does not make Ms. Alvarado Ambrocio atypical. The courthouse-arrest class includes many individuals who have not *yet* been arrested at an immigration courthouse but, like Ms. Alvarado Ambrocio, face a substantial risk of arrest at future removal hearings. In any case, "[i]t does not matter that the named plaintiffs may have in the past suffered varying injuries … Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other or to every class member." *Parsons*, 754 F.3d at 686; *see also Ellis*, 657 F.3d at 985 n. 9 ("Differing factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality.").

### 4.    Adequacy

Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio have established that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Mr. Hernandez Torres has not.

"The adequacy inquiry is addressed by answering two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? If either answer is no, the representative is inadequate." *Small*, 122 F.4th at 1202 (citation modified). To satisfy these criteria, "a class representative must be part of the class and possess the same interest

and suffer the same injury as the class members." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).

As to the proposed class counsel, plaintiffs assert that counsel has no conflicts with the interests of the class and is competent to vigorously prosecute the action on behalf of the class. The government does not argue otherwise.

For purposes of representing the courthouse-arrest class, Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio all assert that they are members of the class, have no conflicts with the class's interests, and will vigorously prosecute this action on behalf of the class. The government argues that their interests differ from the class because they do not face the same injury of likely re-arrest at an immigration courthouse due to this Court's issuance of preliminary injunctions prohibiting the government from re-detaining them without prior notice and a bond hearing. As already explained, however, the preliminary injunctions apply only during the pendency of these proceedings, so Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio continue to face a risk of re-arrest at their next appearances in immigration court following the resolution of this action. Their interests are therefore similar to the other class members'.

For purposes of representing the detention class, Ms. Garcia and Ms. Hernandez Torres similarly assert that they are members of the class, have no conflicts with the class's interests, and will vigorously prosecute this action on behalf of the class. There is no reason to doubt that this is true for Ms. Garcia. But Mr. Hernandez Torres no longer appears to be a member of the proposed detention class because he has been removed to Mexico and thus faces no prospect of being detained at 630 Sansome in the future. Given his unique circumstances, he is likely not an adequate representative of the class members' interests.

Accordingly, both proposed classes and all proposed class representatives except Mr. Hernandez Torres satisfy the Rule 23(a) prerequisites.

### B.    Rule 23(b)(2)

Plaintiffs also satisfy the requirements of Rule 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360; *see also id.* ("The key to the (b)(2) class is the indivisible nature of the

1    injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be

2    enjoined or declared unlawful only as to all of the class members or as to none of them.") (citation

3    modified). "These requirements are unquestionably satisfied when members of a putative class

4    seek uniform injunctive or declaratory relief from policies or practices that are generally

5    applicable to the class as a whole." *Parsons*, 754 F.3d at 688. That is the case here. The putative

6    courthouse-arrest class seeks to vacate ICE and EOIR's 2025 courthouse-arrest guidance as to

7    every member of the class. The putative detention class similarly seeks uniform relief regarding

8    ICE's 12-hour detention waiver and the conditions of confinement at 630 Sansome, where every

9    member of the class is or will be detained.

10           The government's arguments to the contrary are unavailing. First, the government argues

11   that the Court cannot grant an injunction that would provide relief to each member of the proposed

12   classes because § 1252(f)(1) bars relief as to at least some class members. As explained above,

13   however, § 1252(f)(1) does not apply here. Second, the government argues that the Court could

14   not craft appropriate class-wide injunctive relief on plaintiffs' due-process claims challenging

15   conditions of confinement because detained non-citizens' constitutional due-process rights vary

16   based on individualized factors, including the statutory provisions governing the non-citizen's

17   detention. It is true that individuals' *procedural* due-process rights under the Fifth Amendment

18   may change depending on the statute that governs their detention and the attendant statutory

19   procedures to which they are entitled. *See Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018)

20   (noting variance in the "procedural protections" required in different situation); *Diaz v. Garland*,

21   53 F.4th 1189, 1213 (9th Cir. 2022) (similar). But plaintiffs here assert only *substantive* due-

22   process claims concerning the conditions of confinement at 630 Sansome. *See Jones*, 393 F.3d at

23   931 (explaining that such claims invoke substantive due-process protections). The government

24   offers no authority, and the Court is aware of none, suggesting that substantive due-process rights

25   concerning confinement vary depending on the statutory basis for an individual's detention.

26           Accordingly, with the exception of Mr. Hernandez Torres, plaintiffs have established that

27   they satisfy all the prerequisites of Rule 23(a) and the requirements of Rule 23(b)(2) with respect

28

United States District Court
Northern District of California

to the courthouse-arrest and detention classes.[116] The Court provisionally certifies both classes for the purposes of plaintiffs' motions for preliminary injunctive relief and stays of agency action. Ms. Pablo Sequen, Ms. Alvarado Ambrocio, and Ms. Garcia shall represent the courthouse-arrest class, and Ms. Garcia shall represent the detention class.

### III.    Plaintiffs are entitled to preliminary relief addressing the conditions of confinement at 630 Sansome.

Plaintiffs move for a preliminary injunction remedying the allegedly unconstitutional conditions of confinement at 630 Sansome relating to sleep, hygiene, and medical care. To obtain a preliminary injunction, plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[117] "If a plaintiff can only show that

---

[116] The Court acknowledges that, in a similar case challenging conditions of confinement at an ICE holding facility in New York, another district court provisionally certified a narrower class consisting only of individuals who are or will be detained at that facility for more than 12 hours. *See Mercado*, 2025 WL 2658779, at *18. In *Mercado*, however, the plaintiff seeking class certification had not shown "that detainees held for less than 12 hours suffer any injury … as a result of defendants' alleged constitutional violations." *Id.* Here, plaintiffs have established that detainees may be harmed even if they are held for fewer than 12 hours. The lack of medical intakes, access to medication, or adequate medical care risks harm to all detainees, as do the unsanitary and unclean conditions in hold rooms. And while detainees held for fewer than 12 hours during the day may not require sleep, detainees who are held overnight but for fewer than 12 hours—e.g., from 7 PM to 3AM—may be harmed by inadequate sleeping conditions. A temporal limit on the detention class is therefore inappropriate. *Cf. Walters*, 145 F.3d at 1045–46 (affirming certification of class that included some members who were subject to but not harmed by allegedly unconstitutional procedure).

[117] This likelihood-of-success standard "applies to prohibitory injunctions, which aim to preserve the status quo by preventing a party from taking action." *Youth 71Five Ministries v. Williams*, 153 F.4th 704, 717 (9th Cir. 2025) (citation modified). The government instead cites the higher standard applicable to "mandatory injunction[s]," which "alter[] the status quo by requiring a party to take action" and require a plaintiff "to show the facts and law *clearly* favor the moving party." *Id.* (citation modified). To the extent the government suggests that the higher standard applies here, the Court disagrees. While plaintiffs request an injunction compelling the government to remedy the allegedly unconstitutional conditions at 630 Sansome, including by providing bedding, hygiene products, and medical intakes, those actions would preserve the status quo rather than alter it. Courts "determine the status quo based on the legally relevant relationship between the parties before the controversy arose, that is, before the action challenged in the complaint occurred." *Id.* Here, plaintiffs challenge the government's imposition of allegedly inhumane conditions of confinement at 630 Sansome, which allegedly arose only in recent months, due in part to ICE's waiver of its prior 12-hour limit on detention in holding facilities. Before that, non-citizens held at 630 Sansome were not subjected to the current allegedly unconstitutional

38

there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied.'" *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). "Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest— merge." *Hubbard v. City of San Diego*, 139 F.4th 843, 854 (9th Cir. 2025) (citation modified).

### A.     Plaintiffs are likely to succeed on the merits.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199– 200 (1989). That duty includes provision of "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200. Constitutional claims challenging the conditions of civil confinement, such as civil immigration detention, arise under the Fifth Amendment's Due Process Clause. *See Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636, 647 (9th Cir. 2021).

Conditions of confinement may violate the Due Process Clause in either of two ways. First, because the Due Process Clause forbids "punishment" of an individual prior to an adjudication of guilt, conditions of confinement are unconstitutional if they are punitive in nature. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Second, the Clause prohibits government officials from exhibiting deliberate indifference to conditions of confinement that impose a substantial risk of serious harm. *See Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).[118]

---

conditions. "Because it was the [government]'s action that affirmatively changed that status quo and [plaintiffs'] motion for a preliminary injunction seeks to restore that status quo, the relief sought is properly viewed as a prohibitory injunction." *Id.* at 718. Regardless, because plaintiffs have shown that the facts and law clearly favor their position, plaintiffs would be entitled to a preliminary injunction even if that relief were deemed mandatory rather than prohibitory.

[118] While deliberate-indifference claims most frequently arise in cases involving inadequate medical care for detainees, the Ninth Circuit has explained that "medical care claims [are] substantially the same as other conditions of confinement violations," all of which are subject to "the same standard." *Gordon*, 888 F.3d at 1124.

1    Plaintiffs may challenge conditions of confinement under either a punitive-in-nature or deliberate-

2    indifference theory. *See Fraihat*, 16 F.4th at 636, 647 (resolving each type of claim

3    separately). Plaintiffs rely on the former theory, contending that the conditions at 630 Sansome are

4    punitive.[119]

5              **1.    Factual Findings as to the Challenged Conditions**

6              To determine whether the conditions of confinement in the hold rooms at 630 Sansome are

7    likely punitive, the Court must first assess actual conditions at the facility. Based on the

8    declarations submitted by plaintiffs from individuals who have recently been detained at 630

9    Sansome and attorneys who represent such individuals—evidence that the government has failed

10   to rebut for the reasons described above—the Court finds that:

- ICE routinely holds detainees at 630 Sansome overnight or for more than 12 hours.

- ICE holds some detainees at 630 Sansome for 72 hours or more.

- ICE does not provide beds, mattresses, pillows, or blankets to detainees.

- ICE provides most, but not all, detainees with thin foam mats that are no more than one inch thick and thin sheets of plastic or metal to use for sleep.

- Detainees must sleep with their mats placed on metal benches or on the concrete floor of hold rooms, sometimes adjacent to open toilets or within one foot of other detainees.

- ICE maintains frigid temperatures in the hold rooms at 630 Sansome and lights the rooms continuously throughout each night.

- ICE does not regularly clean hold rooms or the toilets therein.

- ICE does not provide detainees with soap, toothbrushes, toothpaste, or other basic hygiene products in hold rooms.

- Some detainees, including those held for multiple days, are never permitted to

---

[119] Though plaintiffs passingly assert that defendants have acted deliberately, their motion includes no discussion of the applicable legal standard for deliberate indifference, and their reply disclaims any reliance on a deliberate-indifference theory. The Court therefore addresses only whether the conditions at 630 Sansome are likely punitive in nature.

United States District Court
Northern District of California

brush their teeth or wash their bodies.

- ICE does not provide detainees with changes of clothing.

- ICE does not provide regular medical screenings of detainees upon their arrival at 630 Sansome.

- ICE does not provide prompt medical care when requested by detainees, particularly when detainees request such care in a language other than English.

- ICE does not provide over-the-counter or prescription medication to detainees and sometimes prevents the delivery of such medication to detainees.

With this record in mind, the Court addresses whether plaintiffs have established a likelihood that the challenged conditions at 630 Sansome are unconstitutionally punitive in nature.

### 2. The conditions at 630 Sansome are likely punitive.

Because "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law," *Wolfish*, 441 U.S. at 535, "a civil detainee awaiting adjudication is entitled to conditions of confinement that are not punitive," *Jones*, 393 F.3d at 933. "A restriction is punitive where it is intended to punish, or where it is excessive in relation to its non-punitive purpose, or is employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Fraihat*, 16 F.4th at 647 (citation modified) (quoting *Jones*, 393 F.3d at 933–34). "But if a particular condition or restriction of [civil] detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Id.* (quoting *Wolfish*, 441 U.S. at 539). "[A] presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held." *Id.* (quoting *Jones*, 393 F.3d at 934). "If a plaintiff establishes that this presumption applies, the burden shifts to the defendant to show (1) legitimate, non-punitive interests justifying the conditions of the detainee's confinement and (2) that the restrictions imposed are not excessive in relation to these interests." *Id.* (citation modified).

#### a. Sleeping Conditions

Plaintiffs have established that the conditions depriving detainees of sleep at 630 Sansome are likely punitive. As to each challenged condition, they have demonstrated that ICE treats

41

detainees similar to or worse than pretrial criminal detainees, creating a presumption that the conditions are punitive in nature. *See id.* The Ninth Circuit has held that because criminal detainees must be provided with beds or mattresses as a "constitutional minimum," a pretrial criminal detainee's uncontroverted allegation that he was not provided with a bed or mattress for two nights in county jail and was instead forced to sleep on a concrete floor "unquestionably constitute[d] a cognizable [due process] claim." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989), *overruled on other grounds by Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010). The Ninth Circuit has also repeatedly held that continuously lighting prison cells with lights so bright that they prevent sleep violates prisoners' Eighth Amendment rights. *See Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996); *Grenning v. Miller-Stout*, 739 F.3d 1235, 1238–39 (9th Cir. 2014). The Supreme Court has suggested that subjecting prisoners to "a low cell temperature at night combined with a failure to issue blankets" would violate the Eighth Amendment. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Because "pretrial [criminal] detainees … possess greater constitutional rights than prisoners," *Stone v. City and County of San Francisco*, 968 F.2d 850, n.10 (9th Cir. 1992); *Manney v. Campbell*, 654 F.2d 1280, 1284 n.5 (9th Cir. 1980), the Due Process Clause likewise forbids the government from subjecting non-criminal detainees to such conditions. Thus, ICE's denial of beds or mattresses, continuous lighting, and maintenance of frigid temperatures without providing blankets subjects detainees at 630 Sansome to conditions below the constitutional minimum for pretrial criminal detainees or prisoners.

The government makes little effort to rebut the resulting presumption that the sleeping conditions at 630 Sansome are punitive. Rather than assert that the denial of beds, mattresses, or blankets and the imposition of cold temperatures serve any "legitimate, non-punitive interests," *Fraihat*, 16 F.4th at 647, the government simply disputes (unsuccessfully) the existence of these conditions. Notably, the government has not argued that it could not feasibly provide beds, mattresses, blankets, or suitable temperatures in the hold rooms at 630 Sansome. *See Doe*, 878 F.3d at 721–22. To the contrary, Mr. Kaskanlian explained that ICE policies *require* the provision

1    of mattress pads and blankets to detainees held overnight in hold rooms.[120]

2          The only condition for which the government offers a "legitimate, non-punitive interest[]"

3    is the continuous lighting of hold rooms overnight. As the government explains:

>    The continuous lighting supports continuous observation by staff,
>    rapid response in case of emergencies, and incident prevention and
>    reduces opportunities for self-harm, assault, harassment, or
>    intimidation. Officers frequently monitor the cells by reviewing video
>    camera footage, and officers cannot adequately review video camera
>    footage if the lights are dimmed.[121]

8    These are legitimate interests. *See Doe v. Kelly*, 878 F.3d 710, 716 (9th Cir. 2017). Yet the

9    government has not explained why it cannot reasonably achieve those interests in other ways.

10   Such alternatives might include, for example, using low-light cameras to monitor cells or lighting

11   only those hold rooms containing detainees deemed to be safety or self-harm risks. Because it has

12   not considered any such alternatives, the government fails to carry its burden of showing that the

13   continuous lighting is not "excessive in relation to these interests." *Fraihat*, 16 F.4th at 647.

14   Plaintiffs have therefore demonstrated that the sleeping conditions at 630 Sansome—including the

15   cold temperatures, continuous lighting, and lack of beds, mattresses, and blankets—are likely

16   punitive.

17          **b.      Unsanitary Conditions and Lack of Basic Hygiene Resources**

18          The unsanitary conditions and denial of basic hygiene resources at 630 Sansome are also

19   likely punitive. Prisoners "have the right to personal hygiene supplies such as toothbrushes and

20   soap." *Keenan*, 83 F.3d at 1091. Detainees also have a right to wash themselves, though not

21   necessarily through daily showers. *See Doe*, 878 F.3d at 722 (holding that individuals detained for

22   fewer than two days may instead be provided with body wipes). It follows from the right to wash

23   oneself that detainees have a right to clean clothing, as changing back into soiled clothing obviates

24   much of the effect of washing. *See Mercado*, 2025 WL 2658779, at *29. "Prison officials [also]

---

[120] *See* Declaration of Andrew Kaskanlian, Dkt. No. 110 ¶ 18; *see also* Performance-Based National Detention Standards, U.S. Immigration & Customs Enforcement (2016), Dkt. 65-1 at 328 (similarly requiring that detainees in long-term ICE facilities be given, at a minimum, a mattress, blanket, pillow, pillowcase, towel, and two sheets).

[121] Dkt. No. 111 at 14 (citing Declaration of Andrew Kaskanlian, Dkt. No. 110 ¶¶ 14, 17).

have a duty to ensure that prisoners are provided adequate … sanitation." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). ICE's failure to provide detainees at 630 Sansome—many of whom are held overnight and sometimes for multiple days—with clean cells, hygiene supplies like toothbrushes, opportunities to wash their bodies, and clean clothing thus violates even the constitutional minima applicable to criminal detainees.

The government fails to articulate any legitimate interest that justifies these unsanitary conditions. As with the sleeping conditions, the government does not argue that it would not be feasible for ICE to provide the basic hygiene supplies and sanitary conditions plaintiffs seek. Quite the opposite: Mr. Kaskanlian insists, albeit without evidentiary support, that ICE already provides each detainee with a change of clothing including "undergarments," "sanitary products," "a set of toiletries that include a toothbrush [and] toothpaste," daily showers, and "a bar of soap."[122] These statements undermine any argument that the actual conditions at 630 Sansome serve any legitimate government interest.

The government attempts to justify its imposition of unsanitary conditions by arguing that class members' "detention serves the legitimate governmental interest of protecting the public and ensuring that the nation's immigration laws are enforced." The Court agrees that the government has a strong interest in enforcing immigration laws and that detention of non-citizens in many cases serves that interest. But the government may detain a person without subjecting her to unsanitary conditions or depriving her of sleep and adequate medical care. The Supreme Court has long held that the Constitution forbids the government from subjecting even duly convicted criminals, who may be legitimately detained, to inhumane conditions of confinement. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Accordingly, even if the government is correct that its detention of class members is lawful, that would not on its own justify the challenged conditions.

Plaintiffs are thus likely to succeed on their claim that the unsanitary conditions and denial of hygiene resources at 630 Sansome violate the due-process rights of the detention class.

---

[122] *See* Declaration of Andrew Kaskanlian, Dkt. No. 110 ¶¶ 19–22.

United States District Court
Northern District of California

### c.      Inadequate Medical Care

Finally, plaintiffs are likely to succeed on the merits of their claim challenging the denial of medical intakes, medication, and medical attention at 630 Sansome. "There is no question that detainees are entitled to adequate medical care." *Doe*, 878 F.3d at 722. While "precedent allows considerable flexibility as to when and how constitutionally adequate medical care is provided," it makes clear that "prisoners must be able to make their medical problems known to medical staff," and the Ninth Circuit has repeatedly held that detainees must therefore receive medical intakes. *Id.* at 722–23. "Adequate medical care" also includes access to needed medication. *See Wiertella v. Lake Cnty., Ohio*, 141 F.4th 775, 781–82 (6th Cir. 2025); *Unknown Parties v. Johnson*, No. CV-15-00250, 2016 WL 8188563, at *14 (D. Ariz. Nov. 18, 2016). The government's failure to provide intakes, to ensure detainees' access to prescription medications delivered to 630 Sansome, to consider requests for medical attention that are not made in English, and to provide prompt medical attention upon request therefore subjects detainees to worse conditions than criminal detainees, such that the presumption of punitiveness applies.

Again, the government does not justify these conditions as serving a legitimate interest. It does not argue that providing adequate medical care is not feasible. Nor could it. ICE's own directive governing the operation of holding facilities provides that the agency must "[m]onitor detainees for any apparent indications of a mental or physical health conditions," ensure detainees' "access to … prescribed medication," "[r]espond immediately to observed or reported medical emergencies and contact … emergency medical services when a detainee is determined to need urgent medical care."[123] Mr. Kaskanlian explained that it is ICE policy to provide medical screenings upon detainees' arrival at 630 Sansome, to permit detainees' family members to bring medication to the hold rooms, and to take individuals who require medical care to a medical facility.[124] Given that ICE itself commits to providing such medical care, the government cannot reasonably assert an interest in denying it. As a result, the government does not rebut the

---

[123] ICE Office of Enforcement and Removal Operations Directive 11087.2, "Operations of ERO Holding Facilities" (Jan. 31, 2024), Dkt. No. 65-3 at 8, 10, 12.

[124] *See* Declaration of Andrew Kaskanlian, Dkt. No. 110 ¶¶ 24–25, 27.

45

1    presumption that its failure to provide adequate medical care is punitive in nature.

2        In sum, plaintiffs have shown that the challenged conditions at 630 Sansome are likely

3    punitive and therefore likely violate the Due Process Clause.

4    **B.    Plaintiffs have established a likelihood of irreparable harm absent a
             preliminary injunction.**

5

6        Members of the detention class are likely to suffer immediate and irreparable harm without

7    preliminary injunctive relief. As discussed above, plaintiffs have demonstrated that members of

8    the detention class—i.e., individuals who are or will be detained at 630 Sansome—will likely be

9    subjected to unconstitutional conditions, including deprivations of sleep, basic hygiene, and

10   medical care. That is an immediate and irreparable harm, even if it lasts only for the period of

11   class members' detention at 630 Sansome. "The loss or threatened infringement upon

12   [constitutional] rights for even minimal periods of time unquestionably constitutes irreparable

13   injury." *Cuviello v. City of Vallejo*, 944 F.3d 816, 832 (9th Cir. 2019) (citation modified).

        The record also establishes that detainees subject to these conditions suffer from

14   irreparable physical harms. The declarations of individuals detained at 630 Sansome and their

15   attorneys document severe leg and spinal pain resulting from detainees sleeping on thin mats, as

16   well as arm pain and respiratory infections caused by the cold temperatures in the hold rooms.[125]

17   Detainees who are denied medication or access to medical attention, or whose care is delayed,

18   report suffering from tachycardia, stroke symptoms, and other ailments, sometimes requiring

19   emergency care.[126]

20       The government argues that plaintiffs have not demonstrated that members of the detention

21   class will suffer irreparable harm because plaintiffs "proffer no analysis or evidence" on that issue.

22   True, plaintiffs' motion did not include a separate section concerning irreparable harm. But there

23   is no requirement that plaintiffs address the issue separately from the other *Winter* factors. And in

24

25   _____

26   [125] *See* Declaration of Mayra Mendez, Dkt. No. 79 ¶ 15; Declaration of Juan Edelmar Alva Alva,
     Dkt. No. 75 ¶ 9; Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶ 9; Declaration of Dalia
27   Blevins, Dkt. No. 119 ¶ 6.

28   [126] *See* Declaration of Ligia Garcia, Dkt. No. 77 ¶ 10; Declaration of Martin Hernandez Torres,
     Dkt. No. 78 ¶¶ 7–24; Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶¶ 5–8.

United States District Court
Northern District of California

any event, plaintiffs' motion twice states that "class members will suffer irreparable harm absent [an injunction]." And "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" once plaintiffs have established a likelihood of success on the merits. *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (citation modified).

### C.       The balance of the equities and the public interest favor an injunction.

The final two *Winter* factors—the balance of the equities and public interest—merge because the government is the opposing party. *Nken*, 556 U.S. at 435. These factors weigh heavily in favor of an injunction. "Because public interest concerns are implicated when a constitutional right has been violated, all citizens have a stake in upholding the Constitution, meaning it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1042. While members of the detention class have an obviously compelling interest in avoiding likely unconstitutional conditions of confinement, the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (holding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice" implicating "constitutional concerns").

The government vaguely asserts that the balance of equities favors it given its "interest in the steady enforcement of its immigration laws and remedying problems caused by illegal immigration." It contends, in general terms, that "the operation of 630 Sansome" advances that interest. But the government makes no effort to explain why depriving detainees held at 630 Sansome of sleep, basic hygiene, and medical care furthers its interest in enforcing the immigration laws. As a court in the Southern District of New York recently explained in relation to another ICE holding facility:

> [A] preliminary injunction will not prevent defendants from pursuing the policies they have set. It merely will require that they conform to the demands of the Constitution in doing so. It is up to defendants to choose whether they wish to expend resources to conform [630 Sansome] to those requirements, or to alter the rate at which they are funneling arrestees into [630 Sansome] and other facilities, or to

select or obtain facilities where detainees can be held in a humane and constitutional manner.

*Mercado v. Noem*, No. 25-cv-6568, 2025 WL 2658779, at *36 (S.D.N.Y. Sept. 17, 2025).

Because plaintiffs have satisfied each of the *Winter* factors, a preliminary injunction compelling the government to remedy the challenged conditions of confinement at 630 Sansome is appropriate.[127]

## IV.    Plaintiffs have not established the need for a stay of ICE's waiver of the 12-hour-detention policy.

The detention class also seeks a stay of ICE's 12-hour-waiver memo under § 705 of the APA. The standard for granting a § 705 stay is essentially the same as the standard for granting a preliminary injunction. *See Nken*, 556 U.S. at 434. In considering whether to grant a stay, the Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion." *Id.* at 433–34.

Plaintiffs fail to carry their burden to establish that the detention class will be irreparably injured absent a stay. Plaintiffs do not argue that detention for longer than 12 hours necessarily violates detainees' constitutional rights or otherwise injures them. They argue only that detention for longer than 12 hours *under the current conditions at 630 Sansome* imposes unconstitutional and irreparable harm. Granting plaintiffs' requested preliminary injunction, which will require the government to ameliorate conditions at the facility, will therefore fully remedy the only irreparable harms that plaintiffs have identified.

---

[127] The government argues that certain of the terms in plaintiffs' proposed preliminary-injunction order are too ambiguous because they are insufficiently specific. For example, the government objects to the proposed language requiring ICE to maintain "comfortable temperatures" in hold rooms, rather than specifying an acceptable temperature range. But the Ninth Circuit has warned district courts against micromanaging the executive branch's administration of detention facilities and has instructed district courts to ensure that agencies retain some flexibility. *See Fraihat*, 16 F.4th at 646; *Doe*, 878 F.3d at 722. Accordingly, the Court finds plaintiffs' proposed terms appropriate.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs argue that the 12-hour-waiver memo has resulted in irreparable harm to detainees

2    at ICE holding facilities other than 630 Sansome where conditions of confinement have also

3    deteriorated, including in Illinois, Florida, Georgia, Virginia, and Los Angeles. Such evidence

4    could be highly relevant in considering whether the public interest favors the granting of a stay,

5    but plaintiffs must separately show that *they or other members of the class they represent* will

6    suffer irreparable harm absent a stay. *See Nken*, 556 U.S. at 426 (explaining that the stay inquiry

7    turns on "whether *the applicant* will be irreparably injured absent a stay" (emphasis added)); *cf.*

8    *Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("It is the role of courts to provide relief to claimants, in

9    individual or class actions, who have suffered, or will imminently suffer, actual harm."). Because

10   the detention class is limited to individuals who are or will be detained at 630 Sansome, conditions

11   of confinement at other facilities cannot support a finding of irreparable injury to class members.

12   Plaintiffs therefore have not carried their burden to show that present circumstances justify

13   a stay of ICE's 12-hour-waiver memo. The parties are ordered to meet and confer to discuss how

14   plaintiffs' APA challenge to the 12-hour-waiver memo can be most expeditiously resolved on its

15   merits.

16                                    **CONCLUSION**

17   For the foregoing reasons, plaintiffs' motion to provisionally certify the courthouse-arrest

18   and detention classes is GRANTED.

19   Plaintiffs' motion for a preliminary injunction concerning the conditions of confinement

20   relating to sleep, hygiene, and medical care at 630 Sansome is also GRANTED. During the

21   pendency of these proceedings, and absent a further order from this Court, defendants are hereby

22   ordered to:

23   (1)    Provide members of the provisionally certified Detention Class ("Detention Class

24          members") a bed, including a mattress and clean bedding (blanket, sheet, and

25          pillow), and provide additional blankets when requested, for any individual held

26          overnight or for more than 12 hours;

27   (2)    Provide Detention Class members held overnight or for more than 12 hours

28          sufficient space to sleep, without having to sleep in a toilet or bathroom area;

49

United States District Court
Northern District of California

(3) Dim lights in the hold room between 9 p.m. and 7 a.m.;

(4) Maintain hold rooms at comfortable temperatures;

(5) Conduct a basic medical screening by a medical professional on each Detention Class member prior to placing them in a hold room. Screening will be sufficient to identify and begin necessary treatment of those with mental or physical illness and injury; to provide access to prescription medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically handicapped;

(6) Provide prompt access to over-the-counter pain medication and, for any Detention Class member with a prescription for medication, the right to possess, receive, and retain their prescribed medication on their person at all times, consistent with the prescription;

(7) Provide prompt access to medical care when requested by a Detention Class member, regardless of the language spoken to make the request, including access to the services of licensed medical personnel, without charge, between the hours of 7 a.m. and 9:30 p.m. In the case of emergencies, respond immediately and provide access to emergency medical care at all times;

(8) Consistent with Directive 11087.2, provide Detention Class members with limited English proficiency with written materials in Spanish outlining the process for requesting medical attention in their primary language. If a Detention Class member is illiterate, or has limited English and Spanish proficiency and speaks a language in which written material has not been translated, Defendants will provide in-person or telephonic oral translation of the process for requesting medical attention;

(9) Provide adequate supplies of hygiene products to each Detention Class member including one bar of soap or equivalent, a toothbrush, toothpaste, a comb or hair brush, a small towel or hygienic wipes, and, for any Hold Room containing any

50

1    women, feminine hygiene supplies. Individuals must be permitted to keep the

2    provided hygiene products on their person;

3    (10)    Provide any Detention Class member held overnight a change of clean clothes,

4    including clean socks and undergarments;

5    (11)    Perform thorough cleaning services in any occupied Hold Rooms performed at

6    least once per day.

7    (12)    Provide written notice in English and Spanish to any Detention Class member in a

8    Hold Room, within one hour of their arrival, informing them of their right to the

9    provisions noted herein;

10    (13)    If a Detention Class member is illiterate or has limited English and Spanish

11    proficiency and speaks a language in which written material (including the notice

12    of rights required in paragraph (12) above) has not been translated, provide in-

13    person or telephonic oral translation, including for all ICE- and facility-related

14    information and communications.

15    Defendants are also ordered not retaliate in any manner against a Detention Class member for

16    complaining about any alleged violation of this order.

17    Plaintiffs' motion for a stay of ICE's 12-hour-waiver memo is DENIED.

18

19    **IT IS SO ORDERED.**

20    Dated: November 25, 2025

21

22

23    P. Casey Pitts
     United States District Judge

24

25

26

27

28

United States District Court
Northern District of California