Mark L. Hejinian (SBN 281417)
ef-mlh@cpdb.com
Marcia V. Valente (SBN 321852)
ef-mvv@cpdb.com
David C. Beach (SBN 226972)
ef-dcb@cpdb.com
Charmaine G. Yu (SBN 220579)
ef-cgy@cpdb.com
Evan G. Campbell (SBN 342223)
ef-egc@cpdb.com
Darien Lo (SBN 347244)
ef-dxl@cpdb.com
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, CA  94104
Telephone: (415) 391-4800

Neil K. Sawhney (SBN 300130)
nsawhney@aclunc.org
Lauren M. Davis (SBN 357292)
ldavis@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

Marissa Hatton (SBN 348678)
mhatton@lccrsf.org
Andrew Ntim (SBN 347084)
antim@lccrsf.org
Jordan Wells (SBN 326491)
jwells@lccrsf.org
Nisha Kashyap (SBN 301934)
nkashyap@lccrsf.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 543-9444

Laura Victoria Sanchez (SBN 253736)
laura@carecensf.org
Tala Berardi Hartsough (SBN 230204)
tala@carecensf.org
CARECEN SF
3101 Mission Street, Suite 101
San Francisco, CA  94110
Telephone: (415) 642-4402

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

CARMEN ARACELY PABLO SEQUEN, YULISA ALVARADO AMBROCIO, MARTIN HERNANDEZ TORRES, and LIGIA GARCIA,

Plaintiffs,

v.

SERGIO ALBARRAN, MARCOS CHARLES, THOMAS GILES, MONICA BURKE, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, TODD M. LYONS, SIRCE E. OWEN, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION AND REVIEW, UNITED STATES OF AMERICA

Defendants.

Case No. 5:25-CV-06487-PCP-NC

**CLASS ACTION**

**STATEMENT OF RECENT DECISION REGARDING PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705**

Date:       December 9, 2025
Time:       10:00 a.m.
Crtrm.:     8

Trial Date:              None Set

STATEMENT OF RECENT DECISION REGARDING PLAINTIFFS' MOTION FOR STAY OF AGENCY
ACTION UNDER 5 U.S.C. § 705

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

Pursuant to Civil Local Rule 7-3(d)(2), Plaintiffs hereby submit this Statement of Recent Decision relevant to Plaintiffs' Motion For Stay Of Agency Action Under 5 U.S.C. § 705 (ECF No. 94), set for hearing on December 9, 2025. Attached as **Exhibit A**, please find the United States Court of Appeals for the District of Columbia Circuit Order Denying Appellants' Motion for an Administrative Stay and Granting in Part and Denying in Part Appellants' Motion for a Stay Pending Appeal entered on November 22, 2025, in *Make the Road New York, et al. v. Kristi Noem, et al.* (No. 25-5320).  *See id.* at 73-79 (Statement of Circuit Judges Millett and Childs, discussing scope of Section 705 stay order).

DATED:  December 5, 2025          LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE
                                  SAN FRANCISCO BAY AREA

By:     /s/ Marissa Hatton
        MARISSA HATTON
        ANDREW NTIM
        JORDAN WELLS
        NISHA KASHYAP
        Attorneys for Plaintiffs

CARECEN SF

DATED:  December 5, 2025

By:     /s/ Laura Victoria Sanchez
        LAURA VICTORIA SANCHEZ
        TALA BERARDI HARTSOUGH
        Attorneys for Plaintiffs

/ / /
/ / /
/ / /
/ / /
/ / /

STATEMENT OF RECENT DECISION REGARDING PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

1  DATED:  December 5, 2025          AMERICAN CIVIL LIBERTIES UNION
2                                    FOUNDATION OF NORTHERN CALIFORNIA

3

4                                    By:      /s/ Neil K. Sawhney
5                                             NEIL K. SAWHNEY
                                             LAUREN M. DAVIS
6                                             Attorneys for Plaintiffs

7

8  DATED:  December 5, 2025          COBLENTZ PATCH DUFFY & BASS LLP
9

10

11                                   By:      /s/ Mark L. Hejinian
12                                            MARK L. HEJINIAN
                                             MARCIA V. VALENTE
13                                            DAVID C. BEACH
                                             CHARMAINE G. YU
14                                            EVAN G. CAMPBELL
                                             DARIEN LO
15                                            Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF RECENT DECISION REGARDING PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705**

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

1

## ATTESTATION

2      I, Mark L. Hejinian, am the ECF user whose identification and password are being used to

3  file the STATEMENT OF RECENT DECISION REGARDING PLAINTIFFS' MOTION FOR

4  STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705. In compliance with LR 5-1(i)(3), I

5  hereby attest that all parties have concurred in this filing.

6

7  DATED:  December 5, 2025                COBLENTZ PATCH DUFFY & BASS LLP

8

9
                                    By:    /s/ Mark L. Hejinian
10                                        MARK L. HEJINIAN
                                        Attorneys for Plaintiffs
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF RECENT DECISION REGARDING PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705**

# EXHIBIT A

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5320**                                    **September Term, 2025**

**1:25-cv-00190-JMC**

**Filed On:** November 22, 2025

Make The Road New York, et al.,

        Appellees

     v.

Kristi Noem, Secretary of the U.S.
Department of Homeland Security, in her
official capacity, et al.,

        Appellants

**BEFORE:**    Millett\*, Rao\*\*, and Childs\*, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for an administrative stay and a stay pending appeal, the opposition thereto, and the reply, it is

**ORDERED** that the motion for an administrative stay be denied and the motion for a stay pending appeal be granted in part and denied in part.   For the reasons stated in the attached statement of Circuit Judges Millett and Childs, the motion for a stay pending appeal of the district court's order is denied except to the extent that the district court's order required any changes to the procedures for determining credible fear of harm upon removal for those individuals who qualify for expedited removal.

### Per Curiam

                         **FOR THE COURT:**
                         Clifton B. Cislak, Clerk

         BY:    /s/
                  Michael C. McGrail
                  Deputy Clerk

\* A statement of Circuit Judges Millett and Childs is attached.
\*\* A dissenting statement of Circuit Judge Rao is attached.

Statement of MILLETT and CHILDS, *Circuit Judges*:  As a general matter, federal law affords individuals present in the United States whom the government charges as being removable the right to a hearing before an immigration judge, whose decision is then subject to review by the Board of Immigration Appeals and then by a federal court of appeals. *See* 8 U.S.C. §§ 1229, 1229a, 1252; 8 C.F.R. §§ 1003.1–1003.3.  At the hearing before the immigration judge, individuals can demonstrate a legal right to remain in the United States or can seek asylum, withholding of removal, Convention Against Torture withholding, or any other relevant protection against removal.  *See* 8 U.S.C. § 1229a; 8 C.F.R. §§ 208.16–208.17, 1208.4, 1208.13, 1208.16–1208.17, 1240.10–1240.11; *see also Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2280–2283 (2021) (discussing the process).

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress authorized (initially) the Attorney General and (now) the Secretary of the Department of Homeland Security to apply "Expedited Removal" procedures to certain individuals who have been unlawfully present in the United States for less than two continuous years.  8 U.S.C. § 1225(b)(1)(A)(iii)(II); *see* 6 U.S.C. § 557 (transferring this authority from the Attorney General to the Department of Homeland Security).[1]

---

[1]  The statute excludes from Expedited Removal those persons who have "affirmatively shown, to the satisfaction of an immigration officer, that [they] ha[ve] been physically present in the United States continuously for the [preceding] 2-year period[.]"  8 U.S.C. § 1225(b)(1)(A)(iii)(II).  For ease of reference, this opinion generally refers to that category as individuals who have been continuously present for at least two years, since the central issue in this case is whether the Department's current procedures afford them a reasonable opportunity to make the affirmative showing of continuous presence on which the exception is predicated.

2

"Expedited removal lives up to its name." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020) ("*Make the Road I*"). If a single immigration officer determines that a person is subject to Expedited Removal, that "officer shall order the alien removed * * * without further hearing or review[.]" 8 U.S.C. § 1225(b)(1)(A)(i). But if that person articulates "an intention to apply for asylum" or a "fear of persecution[,]" she will be referred for additional processing before an asylum officer and, potentially, an immigration judge to determine whether she has a "credible fear of persecution[.]" *See id.* § 1225(b)(1)(A)(i), (b)(1)(B)(ii) & (iii). The credible-fear review by an immigration judge is designed to "be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours[.]" *Id.* § 1225(b)(1)(B)(iii)(III). With limited exceptions, no administrative or judicial review follows. *See id.* §§ 1225(b)(1)(B)(iii)(III) & (b)(1)(C), 1252(a)(2)(A)(iii).

For decades, the government limited its application of Expedited Removal to (1) persons who, within fourteen days of arriving in the United States, are encountered within 100 air miles of a land border, and (2) persons arriving by sea. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004) ("2004 Designation"); Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924 (Nov. 13, 2002) ("2002 Designation").

Officials have long expressed concern about applying Expedited Removal more broadly because of the logistical barriers to ensuring Expedited Removal applies—as statutorily required—only to persons who have not shown at least two years of continuous presence in the United States. *See* 2004 Designation, 69 Fed. Reg. at 48,879 (explaining that the

3

Department will "implement only that portion of the authority granted by [IIRIRA] that bears close temporal and spatial proximity to illegal entries at or near the border"); Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10,312, 10,313 (March 6, 1997) ("1997 Designation") ("[A]pplication of the expedited removal provision to aliens already in the United States will involve more complex determinations of fact and will be more difficult to manage[.]"); Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16,022, 16,024 (March 21, 2022) ("2022 Designation") (noting that expanding Expedited Removal "would involve complex new challenges for the ICE workforce" and "would require time- and fact-intensive training for all current officers, agents, and supervisors").

On January 21, 2025, the Acting Secretary of Homeland Security extended Expedited Removal nationwide to encompass all persons encountered anywhere in the United States who, upon detention, cannot prove their continuous presence in the United States during the preceding two years. Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139, 8,140 (Jan. 24, 2025) (effective date Jan. 21, 2025) ("Expansion Order"). That Expansion Order extended the Expedited Removal scheme to a new and far-reaching geographic area that sweeps in major population centers such as Atlanta, Chicago, Dallas, Los Angeles, New York City, and St. Louis.

The Expansion Order, as well as guidance issued by the Acting Secretary two days later, decided that Department personnel should apply across the United States the same truncated systems and procedures the Department had been applying at the sea coasts and within 100 air miles of the land border. *See* Dep't of Homeland Sec., Memorandum from Acting Secretary Benjamine C. Huffman on Guidance

4

Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) ("Huffman Memorandum"). Those procedures ask detained individuals only if they have a fear of harm if removed from the United States. *See* 8 C.F.R. § 235.3(b)(2)(i); Steinberg Decl. at 94, ECF No. 50-23 (Form I-867AB). They do not ask if the individual has been present in the United States for two or more years. Nothing in the record shows that detained individuals are afforded an opportunity to dispute whether they statutorily qualify for Expedited Removal or to obtain evidence for submission to immigration officers of their two-year continuous presence in the United States before their removal. Nor do the procedures provide a process for immigration officers to consider or review a claim of continuous two-year presence. *Compare* 8 C.F.R. § 235.3(b)(4), *with id.* § 208.30 (process for credible-fear evaluation). Quite the opposite. The district court found that individuals subjected to Expedited Removal are generally ordered removed "within a few days, if not hours" of encountering an immigration officer. *Make the Road N.Y. v. Noem*, No. 25-cv-190, 2025 WL 2494908, at *3 (D.D.C. Aug. 29, 2025).

Make the Road New York, an advocacy organization with members subject to and directly affected by the Expansion Order, filed suit challenging the systems and procedures adopted to implement the expanded Expedited Removal program on statutory and constitutional grounds. The district court preliminarily stayed the effective dates of the Expansion Order and Huffman Memorandum pending litigation on the ground that they deprive detained individuals of constitutional due process. The Department appealed and seeks a stay of the district court's order pending appeal.

We grant the government's motion in part and deny it in part. The Department is likely to succeed in showing that the

5

systems and procedures employed to evaluate detained individuals' claims of credible fear are constitutionally sufficient. But the Department is not likely to succeed in showing that its systems and procedures are constitutionally adequate to provide detained individuals an opportunity to demonstrate their ineligibility for removal on the ground that they have resided in the United States continuously for two or more years, or to otherwise ensure that Expedited Removal operates within its statutorily delimited bounds.

For those reasons, we deny the Department's motion for a stay pending appeal of the district court's order suspending the effective dates of those portions of the Expansion Order and Huffman Memorandum that establish the system for determining eligibility for Expedited Removal. We grant a stay to the extent that the district court's order required any changes to the procedures for determining credible fear of harm upon removal for those individuals who qualify for Expedited Removal.

## I

### A

When Congress enacted IIRIRA in 1996, it overhauled immigration enforcement by establishing two distinct procedures for removing individuals found to be unlawfully present.

The default mechanism for removal is known as "Section 240" proceedings, named for the section of the Act in which it appears. These proceedings are formal, adversarial hearings before an immigration judge, an employee of the Department of Justice who must be an attorney and who bears an affirmative duty to develop the record. 8 U.S.C. § 1229a(a)(1),

6

(b)(1); 8 C.F.R. § 1003.10(a). The individual charged as removable may retain counsel, present evidence, examine witnesses, and challenge the government's evidence. 8 U.S.C. § 1229a(b)(4)(B). Any adverse decision is subject to administrative and judicial review. 8 C.F.R. §§ 1240.15, 1003.1; 8 U.S.C. § 1252.

Congress also created a far more abbreviated process called Expedited Removal. 8 U.S.C. § 1225(b)(1). The government can apply Expedited Removal to two groups of individuals. First, Expedited Removal applies to persons who are "arriving in the United States[.]" 8 U.S.C. § 1225(b)(1)(A)(i). Department regulations define "arriving" as "seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters[.]" 8 C.F.R. § 1.2. Second, the Secretary can designate for Expedited Removal "any or all aliens" who have not been admitted or paroled and have not "affirmatively shown" to an immigration officer's satisfaction that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of the inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(iii)(II); *see also* 6 U.S.C. § 557 (transferring this designation authority from the Attorney General to the Department of Homeland Security).

Unlike Section 240 proceedings, Expedited Removal occurs before an immigration officer, not an immigration judge. 8 U.S.C. § 1225(b)(1)(A). The immigration officer interviews the individual to determine "identity, alienage, and inadmissibility," as well as whether the individual intends to apply for asylum, fears persecution or torture, faces harm from removal, or fears returning to their country of origin. 8 C.F.R. § 235.3(b)(2)(i), (b)(4). The officer informs the individual of

7

the importance of sharing any fears of persecution, harm, or torture upon removal, and then asks only four questions:

> 1. Why did you leave your home country or country of last residence?
> 2. Do you have any fear or concern about being returned to your home country or being removed from the United States?
> 3. Would you be harmed if you are returned to your home country or country of last residence?
> 4. Do you have any questions or is there anything else you would like to add?

Steinberg Decl. at 94, ECF No. 50-23. If the person seeks admission at a port of entry, the officer must decide whether the individual is inadmissible for fraud or for lacking valid entry documents. 8 U.S.C. § 1225(b)(1)(A)(i)–(ii); *id.* § 1182(a)(6)(C), (a)(7). Unless the individual claims to have United States citizenship, lawful permanent residence, refugee status, or asylum, or expresses an intention to apply for asylum or a fear of persecution, *see id.* § 1225(b)(1)(A)(i), (b)(1)(C), the officer "shall" order removal "without further hearing or review[,]" *id.* § 1225(b)(1)(A)(i). The safeguards are minimal. The individual is detained and is not offered an opportunity to secure counsel or to gather relevant evidence. 8 C.F.R. § 235.3(b)(2)(i)–(ii). The officer's determination is reviewed only on paper by a supervisor and is not subject to administrative appeal. *Id.*

If an intention to apply for asylum or a fear of persecution is expressed, the case is referred for a "credible fear" interview. 8 U.S.C. § 1225(b)(1)(A)(i)–(ii). At the interview, the applicant must demonstrate a "significant possibility" of establishing eligibility for asylum. 8 U.S.C. § 1225(b)(1)(B)(v). Detention generally continues throughout

8

the process, 8 C.F.R. § 235.3(b)(4)(ii), and the interview is often conducted by telephone even though credibility is commonly a central question. 8 U.S.C. § 1225(b)(1)(B)(v). Those who make the required endangerment showing are placed into regular Section 240 proceedings. *Id.* § 1225(b)(1)(A)(ii), (b)(1)(B)(ii). Those who do not may seek limited review by an immigration judge, but that hearing narrow in scope and not subject to further administrative or judicial review. *Id.* §§ 1225(b)(1)(B)(iii)(II)–(III), 1252(a)(2)(A)(iii).

The regulations themselves offer only a few additional opportunities for an individual to show their ineligibility for Expedited Removal. During the initial interview, a person may claim to have been lawfully admitted for permanent residence, admitted as a refugee, granted asylum, or to be a U.S. citizen. 8 C.F.R. § 235.3(b)(5)(i). If the officer can verify any of those claims, the individual will not be removed. *Id.* § 235.3(b)(5)(ii)–(iv). If the officer cannot verify the claim but the individual makes it under penalty of perjury, the case must be referred to an immigration judge. *Id.* § 235.3(b)(5)(iv). The regulations also require that individuals be given a "reasonable opportunity" to demonstrate that they were admitted or paroled following inspection at a port of entry. *Id.* § 235.3(b)(6). If they establish lawful admission or parole, the agency then determines whether that status "has been, or should be, terminated." *Id.* If ineligibility is not established, the individual "will be ordered removed pursuant to" the Expedited Removal provision. *Id.*

A central feature of the Expedited Removal process is the near-total absence of judicial review. Congress provided that "no court shall have jurisdiction to review" Expedited Removal determinations except as expressly permitted under a narrow

9

set of provisions.  8 U.S.C. § 1252(a)(2)(A).  Under subsection (e), two limited forms of judicial review are available.

First, an individual may file a habeas petition, but the statute confines that proceeding to reviewing whether the petitioner (1) is a noncitizen, (2) was ordered removed under the Expedited Removal provision, and (3) can prove lawful admission, refugee status, or a grant of asylum.  *Id.* § 1252(e)(2).

Second, individuals may bring challenges to the validity of the statute itself or to any regulation, policy, or written directive implementing it.  8 U.S.C. § 1252(e)(3)(A).  These "[c]hallenges on validity of the system" may contest either the constitutionality of the statute or whether a regulation, policy, or directive is inconsistent with the law or Constitution.  *Id.* Such actions must be filed within sixty days of implementation, *id.* § 1252(e)(3)(B), may not proceed as class actions, *id.* § 1252(e)(1)(B), and must be filed in the United States District Court for the District of Columbia, *id.* § 1252(e)(3)(A).

## B

In IIRIRA, Congress authorized the Secretary of Homeland Security to extend Expedited Removal to individuals who have not been admitted or paroled into the United States, and who have not shown continuous presence in the United States for at least two years.  8 U.S.C. § 1225(b)(1)(A)(iii)(I)–(II).  Yet for more than two decades, the authority to apply Expedited Removal far beyond the land and sea borders lay dormant as successive administrations declined to invoke it to its full extent.  *See* Steinberg Decl. at 226, ECF No. 50-23.

10

That caution was deliberate. The Executive Branch has long recognized that applying Expedited Removal away from the border area raised serious concerns about accuracy and administrability. *See* Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997) ("[A]pplication of the expedited removal provisions to aliens already in the United States will involve more complex determinations of fact and will be more difficult to manage[.]"). Determining when and how a person entered the United States is far more complex in the interior than at a port of entry. Acknowledging that reality, the Secretary initially confined the process to "arriving" individuals—those seeking admission or transit at a port of entry or interdicted at sea. *Id.* at 10,312–10,313, 10,330. The agency even rejected a proposal to include individuals present for less than twenty-four hours, citing the difficulty of establishing unlawful entry or the time of arrival. *Id.* at 10,313.

The program expanded only gradually from there. In 2002, the Department of Homeland Security extended Expedited Removal to foreign individuals who arrived by sea and had been in the country for less than two years. *See* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924, 68,925–68,926 (Nov. 13, 2002) ("2002 Designation"). Two years later, the agency broadened the policy again to include foreign individuals encountered within fourteen days of entry and "within 100 air miles of any U.S. international land border." *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877, 48,879 (Aug. 11, 2004). Apart from a limited expansion covering certain Cuban nationals, that 2004 designation defined the scope of Expedited Removal for the next fifteen years. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409, 35,413 (July 23, 2019) ("2019 Designation"); *see also* Eliminating Exception to

11

the Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4,902, 4,904 (Jan. 17, 2017).

In 2019, the Department sought to exercise the full statutory authority for the first time. It authorized Expedited Removal for all covered individuals present in the United States for less than two years. *See* 84 Fed. Reg. at 35,413–35,414. But that expansion proved short-lived. Because of repeated changes in regulatory guidance and litigation challenges, the Designation was in effect for only roughly seven months before it was rescinded. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. at 16,022, 16,022 (March 21, 2022).[2]

_____

[2] *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16,022, 16,022 (March 21, 2022); *see also id.* at 16,024 ("The fact that the expanded expedited removal authority [under the 2019 Designation] was used so rarely by ICE officers during the approximately one year that it was available to them reflects the operational complexities and limited utility that it presented in practice."); *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 72 (D.D.C. 2019) (enjoining the 2019 Designation on September 27, 2019); *Make the Road I*, 962 F.3d at 618 (reversing and remanding the grant of preliminary injunction on June 23, 2020); Mandate of USCA, *Make the Road N.Y. v. McAleenan*, 19-cv-2369 (D.D.C. Sept. 30, 2020), ECF No. 49 (mandate in *Make the Road I* issuing on September 30, 2020); Dep't of Homeland Sec., Memorandum from Senior Official Tony H. Pham Performing the Duties of the Director on Superseding Implementation Guidance for July 2019 Designation of Aliens Subject to Expedited Removal (Oct. 2, 2020) (ICE guidance limiting the application of the 2019 Designation to individuals who had arrived before that designation's publication); Exec. Order No. 14010, 86 Fed. Reg. 8,267 (Feb. 2, 2021) (directing the Department to "review and consider whether to modify, revoke, or rescind the

12

For nearly two decades, then, Expedited Removal remained a tool deployed almost exclusively at the sea coasts and borders and their vicinity.

That longstanding approach ended on January 21, 2025, when Acting Secretary Benjamine Huffman issued a new designation authorizing Expedited Removal for foreign individuals arrested anywhere in the United States who could not show "to the satisfaction of an immigration officer" continuous presence for the preceding two years. Expansion Order, 90 Fed. Reg. at 8,139. Two days later, the Department issued implementing guidance instructing officers to consider Expedited Removal for any individual "amenable" to it. Huffman Memorandum at 2.

## C

On March 22, 2025, Make the Road New York, a nonprofit, membership-based organization serving immigrant and working-class communities—joined with Mary and John Doe to challenge the Expansion Order and Huffman Memorandum on statutory and due process grounds. Amended Complaint ¶¶ 10, 11, ECF No. 27 ("Am. Compl."). Make the Road provides legal, educational, health, and community services to low-income and immigrant New Yorkers. Fontaine Decl. ¶¶ 2, 7, ECF No. 50-2. Its self-described mission is "to build the power of immigrant and working-class communities to achieve dignity and justice." *Id.* ¶ 3. With more than 28,000 members in the New York area, Make the Road sued on behalf of its members, which include individuals who have been

---

[2019] designation]"); Response to Order to Show Cause, *Make the Road N.Y. v. McAleenan*, 19-cv-2369 (D.D.C. Feb. 4, 2021), ECF No. 75 (Department representing to the district court on February 4, 2021 that it was no longer enforcing the 2019 designation).

13

continuously present in the United States for more than two years, as well as some who have been here for more than fourteen days but less than two years. In that way, Make the Road represents the breadth of individuals adversely affected by the Expansion Order and Huffman Memorandum. Am. Compl. ¶¶ 12, 13, 102.

The individual plaintiffs, Mary and John Doe, have been directly affected by the policy's new reach. A mother and son who lawfully entered the United States through a port of entry and built a life here over the course of a decade were nevertheless removed under the new policy. Am. Compl. ¶¶ 12, 13. The district court noted that:

> While detained, Mary and John were not allowed to make any calls or contact an attorney. By 9 AM the next day, they were issued a Notice and Order of Expedited Removal. They were never asked or given the option to sign [their] deportation orders, and were instead taken to a border bridge in a car and told to walk across.

*Make the Road N.Y.*, 2025 WL 2494908, at \*7 (formatting modified). Their experience, Make the Road contends, is emblematic of a broader pattern in which the Department applied Expedited Removal to individuals to whom Expedited Removal cannot, under IIRIRA, apply. *See* Am. Compl. ¶¶ 12, 13, 102.

The district court found that the Department did not initially implement the Expansion Order and Huffman Memorandum on a large scale. *Make the Road N.Y.*, 2025 WL 2494908, at \*5. But beginning in May 2025, "enforcement efforts significantly ramped up." *Id.* The agency set a goal of "3,000 immigration arrests each day[,]" including many

14

individuals already in regular removal proceedings—often those pursuing asylum or other relief. *Id.* To achieve that end, the Department has repeatedly carried out arrests at immigration hearings. *Id.* The pattern is consistent: The Department first moves orally—and without advance notice— to terminate the individual's pending Section 240 proceedings. *Id.* The moment those proceedings are dismissed, agents seize the individual at the courthouse. They then place the person into Expedited Removal. *Id.* The Department has also launched workplace raids nationwide, describing them as part of a "new phase of the Trump administration's immigration crackdown." *Id.* at *6.

Faced with the accelerating enforcement campaign, Make the Road moved on June 10, 2025, to stay the Expansion Order and Huffman Memorandum under the Administrative Procedure Act ("APA"), 5 U.S.C. § 705. *See* Motion to Postpone Effective Date of Agency Action, ECF. No. 50, at 1. Section 705 authorizes district courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

In its motion, Make the Road argued, among other things, that the implementation of the Designation violates the Due Process Clause of the Fifth Amendment. Motion to Postpone Effective Date of Agency Action, ECF No. 50, at 13. The district court granted Make the Road's motion on that ground and issued a stay postponing the effective dates of the Expansion Order and Huffman Memorandum. *Make the Road N.Y.*, 2025 WL 2494908, at *23. The district court concluded that individuals subject to Expedited Removal possess a substantial liberty interest in remaining in the United States. *Id.* at *13–18. It further found that the risk of erroneous deprivation under the policy was unacceptably high. *Id.* at

15

*14–18.  The Department's procedures, the court explained, were "woefully inadequate" for determining whether an individual had been continuously present for two years.  *Id.* at *16.  The district court also found that the Department's procedures were similarly deficient in ensuring that individuals expressing a fear of return were referred for credible fear interviews, and in guaranteeing that those found to have a credible fear were placed into full removal proceedings.  *Id.* at *14–15.  The district court did not address Make the Road's other claims because it found that Make the Road would likely succeed on the merits of its due process claim.  *Id.* at *9 n.13.

Finally, the court held that the Department's interest in summary removals could not outweigh the minimal burden of implementing "modest procedural safeguards"—such as asking about continuous presence, allowing individuals to contest removal, or permitting them to seek assistance from counsel or third parties in gathering evidence.  *Make the Road N.Y.*, 2025 WL 2494908, at *19.  The Department now asks this court to stay the district court's order pending appeal.

## II

To obtain a stay pending appeal of the district court's stay order, the Department must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal, (2) demonstrate that it is likely to be "irreparably injured" absent a stay, (3) show that the issuance of a stay will not "substantially injure the other parties interested in the proceeding[,]" and (4) establish that the "public interest" favors a stay.  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  The likelihood of success prong includes establishing the trial and appellate courts' jurisdiction.  *See Make the Road I*, 962 F.3d at 623.

16

We hold that that this court likely has appellate jurisdiction under 28 U.S.C. § 1292(a)(1), but the question is difficult under the factors outlined by the Supreme Court in *Carson v. American Brands, Inc.*, 450 U.S. 79 (1981). The Department is unlikely to succeed in showing that Make the Road lacks associational standing, or that the time for filing set out at 8 U.S.C. § 1252(e)(3)(B) bars this suit. In addition, the prohibition in 8 U.S.C. § 1252(f)(1) on issuing injunctive relief in certain immigration lawsuits likely does not apply to the district court's temporary Section 705 stay of the Expansion Order's and Huffman Memorandum's effective dates.

## III

Together, the Department's Expansion Order and Huffman Memorandum contain three programmatic choices, two of which are relevant to this stay motion.

First, the Expansion Order extended the category of persons eligible for Expedited Removal to include all "[a]liens who did not arrive by sea, who are encountered anywhere in the United States [and] * * * who have been continuously present in the United States for less than two years." Expansion Order, 90 Fed. Reg. at 8,139. That judgment to expand the scope of Expedited Removal, by itself, is committed to agency discretion, *Make the Road I*, 962 F.3d at 618, and is not at issue here.

Second, the Department made the decision to apply only its preexisting procedures, formulated for application within 100 air miles of a land border or to those arriving on the sea, to determine whether an individual found anywhere in the United States is statutorily eligible for Expedited Removal, even though those procedures do not ask about or consider the length of an individual's continuous residence. *See* Expansion Order,

17

90 Fed. Reg. at 8,140; Huffman Memorandum at 2. This opinion refers to those procedures as the "Eligibility System."

Third, the Department of Homeland Security elected to apply its existing credible-fear screening procedures for individuals covered by the Expansion Order and found to be statutorily eligible for Expedited Removal. *See* Expansion Order, 90 Fed. Reg. at 8,140; Huffman Memorandum at 2. We shall refer to those procedures as the "Credible Fear Procedures."

But before analyzing the likely merits of the Department's position, we must address five threshold procedural issues.

**A**

Although Make the Road has not contested our appellate jurisdiction over the Department's stay application, we have an "independent obligation" to address our jurisdiction. *New Jersey v. EPA*, 989 F.3d 1038, 1045 (D.C. Cir. 2021) (citations omitted).

Generally, this court's jurisdiction over appeals from district court judgments is limited to those courts' "final decisions[.]" 28 U.S.C. § 1291. There is an exception to that requirement of finality for "interlocutory orders * * * granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions[.]" 28 U.S.C. § 1292(a)(1). While that statutory language focuses on review of injunctions, the Supreme Court and this court have extended its reach to include district court orders that have a "practical effect" analogous to the granting or denying of an injunction. *Carson*, 450 U.S. at 83; *see Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d 1258, 1261–1262 (D.C. Cir. 2012).

18

To establish a qualifying "practical effect," the Department must show that the order "might have a serious, perhaps irreparable consequence" and "can be effectually challenged only by immediate appeal." *Carson*, 450 U.S. at 84 (formatting modified); *see A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (2025) (citing *Carson*, 450 U.S. at 84); *see also A.A.R.P.*, 145 S. Ct. at 1367 ("A district court's inaction in the face of extreme urgency and a high risk of 'serious, perhaps irreparable,' consequences may have the effect of refusing an injunction.") (citation omitted).

This court has never considered whether the "practical effects" aspect of Section 1292(a)(1)'s grant of appellate jurisdiction applies to Section 705 stays under the APA, 5 U.S.C. § 705, and neither party briefed the issue. While the question is analytically close and difficult, we conclude at this preliminary juncture that the Department is likely to establish that this court has appellate jurisdiction, for three reasons.

*First*, for the vast majority of Section 705 stays, Section 1292(a)(1) would provide the only avenue for appellate review. While Congress vested courts with the authority to enter stays of agency action under Section 705 of the APA, nothing in that Act provides for appellate review of such orders, which is unsurprising since the Act itself "is not a jurisdiction-conferring statute." *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006). Nor would a stay like this one, which just preserves the parties' relative positions pending litigation based on a preliminary assessment of the merits, be likely to qualify as an appealable collateral order. *See Swint v. Chambers County Comm'n*, 514 U.S. 35, 41–42 (1995) (to qualify for appeal, a collateral order must, among other things, "resolve important questions separate from the merits") (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S 541, 546

19

(1949)); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106–107 (2009).

Interlocutory appeal under 28 U.S.C. § 1292(b) appears to be of no help either because it requires, among other things, the district court's order to have addressed a "controlling question of law[,]" the resolution of which would "materially advance the ultimate termination of the litigation[.]" The decision to enter a Section 705 stay only tentatively forecasts, rather than resolves, a controlling question of law, and review of it would be unlikely to materially advance the conclusion of litigation given that the appellate court would likely review only the decision to enter the stay in the first place.

In addition, it would be quite difficult to obtain review of a Section 705 stay under the All Writs Act's mandamus standard, 28 U.S.C. § 1651, not only because of the stringent and exceptional limitations on that form of relief, but also because appellate review at the end of the district court litigation would remain an adequate alternative avenue for relief in almost all cases. *See In re National Nurses United*, 47 F.4th 746, 752–753 (D.C. Cir. 2022).

Because nothing in the APA suggests that Congress meant to immunize Section 705 stays from review—and we would not presume such intent without clearer indication—the "practical effects" doctrine under Section 1292(a)(1) seems to be the most appropriate vehicle for reviewing the district court's entry of such an order.

*Second*, the Supreme Court in *Carson* held that a "practical effects" order can be appealed only if it "might have a serious, perhaps irreparable consequence," and "can be effectually challenged only by immediate appeal." 450 U.S. at 84 (internal quotation marks omitted); *see also A.A.R.P*, 145 S. Ct. at 1367.

20

In assessing jurisdiction, this court generally assumes that the party invoking the court's jurisdiction will succeed on the merits before this court. *Cf. Center for Regulatory Reasonableness v. EPA*, 849 F.3d 453, 454 n.1 (D.C. Cir. 2017) (noting that this court "generally will assume the merits" when analyzing jurisdiction); *Tanner-Brown v. Haaland*, 105 F.4th 437, 445 (D.C. Cir. 2024) ("[W]e must consider standing separately from the merits by assuming that the plaintiff will ultimately prevail on her legal theory.").

The Department argues in seeking a stay that the district court's order materially interferes with its enforcement of the immigration laws. *See* Dep't Stay Mot. 25. If we assume—for purposes of establishing jurisdiction only—that the Department will prevail on its appeal, then its inability to implement a law-enforcement statute "might have a serious * * * consequence" for purposes of the second prong of the *Carson* test, 450 U.S. at 84; *see Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025) (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).[3]

The more difficult question is whether the third *Carson* factor—a showing that the legal issue can be effectually challenged only by immediate appeal, *Carson*, 450 U.S. at 84—has been met. To the extent that factor echoes the *Cohen* and *Mohawk* requirement that later appellate review would be unavailable or that delaying review "would imperil 'a substantial public interest' or 'some particular value of a high order[,]'" *Mohawk Indus.*, 558 U.S. at 107 (quoting *Will v. Hallock*, 546 U.S. 345, 352–353 (2006)), there is a substantial

---

[3] Our assumption that the Department will prevail in its appeal pertains to our jurisdictional analysis only. The Department still must show irreparable harm to obtain a stay pending appeal. *See* Section V, *infra*.

21

question whether that is met in this case, especially since the Department did not argue the issue. *See id.* at 107 ("That a ruling may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment * * * has never sufficed.") (quoting *Digital Equip. Corp. v. Desktop Direct, Inc*, 511 U.S. 863, 872 (1994)); *Digital Equip. Corp.*, 511 U.S. at 872 ("[T]he mere identification of some interest that would be 'irretrievably lost' has never sufficed to meet the third *Cohen* requirement.") (citation omitted).

That said, the Supreme Court's recent decision granting review of the denial of a stay in another immigration removal case seemingly combined the "serious, perhaps irreparable consequences" prong and the imperative of immediate appeal in a manner that arguably supports jurisdiction here. *A.A.R.P.*, 145 S. Ct. at 1367.

*Third*, we note that three of our sister circuits have found Section 705 stays to be appealable under Section 1292(a)(1)'s "practical effects" doctrine under certain circumstances. *See, e.g.*, *Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 984 (9th Cir. 2025) (Section 705 stay had "practical effect" of injunction when "an adversarial hearing [was] held and the district court's basis for issuing the order [was] strongly challenged."); *Wyoming v. Department of Interior*, No. 18-8027, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) (unpublished) (Section 705 stay was appealable under Section 1292(a)(1) when it "effectively enjoin[ed] enforcement of [agency rule]"); *Alliance for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725, at *3 n.3 (5th Cir. Apr. 12, 2023) (unpublished) (Section 705 stay of FDA's approval of Mifepristone would have the "practical effect of an injunction" because it effectively removed the drug from the market). While not all of those cases discussed each of the *Carson* stay factors, we are aware of no court of appeals holding that

22

Section 705 stays are not appealable under 28 U.S.C. § 1292(a)(1).

For all of those reasons, we tentatively find *Carson*'s "practical effects" factors sufficiently satisfied in this case to allow this court to resolve the Department's request for a stay.

## B

The Department insists that Make the Road lacks associational standing to challenge any erroneous application of Expedited Removal under the Expansion Order to foreign individuals who have continuously resided in the United States for more than two years.  Dep't Stay Mot. 22–23.  It argues that Make the Road has not alleged that any member with at least two years of continuous physical presence has been, or is likely to be, placed in Expedited Removal.  *Id.* at 22.  Not so.

"An organization has associational standing to bring suit on its members' behalf when:  (1) at least one of its members would have standing to sue in his or her own right; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)).

The first requirement asks whether at least one Make the Road member would have standing individually.  *Sierra Club*, 827 F.3d at 65.  That means showing that the member (1) "suffered an injury in fact that is concrete, particularized, and actual or imminent"; (2) "the injury was likely caused by the defendant"; and (3) "the injury would likely be redressed

23

by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

We begin with whether Make the Road's members who have continuously resided here for more than two years satisfy those criteria. They do.

Make the Road's Co-Executive Director attests that the organization has "many members who have been present for greater than two years[.]" Fontaine Decl. ¶ 41, ECF No. 50-2. The district court found that such members "would have difficulty affirmatively demonstrating two years of [continuous] physical presence, particularly if suddenly detained or given only a short period of time to do so." *Make the Road N.Y.*, 2025 WL 2494908, at *18 (quotation marks omitted). Because Make the Road has not shown that any of these members are presently in Expedited Removal proceedings, the relevant question is whether it has nevertheless shown that such members are likely to face Expedited Removal and thus suffer imminent injury. It has.

First, the record shows the Department is actively enforcing the Expansion Order—a point it does not contest. *See Make the Road N.Y.*, 2025 WL 2494908, at *5 (citing Steinberg Decl. at ¶ 300, ECF No. 50-23) ("[T]he Government set a goal [in May 2025] of making 3,000 immigration arrests each day."); *see also id.* at *6 ("[Two thousand] immigrants *per day* were arrested during the first week in June.") (formatting modified). Further support appears in the Huffman Memorandum itself, where the Department directed officials to consider Expedited Removal for "*any alien* [the Department] is aware of who is amenable to expedited removal but to whom expedited removal

24

has not been applied[.]" Huffman Memorandum at 2 (emphasis added).

The record equally shows that the Department has chosen to do so without any procedures in place to consider the length of residence—that is, to determine whether detained individuals are even statutorily eligible for Expedited Removal because they were not able to demonstrate at least two years of continuous residency. Dep't Stay Mot. 23 ("[T]here is no distinct protocol for assessing continuous presence and no express prompt on Form I-867A for immigration officers to expressly ask" about continuous presence.).

We have long recognized that "[t]he prospect of future injury becomes significantly less speculative where, as here, plaintiffs have identified concrete and consistently[ ] implemented policies claimed to produce such injury." *In re Navy Chaplaincy*, 697 F.3d 1171, 1176–1177 (D.C. Cir. 2012). And in *Make the Road I*, we accepted the district court's conclusion that there is nothing "speculative about a threatened injury if the one who makes the threat simultaneously and unequivocally states that he intends to inflict the threatened harm as soon as possible and without further warning" on those subject to the policy. 962 F.3d at 622; *see also id.* at 627–628.

Second, Make the Road has offered evidence of erroneous Expedited Removals of two members who have been continuously present for more than two years—"confirming that this risk exists for [Make the Road's] members who have been present for longer than two years." *Make the Road N.Y.*, 2025 WL 2494908, at *6; *see id.* at *7 (explaining that members "Plaintiffs Mary and John[,]" who have over two years of continuous presence but were summarily removed anyway, "similarly demonstrate the risk that Make the Road's members who have been here longer than two years will be put

25

into expedited removal"); *see also* Make the Road Opp'n Mot.
16 (collecting cases of erroneous application of Expedited
Removal to such individuals nationwide). Together, this
evidence shows a sufficiently imminent risk of injury to
support standing at this stage.

Members who have been present for more than fourteen
days but less than two years and are already in removal
proceedings have also shown that they are likely to be injured
by the expansion of Expedited Removal under the Expansion
Order and Huffman Memorandum. *See Make the Road N.Y.*,
2025 WL 2494908, at *6 (citing several declarations). The
Department responds that such members face no risk because
those identified are in Section 240 proceedings rather than
Expedited Removal. Dep't Stay Mot. 22–23. That argument
is unpersuasive. The district court found that the Department
has been "systematically" targeting individuals already in
Section 240 proceedings for Expedited Removal. *See Make the
Road N.Y.*, 2025 WL 2494908, at *5, *20 (collecting
declarations). It found that the Department has repeatedly
dismissed Section 240 proceedings without warning and
immediately arrested the individual at the courthouse to initiate
Expedited Removal, short circuiting their ability to
demonstrate endangerment from removal. *Id.* at *5 (citing
several declarations). Far from undermining Article III
standing, the individuals' participation in Section 240
proceedings underscores the likelihood that these members will
face Expedited Removal.

Make the Road's members also satisfy causation and
redressability. "To satisfy th[e] [redressability] requirement,
the asserted injury must be 'capable of resolution and likely to
be redressed by judicial decision.'" *Western Coal Traffic
League v. Surface Transp. Bd.*, 998 F.3d 945, 950 (D.C. Cir.
2021) (quoting *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C.

26

Cir. 2014)). "Causation, or traceability, examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc)). That showing is straightforward here. In its Amended Complaint, Make the Road alleges that its members face an increased risk of erroneous deprivation of liberty because the Department has failed to adopt procedures enabling them to demonstrate their ineligibility for Expedited Removal based on two years of continuous physical presence. *See* Am. Compl. ¶¶ 107–109 (generally discussing the due process claim). And the injury is redressable because a judicial decision staying or vacating the Expansion Order and Huffman Memorandum could facilitate new procedures and alleviate that risk.

The second element of associational standing—that "the interests [the organization] seeks to protect are germane to the organization's purpose"—is likewise met. *Sierra Club*, 827 F.3d at 65 (citations and quotations omitted). This requirement "raises an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–556 (1996).

Make the Road plainly satisfies that standard. Its mission is "to build the power of immigrant and working-class communities to achieve dignity and justice[,]" and this litigation seeks to protect the very interests of those members.

27

*Make the Road N.Y.*, 2025 WL 2494908, at *6 (citing Fontaine Decl. at ¶ 3, ECF No. 50-2).

The final requirement is that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Sierra Club*, 827 F.3d at 67 (citations and quotations omitted). That inquiry "focus[es] * * * on matters of administrative convenience and efficiency, not on elements of a case or controversy." *United Food & Com. Workers Union Loc. 751*, 517 U.S. at 557.

That prong is satisfied here. Make the Road's due process claims and the relief it seeks do not demand "individualized proof." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). These due process claims are also "pure question[s] of law." *Healthy Gulf v. United States Dep't of the Interior*, 152 F.4th 180, 191 (D.C. Cir. 2025) ("Member participation is not required where a suit raises a pure question of law and neither the claims pursued, nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization.") (formatting modified).

Accordingly, Make the Road is likely to succeed in establishing associational standing.

## C

Our third threshold issue is one of timing. Make the Road's claims of the constitutional insufficiency of the Eligibility System and Credible Fear Procedures are, in the words of IIRIRA, challenges to the "validity of the system" implementing the Expansion Order. 8 U.S.C. § 1252(e)(3). A complaint raising such claims "must be filed no later than 60 days after the date the challenged section, regulation, directive,

28

guideline, or procedure * * * is first implemented." *Id.*
§ 1252(e)(3)(B).

While the Department made no argument about the
timeliness of Make the Road's complaint in its stay papers, this
court must double check the timing because we have held that
Section 1252(e)(3)(B) is jurisdictional. *M.M.V. v. Garland*, 1
F.4th 1100, 1108 (D.C. Cir. 2021).

Timeliness is easily verified here.  Make the Road's
complaint, the district court's due process holding, and the
district court's order granting relief show that Make the Road
is challenging the system and procedures for implementing the
Expansion Order identified in that Order itself and in the
January 23, 2025 Huffman Memorandum. *See* Am. Compl.
¶¶ 107–109; *Make the Road N.Y.*, 2025 WL 2494908, at *10;
Dist. Ct. Stay Order at 1, ECF No. 65.  Make the Road filed its
initial complaint challenging the 2025 Expansion Order just
one day after that Order issued, and the amended complaint
adding challenges to the Huffman Memorandum was filed 59
days after the Memorandum issued. *See generally* Complaint,
*Make the Road N. Y.*, 2025 WL 2494908, ECF No. 1 (filed Jan.
22, 2025); Am. Compl. (filed March 22, 2025).

At oral argument before this court, the Department argued
for the first time that Make the Road's suit is time barred
because the government has subjected immigrants who arrive
"by sea" to Expedited Removal under the same procedures
challenged here even if they are found within the Nation's
interior. *See* Transcript of Oral Argument at 4–7, 9, 11, 52
(discussing the 2002 Designation, 67 Fed. Reg. 68,924).

The Department's stay papers referenced the 2002
Designation once in the background section, but the
Department made no argument that it was of any jurisdictional

29

consequence. *See* Dep't Stay Mot. 5–6. For good reason. Absolutely nothing in the record indicates that the government has ever implemented Expedited Removal for sea arrivals in the interior of the Country, or even anywhere other than the sea coasts. Nor has the Department suggested that it could readily identify for expedited-removal purposes a person in the interior of the Nation as someone who arrived by sea and not by land. Plus, the vast majority of U.S. Border Patrol encounters occur at the Southwest Land Border. *See* U.S. Customs & Border Prot., Nationwide Encounter Data, https://perma.cc/4754-VMT8 (showing that, between 2022 and 2024, over 75 percent of Border Patrol encounters occurred at the Southwest Land Border).

In addition, the Huffman Memorandum and the Expansion Order indisputably enlarged the scope of Expedited Removal far beyond the 2002 Designation. Prior to the Expansion Order, Expedited Removal applied only to (1) "arriving aliens," 1997 Designation, 62 Fed. Reg. at 10,313; (2) foreign individuals encountered within 100 air miles of a land border within fourteen days of arrival, 2004 Designation, 69 Fed. Reg. at 48,879; and (3) foreign individuals who had illegally arrived by sea in the past two years, 2002 Designation, 67 Fed. Reg. at 68,924. After the Expansion Order, foreign individuals anywhere in the United States who had arrived by land can be swept into Expedited Removal proceedings. And Make the Road certainly does not allege that all (or any) of its 28,000 members arrived here by sea. *See* Jane Doe 2 Decl. at 18, ¶ 2, ECF No. 50-2 ("We entered the United States in March 2024 through El Paso, Texas.").[4]

_____

[4] In 2019, the Department similarly broadened the scope of Expedited Removal to the statutory limit. *See* 2019 Designation, 84 Fed. Reg. at 35,412. The 2019 Designation was in effect for only

30

The dissenting opinion insists that the filings are untimely because the procedures being applied are the same ones previously applied at border and sea-coast encounters. Dissenting Op. at 6–8. But Make the Road is challenging the separate and distinct decision by the Department—which could only be made upon expansion of Expedited Removal away from sea coasts and border areas—to omit any procedures to consider residency length or to modify the credible fear procedures. The Department, in other words, made considered decisions on January 21 and January 23, 2025, that its preexisting procedures are constitutionally and statutorily sufficient for the application nationwide of Expedited Removal. And the Department did so even though the decision to expand Expedited Removal across the entire United States made the procedures—or lack thereof—for considering residency length of new and especial salience. Those agency judgments embodied in the Expansion Order and Huffman Memorandum are all that this case challenges, and those policies were never previously implemented, 8 U.S.C. § 1252(e)(3)(B), because those agency decisions were not made until January 2025.

Since Make the Road timely filed its complaints within sixty days of the Expansion Order's and Huffman Memorandum's adoption and their implementation of procedures excluding any process for considering residency length or updated credible fear procedures, we conclude at this preliminary stage that Make the Road's suit is likely timely.

_____

roughly seven months before it was rescinded. *See* Section I.B, *supra*. The Department has made no argument here that it actually implemented the 2019 Designation within the Nation's interior during that Designation's brief lifespan.

31

**D**

The Department argues that Section 1252(f)(1) of Title 8 barred the lower court from issuing a stay under 5 U.S.C. § 705. That argument is not likely to succeed.

Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).  Part IV of the referenced subchapter includes the expedited-removal provisions at issue in this case. 8 U.S.C. § 1225.

Neither the Supreme Court nor this court has considered whether Section 1252(f)(1) applies to a Section 705 stay.  But traditional indicia of statutory construction deprive the government's position of a likelihood of success.

**1**

In interpreting Section 1252(f)(1)'s scope, "[w]e begin with the text," *see Smith v. Berryhill*, 139 S. Ct. 1765, 1774 (2019). And that text weighs heavily against the Department's reading. The three actions targeted by Congress in Section 1252(f)(1) are "enjoin," "restrain," and "operation[.]"  By their settled

32

meaning, each of those words directs us toward forms of relief
that tell an agency or individual what actions to take or not to
take.

Specifically, "[t]he term 'to enjoin' ordinarily means to
'require,' 'command,' or 'positively direct' an action or to
'require a person to perform * * * or to abstain or desist from,
some act.'" *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057,
2064 (2022) (quoting *Enjoin*, BLACK'S LAW DICTIONARY (6th
ed. 1990)). Similarly, the word "'restrain' means to 'check,
hold back, or prevent (a person or thing) from some course of
action.'" *Aleman Gonzalez*, 142 S. Ct. at 2064 (quoting 5
OXFORD ENGLISH DICTIONARY 756 (2d ed. 1989)). And
"operation" seals the deal: "The 'operation of' (a thing) means
the functioning of or working of (that thing)," *Aleman
Gonzalez*, 142 S. Ct. at 2064 (citing RANDOM HOUSE
DICTIONARY OF THE ENGLISH LANGUAGE 1357 (2d ed. 1987)),
and "[t]he way in which laws ordinarily 'work' or 'function' is
through the actions of officials or other persons who implement
them," *Aleman Gonzalez*, 142 S. Ct. at 2064.

In the Supreme Court's words: "Putting these terms
together, § 1252(f)(1) generally prohibits lower courts from
entering injunctions that *order federal officials to take or to
refrain from taking actions* to enforce, implement, or otherwise
carry out the specified statutory provisions." *Aleman
Gonzalez*, 142 S. Ct. at 2065 (emphasis added). Confirming
that reading, Congress enacted the heading for Section 1252(f),
which says that the Section's scope is "Limit on *injunctive*
relief." Omnibus Consolidated Appropriations Act of 1997,
Pub. L. No. 104–208 § 242(f), 110 Stat. 3009, 3009-611–612
(1996) (formatting modified and emphasis added); *see Biden v.
Texas*, 142 S. Ct. 2528, 2540 (2022) ("By its plain terms, and
even by its title, [Section 1252(f)(1)] is nothing more or less
than a limit on injunctive relief.") (alteration in original)

33

(quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999)).

By its plain language, then, Section 1252(f)(1)'s bar applies to those forms of relief that operate *in personam*—on individual actors. *Cf. Nken*, 556 U.S. at 428.  That is exactly what injunctions do.  "When a court employs 'the extraordinary remedy of injunction,' it directs the conduct of a party, and does so with the backing of its full coercive powers." *Id.* (citations omitted).  Put simply, an injunction "is a means by which a court tells someone what to do or not to do." *Id.*; *see also I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986) ("The definition of an injunction under Section 1292(a)(1) is broad:  [I]t is any order '*directed to a party*, enforceable by contempt, and designed to accord or protect, some or all of the substantive relief sought by a complaint in more than preliminary fashion.'") (citation omitted and emphasis added).

A Section 705 stay operates quite differently.  When a court enters a stay, it does not direct individuals to act or not to act. Instead, the order simply "suspend[s] the [legal] source of authority to act[.]" *Nken*, 556 U.S. at 428–429.  Reading Section 705 alongside Section 706's authorization for courts to "hold unlawful and set aside"—that is, to vacate—agency actions, a stay under Section 705 functions as a "temporary form of vacatur." *Alliance for Hippocratic Med.*, 78 F.4th at 254 (5th Cir. 2023), *rev'd on other grounds*, 144 S. Ct. 1540 (2024); *see* Dist. Ct. Stay Order, ECF No. 65, at 1 (district court's order "immediately postpone[s] and stay[s]" the "effective dates of implementation and enforcement").   If Make the Road ultimately succeeds on the merits of its claims and the district court grants its request for vacatur, the district court's Section 705 stay's temporary postponement of effective dates will become permanent:  The district court will "hold

34

unlawful and set aside," 5 U.S.C. § 706(2), the Department's Eligibility System or Credible Fear Procedures for implementing the Expansion Order and Huffman Memorandum; it will not "enjoin" or "restrain" the actions of individual officials.

On top of all that, Congress knows how to limit courts' power to enter Section 705 stays when it wants to.  And it uses different language to do so.  Both the Magnuson-Stevens Act and the Clean Air Act, for example, explicitly limit the availability of APA relief, including under Sections 705 and 706.  16 U.S.C. § 1855(f)(1)(A) ("[S]ection 705 of [Title 5] is not applicable[.]") (Magnuson-Stevens Act); 42 U.S.C. § 7607(d)(1) ("[S]ection 706 of title 5 shall not * * * apply to actions to which this subsection applies.") (Clean Air Act).

By all textual indications, then, Congress chose to confine Section 1252(f)(1)'s bar to injunctive relief, leaving the courts' power to enter stays unaffected.  Because the district court's stay acts directly on the authorizing sources of law—the Expansion Order and the Huffman Memorandum—and not on individuals, the best reading of Section 1252(f)(1) is that it does not bar stays of agency action.

**2**

The statutory structure reinforces the conclusion that the Department's broad reading of Section 1252(f)(1) is unlikely to succeed.  Most notably, Congress "specifically provided in the expedited removal context for more traditional review of '[c]hallenges on validity of the system.'"  *Make the Road I*, 962 F.3d at 625 (quoting 8 U.S.C. § 1252(e)(3)).  Specifically, Congress authorized actions challenging "whether [a statutory] section, or any regulation issued to implement such section[] is constitutional," 8 U.S.C. § 1252(e)(3)(A)(i), and "whether

35

* * * a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the [Secretary] to implement [Expedited Removal] is not consistent with applicable provisions of [the Immigration and Nationality Act] or is otherwise in violation of law[,]" *id*. § 1252(e)(3)(A)(ii).

In addition, Section 1252(e)(3) preserves courts' jurisdiction over such claims when brought not just by individuals, but also by associations on behalf of their individual members. *Make the Road I*, 962 F.3d at 628. That is so because "[w]hether aggrieved individuals sue on their own or band together through a representative association does not change the nature of the lawsuit[.]" *Id.*

Stays and vacatur are well-established remedies for unconstitutional and unlawful agency action. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated[.]" *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) ("When an agency's action is unlawful, vacatur is the normal remedy.") (quotation marks omitted). If Section 1252(f)(1) barred courts from setting aside agency action, either temporarily (as in a stay) or permanently (as in vacatur), Section 1252(e)(3) would offer little to no concrete or enforceable relief for those bringing suit. We do not "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other." *Grace v. Barr*, 965 F.3d 883, 893 (D.C. Cir. 2020) (quoting *Clark v. Uebersee Finanz-Korporation*, 332 U.S. 480, 489 (1947)).

We note that our conclusion accords with the rulings of our sister circuits that have confronted this same or a similar question. *See Immigrant Defs. Law Ctr.*, 145 F.4th at 989–990

36

(holding that Section 1252(f)(1) does not apply to a Section 705 stay); *cf. Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (holding that Section 1252(f)(1) does not bar vacatur because "a vacatur does nothing but re-establish the status quo absent the unlawful agency action[,]" and "vacatur neither compels nor restrains further agency decision-making").

**3**

The Department argues that the Supreme Court's decision in *Aleman Gonzalez* shows that Section 1252(f)(1) extends to stays. *See* Dep't Stay Mot. 9–11.

Not at all. In *Aleman Gonzalez*, the Supreme Court held that Section 1252(f)(1) barred the lower court from issuing a class-wide injunction requiring the government to provide bond hearings for individuals detained for lack of documentation, 142 S. Ct. at 2067–2068. The Supreme Court then explicitly reserved the question of whether "1252(f)(1) not only bars class-wide injunctive relief but also prohibits any other form of relief that is 'practically similar to an injunction,' including class-wide declaratory relief." *Id.* at 2065 n.2. The Supreme Court said not a word about Section 705 stays.

Notably, the Supreme Court has since emphasized the "narrowness of [Section 1252(f)(1)'s] scope." *Biden v. Texas*, 142 S. Ct. at 2539; *see also id.* at 2540. And on that same theme, the Supreme Court has also ruled that Section 1252(f)(1) does not apply to declaratory judgments. *Nielson v. Preap*, 139 S. Ct. 954, 962 (2019). In addition, unlike this suit, *Aleman Gonzalez* did not involve relief for asserted constitutional violations under a statutory provision expressly providing for such challenges to the insufficiency of process, 8 U.S.C. § 1252(e)(3).

37

Still, the Department insists that *Aleman Gonzalez*'s reasoning applies to Section 705 stays, because stays function exactly like injunctions. *See* Dep't Stay Mot. 9–10. But as the Supreme Court has explained, although stays and injunctions can both "have the practical effect of preventing some action before the legality of that action has been conclusively determined," a stay "achieves this result by temporarily suspending the source of authority to act—the order or judgement in question—not by directing an actor's conduct." *Nken*, 556 U.S. at 428–429. That difference matters given the plain text of Section 1252(f)(1), the statutory structure, and Congress's omission of language it has included in other statutes when seeking to bar stays or vacatur.

Lastly, the Department points out that, unlike Section 1252(f)(2), which was at issue in *Nken*, Section 1252(f)(1) also bars orders that "restrain" government actors. That is true, but it is of no help to the government. *See* Dep't Stay Mot. 10–11. The Supreme Court has already held that the word "restrain" in Section 1252(f)(1) speaks in injunctive language: It means "to 'check, hold back, or prevent (a person or thing) from some course of action.'" *Aleman Gonzalez*, 142 S. Ct. at 2064 (quoting 5 OXFORD ENGLISH DICTIONARY 756 (2d ed. 1989)). So like its companion term "enjoin," the word "restrain" operates on and regulates the conduct of individuals, presumably extending the injunction bar to also preclude temporary restraining orders. *See Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011) (reasoning that the word "restrain" in Section 1252(f)(1) "refers to one or more forms of temporary injunctive relief, such as a temporary restraining order").

The dissenting opinion says that this reading of the statute "effectively read[s] 'or restrain' out of the statute" because temporary restraining orders are a form of "temporary *injunctive* relief." Dissenting Op. at 15.

38

That analysis is mistaken. First, temporary restraining orders are, to be sure, a form of "injunctive relief," which is all that Section 1252(f)'s denomination "Limit on injunctive relief" covers. But the law has long recognized that temporary restraining orders involve different processes and limitations from injunctions, so there is no redundancy. *See* FED. R. CIV. P. 65 (setting out separate requirements for preliminary injunctions and temporary restraining orders); *see also Injunction*, BLACK'S LAW DICTIONARY (6th ed. 1990) ("Within the category of interlocutory injunctions there are two distinct types which must be considered individually. The first is generally referred to as a preliminary injunction, * * * [and] [t]he second is generally referred to as a temporary restraining order[.]").

Second, the dissenting opinion's real beef is with the Supreme Court, which has already held that "restrain" speaks in injunctive language. *See Aleman Gonzalez*, 142 S. Ct. at 2064; *see also id.* at 2065 ("Putting [the terms 'enjoin,' 'restrain,' and 'operation of'] together, § 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions.").

Trying a different tack, the dissenting opinion points to the Hobbs Act, which, in its view, "suggests that 'restrain' and 'stay' have closely related meanings" in the immigration context. Dissenting Op. at 14.

The Department has not raised this argument here. For good reason. The dissenting opinion's Hobbs Act analogy would only trade a mistakenly asserted surplusage problem for a real one. Section 2349(b) of Title 28 provides that "[t]he

39

filing of the petition to review does not of itself stay or suspend the operation of the order of the agency, but the court of appeals in its discretion may restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the petition." 28 U.S.C. § 2349(b). But if stays "temporarily suspend[] the source of authority to act[,]" *Nken*, 556 U.S. at 428–429, "suspend" in Section 2349(b) adds nothing to "stay." *See also Suspend*, BLACK'S LAW DICTIONARY (6th ed. 1990) ("To interrupt; to cause to cease for a time; to postpone; to stay, delay, or hinder; to discontinue temporarily, but with an expectation or purpose of resumption.").

Given the Supreme Court's relevant precedent and analysis, its direction to read Section 1252(f)(1) narrowly, and the strong textual evidence that Congress intended not to address stays, the Department has not shown that it is likely to succeed in showing that Section 1252(f)(1) barred the district court from granting a stay under Section 705 of the APA.

**E**

The last threshold argument before us is whether the Department's selection of the procedures for implementing Expedited Removal nationwide is a matter "committed to agency discretion by law," making the APA's cause of action unavailable. 5 U.S.C. § 701(a)(2).

IIRIRA provides:

**(I) In general**
The Attorney General may apply [Expedited Removal provisions] to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable

40

discretion of the Attorney General and may be modified at any time.

**(II) Aliens described**
An alien described in this clause is an alien who is not described in subparagraph (F), who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

8 U.S.C. § 1225(b)(1)(A)(iii).

That provision precludes plaintiffs from bringing suit under the APA to "scrutinize the Secretary's [expedited] designation decision[s] so long as [they] fall[] within statutory and constitutional bounds." *Make the Road I*, 962 F.3d at 635.

Before the district court, the Department contended that this provision barred Make the Road's lawsuit. The district court did not address this argument, *see Make the Road N.Y.*, 2025 WL 2494908, at *8, and the Department affirmatively waived the issue in its stay papers here. *See* Transcript of Oral Argument at 20 ("[W]e made what we thought were our strongest arguments in our 5,200 words[.]").

Section 701(a)(2) speaks only to whether an APA cause of action is available. *See Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011); *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009). And whether a cause of action exists does not go to this court's jurisdiction. *See Shapiro v. McManus*, 577 U.S. 39, 45 (2015) ("Absent * * * frivolity, 'the failure to

41

state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.'") (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)); *Verizon Md., Inc v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642–643 (2002) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction[.]") (quotation marks omitted).

The Department admitted as much, stating that whether we reach the "committed to agency discretion" argument is "largely a matter of discretion." Transcript of Oral Argument at 19–20. Given the Department's express waiver of this argument, we decline to address the issue. *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) ("Ordinarily, arguments that parties do not make on appeal are deemed to have been waived.").[5]

---

[5] There is a circuit split on whether Section 701(a)(2)'s "committed to agency discretion" bar is jurisdictional. *See Builders Bank v. FDIC*, 846 F.3d 272, 274 (7th Cir. 2017) (identifying and analyzing the split). In addition to our circuit, the Seventh and Eighth Circuits consider Section 701(a)(2) to be non-jurisdictional. *See id.*; *Ochoa v. Holder*, 604 F.3d 546, 549 (8th Cir. 2010) ("When a plaintiff complains about an action that is committed to agency discretion by law, it does not mean that a court lacks subject matter jurisdiction over the claim."). The Second, Fifth, Ninth, and Tenth Circuits consider Section 701(a)(2) to be jurisdictional. *See Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003); *Texas v. DHS*, 123 F.4th 186, 217 (5th Cir. 2024); *Alcaraz v. Immigration and Naturalization Serv.*, 384 F.3d 1150, 1161 (9th Cir. 2004); *Tsegay v. Ashcroft*, 386 F.3d 1347, 1354 (10th Cir. 2004). However, the Second Circuit has since questioned whether its holding in *Lunney* remains good law. *See Sharkey v. Quarantillo*, 541 F.3d 75, 87 (2d Cir. 2008) ("It is uncertain in light of recent Supreme Court precedent whether these threshold limitations are truly jurisdictional

42

The dissenting opinion next contends that "[t]he district court erred by providing an APA remedy without identifying any viable APA claim." Dissenting Op. at 8. At the heart of the dissenting opinion's concern is an assumption that Make the Road's due process count "must be understood as an equitable constitutional claim" wholly divorced from its APA cause of action. Dissenting Op. at 9 n.5.

Once again, the Department saw no such ground for objection. Which makes sense. The complaint never says that the constitutional claim is divorced from the APA cause of action. The prayer for relief expressly requests a stay, in addition to injunctive relief. Am. Compl. at 31. To that same point, Make the Road's stay briefing wove the constitutional due process and statutory APA challenges together. *See* Memorandum in Support of Mot. to Postpone Effective Date of Agency Action, ECF No. 50-1, at 13, 16 n.8; Plaintiff's Reply in Support of Mot. to Postpone Effective Date of Agency Action, ECF No. 58, at 1. At no point has Make the Road argued that its constitutional claim is grounded exclusively in an independent implied constitutional cause of action. *Contrast National Treasury Emps. Union v. Vought*, 149 F.4th 762, 792 (D.C. Cir. 2025) (plaintiffs "assert[ed] what they

---

or are rather essential elements of the APA claims for relief.") (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514–515 (2006)).

That difference of opinion is of no moment here because Section 1225(b)(1)(A)(iii) is explicit that the only action that is committed to agency discretion is the Secretary's decision which, if any, of the individuals "described in subclause (II)" will be subjected to Expedited Removal. That the discretion does not extend to the choice of systems and procedures to implement a designation is reconfirmed by Section 1252(e)(3)(A)(ii), which authorizes legal challenges to those very procedures, which is all this case is about.

43

describe[d] [in brief] as a 'cause of action under the Constitution for the violation of the separation of powers.'").

Nor has the Department ever read the complaint that way before the district court or this court. Quite the opposite, the Department's briefing on Make the Road's stay motion takes as given that the complaint presses the constitutional claim under the APA. *See* Dep't Stay Mot. 26–27. And the Department's motion to dismiss expressly puts the due process claim on equal footing with Make the Road's statutory APA claims in asserting a common ground for their dismissal under the APA. Motion to Dismiss, ECF No. 36, at 21 n.4, 28.

The dissenting opinion is correct that the district court rested its stay "ruling only on the constitutional claim" and was "not reach[ing] Make the Road's APA claims[.]" Dissenting Op. at 9 (quoting *Make the Road N.Y.*, 2025 WL 2494908, at *9 n.14). But the choice of which counts—statutory or constitutional—to rely on for purposes of the court's stay analysis says nothing about whether the APA is the cause of action for both the constitutional and statutory claims. As the district court's preceding footnote explains, it chose the constitutional claim solely because it considered the due process count to be the "most substantial, and seemingly strongest, claim[]" for emergency relief. *Make the Road N.Y.*, 2025 WL 2494908, at *9 n.13.[6]

_____

[6] The dissenting opinion contends that "[i]f the district court was in fact relying on an APA claim, it would run into the restrictions of *Make the Road I*[.]" Dissenting Op. at 9 n.5. However, as the government recognized in its motion to dismiss below, *see* ECF No. 36 at 21, and conceded at oral argument, *see* Transcript of Oral Argument at 21, *Make the Road I* expressly declined to extend its holding to constitutional claims. *See Make the Road I*, 962 F.3d at 634 ("[W]e do not address whether there would be a cause of action

44

The proof of the dissenting opinion's mistaken cause-of-action premise is in the pudding.  Even after the district court grounded its stay ruling solely in the constitutional count of the complaint, the Department made no objection that a Section 705 stay was unavailable for the due process claim.

Given all of that, this court should be loath on an emergency motion at the threshold of a case to read the complaint in a way that goes beyond its text and the parties' demonstrated understanding of the complaint—especially under a theory that not only has not been briefed or argued by any party, but was expressly waived by the Department, *see* Transcript of Oral Argument at 20.

## IV

With that long prologue concluded, we turn to the merits question posed by this appeal:  Whether the Expansion Order and Huffman Memorandum provide constitutionally adequate process to ensure both that Expedited Removal is applied only to those persons statutorily subject to such treatment and that credible-fear claims are appropriately considered.  We conclude that the Department is not likely to succeed in showing that its existing procedures provide constitutionally adequate notice and an opportunity to be heard on the question of whether a detained person has lived in the United States for at least two continuous years.  The Department, however, is likely to succeed in showing that, for those persons determined to be eligible for Expedited Removal, its Credible Fear Procedures are sufficient.

---

under the APA  * * *  if the Secretary's actions were unconstitutional.").

45

**A**

**1**

The Due Process Clause of the Fifth Amendment prohibits the federal government from "depriv[ing]" any "person" "of life, liberty, or property, without due process of law[.]" U.S. CONST. Amend. V. Persons protected by the Fifth Amendment's due process protections include individuals present in the United States, whether they arrived here lawfully or unlawfully. As the Supreme Court has emphasized, the Fifth Amendment applies to all "person[s]"—not just to all citizens or lawful residents. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). As a result, those persons "who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment * * * protects every one of these persons from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.") (citation omitted).

In addition, "'[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *A.A.R.P.*, 145 S. Ct. at 1367 (2025) (same). That means that "'no person shall be' removed from the United States 'without opportunity, at some time, to be heard'" in a meaningful way. *A.A.R.P.*, 145 S. Ct. at 1367 (quoting *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)).

46

As more than a century of precedent documents, due process protections are vital in determining a person's eligibility for deportation or removal from the United States. Removal, after all, may result in "loss of both property and life, or of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). Deportation "visits a great hardship on the individual[,]" *Bridges v. Wixon*, 326 U.S. 135, 154 (1945), and "may result in poverty, persecution and even death[,]" *id.* at 164 (Murphy, J., concurring); *see also Quintero v. Garland*, 998 F.3d 612, 647 (4th Cir. 2021) ("[T]he consequences [that individuals facing removal proceedings] may face are severe: family separation, prolonged detention, and deportation to a country where persecution or even death awaits."); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). Deportation also may result in detention with no foreseeable end. *A.A.R.P.*, 145 S. Ct. at 1368; *see also Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("We have long recognized that deportation is a particularly severe 'penalty,'" even if "it is not, in a strict sense, a criminal sanction.") (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893)); *Sessions v. Dimaya*, 584 U.S. 148, 157 (2018) (Deportation is "a 'drastic measure,' often amounting to lifelong 'banishment or exile[.]'") (quoting *Jordan v. De George*, 341 U.S. 223, 231 (1951)).

Due process generally must also ensure fair consideration of a person's claims that they should not be removed before it occurs. That is because, once an individual has been expelled from the United States, the ability of a federal court to provide any meaningful review and remedy is significantly constrained. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (noting that the district court's order to "effectuate" the return of a wrongfully expelled individual "may exceed the District Court's authority[,]" and that courts must give "due regard for

47

the deference owed to the Executive Branch in the conduct of foreign affairs" in issuing relief after removal has occurred). As a result, an individual's liberty interest in avoiding a wrongful removal is "particularly weighty," *A.A.R.P.*, 145 S. Ct. at 1368, and "'[p]rocedural due process rules are meant to protect' against 'the mistaken or unjustified deprivation of life, liberty, or property[,]'" *id.* at 1367 (quoting *Carey v. Piphus*, 435 U.S. 247, 259 (1978)).

**2**

The Department insists that anyone who entered the United States unlawfully and who has not been continuously present for the past two years enjoys no constitutional protection under the Due Process Clause and, instead, enjoys only "whatever" process Congress chooses to dispense.  Dep't Stay Mot. 18 (quoting *Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020)).  To get there, the Department argues that the so-called "entry fiction" applies to everyone anywhere in the United States whose presence is unlawful.  *See* Dep't Stay Mot. 14–15.  That argument is not likely to succeed.

The "entry fiction" applies to three groups of persons who, although having technically crossed the border and entered the United States, have not established any long-term connection to this Country.

First, "more than a century of precedent" confirms that individuals attempting to enter the United States can be stopped at the border and, when that happens, they "never * * * acquire[] any domicil[e] or residence within the United States[.]"  *Thuraissigiam*, 140 S. Ct. at 1982 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)). As a result, those persons receive only whatever process

48

protections Congress chooses to confer. *Id.* (collecting cases). Those individuals, of course, are not living in the interior of the United States, where Expedited Removal now applies.

Second, the "entry fiction" and its limitation on due process apply to individuals who are not stopped right at the border, but have only briefly "set foot on U.S. soil," *Thuraissigiam*, 140 S. Ct. at 1982, and so are "'on the threshold'" of entry to the United States, *id*. at 1983 (quoting *Mezei*, 345 U.S. at 212); *see Thuraissigiam*, 140 S. Ct. at 1964 (applying entry fiction to person stopped "just 25 yards from the border"). Those persons intercepted shortly after crossing the border and proximate to it also have "only those rights regarding admission that Congress has provided by statute." *Id.* at 1983. Likewise, individuals living in the expanded area for Expedited Removal are far beyond the threshold of entry and Make the Road's members have been here for from fourteen days to ten years. Am. Compl. ¶¶ 12, 13, 97–102.

Third, the entry fiction extends to individuals who have been paroled and are awaiting removal proceedings. *See Thuraissigiam*, 140 S. Ct. at 1982 (collecting cases); *Kaplan v. Tod*, 267 U.S. 228, 229–230 (1925) (immigrant who was initially denied admission at Ellis Island and later paroled into the United States "was still in theory of law at the boundary line and had gained no foothold" in the United States). Parole occurs when the government chooses to release from detention and into the United States, under strict conditions, an individual who was stopped at or near the border. Parole can be granted for humanitarian reasons and to conserve resources while an individual's claimed reasons for being allowed into the United States (for example, asylum) are evaluated. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b); *see also Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018). Because those on parole are excluded from Expedited Removal, 8 U.S.C.

49

§ 1225(b)(1)(A)(iii)(II), that exception has no application to the expanded scope of summary removal at issue here.

The Department's insistence that the entry fiction should be extended to every individual who is unlawfully present and who has not resided in the United States for two years, wherever they may live, has two central flaws.

**a**

To start, the Department's argument runs headlong into over a century of precedent in which the Supreme Court has recognized a difference in the due process rights between those who are stopped at or near the border, and so do not fall within the Due Process Clause's compass, and those who have "become subject in all respects to [the United States'] jurisdiction, and a part of its population, although alleged to be illegally here[.]" *Yamataya*, 189 U.S. at 101. Those "who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Mezei*, 345 U.S. at 212 (citing *Yamataya*, 189 U.S. at 100–101).

This "distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas*, 533 U.S. at 693 (collecting cases); *compare Mezei*, 345 U.S. at 208, 212–213 (individual detained at Ellis Island indefinitely not protected by due process because "harborage at Ellis Island is not entry into the United States[,]" and so Mr. Mezei was "an alien on the threshold of initial entry"), *with Yamataya*, 189 U.S. at 87, 101 (individual stopped four days after entry must be afforded "all opportunity to be heard upon the questions involving [her] right to be and remain in the United States").

50

*Thuraissigiam*, on which the Department relies for its argument, reaffirmed the distinction:

> While aliens who have established connections in this country have due process rights in deportation proceedings, the Court long ago held that Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as a result, an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause.

140 S. Ct. at 1963–1964.

The Department responds that affording any due process to persons whose presence is unlawful ends up treating parolees who entered at a border or port of entry "worse" than those who entered the country unlawfully. Dep't. Stay Mot. 14–15. Not so.

*First*, parolees and those who are present without authorization are simply in different positions. Parolees enter on the condition and with the understanding that they remain legally at the border. Any connections they make within the United States are with the knowledge of their un-entered status, and so they develop no reasonable expectations or reliance interests based on their continued presence. *See Thuraissigiam*, 140 S. Ct. at 1982–1983; *Kaplan*, 267 U.S. at 229–230; *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958).

*Second*, parolees are not treated worse. They are statutorily excepted from, and so ineligible for, the Expedited Removal process while on parole. 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (describing as eligible for Expedited Removal "[a]n alien described in this clause * * * who has not been admitted or paroled into the United States").

51

Instead, parolees' presence is governed by statutory and regulatory procedures that provide more extensive process and protection than Expedited Removal allows. For example, parole may only be terminated with prior written notice or "at the expiration of the time for which parole was authorized," meaning that the parolee is on notice of a potential departure date from their initial qualified entry. 8 C.F.R. § 212.5(e)(1). For any earlier removal, the parolee must first receive "written notice," before "any order of exclusion, deportation, or removal previously entered shall be executed." 8 C.F.R. § 212.5(e)(2). This advance notice affords parolees time to plan ahead to apply for an adjustment of status, *see* 8 C.F.R. § 212.5(c), to locate legal representation, or to seek habeas relief if circumstances demand, *see Kaplan*, 267 U.S. at 229 (parolee afforded over three months between the issuance of her "warrant of deportation" and the removal date, which afforded her time to petition for a writ of habeas corpus).

*Third*, all the additional processes baked into the parole system create a lower risk of erroneous removal than there is for those who are present without authorization and subjected to summary removal. Parolees have already gone through an elaborate process to obtain parolee status, *see Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States*, U.S. Citizenship and Immigration Services, https://perma.cc/MM5J-XGME; *see also* 8 C.F.R. § 223.2 (outlining application and processing requirements for advance parole), and the government can quickly identify whether someone is a parolee or not by consulting its database.

The same cannot be said for an individual picked up off the street or at her workplace on *suspicion* of being unlawfully present. That individual is neither given notice that proof of two years of continuous presence will exempt her from

52

Expedited Removal, nor afforded an opportunity to obtain evidence to demonstrate such presence. *See* 8 C.F.R. § 235.3(b)(2)(i); *Make the Road N.Y.*, 2025 WL 2494908, at *16 ("[T]here is nothing in the expedited removal interview process that would prompt an individual to put forward the 'affirmative[]' evidence of continuous two-year presence that is required under the statute, 8 U.S.C. § 1225(b)(1)(A)(iii)(II)."). Indeed, "[u]nlike section 240 proceedings, which often take place over the course of several months, the expedited removal order is 'usually issued within a few days, if not hours.'" *Make the Road N.Y.*, 2025 WL 2494908, at *3 (quoting Hartzler Decl., ECF No. 50-16); *see also* Am. Compl. ¶ 44 ("Once a determination on inadmissibility is made, removal can occur rapidly, within twenty-four hours."); Mary Doe Decl. ¶¶ 12–22, ECF No. 50-7 (describing two individuals subjected to Expedited Removal in January 2025 who were removed from the country within a 24-hour period after ten years' residence in the United States).

**b**

The second problem with the Department's effort to deny all persons unlawfully present in the United States any modicum of due process is that it ignores the sorting problem that sits at the heart of its argument. Specifically, Congress was crystal clear that persons who could show that they have resided continuously in the United States for two or more years are not subject to Expedited Removal. 8 U.S.C. § 1225(b)(1)(A)(iii)(II). So the Department's objection that persons who have been here less than two years should not receive due process skips right over the predicate problem of determining who has been here for two years or more and who has not.

53

After all, the Department does not claim that, without information provided by the individual, it can tell who among those it detains has been present in the United States less than two years.  Quite the opposite, the complaint and declarations in this case identify specific instances in which persons statutorily *ineligible* for Expedited Removal nevertheless have been trapped in its net and, in at least two cases, summarily deported.  Am. Compl. ¶¶ 12–13, 86–87, 105; Mary Doe Decl. ¶¶ 12–22, *Make the Road N.Y.*, 2025 WL 2494908, ECF No. 50-7 (mother and son who had lived in this Country for over ten years were stopped, detained, prevented from contacting a lawyer or making any phone calls, and deported within 24 hours).

When it comes to that critical and mandatory differentiation process, the Supreme Court underscored just a few months ago that "[t]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings[,]" even summary ones.  *A.A.R.P.*, 145 S. Ct. at 1367 (quoting *J.G.G.*, 145 S. Ct. at 1006).  That process of determining eligibility for summary removal must be sufficient to ensure that "'no person shall be' removed from the United States 'without opportunity, at some time, to be heard'" to demonstrate their ineligibility for such removal.  *Id.* (quoting *Yamataya*, 189 U.S. at 101).

The constitutional minimum, in other words, must be process that is adequate to prevent wrongful removals.  *See id.* (quoting *J.G.G.*, 145 S. Ct. at 1006).  "It is not competent," after all, for "any executive officer * * * arbitrarily to cause an alien who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard

54

upon the questions involving his right to be and remain in the United States." *Yamataya*, 189 U.S. at 101.

The Department's stay papers say nothing about this due process hole in its argument.[7]

Instead, the Department argues that according due process protections to those whose presence is unlawful "would thrust the federal courts into an area that the Constitution exclusively assigns to the political branches." Dep't Stay Mot. 15. In their words, "[w]hether an alien has 'established connections' sufficient to merit additional process is a political judgment that falls to the political branches[.]" *Id.* (quoting *Thuraissigiam*, 140 S. Ct. at 1963–1964).

That argument is meritless. The Supreme Court precedent cited above, *see* Sections IV.A.1, 2, *supra*, says otherwise. Which makes sense because, under the Constitution, it is the role of the courts, and not the Political Branches, to say conclusively what the Fifth Amendment's Due Process Clause requires and to whom it applies. *E.g.*, *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *A.A.R.P.*, 145 S. Ct. at 1367; *J.G.G.*, 145 S. Ct. at 1006. Plus, due process is simply enforcing the residency eligibility line that Congress and a President—the Political Branches—enacted into law. That leaves the

---

[7] For purposes of identifying this problem in the Department's rationale, we have assumed without deciding the additional question of how much and in what form due process protects those who have been in the United States for less than two years but for at least the four or more days that the Supreme Court found sufficient to trigger due process protections in *Yamataya*, 189 U.S. at 87, 101–102, or the fourteen or more days that had sufficed to preclude Expedited Removal for the preceding almost nineteen years of the Expedited Removal program, *see* 2004 Designation, 69 Fed. Reg. at 48,879; 2022 Designation, 87 Fed. Reg. at 16,022.

55

Department no leg to stand on in insisting that it can ignore the baseline constitutional process needed to execute the law as statutorily required. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–638 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb.").

\*\*\*\*\*

For all of those reasons, the Department is unlikely to succeed in its argument that all persons in the United States found by the Department's summary procedures to be here without authorization categorically fall outside the protection of the Due Process Clause.

**3**

Because the Department has failed to show a likelihood that due process protections do not apply to those affected by the Expansion Order, the question is whether the procedures adopted by the Department to implement its expansion—its Eligibility System—are constitutionally sufficient. On this front too, the Department is unlikely to succeed given the Eligibility System's serious risks of erroneous summary removal—risks that, according to the record at this stage, have actually materialized in wrongful inclusion in the Expedited Removal process and removals. *See* Mary Doe Decl. ¶¶ 9–12, 15–21, ECF No. 50-7 (two individuals who had resided in the United States for over ten years wrongly subjected to Expedited Removal); Levenson Decl. ¶¶ 23–24, ECF No. 50-4 (noting detention of individual with three years of continuous presence for Expedited Removal); *see also Co Tupul v. Noem*, No. 25-cv-02748, 2025 WL 2426787, at *1 (D. Ariz. Aug. 4, 2025) (Expedited Removal order issued to person with

56

documentary evidence of thirty years of continuous presence,
including 16 affidavits and official and medical records);
*Castillo Lachapel v. Joyce*, 786 F. Supp. 3d 860, 862–863
(S.D.N.Y. 2025) (Department conceded that person with more
than two years of continuous presence was issued an Expedited
Removal order); *Orellana Juarez v. Moniz*, 788 F. Supp. 3d 61,
64 (D. Mass. 2025) (same Department concession); *Tamay v.
Scott*, No. 25-cv-438, 2025 WL 2507011, at *1 (D. Me. Sept. 2,
2025) (individual put into Expedited Removal likely to succeed
in showing continuous presence for more than six years);
*Choglio Chafla v. Scott*, No. 25-cv-437, 2025 WL 2531027, at
*1 (D. Me. Sept. 2, 2025) (same, for more than two years);
*Domingo-Ros v. Archambeault*, No. 25-cv-1208, 2025 WL
1425558, at *3 (S.D. Cal. May 18, 2025) (individual put into
Expedited Removal made a serious showing of more than two
years' presence).

    In expanding Expedited Removal away from land and sea
borders so that it now covers the entire United States and its
full population, the need for the Department to ensure that the
summary removal process stays within statutory bounds has
become exponentially more acute.  The district court found that
the "vast majority" of undocumented individuals present in the
United States have been living here for over two years—and
are thus statutorily ineligible for Expedited Removal if given a
chance to prove the duration of their residence.  *Make the Road
N.Y.*, 2025 WL 2494908, at *16 (citing Steinberg Decl. at 58,
ECF No. 50-24; Steinberg Decl. at 258, ECF No. 50-23).  And
those living further away from the border—*i.e.*, those to whom
the Expansion Order extends Expedited Removal—are less
likely to have recently entered the United States.  *Id.* at *17.

    The Department has not contested either of those facts.
For good reason.  The additional risks of error associated with
expanding Expedited Removal to blanket the United States is

57

something the government itself has long recognized. *See* 1997 Designation, 62 Fed. Reg. at 10,313 (application of Expedited Removal to people "already in the United States will involve more complex determinations of fact and will be more difficult to manage"); 2022 Designation, 87 Fed. Reg. at 16,023 (same); *see also id.* at 16,024 (noting that the use of expanded Expedited Removal "would involve complex new challenges for the ICE workforce" and "would require time- and fact-intensive training for all current officers, agents, and supervisors"). In fact, these "operational complexities" are one of the reasons the 2019 Designation was never implemented in any meaningful way. *Id.* ("The fact that the expanded expedited removal authority was used so rarely by ICE officers during the approximately one year that it was available to them [via the 2019 Designation] reflects the operational complexities and limited utility that it presented in practice.").

To be sure, the statute puts the burden of proving two-year residency on the individual. 8 U.S.C. § 1225(b)(1)(A)(ii). But the Department's processes must afford detained persons notice and some reasonable opportunity to meet that burden. *See*, *e.g.*, *A.A.R.P.*, 145 S. Ct. at 1367–1368; *compare* Dep't Opp. to Plaintiffs' Mot. to Postpone Effective Date of Agency Action at 35, ECF No. 56 (Department conceding in district court that it has a legal obligation under 8 U.S.C. § 1225(b)(1) to "determine whether the alien has been present for fewer than two years"), *with* Dep't Stay Mot. 23 ("[T]here is no distinct protocol for assessing continuous presence and no express prompt on Form I-867A for immigration officers to expressly ask" about continuous presence.); *contrast* Dep't of Homeland Sec., Memorandum from Acting Director Matthew T. Albence on Implementation of July 2019 Designation of Aliens Subject to Expedited Removal at 2 (July 24, 2019) ("If an alien is unable to personally provide such evidence at the time of encounter but claims to have access to such evidence, the alien

58

shall be permitted a brief but reasonable opportunity to obtain it or communicate with a third party to obtain such evidence.").

The record at this stage shows that the Department is not providing any such process. The Eligibility System being applied to the expanded scope of removal is the same one that had been applied to those found at the sea coasts and within 100 air miles of the border, where the likelihood of encountering recent border crossers is much higher. *See Make the Road N.Y.*, 2025 WL 2494908, at *17 (noting that "those living far away from the border are less likely to have recently crossed"); *cf. United States v. Brignoni-Ponce*, 422 U.S. 873, 884–885 (1975).

The Expansion Order provides no added procedures beyond those already in place. It simply leaves it to the detained individual to spontaneously and affirmatively prove two years of continuous residence. *See* Expansion Order, 90 Fed. Reg. at 8,140. The Huffman Memorandum similarly says only that the "actions contemplated by this memorandum shall be taken in a manner consistent with applicable statutes, regulations, and court orders," and relies solely on existing asylum/credible-fear procedures. Huffman Memorandum at 2.

Under the Eligibility System, then, the Department chose to apply only its pre-existing regulations that provide no mechanism for detained individuals to demonstrate their residency length or for immigration officials to consider it. All that those rules require is that an immigration officer first must read a statement from Form I-867A, 8 C.F.R. § 235.3(b)(2)(i) that informs the individual only of the importance of telling the immigration officer if the individual is afraid to return home. Steinberg Decl. at 94, ECF No. 50-23 (reproducing text of Forms I-867A) ("If you fear or have a concern about being removed from the United States or about being sent home, you

59

should tell me so during this interview because you may not have another chance."). Nowhere in that statement is the individual given notice to inform the officer if she has been present in the United States continuously for two or more years. *Id.*

Second, the officer is required to ask four questions from Form I-867B. *See* 8 C.F.R. § 235.3(b)(2)(i). Those questions are: (1) "Why did you leave your home country or country of last residence?" (2) "Do you have any fear or concern about being returned to your home country or being removed from the United States?" (3) "Would you be harmed if you are returned to your home country or country of last residence?" (4) "Do you have any questions or is there anything else you would like to add?" Steinberg Decl. at 94, ECF No. 50-23 (reproducing text of Form I-867B).

Again, these questions—which on their face were designed for operation closer to the border or sea—do not ask about the length of residence, provide no notice of the legal relevance of the person's length of residence, do not request any documentation of residence, and provide no mechanism for individuals to obtain and later present such evidence if they do not happen to have two years of, for example, employment records or rental payment documentation on their person. *Id.* Instead, if the immigration officer determines on the basis of the answers to those four questions that the individual is eligible for Expedited Removal, and a supervising officer reviews and approves that determination, then the individual is ordered to be summarily removed—with no further inquiry or review. 8 U.S.C. §§ 1225(b)(1)(A)(i), 1252(a)(2)(A)(i); 8 C.F.R. § 235.3(b)(2)(i)–(ii).

Absent a credited claim of harm if returned, then, that is now the full sum of the process provided before a person is

60

ordered removed after being found anywhere in the United States no matter how long she has lived here. The question of residence length makes no appearance anywhere in the process. In the Department's own words, "there is no distinct protocol for assessing continuous presence and no express prompt on Form I-867A for immigration officers to expressly ask" about continuous presence. Dep't Stay Mot. 23.

Nor is there any point in the process where an individual is given notice of the relevance of their residence length or an opportunity to provide evidence of continuous presence that would, as a matter of law, take her out of the Expedited Removal process. Simply put, at no point before the district court or this court has the Department shown that it is providing any process to account for the need to cabin Expedited Removal based on a person's ability to demonstrate two years' continuous residence.

The Department makes two arguments that its extant procedure of providing no notice or opportunity to demonstrate residence nonetheless passes constitutional muster. Neither is likely to succeed.

*First*, the Department reasons that the opportunity for detained individuals to *sua sponte* raise their ineligibility for Expedited Removal on residency grounds and to come forward with evidence suffices. *See* Dep't Stay Mot. 23 (citing Castano Decl. ¶ 6, Dep't Stay Mot. Ex. C) (explaining that detained individuals can offer evidence like "banknotes, leases, deeds, licenses, bills, receipts, employment records, and the like").

That argument blinks away the reality that, at least on this record, detained individuals (1) are not informed that they are facing a form of summary removal that could be cut off by evidence of continuous residency, so they do not even know to

61

raise the issue, (2) are highly unlikely to carry with them at all times evidence proving their residency for two continuous years, and (3) have no realistic opportunity to contact a third party able to bring evidence to the detained individual before Expedited Removal occurs. *See Make the Road N.Y.*, 2025 WL 2494908, at *7 (citing Mary Doe Decl. ¶¶ 12–21, ECF No. 50-7) (two individuals apprehended, denied access to a phone, and summarily removed the next morning). For those reasons, the Department's assurance that it will "consider[]" documentary evidence, Castano Decl. ¶ 6, Dep't Stay Mot. Ex. C, only if the detained individual thinks to volunteer it and if she happens to have it on her person, falls far short of affording persons the required "'notice * * * that they are subject to removal'" with "sufficient time and information" to "'actually'" contest their removal. *A.A.R.P.*, 145 S. Ct. at 1368 (quoting *J.G.G.*, 145 S. Ct. at 1006); *see also J.G.G.*, 145 S. Ct. at 1006.

*Second*, the Department argues that there is no constitutional requirement to "affirmatively inform every alien of every possible defense to expedited removal[.]" Dep't Stay Mot. 24. Sure. But when (1) the statute forecloses the application of Expedited Removal to an entire category of persons; (2) the Department admits it is doing nothing on its end to ensure compliance with that restriction on its power, (3) even though the Department has chosen to apply its program in new locations where the risk of misapplication is (at the least) substantial; and (4) the Department chooses to engage in a form of summary removal that does not allow detained individuals any opportunity to learn of the need for such evidence or to obtain it, then due process requires notice and a reasonable opportunity to be heard before summary removal. In other words, the Department cannot erase express statutory limits on its removal power by combining inattention to statutory limitations on its own part with the construction of practicably

62

insurmountable barriers to claiming the law's protection on the part of those affected.

At oral argument, counsel for the Department asserted for the first time thus far in this litigation that immigration officers are following procedures laid out in the "2019 Guidance." Transcript of Oral Argument at 9–15, 46–47, 50–51. Counsel then contended that, under these procedures, it is "very typically" the case that individuals are informed that they are being put into Expedited Removal proceedings due to a lack of continuous presence. *Id.* at 10.

There are multiple problems with this effort to introduce facts for the first time at an appellate argument. *See United States v. Askew*, 529 F.3d 1119, 1142 n.4 (D.C. Cir. 2008) ("*[D]e novo* factfinding" is "wholly inconsistent with the function of an appellate court.").

To start, nothing in the Expansion Order, Huffman Memorandum, or anything else cited by counsel says that the 2019 Guidance applies to the 2025 Expansion Order. In fact, the Department said the opposite in its stay papers: "[T]here is no distinct protocol for assessing continuous presence[.]" Dep't Stay Mot. 23.

In addition, counsel for the Department provided no basis, in the record or otherwise, for characterizing this asserted practice as "very typical[.]" Transcript of Oral Argument at 10. Counsel cited no record evidence at all to support that claim, and we have found none.

Further, the Department has never submitted the 2019 Guidance as part of this record before the district court or even to this court after oral argument, despite an invitation for the Department to do so. Transcript of Oral Argument at 52.

63

The only 2019 Guidance this court could locate simply repeats that the individual "bears the affirmative burden to show to the satisfaction of the encountering immigration officer" that she has been physically present for two years. Dep't of Homeland Sec., Memorandum from Acting Director Matthew T. Albence on Implementation of July 2019 Designation of Aliens Subject to Expedited Removal at 2 (July 24, 2019). The Guidance further lists some examples of evidence that may demonstrate continuous physical presence and states that, if an individual "claims to have access to such evidence," the individual shall be given a "brief but reasonable opportunity to obtain" said evidence. *Id.*

That 2019 Guidance makes things worse, not better, for the Department.

- The omission of any similar reference to an opportunity to obtain evidence of residency length in the Expansion Order and Huffman Memorandum is telling.
- Nothing in that 2019 Guidance remotely suggests that immigration officers are affirmatively asking about residency length, contrary to counsel's statement.
- And counsel's argument appears to be a straw man because that 2019 Guidance was superseded in 2020 by new guidance that says not a word about notifying detained persons of the relevance of their residency length or affording them an opportunity to obtain evidence of residency before removal (at least not in the portions of the memorandum that are publicly available). *See generally* Dep't of Homeland Sec., Memorandum from Senior Official Tony H. Pham Performing

64

the Duties of the Director on Superseding
Implementation Guidance for July 2019
Designation of Aliens Subject to Expedited
Removal (Oct. 2, 2020).

In any event, for purposes of this stay motion, counsel's
wholly unsubstantiated and record-contradicting assertion is an
evidentiary argument that is forfeited. *See Ascension Borgess
Hosp. v. Becerra*, 61 F.4th 999, 1003 (D.C. Cir. 2023)
(deeming forfeited an argument made "for the first time at oral
argument on appeal to this court").

In sum, the Expedited Removal statute requires a
determination of residency length before an individual is
summarily removed, and due process requires that detained
individuals be given "notice and an opportunity to challenge
their removal['s]" legal basis. *J.G.G.*, 145 S. Ct. at 1006. That
notice "must be afforded within a reasonable time and in such
a manner as will allow [detained individuals] to actually seek"
relief from their removal. *Id.* More specifically, the
Department "must" afford detained individuals "sufficient time
and information to reasonably be able to" demonstrate their
ineligibility for Expedited Removal. *A.A.R.P.*, 145 S. Ct. at
1368. Because the Eligibility System chosen to implement the
Expansion Order does not afford detained individuals such
process, the Department is unlikely to succeed in challenging
the constitutional merits of the district court's stay order.

**B**

Turning to the Department's process for evaluating
whether detained persons face a credible fear of harm if
removed to their country of origin or another location, the
Department is likely to succeed in showing that its Credible

65

Fear Procedures under the Expansion Order comply with due process.

As noted earlier, the Expansion Order and the Huffman Memorandum chose to carry forward the preexisting procedures for evaluating detained individuals' credible-fear protections. In stark contrast to the complete absence of any process regarding residency length, the Credible Fear Procedures involve immigration officers directly and specifically asking all persons why they left their home country or country of last residence; if they "have any fear or concern about being returned to [their] home country or being removed from the United States"; and if they would "be harmed if [they] are returned to [their] home country or country of last residence[.]" Steinberg Decl. at 94, ECF No. 50-23 (text of Form I-867B); 8 C.F.R. § 235.3(b)(2)(i) (requiring use of Form I-867AB). These questions are asked only after the immigration officer informs an individual about the importance of coming forward with any "fear" or "concern about being removed from the United States or about being sent home" because the individual "may not have another chance" to do so. Steinberg Decl. at 94, ECF No. 50-23 (text of Form I-867A).

Make the Road does not argue here that those procedures fell constitutionally short when applied to those arriving from the sea or within 100 air miles of a land border. It argues only that they run afoul of the Due Process Clause when applied nationwide under the Expansion Order.

The difficulty for Make the Road is that, unlike the new need to evaluate residency length as Expedited Removal operates far away from sea and land borders, nothing about the Expansion Order changes the nature of the credible-fear inquiry or its analysis. Make the Road has not shown that those facing a credible fear of persecution or harm are any more

66

likely to be present in the interior of the United States than at its borders and abutting seas.  Nor has it shown how the existing procedures become any less reliable in ensuring compliance with statutory protections and limitations on Expedited Removal when asked in Illinois rather than in Arizona.

In addition, unlike the procedures' marked silence with respect to residency length, the Credible Fear Procedures give affirmative and official notice to individuals that their fear of harm is relevant to their potential removal through the immigration officer's repeated raising of the issue.  In addition, the Credible Fear Procedures invite individuals to provide information about the source and nature of their fear to the immigration officer.  *See* 8 C.F.R. § 235.3(b)(2)(i); Steinberg Decl. at 94, ECF No. 50-23 (Form I-867AB).  If an individual just "indicates" or "expresses" a fear of persecution or torture, or of harm upon removal, then the individual is taken out of the Expedited Removal process and referred for a credible-fear interview with an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(i) & (ii); 8 C.F.R. § 235.3(b)(4).   Before that interview, an individual "may consult" with persons of their choosing and, during the hearing, the individual "may present other evidence, if available."  8 C.F.R. § 208.30(d)(4).  An adverse credible-fear decision can then be appealed to an immigration judge, which includes "an opportunity" for the individual "to be heard and questioned[.]"  8 U.S.C. § 1225(b)(1)(B)(iii)(III).  Also, unlike the residency issue, individuals are not expected at the time of initial detention to produce hard evidence of their credible fear.

Nonetheless, Make the Road argues, and the district court determined, that the procedures for determining whether an individual has a credible fear of persecution are inadequate.  These alleged defects include that (1) the decision of whether to refer an individual for a credible fear interview is made by

67

an immigration officer, with no review of the decision outside of the Executive Branch, and (2) credible-fear interviews are conducted so quickly that there is no opportunity for an individual to gather and present evidence, or to prepare for an appeal to an immigration judge. *See* Am. Compl. ¶¶ 74–84, ECF No. 27 (citing 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. §§ 208.30(d), 1003.42(c)); *Make the Road N.Y.*, 2025 WL 2494908, at *15 (citing 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 208.30(d)).

While not foreclosing the possibility that Make the Road could make out a constitutional due process problem going forward, at this preliminary juncture it has not shown how the existing procedures are any less reliable when employed as a means of implementing the expansion of Expedited Removal's scope, which is the only due process challenge advanced here. *Cf. Thuraissigiam*, 140 S. Ct. at 1963–1964, 1982–1983 (2020) (holding that these procedures are constitutionally sufficient for people "at the threshold of initial entry").

For those reasons, the Department has shown at this stage that Make the Road is not likely to succeed in its challenge to the Credible Fear Procedures that implement the Expansion Order.

**V**

The remaining stay factors—irreparable harm, the balance of the equities, and the public interest—also counsel against granting the Department's requested stay as to the Eligibility System.

The Department has not carried its burden of showing that it will face irreparable injury, *Nken*, 556 U.S. at 433–434, as is required to secure the "extraordinary relief of a stay pending

68

appeal," *Citizens for Resp. & Ethics in Wash. v. FERC*, 904
F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam).

The Department's and dissenting opinion's primary
contention is that the government "'suffers a form of
irreparable injury' '[a]ny time [it] is enjoined by a court from
effectuating statutes enacted by representatives of its people.'"
Dep't Stay Mot. 24 (quoting from a parenthetical in *CASA*, 145
S. Ct. at 2562); Dissenting Op. at 18. The district court's
Section 705 stay order, in the Department's view, interferes
with executive implementation of immigration law both by
"halt[ing] expedited removal" of newly designated foreign
individuals and by "interfer[ing] with the Executive's
constitutional and statutory responsibility to remove" those
"who have no right to remain in the country—including [those]
with criminal records." Dep't Stay Mot. 25.

We disagree. To start, the Department overreads the
district court's order. That stay order does not prevent the
Department from effectuating the Expedited Removal statute
to remove statutorily eligible individuals. *See generally Make
the Road N.Y.*, 2025 WL 2494908. As the district court
underscored, the Department remains free to "implement"
"modest procedural safeguards" in pursuing Expedited
Removal of the newly designated group of individuals through
"constitutionally adequate procedures." *Id.* at *19. The
Department is not irreparably harmed merely because it cannot
implement the Expedited Removal statute using
constitutionally deficient procedures. As we have explained,
the government may not "prioritize any policy goal over the
Due Process Clause." *Karem v. Trump*, 960 F.3d 656, 668
(D.C. Cir. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653
(D.C. Cir. 2013)) (addressing the government's harm in
balance of equities analysis).

69

Further, our determination that Make the Road is likely to succeed on the merits of its due process claim, Section IV.A, *supra*, "lightens the Executive's stated interests," *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022). We recognize the government's responsibility for removing unlawfully present individuals and appreciate that Expedited Removal is one of the tools Congress has prescribed for doing so. *See* 8 U.S.C. § 1225(b). But courts cannot "permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021) (citation omitted). Indeed, the Supreme Court has explained that even the government's "significan[t]" immigration "interests" must be "pursued in a manner consistent with the Constitution." *See A.A.R.P.*, 145 S. Ct. at 1368 (temporarily enjoining summary removal of alleged members of a terrorist organization under the Alien Enemies Act "while the question of what notice is due is adjudicated").

Said more simply, we have found that Make the Road is likely to succeed in showing that the Department is *not*, in fact, "effectuating [the] statute[] enacted by representatives of its people" because it is not giving effect to the statute's exclusion of individuals capable of showing that they have been present in the United States more than two years. *CASA*, 145 S. Ct. at 2562. That is the central problem with the Department's choice to proceed with no procedures in place at all to ensure the statute is enforced within the limits Congress—the "representatives of its people"—set. *Id.*

Next, the Department insists that the stay order will "impose[] substantial administrative burdens by requiring [the Department] to litigate [Section] 240 removal hearings if it chooses to pursue removal," thus leading to "reduced detention capacity for [individual]s who are removal priorities." Dep't Stay Mot. 25. But the district court's stay order maintains the

70

status quo that has existed for decades:  The Department has litigated Section 240 removal proceedings for foreign individuals encountered beyond the sea coasts or more than 100 air miles from the border consistently since 2004 (with at most an arguable-but-unproven seven-month interlude).  *See* Section I.B, *supra.*  The Department provides no justification for why irreparable injury will result from continuing this decades-long practice for a short period of time while this court adjudicates the merits of this appeal.

In addition, the Department's asserted administrative injuries are too speculative to support a stay.  Injuries warranting a stay pending appeal "must be 'both certain and great,' 'actual and not theoretical,'" and "'immin[ent]'" such "'that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  Here, the Department has not even alleged that the district court's order *will* lead them to run out of detention capacity or *will* render them unable to detain individuals with serious criminal records.  Instead, it alleges that limits on Expedited Removal will "reduce[]" to some unexplained extent "available detention space for higher-priority removals" and "limit" in some unexplained way "ICE's ability to detain newly encountered and apprehended [individual]s with serious criminal records or other derogatory information."  Castano Decl. ¶ 12, Dep't Stay Mot. Ex. C.  And the Department posits that restricting Expedited Removal "*may* result in [deportation] flights that are not filled to capacity, creating additional challenges for ICE in planning and carrying out removals efficiently."  *Id.* ¶ 13 (emphasis added).  These vague and speculative assertions of "what is likely to occur" are insufficient to carry the Department's weighty burden of showing irreparable injury.  *Wisconsin Gas Co.*, 758 F.2d 669,

71

674 (D.C. Cir. 1985) (per curiam) ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur. The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.").

That is especially so because it is only a cognizable "injury" if the Department has confined those removals, detentions, and airline flights to individuals statutorily authorized to be summarily removed—a showing it has not made on this record because it admits it has no procedures in place to differentiate between individuals based on residency length.[8]

Finally, the Department's asserted economic loss from increased detention driving up costs, Dep't Stay Mot. 25— "does not, in and of itself, constitute irreparable harm," *Wisconsin Gas*, 758 F.2d at 674; *accord Mexichem Specialty Resins, Inc.*, 787 F.3d. at 555 ("Where the injuries alleged are purely financial or economic, the barrier to proving irreparable injury is higher still, for it is well settled that economic loss does not, in and of itself, constitute irreparable harm." (internal quotation marks omitted)).

---

[8] Also, of note, the Department did not raise these factual assertions of administrative injuries in its request for a stay in the district court. ECF 67, 14–16; *see Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 720 (D.C. Cir. 2016) ("Generally, an argument not made in the lower tribunal is deemed forfeited and will not be entertained [on appeal] absent exceptional circumstances.") (citation omitted). Nor is the Liana J. Castano Declaration (attached as "Exhibit C" to the government's Emergency Motion for an Administrative Stay and a Stay Pending Appeal) part of the district court record.

72

By contrast, staying the district court's order would irreparably harm Make the Road's members facing an imminent risk of removal under constitutionally inadequate procedures. *See* Section IV.A, *supra*. As we have reiterated, "a prospective violation of a constitutional right constitutes irreparable injury." *Karem*, 960 F.3d at 667 (internal quotations omitted). Expedited removal proceedings begin and end within a matter of hours or days, Hartzler Decl. ¶ 13, ECF No. 50-16, leaving individuals caught up in such proceedings with virtually no opportunity to obtain the procedural protections that the Constitution guarantees prior to removal. The statutory limitations on habeas corpus likewise provide no such opportunity to press a due process claim to the Eligibility System. 8 U.S.C. § 1252(e)(2).

Nor is there any realistic avenue by which Make the Road's members could retroactively obtain the process they were denied after removal. *See Abrego Garcia*, 145 S. Ct. at 1018 (noting that the district court may have exceeded its authority in ordering the Executive Branch to "effectuate" the return of a wrongfully expelled individual); *Make the Road N.Y.*, 2025 WL 2494908, at *21 (disclaiming any power to order the Department to provide removed individuals due process); *see also Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306, 2025 WL 1825431, at *56 (D.D.C. July 2, 2025) (noting that the government has "taken the position that [the district court] lacks the authority to provide relief to any [individual]s once they are removed").

Turning to the public interest, Make the Road's likelihood of success on the merits of its due process claim is a "strong indicator" that leaving in place the district court's stay would "serve the public interest because [t]here is generally no public interest in the perpetuation of unlawful agency action."

73

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (alteration in original) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)) (quotation marks omitted). It is worth reiterating that the "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653. "Plus," as we have recently recognized, "the Supreme Court has said that the public has a strong interest in 'preventing [foreign individuals] from being wrongfully removed.'" *Huisha-Huisha*, 27 F.4th at 734 (quoting *Nken*, 556 U.S. at 436); *see A.A.R.P.*, 145 S. Ct. at 1367.

## VI

Lastly, the Department objects that the district court did not confine the stay to Make the Road and any members it identifies to the government. That argument bears little prospect of success.

The APA authorizes a district court, in reviewing agency action, to grant "[r]elief pending review" when and "to the extent necessary to prevent irreparable injury[.]" 5 U.S.C. § 705. Specifically, if warranted, the court may "issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve status or rights pending conclusion of the review proceedings." *Id.*

Relying on that statutory authority, the district court ordered that:

[P]ending conclusion of the review proceedings, the effective dates of implementation and enforcement of the January 21 Designation Notice and the January 23 Huffman Memorandum, insofar as it implements the

74

January 21 Designation Notice, are immediately
postponed and stayed.

Dist. Ct. Stay Order, ECF No. 65, at 1.

The Department argues that the district court's order
amounts to a "universal stay" that exceeds the authority granted
by Section 705. Dep't Stay Mot. 26. Relying on *Trump v.
CASA, Inc.*, 145 S. Ct. 2540 (2025), the Department argues that
this court must "limit" the district court's stay so that it applies
only to Make the Road's clients, Dep't Stay Mot. 26 (quotation
marks omitted), who necessarily would have to be identified in
advance to benefit from the order's protections. That argument
is unlikely to succeed for three reasons.

*First*, *CASA* does not control the scope of relief available
under Section 705. In *CASA*, the Supreme Court answered the
question "whether Congress has granted federal courts the
authority to universally enjoin the enforcement of an executive
or legislative policy[.]" 145 S. Ct. at 2550. To do so, the Court
looked to the statute under which the courts had entered the
injunctions at issue: the Judiciary Act of 1789. That statute
endows federal courts with jurisdiction over "all suits * * * in
equity." *Id.* at 2551 (quoting § 11, 1 Stat. 78). The Court then
reasoned that the scope of the authority granted is analogous to
that wielded "by the High Court of Chancery in England at the
time of the adoption of the Constitution and the enactment of
the original Judiciary Act." *Id.* (quoting *Grupo Mexicano de
Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308,
318–319 (1999)). The Court also surveyed the practices of
"founding-era courts of equity." *Id.*

Drawing from those historical predicates, the Supreme
Court concluded that so-called "universal injunctions"—
injunctions tailored to the defendant's unlawful action rather

75

than the plaintiff's harms—"lack[] a historical pedigree," and so "fall[] outside the bounds of a federal court's equitable authority under the Judiciary Act." *CASA*, 145 S. Ct. at 2554; *see id.* at 2567 (Kavanaugh, J., concurring) ("Under [*CASA*], district courts issuing injunctions under the authority afforded by the Judiciary Act of 1789 may award only plaintiff-specific relief.").

As the Court's analysis shows, *CASA* is a statutory-interpretation case, and the statute interpreted was the Judiciary Act of 1789. Necessarily then, *CASA* is *not* a case about the scope of relief for agency review authorized by the APA when it was adopted in 1946. The Supreme Court has said as much: "Nothing" in *CASA* "resolves the distinct question whether the Administrative Procedure Act authorizes federal courts" to issue defendant-specific relief. 145 S. Ct. 2554 n.10; *see also id.* at 2567 (Kavanaugh, J., concurring) ("[I]n cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily set aside a new agency rule.") (quotation marks omitted). The Department accordingly does next to nothing to advance the ball by pointing to *CASA* as the source of its purported limitation on the scope of stay relief under the APA.

*Second*, the Department's argument that *CASA* shows that "'irreparable injury' in the context of interim equitable relief refers to irreparable injury to the plaintiff—not third parties" does not hold up. Dep't Stay Mot. 26 (citing *Immigrant Defs. Law Ctr.*, 145 F.4th at 996).

For starters, the Department's party-specific-relief rule ill fits Section 705's text. Section 705 empowers courts "to postpone the effective date *of an agency action*[.]" 5 U.S.C. § 705 (emphasis added). As explained, in Section III.D, *supra*, Section 705 stays operate on the legal source of authority for

76

an agency to act at all.  They generally do not simply insulate certain parties from enforcement measures.

Section 705 also speaks in terms of "*the* effective date" of an agency rule or policy.  5 U.S.C. § 705 (emphasis added). "[T]hat definite article suggests specificity."  *Noel Canning v. NLRB*, 705 F.3d 490, 500 (D.C. Cir. 2013).  Which makes sense because agency orders, regulations, and rules almost always have but one effective date.  If a court orders that an agency action shall not apply against certain individuals, but that the agency can apply that action against everyone else, *the* effective date of the action has not been postponed.

To be sure, Section 705 stays can only operate "to the extent necessary to prevent irreparable injury[.]"  5 U.S.C. § 705.  That just means that courts should stay the effective date only of those portions of the agency action that are inflicting injury.  For example, if one severable piece of an omnibus rulemaking is at issue, a district court should postpone the effective date of the severable piece and let the other portions of the rule take effect as scheduled.  *See Career Colls. & Schs. of Texas v. Department of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (Section 705 "relief should only involve postponing the effective date of the portions of the [agency action] that [the plaintiff] actually challenges and for which it has shown a likelihood of success on the merits.") (emphasis omitted).

That is exactly what this court is doing.  Because Make the Road is likely to succeed on the merits of its challenge to the Eligibility System, we deny the government's application to stay the district court's Section 705 order postponing the effective date of those portions of the Expansion Order and Huffman Memorandum adopting that system.  But because Make the Road is unlikely to succeed on its challenge to the

77

Credible Fear Procedures, we are granting a stay of that portion of the district court's Section 705 stay order.

In addition to the textual indicia cutting against the Department's position, the Department has not shown that the background equitable principles at play in *CASA* translate to the APA. In fact, there is good reason to think that Congress did not intend to incorporate "background equitable principles" into the APA. *Corner Post, Inc. v. Board of Governors of Fed. Reserve Sys.*, 144 S. Ct. 2440, 2467 (2024) (Kavanaugh, J., concurring). "'Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA' and related statutory provisions 'go further by empowering the judiciary to act directly against the challenged agency action.'" *Id.* (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018)). That "depart[ure]" from traditional equity follows from Congress's understanding that the APA tasked courts with reviewing agency actions "the same way that appellate courts [review] the judgments of trial courts." *Id.*

As a result, the founding-era history and tradition of equity that underlay *CASA* says little about the framework for judicial review that informed the APA's remedial provisions. And the Department, for its part, has not made any argument or showing that, at the time of the APA's enactment, relief ordered by courts in analogous circumstances in the first half of the 20th Century was confined to party-specific remedies. In fact, caselaw suggests otherwise. *See Scripps-Howard Radio v. FCC*, 316 U.S. 4, 16–17 (1942) (A statute providing for judicial review of agency action but lacking express authority to issue stays "affords no warrant for depriving the Court of Appeals of the conventional power of an appellate court to stay the enforcement of an order pending the determination of an appeal[] challenging its validity"—"a power as old as the

78

judicial system of the nation."); *Chicago, Rock Island & Pac. Ry. Co. v. United States*, 284 U.S. 80, 87, 96, 100 (1931) ("[T]he court below should have set aside paragraph (5) of" an Interstate Commerce Commission regulation governing "[a]ll common carriers by railroad in the United States" because that portion of the regulation "is in flat opposition to the [underlying policy] finding and cannot be permitted to stand.").[9]

*Third*, the Department's procrustean effort to stretch *CASA*'s plaintiff-specific remedial framework onto the APA defies "countless" precedents to the contrary. *Corner Post*, 144 S. Ct. at 2463 (Kavanaugh, J., concurring). The Supreme Court regularly, repeatedly, and recently has applied Section 705's statutory neighbor, Section 706, to provide universal relief under the APA. *E.g.*, *Department of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1916 & n.7 (2020); *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 486 (2001); *Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 364–365 (1986). And we have held, in binding precedent that controls our action on this stay motion, that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon*, 878 F.2d at 495 n.21; *see Bridgeport*

---

[9] *See also Corner Post*, 144 S. Ct. at 2468 (Kavanaugh, J., concurring) (observing that "examples abound" of relevant historical analogues for universal relief under the APA); Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L.J. 2304, 2326–2335, 2354–2359 (2024) (collecting examples from immediately before and after the APA); Robert H. Jackson, *Final Report of Attorney General's Committee on Administrative Procedure* 116–117 (1941) (Under "the recent statutes conferring rule-making power" on agencies, a reviewing court's "judgment adverse to a regulation results in setting it aside.").

79

*Hosp.*, 108 F.4th at 890 ("When an agency's action is unlawful, vacatur is the normal remedy.") (quotation marks omitted).

The story is the same under Section 705. In recent years the Supreme Court has twice stayed agency actions *in toto* pending judicial review without narrowing its relief to the parties at hand. *NFIB v. OSHA*, 142 S. Ct. 661, 664 (2022) (universally staying vaccine mandate); *West Virginia v. EPA*, 577 U.S. 1126, 1126 (2016) (universally staying Clean Power Plan). And this court too has long recognized the availability of such relief. *See In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985).[10]

For all of those reasons, the Department is unlikely to succeed in its argument that Section 705 stays must be confined to the plaintiffs before the court.

## VII

In conclusion, we deny the Department's motion for an administrative stay and a stay pending appeal of the district court's order suspending the effective dates of those portions of the Expansion Order and Huffman Memorandum that establish the Eligibility System for Expedited Removal. We grant a stay to the extent that the district court's order required

---

[10] When the government first previewed its theory of plaintiff-specific relief under the APA at oral argument in *United States v. Texas*, 143 S. Ct. 1964 (2023), Chief Justice Roberts exclaimed "Wow" before noting that the government's position would undermine "what the D.C. Circuit and other courts of appeals have been doing all the time as a staple of their decision output[,]" which decisions the Supreme Court has upheld "over and over and over again." Transcript of Oral Argument at 36, 38, *Texas*, 143 S. Ct. 1964 (No. 22-58).

80

any changes to the Credible Fear Procedures for those individuals who qualify for Expedited Removal. We previously issued an order expediting the appeal, which will be heard in December 2025.

RAO, *Circuit Judge*, dissenting: The Secretary of the Department of Homeland Security ("DHS") expanded the application of expedited removal procedures to all aliens eligible under the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). The Secretary explained that this will "enhance national security and public safety" and that "full application of expedited removal authority will enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139, 8139 (Jan. 24, 2025) (the "Designation Notice").

The district court stayed implementation of the Secretary's decision, concluding that Make the Road was likely to succeed on its due process claim and that interim relief was appropriate under the Administrative Procedure Act ("APA"). The government seeks a stay of the district court's order pending appeal so that it may continue to carry out its immigration enforcement priorities.

I would grant the government's motion. The government is likely to succeed on the merits because there are at least three threshold problems with the stay ordered by the district court. First, the district court lacked jurisdiction to entertain Make the Road's due process claim, which challenges longstanding procedures used to carry out expedited removals. Those procedures had to be challenged within 60 days of when they were first implemented, which all agree occurred years ago. Second, even assuming it had jurisdiction over Make the Road's due process claim, the district court erred by ordering a stay under APA section 705 as a remedy for a non-APA claim. And finally, regardless of the underlying source of remedial authority, the district court's sweeping stay order is barred by IIRIRA's strict limitations on judicial relief. The government suffers irreparable harm from this impermissible judicial interference with the Secretary's authority to carry out

2

expedited removals, and the balance of the equities tips in the government's favor. I respectfully dissent.

I.

IIRIRA amended the Immigration and Nationality Act ("INA") "to substantially shorten and speed up the removal process" for aliens not lawfully admitted to this country. *Make the Road N.Y. v. Wolf* ("*Make the Road I*"), 962 F.3d 612, 618 (D.C. Cir. 2020). As relevant here, expedited removal proceedings may be initiated against certain inadmissible aliens who have "not affirmatively shown, to the satisfaction of an immigration officer," that they have been continuously present in the country for two years. 8 U.S.C. § 1225(b)(1)(A)(iii)(II). The Secretary may designate "any or all" such aliens for expedited removal.[1] 8 U.S.C. § 1225(b)(1)(A)(iii)(I).

Two features of IIRIRA's expedited removal regime are especially relevant to this case. First, the Secretary's decision to designate eligible aliens for expedited removal is not reviewable under the APA because it is committed to the Secretary's "sole and unreviewable discretion." *Id.*; *see Make the Road I*, 962 F.3d at 631–35. Second, while this court has interpreted IIRIRA to permit judicial review of policies implementing the expedited removal statute, such review is subject to jurisdictional and remedial limitations. A challenge to any such policy must be "filed no later than 60 days after" it is "first implemented." 8 U.S.C. § 1252(e)(3)(B). And lower courts are stripped of "jurisdiction or authority to enjoin or restrain the operation of" the expedited removal provisions

---

[1] Section 1225(b) refers to the Attorney General, whose authority under the statute has since been transferred to the Secretary of DHS. *See* 6 U.S.C. §§ 251, 557.

3

(except in individual removal proceedings, which are not at issue here). *Id.* § 1252(f)(1).

For years, the only aliens designated by the Secretary for expedited removal were those who arrived by sea and those who, having arrived by land, were apprehended within 100 miles of the border and within 14 days of entry. In January 2025, the Secretary issued a designation expanding expedited removal "to the fullest extent authorized by statute." Designation Notice, 90 Fed. Reg. at 8139. This permitted the application of expedited removal procedures to inadmissible aliens apprehended anywhere in the country who could not show at least two years of continuous physical presence. The Secretary also issued a guidance memorandum for implementation of the designation. DHS, Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) (the "Guidance"). The Guidance did not impose any new procedures for carrying out expedited removals.

Make the Road filed this lawsuit challenging the Designation Notice and Guidance, asserting violations of the APA as well as a constitutional claim that the procedures for expedited removal violated the Fifth Amendment's Due Process Clause. Although IIRIRA generally bars judicial review of actions related to expedited removal, Make the Road averred that its claims fell within a narrow jurisdictional exception. *See* 8 U.S.C. § 1252(e)(3)(A). Under *Make the Road I*, this exception confers jurisdiction over pre-enforcement challenges to written policies and procedures implementing the expedited removal statute. *See* 962 F.3d at 625–26.

In June 2025, Make the Road sought interim relief—but not in the form of a preliminary injunction, which would be squarely barred by section 1252(f)(1). *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064–65 (2022). Instead, Make the

4

Road invoked 5 U.S.C. § 705, the APA provision for relief pending judicial review. Explaining that Make the Road was "seeking a stay," rather than an injunction, the district court relied on section 705 to stay implementation of the Designation Notice and Guidance. *Make the Road N.Y. v. Noem*, 2025 WL 2494908, at *7–9 & n.14 (D.D.C. Aug. 29, 2025). The court expressly declined to address the government's argument, based on *Make the Road I*, that the designation decision was committed to the Secretary's discretion by law and thus unreviewable under the APA. The district court also made clear that it did not reach the APA claims and instead rested the grant of section 705 relief exclusively on Make the Road's non-APA due process claim. The government moved for a stay.

## II.

To prevail on an application for a stay pending appeal, the applicant must make "a strong showing that it is likely to succeed on the merits" of its appeal, "that it will be irreparably injured absent a stay, that the balance of the equities favors it, and that a stay is consistent with the public interest." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (cleaned up). The most critical of these factors is the likelihood of success on the merits. *See Ohio v. EPA*, 144 S. Ct. 2040, 2052–53 (2024). When the government is a party, the balance of the equities and public interest factors merge. *See Nken* v. *Holder*, 556 U.S. 418, 435 (2009).

## III.

The government is likely to prevail on the merits because the relief ordered by the district court is foreclosed in multiple ways.[2] First, Make the Road's due process claim—the only

---

[2] I agree with my colleagues that we have appellate jurisdiction because the district court's order has the "practical effect" of granting

5

claim the district court addressed—challenges the adequacy of longstanding procedures used to carry out expedited removals. Because these procedures were first implemented more than 60 days before Make the Road's lawsuit was filed, this due process challenge is barred by section 1252(e)(3)(B)'s jurisdictional time bar. Moreover, even if Make the Road's due process claim is characterized as a challenge to the issuance of the Designation Notice and Guidance, such that it was timely, the district court lacked authority to grant relief predicated on section 705 of the APA. Such relief was not available here because the district court considered only a non-APA, i.e., equitable, constitutional claim. Finally, even if relief under section 705 were available, the district court's stay is barred because it "restrain[s] the operation of" IIRIRA's expedited removal provisions outside the context of an individual removal proceeding. 8 U.S.C. § 1252(f)(1).

A.

Section 1252(e)(3)'s jurisdictional time bar precludes Make the Road's due process claim. A lawsuit under subsection (e)(3) "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure … is first implemented." 8 U.S.C. § 1252(e)(3)(B). This time bar is jurisdictional, so it cannot be forfeited and is not subject to equitable tolling. *M.M.V. v. Garland*, 1 F.4th 1100, 1108–10 & n.6 (D.C. Cir. 2021). The key question for whether a claim is timely under section 1252(e)(3)(B)—and whether judicial review is available—is when the relevant policy or procedure was "first implemented." "[F]irst

---

an injunction, has irreparable consequences, and can be effectively challenged only by immediate appeal. *See Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d 1258, 1261–62 (D.C. Cir. 2012) (applying *Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981)).

6

implemented" can mean either when the policy or procedure is promulgated or when it is first applied *anywhere*—but "not when it is first applied" to the specific alien(s) bringing a legal challenge. *M.M.V.*, 1 F.4th at 1108–09; *accord Mendoza-Linares v. Garland*, 51 F.4th 1146, 1157 (9th Cir. 2022).

Make the Road's due process claim is foreclosed by the 60-day time bar. As the district court recognized, the due process claim challenges the adequacy of preexisting expedited removal procedures *as applied* to the expanded class of aliens. *See Make the Road N.Y.*, 2025 WL 2494908, at *14–18; *see also* Majority Op. 58–60 (analyzing preexisting procedures). The Designation Notice and Guidance direct DHS to extend expedited removal to a new class of aliens, but neither document sets out new procedures. Rather, they direct the agency to apply preexisting expedited removal procedures to these aliens. *See* Majority Op. 16 ("[T]he Department made the decision to apply only its preexisting procedures."); 8 C.F.R. § 235.3(b) (codifying procedures). These "challenged … procedure[s]" were "first implemented," at the latest, when the government first applied them to any alien designated for expedited removal. *See* 8 U.S.C. § 1252(e)(3)(B); *M.M.V.*, 1 F.4th at 1109, 1111. Because the first application of these procedures indisputably occurred years ago, and certainly more than 60 days before Make the Road brought its due process claim, the district court lacked jurisdiction to consider it.

The Designation Notice and Guidance apply longstanding expedited removal procedures to a new class of aliens, but that does not reset the 60-day time bar. The majority's contrary conclusion is squarely foreclosed by this court's decision in *M.M.V.*[3] In that case, the plaintiff aliens challenged a written

---

[3] My colleagues mark the 60-day time bar from the promulgation of the Designation Notice and Guidance because that is when the

7

agreement that allowed U.S. Customs and Border Protection ("CBP") agents to conduct credible fear interviews. *M.M.V.*, 1 F.4th at 1108. We explained the 60-day time bar began to run either when the agreement became effective or "when CBP agents began conducting interviews"—"not when [the agreement was] first applied to specific facilities or aliens." *Id.* at 1109. The *M.M.V.* plaintiffs had argued the 60-day clock began when the policy was applied to the facility where they were held. *Id.* We rejected this argument, explaining that "Congress designed the statute so that the 60 days ran from a fixed point, the initial implementation of the challenged provisions, *rather than from the date of application ... to a particular alien*." *Id.* at 1111 (emphasis added) (cleaned up).

The 60-day time bar thus operates as a statute of repose: it runs from the date of the government's first implementation, not from any particular plaintiff's injury. *See CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014). The expedited removal procedures challenged by Make the Road were "first implemented" years ago when applied to other aliens. The application of those procedures to a new class of aliens is irrelevant to the 60-day time bar, which prohibits judicial reassessment of expedited removal procedures and policies every time the Secretary exercises his unreviewable discretion to designate additional eligible aliens. Of course, this means

---

expedited removal procedures were applied to aliens "within the Nation's interior." Majority Op. 28. Even assuming such aliens might have different due process claims than those apprehended close to the border, that is irrelevant to the 60-day jurisdictional time bar, which runs from when the expedited removal procedures were "first implemented." *M.M.V.*, 1 F.4th at 1109. Nor can this court evade the time bar by describing the application of preexisting procedures to a new class of aliens as an unwritten "decision ... to omit" some unspecified new procedures. *Contra* Majority Op. 30.

8

that for many aliens newly designated for expedited removal, "there is no possibility of bringing a challenge at all." *Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1363 (D.C. Cir. 2000) (cleaned up). "But this is precisely what Congress intended." *Id.*

In sum, we must respect the jurisdictional time bar Congress enacted in section 1252(e)(3). Make the Road's due process claim—the sole basis for the stay order—challenges expedited removal procedures first implemented years ago, well outside the 60-day period. Because the district court lacked jurisdiction over the due process claim, the government is likely to succeed in its challenge to the district court's stay order.

B.

Even if we accept the majority's conclusion that Make the Road's due process claim is timely, the government is still likely to succeed on the merits. The district court lacked authority to stay implementation of the Designation Notice and Guidance for two distinct reasons. First, the district court reached only Make the Road's non-APA constitutional claim, so relief under section 705 of the APA was not available. Second, the district court's stay order is barred by section 1252(f)(1) because it "restrain[s] the operation of" IIRIRA's expedited removal provisions outside the context of an individual removal proceeding.

1.

The district court erred by providing an APA remedy without identifying any viable APA claim.[4] Make the Road's

---

[4] The government did not raise this argument in its stay motion. This omission does not, however, foreclose our consideration of the issue.

9

motion asked the district court to "postpone the effective date" of the Designation Notice and Guidance under section 705 of the APA. In granting the motion, the district court made clear it did "not reach Make the Road's APA claims" and was "instead ruling only on the constitutional claim."[5] *Make the Road N.Y.*, 2025 WL 2494908, at *9 n.14. The court was also clear that it was relying on section 705 to authorize the stay. *Id.* at *8. In other words, the district court concluded that Make the Road was likely to succeed on an equitable constitutional claim, but rather than grant an appropriate equitable remedy, issued a stay under the APA.

   Applying an APA stay under section 705 to an equitable constitutional claim appears to be wholly novel and finds no

_____

A "court may consider an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief." *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (cleaned up). Whether the district court could rely on section 705 of the APA in the absence of an APA claim strikes at Congress's careful limits on the APA cause of action, limits the parties cannot constructively amend by stipulation or forfeiture.

[5] Make the Road's amended complaint does not specify whether its due process claim is brought under the APA or as an equitable constitutional claim. *Cf.* Majority Op. 42. That claim, however, is the only one of Make the Road's six claims that does not refer to the APA. In any event, we are reviewing the district court's stay order, and the district court explicitly stated that it was not relying on any APA claim. If the district court was in fact relying on an APA claim, it would run into the restrictions of *Make the Road I*, as the government argued. If we take the district court at its word, then this non-APA constitutional claim must be understood as an equitable constitutional claim.

10

support in the text or structure of the APA.[6] Under section 705, a court reviewing agency action "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. This provision ties the relief described to the existence of ongoing "review proceedings," which is most naturally read as referring to proceedings *under the APA*. This reading is consistent with section 701, which provides that "[t]his chapter applies, according to the provisions thereof, except to the extent that" no APA claim is available because "statutes preclude judicial review" or "agency action is committed to agency discretion by law." *Id.* § 701(a). Considering the APA's text and structure, section 705 does not provide a free-floating remedy divorced from the existence of an APA claim.[7] *See Webster v. Doe*, 486 U.S. 592, 599 (1988) (recognizing that section 701 "limits application of the entire APA"); *cf. Deanda v. Becerra*, 96 F.4th 750, 767–68 (5th Cir. 2024) ("We know of no authority … authorizing a court to vacate a regulation under § 706(2) in the absence of an APA claim."). The district court lacked authority to issue relief predicated on section 705 without addressing any APA claim.

The mismatch between the equitable constitutional claim and the APA remedy is a legal error warranting a stay of the

---

[6] I am not aware of any case or authority, nor does the district court cite one, for imposing a statutory APA remedy as redress for an equitable constitutional claim.

[7] To be sure, the APA permits challenges to agency actions that are "contrary to constitutional right." 5 U.S.C. § 706(2)(B). But as explained, the district court did not construe Make the Road's due process challenge as an APA claim, presumably because the Designation Notice is committed to agency discretion by law and therefore not reviewable under the APA. *See Make the Road I*, 962 F.3d at 631–34.

11

district court's order, particularly because Make the Road otherwise cannot dodge the restrictions on judicial review in IIRIRA and the APA.

Let me explain. Make the Road brought several APA claims challenging the Designation Notice and Guidance. But this circuit has squarely held that designation decisions are "committed to agency discretion by law" and therefore not judicially reviewable under the APA. *Make the Road I*, 962 F.3d at 631–32 (quoting 5 U.S.C. § 701(a)(2)). So instead of resting its stay on Make the Road's APA claims, the district court found a likelihood of success on an equitable constitutional claim alleging the Designation Notice and Guidance violated due process. It is true that plaintiffs may rely on an equitable cause of action for violations of the Constitution by federal officers, even in the absence of a statutory cause of action. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Because such claims are equitable, courts may remedy violations with appropriate forms of equitable relief, most commonly injunctions against government action in excess of constitutional authority. The district court could not enter an injunction for this claim, however, because IIRIRA explicitly bars injunctive relief in this context, as all agree. *See* 8 U.S.C. § 1252(f)(1); *Aleman Gonzalez*, 142 S. Ct. at 2064–65. Taking all of this together, the district court relied on an equitable constitutional claim, thereby avoiding the limitations of the APA; the court then imposed an APA remedy, thereby at least nominally avoiding the limitations on relief in IIRIRA.

Because the district court lacked authority to stay the implementation of the Designation Notice and Guidance under APA section 705, the government is likely to succeed on appeal.

12

2.

Finally, even if an APA stay can issue in the absence of an APA claim, the district court's order is barred by section 1252(f)(1). Under section 1252(f)(1), "Regardless of the nature of the action or claim … no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" the expedited removal statute.[8] 8 U.S.C. § 1252(f)(1). The Supreme Court has not addressed the specific question of whether an APA stay is barred by section 1252(f)(1). *Cf. Biden v. Texas*, 142 S. Ct. 2528, 2540 n.4 (2022); *Aleman Gonzalez*, 142 S. Ct. at 2065 n.2. But the plain meaning of "enjoin *or restrain*" encompasses more than just injunctions and, following the reasoning of the Supreme Court, includes the relief ordered here.

As explained above, the district court relied on section 705 of the APA to order a "stay of agency action … pending conclusion of these review proceedings." *Make the Road N.Y.*, 2025 WL 2494908, at *23. It is undisputed that if the district court styled its order as a preliminary injunction, the order would be barred by section 1252(f)(1). *See* Oral Arg. Tr. 69:22–70:2 (Make the Road conceding this point); Majority Op. 33–34. The district court's remedial authority thus seemingly turns on the distinction between an APA stay and an injunction. But accepting the district court's stay label is not sufficient to avoid the remedial bar of section 1252(f)(1), which encompasses more than just injunctions. It "deprives courts of the power to issue a specific *category of remedies*: those that

---

[8] This limitation on judicial review does not apply "to an individual alien against whom proceedings … have been initiated," but Make the Road is not challenging the application of expedited removal to any individual member who has been placed in such proceedings. 8 U.S.C. § 1252(f)(1); *see* Majority Op. 23.

13

'enjoin or restrain the operation of'" the statute. *Texas*, 142 S. Ct. at 2539 (emphasis added).

The district court's stay order is foreclosed by section 1252(f)(1) because it restrains the operation of the statutory expedited removal provisions, as implemented by the Designation Notice and Guidance. The phrase "enjoin or restrain" sweeps broadly and naturally refers to more than just enjoining. It is a "fundamental rule of statutory interpretation" that "courts should give effect, if possible, to every word used by Congress." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 688 (D.C. Cir. 2023) (cleaned up). Nothing in IIRIRA suggests a reason to depart from this principle, so "restrain" must have some meaning independent of "enjoin."

In *Aleman Gonzalez*, the Supreme Court focused on the "ordinary meaning" of section 1252(f)(1) and explained that "to enjoin" means "to require, command, or positively direct an action or to require a person to perform, … or to abstain or desist from, some act." 142 S. Ct. at 2064 (cleaned up). And "to restrain" means "to check, hold back, or prevent (a person or thing) from some course of action," such that orders to "restrain" include "judicial orders that inhibit particular actions" or "stop (or perhaps compel) such acts."[9] *Id.* (cleaned

---

[9] Of course, this reading means there is some overlap between "enjoin" and "restrain." An injunction prohibiting a government official from taking some action to carry out expedited removals, for example, would both "enjoin" and "restrain" the operation of the expedited removal provisions. Recognizing that terms have independent meaning does not preclude some overlap, as the Supreme Court's analysis of 1252(f)(1) in *Aleman Gonzalez* demonstrates. And "enjoin" still does independent work under this interpretation of "restrain," because "enjoin" encompasses

14

up) (citing *Direct Marketing Ass'n v. Brohl*, 575 U.S. 1, 12–13 (2015)); *see also Restrain*, Black's Law Dictionary (6th ed. 1990) ("To limit, confine, abridge, narrow down, restrict, obstruct, impede, hinder, *stay*, destroy.") (emphasis added). To "restrain" the operation of the statute includes relief like stays that stop the Executive's implementation of the expedited removal statute. *See Nken*, 556 U.S. at 428–29 (explaining that stays "temporarily suspend[] the source of authority to act").

Statutory context further reinforces that "enjoin or restrain" includes stays of agency action. In the very next subsection of IIRIRA, Congress enacted a similar remedial bar using only the word "enjoin." *See* 8 U.S.C. § 1252(f)(2) ("[N]o court shall enjoin the removal of any alien pursuant to a final order under this section unless …."). The phrase "enjoin or restrain" in (f)(1) most naturally suggests more than just "enjoin" in (f)(2). In addition, another judicial review provision referenced in the INA suggests that "restrain" and "stay" have closely related meanings in this context. Judicial review of final orders of removal is generally governed by 28 U.S.C. §§ 2341–51. *See* 8 U.S.C. § 1252(a)(1). Section 2349(b) states, "The filing of the petition to review does not of itself *stay or suspend* the operation of the order of the agency, but the court of appeals in its discretion may *restrain or suspend* … the operation of the order pending the final hearing and determination of the petition." 28 U.S.C. § 2349(b) (emphasis added). Use of "restrain or suspend" in parallel with "stay or suspend" suggests an overlap between "restrain" and "stay."

Statutory text and context therefore support reading section 1252(f)(1) to prohibit the stay ordered by the district court. The district court relied on section 705 of the APA to

---

injunctions that "positively direct" particular acts. *Aleman Gonzalez*, 142 S. Ct. at 2064 (cleaned up).

15

stay the Designation Notice and Guidance, an action that plainly "restrain[s]" the government's implementation of the expedited removal statute.

To reach a contrary conclusion, my colleagues emphasize the differences between stays and injunctions. Majority Op. 31–34. But so long as "or restrain" encompasses more than just injunctions, the fact that stays and injunctions are different remedies says nothing about whether stays "restrain the operation of" the expedited removal provisions.[10] The majority avoids this question by effectively reading "or restrain" out of the statute, suggesting that "or restrain" at most extends to "temporary restraining orders." *Id.* at 37. But as the majority recognizes, temporary restraining orders are a form of "temporary *injunctive* relief." *Id.* (emphasis added) (cleaned up). They are thus prohibited by "enjoin," leaving "or restrain" with no independent meaning.

Finally, section 1252(f)(1) need not specifically reference section 705 stays for "or restrain" to encompass this relief. *Contra id.* at 34. Section 1252(f)(1) explicitly states that the limit on the court's remedial authority applies "[r]egardless of the nature of the action or claim." For all actions and claims, IIRIRA provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" numerous immigration provisions. 8 U.S.C. § 1252(f)(1). Nothing in this sweeping language supports a carveout for APA claims or remedies. The Supreme Court has cautioned against requiring Congress to use "magic words," even when Congress "confines a court's authority." *Harrow v.*

---

[10] To sustain appellate jurisdiction, my colleagues conclude that section 705 stays have the "practical effect" of an injunction. *See* Majority Op. 17–22. They do not explain, however, why a stay with the practical effect of an injunction does not "restrain" within the meaning of section 1252(f)(1).

16

*Dep't of Def.*, 144 S. Ct. 1178, 1183 (2024). "A statute affecting federal jurisdiction must be construed both with precision and with fidelity to the terms by which Congress has expressed its wishes." *Kucana v. Holder*, 558 U.S. 233, 252 (2010) (cleaned up).

Considering the ordinary meaning of "restrain," the statutory context of IIRIRA, and the nature of section 705 relief, section 1252(f)(1) strips the district court of authority to stay the Designation Notice and Guidance.

## C.

Finally, I emphasize for purposes of further review by our en banc court or the Supreme Court that IIRIRA is best read to strip jurisdiction over designation decisions altogether. Although this argument is foreclosed by *Make the Road I*, the district court's stay order further highlights the legal anomalies that arise by asserting jurisdiction over such suits.

As I have previously explained, IIRIRA generally bars judicial review of "any … decision or action" of the Secretary "the authority for which is specified … to be in the [Secretary's] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). Designation decisions are so specified because they are explicitly committed by Congress to the "sole and unreviewable discretion" of the Secretary. *Id.* § 1225(b)(1)(A)(iii)(I). Section 1252(a)(2)(B) thus strips lower courts of subject matter jurisdiction to review designation decisions. *Make the Road I*, 962 F.3d at 639–41 (Rao, J., dissenting). Under the best reading of IIRIRA, Make the Road's lawsuit is barred at the outset.

Furthermore, IIRIRA generally strips jurisdiction to review policies and procedures for implementing expedited removal, including designation decisions. *See* 8 U.S.C.

17

§ 1252(a)(2)(A)(iv). Some limited actions are excepted from this bar. *See id.* § 1252(e)(3). But the exception includes only "determinations under section 1225(b) … and its implementation." *Id.* § 1252(e)(3)(A). Because all "determinations" addressed in section 1225(b) involve the application of expedited removal to individual aliens, section 1252(e)(3) preserves review of policies and procedures implementing expedited removal *only* in the context of "individual determinations." *Make the Road I*, 962 F.3d at 642–43 & nn.10–11 (Rao, J., dissenting). This interpretation of section 1252(e)(3) is consistent with the best reading of section 1252(f)(1), which limits the remedy available in pre-enforcement suits to declaratory relief (at most) but does not limit the relief available in individual removal proceedings. *Cf. Texas*, 142 S. Ct. at 2540. Asserting jurisdiction over designation decisions, as *Make the Road I* permits, is inconsistent with the remedial limits in section 1252(f)(1).

The majority holds that designation decisions, which are committed to the Secretary's discretion by law, are nonetheless reviewable through an equitable constitutional claim and may be stayed under APA section 705. This conclusion turns IIRIRA's statutory scheme on its head because courts have no jurisdiction to review designation decisions at all.

\* \* \*

For the reasons explained above, and consistent with the conclusions of *Make the Road I*, the government is likely to succeed in its challenge to the stay order. The district court lacked jurisdiction over Make the Road's untimely due process claim, and, even if it had jurisdiction, the court could not issue an APA stay in the absence of an APA claim. In any event, the APA stay ordered here "enjoin[s] or restrain[s]"

18

implementation of expedited removal provisions and therefore is barred by section 1252(f)(1).

IV.

In addition to showing a likelihood of success on the merits, the government has also demonstrated that it will suffer irreparable injury and that the equities, on balance, favor granting a stay. *See Nken*, 556 U.S. at 434–35.

The Supreme Court recently recognized the government is irreparably harmed any time it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2561 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). The Designation Notice and Guidance apply expedited removal to all aliens eligible under IIRIRA, and it is undisputed that expedited removal may reach these aliens. The district court's APA stay bars the government from enforcing the laws to the fullest extent authorized by Congress in IIRIRA. My colleagues argue the government is not irreparably harmed when it is constrained from "using constitutionally deficient procedures." Majority Op. 68. But that reasoning collapses the question of irreparable harm with the merits. Whether the government is irreparably harmed does not turn on whether it is likely to succeed on the underlying appeal. *See CASA*, 145 S. Ct. at 2562; *King*, 567 U.S. at 1303.

Moreover, the balance of the equities also favors the government. As in most "cases involving a significant new law or government action, the interim harms and equities are … weighty on both sides." *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *4 n.3 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring in the grant of the application for stay). Here the government seeks to implement its law enforcement priorities in the area of immigration—a weighty

19

interest for the Executive as well as the public. *Cf. Nken*, 556 U.S. at 435–36 ("There is always a public interest in prompt execution of removal orders."). On the other hand, Make the Road's members, who are present in the United States unlawfully, may not have a right to remain in the country, but they have a strong interest in not being removed without legally adequate procedures. In other recent immigration cases where the equities of the government's enforcement of immigration laws were balanced against the equities of broad groups of aliens, the Supreme Court found in favor of the government and stayed district court injunctions. *See Vasquez Perdomo*, 2025 WL 2585637, at *1 (granting stay of district court injunction preventing the government from conducting certain immigration enforcement stops around Los Angeles); *Noem v. Doe*, 145 S. Ct. 1524, 1524–25 (2025) (granting stay of district court order staying notice terminating parole and work authorization for aliens from Cuba, Haiti, Nicaragua, and Venezuela). In exercising our "equitable discretion," we must be guided by the Supreme Court's decisions in "like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Following the Court's direction, the balance of the equities here also favors a stay.

\* \* \*

"Observing the limits on judicial authority … is required by a judge's oath to follow the law." *CASA*, 145 S. Ct. at 2561. The district court justified a stay of these immigration policies only by ducking and weaving past the jurisdictional and remedial limits of IIRIRA and the APA. Because the district court was without authority to enter this stay, while appeal is pending, the government is entitled to continue carrying out expedited removals of unlawfully present aliens. I respectfully dissent.