1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7   CARMEN ARACELY PABLO SEQUEN,        Case No.  25-cv-06487-PCP
    et al.,
8                    Plaintiffs,        **ORDER STAYING AGENCY ACTION**
9          v.                           Re: Dkt. No. 94
10  SERGIO ALBARRAN, et al.,
11                   Defendants.

12        In this putative class action, a group of noncitizens challenges several recent policies

13  issued by Immigration and Customs Enforcement (ICE) and the Department of Justice's Executive

14  Office for Immigration Review (EOIR). These policies include guidance issued by ICE and EOIR

15  that authorizes ICE agents to conduct widespread civil arrests of noncitizens at immigration

16  courthouses. Plaintiffs challenge these courthouse-arrest policies under the Administrative

17  Procedure Act on behalf of a "courthouse-arrest class" consisting of "[a]ll persons who have an

18  immigration court hearing in a proceeding on EOIR's non-detained docket in an immigration

19  courthouse in ICE's San Francisco Area of Responsibility." The Court previously granted

20  plaintiffs' motion to provisionally certify the courthouse-arrest class for purposes of entering

21  preliminary relief. Now before the Court is plaintiffs' motion to stay the courthouse-arrest policies

22  pending the final resolution of their APA challenge to those policies. For the reasons that follow,

23  the Court grants the requested stay but limits its scope to ICE's San Francisco area of

24  responsibility.

25                            **BACKGROUND**

26        Prior to 2025, ICE conducted civil immigration arrests in courthouses only in limited

27  circumstances. In 2014, for example, ICE issued internal guidance stating that civil enforcement

28

United States District Court
Northern District of California

actions at or near courthouses would be undertaken only against noncitizens who "pose[d] a danger to national security" or "a serious risk to public safety" because they were "engaged in or suspected of terrorism," had been convicted of violent crimes or felonies, "participated in organized criminal gangs," or were "subject to outstanding criminal warrants."[1] ICE issued similar guidance the following year, authorizing courthouse arrests of only noncitizens who endangered national security or had been convicted of felonies or criminal offenses involving "active participation in a criminal street gang."[2]

In accordance with the President's 2017 executive order expanding the categories of noncitizens prioritized for removal, *see* Exec. Order No. 13,768, 82 Fed. Reg. 8799, 8800 (Jan. 25, 2017), ICE issued a directive in 2018 that expanded permissible civil enforcement actions at courthouses to "include actions against specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed ... but have failed to depart, and aliens who have re-entered the country illegally after being removed."[3] The directive instructed that other noncitizens whom ICE "encountered during a civil immigration enforcement action inside a courthouse, such as family members or friends accompanying the target [individual] … or serving as a witness in a proceeding, will not be subject to civil immigration enforcements action, absent special circumstances, such as where the individual poses a threat to public safety."[4] And while ICE vested its officers and agents with discretion to "make enforcement determinations on a case-by-case basis," the 2018 directive made clear that "ICE officers and agents should generally avoid enforcement actions in courthouses … that are dedicated to non-criminal … proceedings."[5] The directive authorized civil enforcement actions in

---

[1] Message from Philip T. Miller, ICE's Assistant Director for Field Operations, on "Enforcement Actions at or Near Courthouses" (Mar. 19, 2014), Dkt. No. 107, at 5.

[2] Message from Philip T. Miller, ICE's Assistant Director for Field Operations, on "Guidance Update: Enforcement Actions at or Near Courthouses" (Jan. 26, 2015), Dkt. No. 107, at 7.

[3] ICE Directive 11072.1, "Civil Immigration Enforcement Actions Inside Courthouses" (Jan. 10, 2018), Dkt. No. 107, at 10

[4] *Id.*

[5] *Id.* at 10 n.1, 11.

non-criminal courthouses only when "operationally necessary" and with advance supervisory approval.

After the executive order underlying ICE's 2018 directive was revoked, *see* Exec. Order 13,993, 86 Fed. Reg. 7051, 7051 (Jan. 20, 2021), ICE issued new guidance in 2021, explaining that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice."[6] "[S]o as not to unnecessarily impinge upon the core principle of preserving access to justice," ICE's 2021 guidance permitted such actions only if they involved "a national security threat," "an imminent risk of death, violence, or physical harm"; "hot pursuit" of a person who threatened public safety; "an immediate risk of destruction of [criminal] evidence"; or, subject to advance supervisory approval, if no "safe alternative location" for the arrest existed.[7]

EOIR, which oversees the nation's immigration courts, took a similar approach to civil arrests at its immigration courthouses. In 1996, it concluded that the presence of immigration officers in courtrooms "ha[d] produced a 'chilling' effect on the conduct of" several recent hearings and issued guidance forbidding arrests in immigration courtrooms "except in exigent circumstances."[8] In 2023, EOIR expanded the restriction on civil arrests in its courtrooms to cover all spaces where immigration-court business took place.[9] EOIR's 2023 guidance explained that, in addition to having a "chilling effect," allowing civil-enforcement actions in immigration courthouses "would disincentivize noncitizens from appearing for their hearings" and "may create safety risks for those who may be present" in courthouses, "including children."[10] The 2023

---

[6] Memorandum from Tae Johnson, Acting Director of ICE & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on "Civil Immigration Enforcement Actions in or near Courthouses" (Apr. 27, 2021), Dkt. No. 95, at 5.

[7] *Id.* at 5–6.

[8] Memorandum from Michael J. Creppy, Chief Immigration Judge, on "Arrests by INS Officers In or Near Immigration Court Facilities," at 1, 3 (Sept. 30, 1996), https://perma.cc/55GA-Q9FA.

[9] *See* Operating Policies and Procedures Memorandum 23-01 from Sheily McNulty, Chief Immigration Judge, on "Enforcement Actions in or Near OCIJ Space" (Dec. 11, 2023), Dkt. No. 95-2, at 2–3.

[10] *Id.* at 3.

United States District Court
Northern District of California

1  guidance also reasoned that limiting civil immigration arrests at immigration courthouses would

2  "reinforce the separate and distinct roles of [the Department of Homeland Security]," including

3  ICE, "and [EOIR]."[11] To guard against these risks, EOIR permitted civil immigration arrests at or

4  near its courthouses only in the exceptional circumstances outlined in ICE's 2021 guidance.[12]

5     Plaintiffs have submitted multiple declarations attesting that, before 2025, ICE conducted

6  civil arrests at immigration courthouses in northern California only in limited circumstances.[13]

7  One former immigration judge who sat in San Francisco from 1990 to 2011 states, for example,

8  that she was "unaware of any civil immigration arrests by [ICE] at the court" during her 21-year

9  tenure.[14] Another former immigration judge who sat in San Francisco from 2021 to 2025 and

10 practiced as an immigration attorney in the San Francisco immigration court for six years before

11 that is similarly "unaware of any civil immigration arrests conducted by [ICE] at the court prior to

12 May 2025."[15] According to attorneys practicing in the San Francisco, Sacramento, and Concord

13 immigration courts, "it was rare" to see ICE Enforcement and Removal Operations officers at

14 those courthouses until May 2025.[16] And an immigration attorney who has practiced in the San

15 Francisco immigration court since 2009 states that she had never observed or heard of civil

16

17 [11] *Id.*

   [12] *Id.* at 3–4.

18
19 [13] The government objects to the Court's consideration of these declarations under the Federal
   Rules of Evidence. But "the Federal Rules of Evidence do not strictly apply" in the preliminary-
   relief context. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th
20 Cir. 2024). "Given that the 'purpose of a [§ 705 stay] is merely to preserve the relative positions of
   the parties until a trial on the merits can be held,' and 'given the haste that is often necessary if
21 those positions are to be preserved,' courts must often resolve motions for preliminary relief "on
   the basis of procedures that are less formal and evidence that is less complete than in a trial on the
22 merits." *Id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). For that reason, the
   Ninth Circuit has held that district courts "may give even inadmissible evidence some weight,
23 when to do so serves the purpose of preventing irreparable harm before trial." *Id.* (quoting *Flynt
   Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). "Given the haste" required to
24 prepare a motion for a stay of agency action, and because this evidence documents the existence of
   and irreparable harm resulting from ICE and EOIR's challenged policies, considering the evidence
25 is proper here.

26 [14] Declaration of Bette Stockton, Dkt. No. 96 ¶¶ 2–4, 10.

   [15] Declaration of Shira Levine, Dkt. No. 100 ¶¶ 2, 4.
27
   [16] Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶ 11; Declaration of Sean Lai McMahon, Dkt. No.
28 99 ¶ 10; Declaration of Nikolas De Bremaeker, Dkt. No. 33-10 ¶ 11; Declaration of Reena Arya,
   Dkt. No. 67 ¶ 8.

United States District Court
Northern District of California

immigration arrests at the court before May 2025.[17]

This changed in 2025 when the President revoked the existing guidance regarding civil immigration-enforcement priorities and instructed federal agencies "to ensure the faithful execution of the immigration laws ... against *all* inadmissible and removable aliens." Exec. Order 14,159, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025) (emphasis added). Based on that executive order, ICE issued a new interim guidance on civil immigration arrests at courthouses in January 2025 and a final version in May 2025.[18] (ICE's interim and final courthouse-arrest policies are the same in all material respects, and the Court addresses them together unless otherwise specified.) The new courthouse-arrest policies acknowledge that "civil immigration enforcement actions in or near courthouses" are generally "against targeted aliens," like those who pose "[n]ational security or public safety threats," have "[s]pecific ... criminal convictions," are "gang members," or have remained in or re-entered the United States after being ordered removed.[19] But unlike ICE's prior guidance, ICE's new policies state that courthouse arrests are "not limited" to these groups and that other noncitizens "encountered … in or near a courthouse … may be subject to civil immigration enforcement action[s]" at courthouses "on a case-by-case basis considering the totality of the circumstances."[20] Under the guidance, "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses" whenever "credible information ... leads them to believe" that the noncitizen they seek to arrest "will be present" at a courthouse.[21] The policies discuss the benefits of courthouse arrests to the government's enforcement of immigration

[17] Declaration of Milli Atkinson, Dkt. No. 98 ¶¶ 12, 21.

[18] *See* ICE Policy No. 11072.3, Memorandum from Caleb Vitello, Acting ICE Director, on "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" (Jan. 21, 2025) [Interim Guidance], Dkt. No. 107, at 21–23; ICE Policy No. 11072.4, ICE Memorandum from Todd M. Lyons, Acting ICE Director, on "Civil Immigration Enforcement Actions In or Near Courthouses" (May 27, 2025) [Final Guidance], Dkt. No. 107, at 25–27.

[19] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26.

[20] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26.

[21] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26. The interim guidance required that civil immigration enforcement actions not be "precluded by laws imposed by the jurisdiction in which the enforcement action will take place," ICE Policy No. 11072.3, Dkt. No. 107, at 22, but the final guidance removed this restriction, *see* ICE Policy No. 11072.4, Dkt. No. 107, at 26.

laws but do not directly address the concerns raised in earlier guidance concerning chilling effects, safety risks, and impacts on hearing attendance.

EOIR also issued new guidance on courthouse arrests in late January, and that policy remains in effect.[22] EOIR's 2025 courthouse-arrest policy rescinds the office's prior restrictions on ICE civil enforcement actions in immigration courthouses.[23] EOIR states that its earlier policy primarily stemmed from ICE's since-revoked 2021 guidance and that "the other bases given ... were unpersuasive, inconsistent with current Executive Branch policy, pretextual, or unsubstantiated on any systematic basis."[24] EOIR's new policy also reasons that it lacks authority to prohibit ICE from taking lawful enforcement actions.[25] As a result, the policy places no independent limits on ICE's civil enforcement actions in immigration courthouses.

In the wake of ICE and EOIR's 2025 courthouse-arrest policies, ICE has sharply increased its civil enforcement activity at immigration courthouses in northern California.[26] As the government conceded at the motion hearing, nothing in the record suggests that the arrests have targeted only noncitizens in high-priority groups. And the increased arrests have coincided with "a significant increase in the number of individuals not appearing for their hearings."[27] An attorney

---

[22] *See* Operating Policies and Procedures Memorandum 25-06 from Sirce E. Owen, Acting EOIR Director, on "Cancellation of Operating Policies and Procedures Memorandum 23-01" (Jan. 28, 2025), Dkt. No. 107, at 29.

[23] *Id.* at 30

[24] *Id.* at 29.

[25] *Id.* at 30.

[26] *See* Declaration of Milli Atkinson, Dkt. No. 98 ¶ 19 (reporting "dozens of arrests at the San Francisco Immigration Courts" between May and July 2025, including "approximately 19" arrests in August and "approximately 26" in September); Declaration of Sean Lai McMahon, Dkt. No. 99 ¶ 23 (documenting 23 arrests at the Concord immigration court "between late May and the beginning of September); Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶ 14 (stating that an attorney's organization "is aware of at least 39 people who ICE arrested at the Sacramento immigration court"); Declaration of Nikolas De Bremaeker, Dkt. No. 33-10 ¶ 13 (reporting organization's knowledge of "at least 35 people who have been arrested at immigrations courts in the Bay Area since May 2025"); Declaration of Martha Ruch, Dkt. No. 66 ¶ 12 (reporting 9 arrests since July "at 630 Sansome alone"); *see also Garro Pinchi v. Noem*, No. 25-CV-05632-PCP, 2025 WL 3691938, at *3 (N.D. Cal. Dec. 19, 2025) (discussing ICE's increased civil enforcement activities and noting that "many of these arrests occur ... at immigration courthouses").

[27] Declaration of Milli Atkinson, Dkt. No. 98 ¶ 43; *see also* Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶ 23 ("ICE's arrests at the Sacramento immigration court have had a major impact on the number of people who appear for their immigration hearings."); Declaration of Nikolas De

United States District Court
Northern District of California

in San Francisco states that, before May, at least two thirds of noncitizens scheduled for removal hearings usually appeared for their proceedings. Since May, however, "it is common to have a docket where only 1–2 unrepresented individuals appear at a docket of 20–30 scheduled Respondents and the vast majority of the Respondents are ordered removed *in absentia*."[28] On at least one day, "none of the Respondents appeared," and "all Respondents on the docket were ordered removed *in absentia*."[29] The same attorney explains that her organization "has experienced an increase in the number of calls for legal consultations from individuals who state they are afraid to go to court."[30] An attorney in Concord similarly attests that the proportion of non-appearances and consequent *in absentia* removal orders has increased from around "a third of all cases" before ICE began making civil arrests at the courthouse to a "majority of pro se respondents" in recent months.[31] Another attorney reports similar trends at the Sacramento immigration court.[32] A former immigration judge also attests that "[o]nce ICE began conducting arrests at the San Francisco Immigration Court, [she] noticed a dramatic decline in attendance at master calendar hearings in [her] courtroom."[33] While many noncitizens request to appear remotely to avoid the risk of arrest, immigration judges reportedly deny many noncitizens the opportunity to do so.[34] Noncitizens who appear remotely without permission may receive *in absentia* removal orders for failing to appear in person.[35]

 Among the noncitizens ICE recently arrested at immigration courthouses are plaintiffs

---

Bremaeker, Dkt. No. 33-10 ¶ 18 (explaining the "clear chilling effect" and rise in nonappearances and *in absentia* removal orders in the San Francisco and Sacramento immigration courts).

[28] Declaration of Milli Atkinson, Dkt. No. 98 ¶ 43; *see also* Declaration of Martha Ruch, Dkt. No. 66 ¶ 15 (reporting similar trends at the San Francisco immigration court).

[29] Declaration of Milli Atkinson, Dkt. No. 98 ¶ 44.

[30] *Id.* ¶ 46.

[31] Declaration of Sean Lai McMahon, Dkt. No. 99 ¶ 24; *see also* Declaration of Reena Arya, Dkt. No. 67 ¶ 11.

[32] Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶¶ 23–25.

[33] Declaration of Shira Levine, Dkt. No. 100 ¶ 6.

[34] *See* Declaration of Milli Atkinson, Dkt. No. 98 ¶¶ 46–48.

[35] *See* Declaration of Sean Lai McMahon, Dkt. No. 99 ¶ 24.

United States District Court
Northern District of California

1    Carmen Aracely Pablo Sequen and Ligia Garcia. ICE arrested Ms. Pablo Sequen, an asylum-

2    seeker from Guatemala, as she was leaving a routine hearing at the San Francisco immigration

3    court. ICE also arrested Ms. Garcia, an asylum-seeker from Colombia, as she was leaving a

4    hearing at the San Francisco immigration court. ICE agents attempted to arrest and detain plaintiff

5    Yulisa Alvarado Ambrocio—an asylum-seeker from Guatemala—under similar circumstances,

6    but they refrained from doing so because Ms. Alvarado Ambrocio's nursing infant was with her.

7    ICE suggested at the time, and the government later conceded to the Court, that ICE would likely

8    arrest Ms. Alvarado Ambrocio at her next appearance in immigration court.[36]

9        In this action, Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio each filed

10   petitions for a writ of habeas corpus seeking release from ICE custody. This Court issued

11   temporary restraining orders requiring Ms. Pablo Sequen and Ms. Garcia's immediate release,

12   *Pablo Sequen v. Kaiser* ("*Pablo Sequen I*"), 793 F. Supp. 3d 1114, 1121 (N.D. Cal. 2025); *Pablo*

13   *Sequen v. Kaiser* ("*Pablo Sequen III*"), No. 25-CV-06487-PCP, 2025 WL 2691143, at *4 (N.D.

14   Cal. Sept. 19, 2025), followed by preliminary injunctions prohibiting ICE from re-detaining Ms.

15   Pablo Sequen, Ms. Garcia, or Ms. Alvarado Ambrocio without first demonstrating a valid basis for

16   their detention to an immigration judge, *Pablo Sequen v. Kaiser* ("*Pablo Sequen II*"), No. 25-CV-

17   06487-PCP, 2025 WL 2650637, at *10 (N.D. Cal. Sept. 16, 2025); *Pablo Sequen v. Albarran*

18   ("*Pablo Sequen IV*"), No. 25-CV-06487-PCP, 2025 WL 2935630, at *14 (N.D. Cal. Oct. 15,

19   2025).

20       Plaintiffs then moved for, and the Court granted, provisional certification of a "courthouse-

21   arrest class" consisting of "[a]ll persons who have an immigration court hearing in a proceeding

22   on EOIR's non-detained docket in an immigration courthouse in ICE's San Francisco Area of

23   Responsibility." *Pablo Sequen v. Albarran (*"*Pablo Sequen V*"*)*, No. 25-CV-06487-PCP, 2025 WL

24   3283283, at *10, 29 (N.D. Cal. Nov. 25, 2025). The class is represented by Ms. Pablo Sequen, Ms.

25   Garcia, and Ms. Alvarado Ambrocio. *Id.* On behalf of that provisional class, plaintiffs now move

26

27   ---
     [36] The fourth named plaintiff, Martin Hernandez Torres, was not arrested at an immigration
28   courthouse, does not represent the courthouse-arrest class, and does not challenge ICE and EOIR's
     courthouse-arrest policies.

1    under § 705 of the APA for a stay of ICE and EOIR's courthouse-arrest policies.

2                                    **DISCUSSION**

3    **I.    The government's threshold arguments are unavailing.**

4          Before reaching the merits of plaintiffs' motions, the Court must address the government's

5    argument that plaintiffs' claims are not justiciable because plaintiffs lack standing and their claims

6    are unripe and moot.

7          The government insists that Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio

8    all lack standing to challenge the courthouse-arrest policies, and that their claims are unripe and

9    moot, due to the preliminary injunctions issued by this Court. Under those injunctions, the

10   government may not re-detain Ms. Pablo Sequen, Ms. Garcia, or Ms. Alvarado Ambrocio during

11   the pendency of these proceedings unless the government first demonstrates to an immigration

12   judge that they pose either a flight risk or danger to the public. *See Pablo Sequen II*, 2025 WL

13   2650637, at *10; *Pablo Sequen IV*, 2025 WL 2935630, at *14.[37]

14         The Court has already rejected these arguments, *see Pablo Sequen V*, 2025 WL 3283283,

15   at *15–16, and does so again here.

16         In a class action, standing is assessed at the time the operative complaint was filed,

17   *see Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014); *County of*

18   *Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (analyzing standing as of the time the "second

19   amended complaint was filed"), and only one named plaintiff need have standing, *Ellis v. Costco*

20   *Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011). When plaintiffs filed their amended

21   complaint, only Ms. Pablo Sequen had the benefit of a preliminary injunction. Ms. Alvarado

22   Ambrocio had just narrowly avoided detention at the courthouse and faced likely detention at her

23   next hearing, which was only a few weeks away. Indeed, at the hearing on the second motion for a

24   preliminary injunction, "the government expressly conceded ... that ICE would likely detain Ms.

25

26   ───────────────────

27   [37] The government also argues that Mr. Hernandez Torres, the fourth named plaintiff, lacks
     standing because he has been removed to Mexico. Because Mr. Hernandez Torres neither
     represents the courthouse-arrest class nor challenges the courthouse-arrest policies, this argument
28   does not bear on the instant motion.

United States District Court
Northern District of California

Alvarado Ambrocio after the [next] hearing." *See Pablo Sequen IV*, 2025 WL 2935630, at *12. At the very least, then, "Ms. Alvarado Ambrocio … faced an imminent and concrete injury in the form of her likely re-detention," which was "directly traceable to the … challenged policies permitting courthouse arrests, and the requested vacatur of those policies would redress [her] injur[y] by removing the threat of re-detention at future immigration-court appearances." *Pablo Sequen V*, 2025 WL 3283283, at *15. That is sufficient to establish Ms. Alvarado Ambrocio's standing to challenge the courthouse-arrest policies. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (describing standing requirements). And because only one named plaintiff need have standing at the time of a complaint's filing to satisfy Article III, the Court need not consider whether Ms. Garcia, who had just been re-arrested at the San Francisco immigration courthouse and was then in ICE custody, would also have standing based on the likelihood of another arrest following any release.

The government argues that plaintiffs claims are not ripe "for the same reasons" that they lack standing. The argument fails for the reasons just discussed. *See Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (explaining that the ripeness inquiry "merges almost completely with standing").

As to mootness, "if a district court certifies a class before the class representative's claim becomes moot, 'mooting the putative class representative's claim will not moot the class action.'" *Washington v. Trump*, 145 F.4th 1013, 1025 (9th Cir. 2025) (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011)). The only question, then, is whether plaintiffs' individual claims became moot before the Court provisionally certified the courthouse-arrest class. *See id.* The Court has already concluded that its preliminary injunctions did not moot Ms. Pablo Sequen, Ms. Garcia, or Ms. Alvarado Ambrocio's claims. *See Pablo Sequen V*, 2025 WL 3283283, at *16. That is because the preliminary injunctions protect plaintiffs only "during the pendency of these proceedings," *Pablo Sequen II*, 2025 WL 2650637, at *10; *Pablo Sequen IV*, 2025 WL 2935630, at *14, and the government has never disclaimed its intent to re-detain them. Quite the opposite: The government recently appealed the Court's preliminary injunction as to Ms. Garcia and Ms.

United States District Court
Northern District of California

Alvarado Ambrocio.[38] "There thus remains a strong possibility that the government will re-detain one of the plaintiffs … after a final judgment in the government's favor." *Pablo Sequen V*, 2025 WL 3283283, at *16. For similar reasons, the Supreme Court has explained that a "revision … made only for the purpose of interim compliance with [a] District Court's judgment and order" pending appeal "does not render the case moot" where the government "desires to reinstate the invalidated [practice]." *Maher v. Roe*, 432 U.S. 464, 469 n.4 (1977). And in any event, for the reasons explained in the Court's prior order provisionally certifying the court-house arrest class, mooting plaintiffs' individual claims would not moot the class action because their claims fall within the exception for inherently transitory claims. *See Pablo Sequen V*, 2025 WL 3283283, at *16.

In sum, plaintiffs' APA claims challenging the court-house arrest policies are justiciable. The Court therefore turns to the substance of plaintiffs' motion for a stay of agency action.

## II.    Plaintiffs have established that the circumstances justify a stay of ICE and EOIR's courthouse-arrest policies.

"[T]o prevent irreparable injury," § 705 of the APA authorizes "the reviewing court … to postpone the effective date of an agency action … pending conclusion of the review proceedings." 5 U.S.C. § 705. A stay is "an exercise of judicial discretion," and "the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009) (citation modified). Four factors guide courts' consideration of whether the circumstances warrant a stay:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 433–34 (citation modified). These factors "substantially overlap with the *Winter* factors for a preliminary injunction." *Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir. 2025). As in the preliminary-injunction context, "[t]he first two factors are the most critical." *Id.* (citation

---

[38] *See* Preliminary Injunction Appeal, Dkt. No. 142.

1    modified) (quoting *Nken*, 556 U.S. at 434). And "[w]here the government is the opposing party,"

2    the final two factors—that is, "the balancing of the harm and the public interest"—"merge." *Id.*

3         Here, plaintiffs seek a § 705 stay of ICE and EOIR's courthouse-arrest policies. Because

4    they have established that each of the four factors weighs in their favor, the Court exercises its

5    discretion to issue a stay.

6         **A.    Plaintiffs are likely to succeed on the merits of their claims.**

7         Plaintiffs challenge ICE and EOIR's courthouse-arrest policies under the APA, which "sets

8    forth the procedures by which federal agencies are accountable to the public and their actions

9    subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). With

10   limited exceptions, judicial review under the APA is available for "final agency action for which

11   there is no other adequate remedy in a court." 5 U.S.C. § 704. "A preliminary, procedural, or

12   intermediate agency action … is subject to review on the review of the final agency action." *Id.*

13   Judicial review is available to any "person suffering legal wrong because of [the] agency action, or

14   adversely affected or aggrieved by [such] action." *Id.* § 702. As relevant here, the APA requires

15   courts to "hold unlawful and set aside agency action … found to be … arbitrary, capricious, an

16   abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

17        Plaintiffs allege that ICE and EOIR's courthouse-arrest policies are reviewable agency

18   actions that are arbitrary and capricious. They are likely to succeed on the merits of their claims.

19        **1.    The challenged policies are reviewable under the APA.**

20        "In general, there is a strong presumption that Congress intends judicial review of

21   administrative action.'" *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718–19 (9th Cir.

22   2011) (citation modified). The government nevertheless argues that the challenged policies are

23   unreviewable because (1) ICE's interim courthouse-arrest policy is not "final agency action," 5

24   U.S.C. § 704; (2) 8 U.S.C. § 1226(e) "preclude[s] judicial review" of all three policies, *id.*

25   § 701(a)(1); (3) the policies are "committed to agency discretion by law," *id.* § 701(a)(2); and (4)

26   plaintiffs have "[an]other adequate remedy in a court," 5 U.S.C. § 704. Each argument fails.

27

28

United States District Court
Northern District of California

**a.    ICE's interim courthouse-arrest policy is reviewable even if it is not "final agency action."**

The government contends that plaintiffs may not challenge ICE's interim courthouse-arrest policy because it is not "final agency action." 5 U.S.C. § 704. While "[a] preliminary, procedural, or intermediate agency action or ruling [is] not directly reviewable," the APA provides for review of such an interim action "on the review of the final agency action" that supersedes it. 5 U.S.C. § 704. So if ICE's final courthouse-arrest policy is "final agency action," the interim policy is also "subject to review." 5 U.S.C. § 704; *see also Clark v. Busey*, 959 F.2d 808, 811 (9th Cir. 1992).

ICE's final courthouse-arrest policy is unquestionably "final agency action."[39] Agency action is final under the APA "if it both (1) marks the consummation of the agency's decisionmaking process," i.e., is not "of a merely tentative or interlocutory nature," and "(2) is one by which rights or obligations have been determined, or from which legal consequences will flow." *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (citation modified) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). In assessing whether these criteria are satisfied, courts "look to whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party." *Id.* "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Tohono O'odham*

---

[39] For the first time as the motion hearing, the government suggested that ICE's new practice of conducting widespread civil arrests at immigration courthouses is not the result of any "policy" at all and instead stems from individual officers' discretionary enforcement decisions. In essence, the government argues that there is no "agency action" for the Court to review. *See S.F. Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 575 (9th Cir. 2019); *see also* 5 U.S.C. § 704. Because the government raised the argument only at the hearing, the argument is forfeited and the Court need not consider it. *See Takagi v. Twitter, Inc.*, No. 22-MC-80240, 2023 WL 1442893, at *2 n.2 (N.D. Cal. Feb. 1, 2023); *Foster v. Adams & Assocs., Inc.*, No. 18-cv-02773-JSC, 2020 WL 3639648, at *3 n.3 (N.D. Cal. July 6, 2020); *cf. Booth v. United States*, 914 F.3d 1199, 1206 (9th Cir. 2019) (stating that arguments raised for first time at oral argument are waived). In any event, it lacks merit. As detailed above, plaintiffs challenge ICE and EOIR policies authorizing widespread courthouse arrests that were memorialized in written guidance. These written policies undoubtedly constitute "agency action," a term that "is meant to cover comprehensively every manner in which an agency may exercise its power." *S.F. Herring Ass'n*, 946 F.3d at 577 (quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Both ICE's final policy and EOIR's policy fall squarely within the definition of "agency action," which includes a term defined to include "agency statement[s] of … future effect" that are "designed to implement … or prescribe law or policy or describ[e] the … procedure[] or practice requirements of an agency." 5 U.S.C. § 551(4), (13); *see also id.* § 701(b)(2). The written policies challenged here do just that.

1    *Nation v. U.S. Dep't of the Interior*, 138 F.4th 1189, 1200 (9th Cir. 2025) (quoting *Franklin*, 505

2    U.S. at 797).

3         Here, ICE's final courthouse-arrest policy clearly reflects that the agency has completed its

4    decisionmaking process. The policy "stat[ed] a definitive position" that ICE agents may arrest

5    noncitizens at immigration courthouses at their discretion, whether or not they fall within a

6    specific target group, and "then sen[t] officers out into the field" to make arrests under the policy.

7    *S.F. Herring Ass'n*, 946 F.3d at 579; *see also J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1067 (N.D.

8    Cal. 2018) (explaining that guidance was final agency action where agency began concretely

9    implementing the guidance). The result of ICE's decisionmaking process "is one that will directly

10   affect the parties," as evidenced by Ms. Pablo Sequen and Ms. Garcia's arrests at immigration

11   court. *Tohono O'odham Nation*, 138 F.4th at 1200 (quoting *Franklin*, 505 U.S. at 797). That the

12   final courthouse-arrest policy had an "immediate effect on [ICE's] day-to-day operations" in

13   authorizing widespread arrests at immigration courthouses across northern California conclusively

14   establishes that the policy is final agency action. *Ctr. for Biological Diversity*, 58 F.4th at 417.[40]

15        Because the final courthouse-arrest policy is a "final agency action," the interim policy is

16   reviewable.

17              **b.    8 U.S.C. § 1226(e) does not "preclude judicial review" of**
18              **plaintiffs' claims.**

19        Section 701(a)(1) of the APA provides that relief from agency action is not available where

20   "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The government argues that 8 U.S.C.

21   § 1226(e) "preclude[s] judicial review" of the challenged policies because it states that "[t]he

22   Attorney General's discretionary judgment regarding the application of this section shall not be

23   subject to review" and "[n]o court may set aside any action or decision … under this section

24   regarding the detention of any alien." But as the Supreme Court has explained, § 1226(e) merely

25   "precludes an alien from challenging a discretionary judgment by the Attorney General or a

26   decision that the Attorney General has made regarding his detention or release." *Jennings v.*

27

28   ────────────────
     [40] For similar reasons, EOIR's policy is also a "final agency action."

*Rodriguez*, 583 U.S. 281, 295 (2018) (citation modified) (quoting *Demore v. Kim,* 538 U.S. 510, 516 (2003)). In other words, § 1226(e) precludes review only of individual custody determinations. *See Doe v. Noem*, 783 F. Supp. 3d 907, 932 (W.D. Va. 2025) (collecting cases declining review of such determinations). The Supreme Court has thus repeatedly held that "§ 1226(e) does not preclude challenges to the statutory framework that permits the alien's detention without bail." *Id.* (quoting *Demore*, 538 U.S. at 517). Similarly, § 1226(e) does not preclude plaintiffs' challenge to ICE and EOIR's policies implementing that statutory framework. None of plaintiffs' APA claims attack a decision to detain or release an individual noncitizen.[41] Instead, they challenge the reasoning (or lack thereof) underlying ICE and EOIR's decisions to allow widespread civil enforcement actions at immigration courthouses. Section § 1226(e) does not bar such claims.

### c.    ICE and EOIR's courthouse-arrest policies are not "committed to agency discretion."

Under § 701(a)(2) of the APA, judicial review is not available where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The government argues that plaintiffs' claims fall within this narrow exception.

"[T]he APA's basic presumption of judicial review can only be overcome if there is clear and convincing evidence that Congress intended to preclude judicial review." *Washington v. Dep't of State*, 996 F.3d 552, 560 (9th Cir. 2021). So "where substantial doubt about the congressional intent exists, th[at] general presumption … is controlling." *Block v. Community Nutrition Institute*, 467 U.S. 340, 351 (1984). Accordingly, "[s]ection 701(a)(2)'s exception for action committed to agency discretion is read 'quite narrowly.'" *Johnson Tr. of Charley E. Johnson Revocable Living Tr. v. United States*, 145 F.4th 1158, 1163 (9th Cir. 2025) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). "[A]gency action is 'committed to agency discretion' only in 'those rare circumstances where the relevant statute is drawn so that a court would have no

---

[41] While plaintiffs amended complaint included individual habeas claims challenging Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio's detention by ICE, the Court has since severed those claims into separate actions.

United States District Court
Northern District of California

meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019)). In other words, "judicial review is unavailable when there is 'no law to apply.'" *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). And the Supreme Court "generally limit[s] the exception to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Dep't of Commerce*, 588 U.S. at 772 (citation modified).

This is not the "rare circumstance[]" where "there is no law to apply." *Johnson*, 145 F.4th at 1163 (citation modified). "Even where statutory language grants an agency 'unfettered discretion,' its decision may nonetheless be reviewed if regulations or agency practice provide a 'meaningful standard by which this court may review its exercise of discretion.'" *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) (quoting *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003)). Here, ICE and EOIR's *prior* policies governing courthouse arrests and detention in holding facilities provide a standard. Even if ICE and EOIR's recent departures from those policies "could conceivably fall within [their] broad discretion" under the relevant statutes, "judicial review under the APA concerns not only the particular outcome [an] agency reaches, but also the process in which the agency engages and the reasoning the agency articulates when it reaches that outcome." *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1017 (9th Cir. 2024). ICE and EOIR's prior policies, as well as several related policies that remain in place, provide a benchmark against which to measure "whether [each] agency justified its choice on specious grounds, failed to satisfy the general requirements of reasoned agency decisionmaking, or failed to comply with its own regulations." *Id.* (citation modified). In other words, the prior policies provide the "law to apply" in determining whether the new agency action is arbitrary and capricious.

Further, the government has not established that "courts traditionally have regarded" immigration enforcement decisions "as committed to agency discretion" to such a degree that they are beyond judicial review under the APA. *Dep't of Commerce*, 588 U.S. at 772 (citation modified). To the contrary, the Ninth Circuit "ha[s] held that there are meaningful standards of review and have declined to apply § 701(a)(2)" in "several immigration cases." *Perez Perez v.*

1    *Wolf*, 943 F.3d 853, 861 (9th Cir. 2019) (collecting cases and holding that denial of U-visa

2    petitions is subject to judicial review). So § 701(a)(2)'s exception for action committed to agency

3    discretion does not bar judicial review here.

### d.    Plaintiffs have no other adequate remedy.

5    Section 704 limits APA review to agency actions "for which there is no other adequate

6    remedy in a court." 5 U.S.C. § 704. The government thus suggests, in a single sentence, that § 704

7    precludes plaintiffs' APA claims because plaintiffs could instead pursue "a habeas action or

8    potential claim for damages." But the Supreme Court has emphasized that § 704 "should not be

9    construed to defeat the [APA's] central purpose of providing a broad spectrum of judicial review

10   of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Instead, "Congress

11   intended by that provision simply to avoid duplicating previously established special statutory

12   procedures for review of agency actions." *Darby v. Cisneros,* 509 U.S. 137, 146 (1993).

13   The government has identified no procedures by which plaintiffs could have pursued their

14   claims outside the APA. It suggests that habeas offers such a procedure, but habeas petitioners

15   may challenge only the fact or duration of confinement. Plaintiffs could not use habeas to

16   challenge the location of their arrests (i.e., at immigration courthouses), as the government has

17   repeatedly argued in this very case. And though the government contends that plaintiffs have an

18   adequate remedy in a "potential claim for damages," it makes no effort to identify a cause of

19   action for which plaintiffs could seek damages resulting from the challenged policies. *See Goldey*

20   *v. Fields*, 606 U.S. 942, 942 (2025) (explaining that the Supreme Court has declined to imply any

21   new constitutional cause of action for damages against federal officers since 1980 and instructing

22   that it would be improper to do so "in all but the most unusual circumstances"); *see also Brown v.*

23   *Gilliam*, No. EDCV-21-477, 2022 WL 19775026, at *3 (C.D. Cal. Dec. 6, 2022) ("Given the

24   Supreme Court's recent guidance, recognizing a new *Bivens* cause of action is plainly disfavored,

25   if not insurmountable."). The Court therefore concludes that there is no risk that "a legal remedy

26   under the APA would impermissibly provide for duplicative review." *Hyatt v. Off. of Mgmt. &*

27   *Budget*, 908 F.3d 1165, 1173 (9th Cir. 2018) (quoting *City of Oakland v. Lynch*, 798 F.3d 1159,

28   1165 (9th Cir. 2015)).

### 2.    The challenged policies are likely arbitrary and capricious

Section 706(2)(A) of the APA authorizes courts to "set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The touchstone of arbitrary and capricious review under the APA is reasoned decisionmaking." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (citation modified). "That means an agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation modified). If "the agency has ... entirely failed to consider an important aspect of the problem," the agency's decisionmaking is insufficiently reasoned. *Id.* at 492 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Important aspects include "the costs as well as the benefits" of the agency action. *State Farm*, 463 U.S. at 54; *cf. Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.").

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). At a minimum, an agency that "changes its existing position" must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). An agency undertaking "policy change" must also provide "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Id.* at 222 (quoting *Fox Television Stations*, 556 U.S. at 515–16). "[A]n unexplained inconsistency in agency policy is a reason for holding [a new action] to be an arbitrary and capricious change from agency practice." *Id.* (citation modified) (quoting *Nat'l Cable & Telecommunications Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

Plaintiffs contend that both ICE's courthouse-arrest policies and EOIR's courthouse-arrest policy are arbitrary and capricious. Those claims are likely to succeed.

### a.    ICE's courthouse-arrest policies

As detailed above, ICE's internal guidance since at least 2014 limited the circumstances under which the agency's officers could engage in civil arrests at courthouses. In line with this practice, ICE issued guidance in 2021 that specified when its officers could engage in civil enforcement actions, including "civil apprehensions," at "a courthouse …, including immigration courts."[42] ICE's 2021 guidance permitted such actions only if they involved "a national security threat," "an imminent risk of death, violence, or physical harm"; "hot pursuit" of a person who threatened public safety; "an immediate risk of destruction of [criminal] evidence"; or, subject to advance supervisory approval, if there was no "safe alternative location" at which an individual who threatens public safety could feasibly be arrested.[43]

ICE's 2021 courthouse-arrest guidance provided two primary reasons for limiting courthouse enforcement actions in this way. First, the guidance explained that the limitations would "preserv[e] access to justice."[44] The guidance reasoned that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice."[45] Second, the guidance explained that the limitations on courthouse enforcement actions would ensure "safety for crime victims" who may be present in courthouses.[46] "At the same time," the 2021 guidance acknowledged that "there may be legitimate need to execute a civil immigration enforcement action in or near a courthouse."[47] The guidance therefore permitted such actions in the five circumstances discussed above. The guidance did not directly explain why each of these five exceptions was warranted. But each appeared to concern circumstances in which ICE has a heightened interest in apprehending an

---

[42] *See* Memorandum from Tae Johnson, Acting Director of ICE & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on "Civil Immigration Enforcement Actions in or near Courthouses" (Apr. 27, 2021), Dkt. No. 95, at 6.

[43] *Id.*

[44] *Id.* at 5.

[45] *Id.*

[46] *Id.*

[47] *Id.*

United States District Court
Northern District of California

individual, either due to increased time pressure (e.g., because a failure to arrest the individual immediately would allow them to escape hot pursuit, destroy evidence, threaten national security, or result in imminent violence or self-harm) or because apprehension elsewhere would expose officers to an unacceptable and unavoidable risk (i.e., there was no safe alternative location to arrest a person who threatened public safety).

ICE's 2025 courthouse-arrest policies did away with these limitations on civil enforcement actions at courthouses, including immigration courthouses.[48] Though the policies contemplate that "civil immigration enforcement actions in or near courthouses" will generally be "against targeted aliens," the policies state that courthouse arrests are "not limited" to these groups and that other noncitizens "may be subject to civil immigration enforcement action[s]" at courthouses even absent exigent or other special circumstances.[49] Under the 2025 policies, "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses" whenever "credible information ... leads them to believe" that the noncitizen they seek to arrest "will be present" at a courthouse.[50] As noted above, the record shows that ICE has in fact arrested dozens of noncitizens at three nearby immigration courthouses since May 2025.[51]

ICE's 2025 courthouse-arrest policies justify their authorization of widespread civil arrests at courthouses in three ways. First, they reason that "[f]ederal, state, and local law enforcement agencies routinely engage in enforcement activities in or near courthouses" against individuals who appear in a courthouse for "criminal or civil violations" that are "unrelated" to the offense for which the authorities seek to arrest them.[52] Second, the policies reason that conducting civil enforcement actions in or near courthouses "can reduce safety risks to the public, targeted alien(s), and ICE officers and agents" because "[i]ndividuals entering courthouses are typically screened by

---

[48] *See* ICE Policy No. 11072.3, Dkt. No. 107, at 21–23; ICE Policy No. 11072.4, Dkt. No. 107, at 25–27.

[49] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26.

[50] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26.

[51] *See supra* note 26.

[52] ICE Policy No. 11072.3, Dkt. No. 107, at 21; ICE Policy No. 11072.4, Dkt. No. 107, at 25.

law enforcement personnel to search for weapons and other contraband."[53] Third, the policies state that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE, including when such jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE custody."[54] Though the interim 2025 policy stated that it rescinded and superseded the 2021 guidance,[55] neither the interim nor final 2025 policy otherwise referred to or directly engaged with the reasoning of the 2021 guidance.

Plaintiffs have established that ICE's 2025 courthouse-arrest policies are arbitrary and capricious because the policies (1) ignore important aspects of the problem that underlay previous ICE policies and (2) rely on implausible and illogical reasoning.[56]

### i. ICE's courthouse-arrest policies ignore an "important aspect of the problem" underlying prior guidance.

Plaintiffs have demonstrated that ICE's 2025 courthouse-arrest policies are arbitrary and capricious due to their failure to provide "a reasoned explanation … for disregarding" critical "facts and circumstances that underlay or were engendered by [ICE's] prior policy," *Fox Television Stations*, 556 U.S. at 516—namely, the chilling effect of widespread immigration-courthouse arrests on noncitizens' participation in removal proceedings. As the government acknowledged at the motion hearing, ICE's 2025 policies say nothing about these chilling effects.[57]

The government argues that ICE's new policies tacitly address the potential chilling effect of courthouse arrests because they "include[] provisions designed to ensure that enforcement actions within courthouses are conducted in an orderly, safe, and non-disruptive manner." But the

---

[53] ICE Policy No. 11072.3, Dkt. No. 107, at 21; ICE Policy No. 11072.4, Dkt. No. 107, at 25.

[54] ICE Policy No. 11072.3, Dkt. No. 107, at 21; ICE Policy No. 11072.4, Dkt. No. 107, at 25.

[55] ICE Policy No. 11072.3, Dkt. No. 107, at 21.

[56] Because the Court concludes that ICE's courthouse-arrest policies are likely arbitrary and capricious on these bases, it need not address plaintiffs' additional arguments that ICE failed to "display awareness that it [was] changing position," *Fox Television Stations*, 556 U.S. at 515, and failed to address "serious reliance interests," *Encino Motorcars*, 579 U.S. at 222.

[57] While EOIR's new courthouse-arrest policy purports to address the chilling effect of courthouse arrests, *see* Operating Policies and Procedures Memorandum 25-06, Dkt. No. 107, at 29–30, the government conceded at the hearing that EOIR's policy cannot cure any deficiencies in ICE's.

chilling effect contemplated by the 2021 guidance arises from the *fact* of courthouse arrests, not the *manner* in which such arrests are conducted.[58] As plaintiffs explain (and as common sense suggests), it is the desire to avoid arrest entirely, not merely to avoid disorderly or disruptive arrests, that disincentivizes noncitizens from appearing in immigration court. In other words, as the declarations of immigration attorneys show, the chilling effect operates before noncitizens even get to the courthouse.[59] Maintaining order at the courthouse does nothing to mitigate that chilling effect. ICE's 2025 courthouse-arrest policies simply do not address, either expressly or impliedly, one of the primary concerns raised in the 2021 guidance—a concern that the record amply demonstrates has come to pass in the time since ICE began conducting such arrests. This "unexplained inconsistency" on its own renders the 2025 policies likely to be arbitrary and capricious for the purposes of plaintiffs' § 705 motion. *Encino Motorcars*, 579 U.S. at 222 (quoting *Brand X*, 545 U.S. at 981).[60]

Even if the prior policy's reasoning had not focused on chilling effects, ICE likely would have been required to consider them as an "important aspect of the problem" concerning courthouse arrests. Whether something is an important factor that must be considered "turns on

---

[58] *See* Memorandum from Tae Johnson, Acting Director of ICE & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on "Civil Immigration Enforcement Actions in or near Courthouses" (Apr. 27, 2021), Dkt. No. 95 at 5 (stating that "[e]xecutive civil immigration enforcement actions in or near a courthouse may chill individuals' access to" without differentiating among orderly and disorderly arrests).

[59] *See, e.g.*, Declaration of Milli Atkinson, Dkt. No. 98 ¶ 43–46 (explaining that ICE's courthouse arrests have caused many noncitizens not to appear for removal proceedings at all); Declaration of Sean Lai McMahon, Dkt. No. 99 ¶ 24 (similar); Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶¶ 23–25 (similar); Declaration of Martha Ruch, Dkt. No. 66 ¶ 15 (similar); Declaration of Reena Arya, Dkt. No. 67 ¶ 11 (similar).

[60] The Court is aware that another court in the Southern District of New York recently concluded that ICE's courthouse-arrest policies sufficiently addressed the reasons underlying the 2021 guidance because ICE's interim courthouse-arrest policy stated that the 2021 guidance "is now rescinded for ICE and is superseded by this interim" policy. *See Afr. Communities Together v. Lyons*, No. 25-CV-6366, 2025 WL 2633396, at *21 (S.D.N.Y. Sept. 12, 2025). That court reasoned that such an "acknowledge[ment] [of] the existence and rescinding of the prior policy … [wa]s an implicit and sufficient statement of belief that the new policy is better." *Afr. Communities Together*, 2025 WL 2633396, at *21. This Court disagrees that this satisfies the APA's requirements. "Merely saying something 'was considered is not enough to show reasoned analysis.'" *Immigr. Defs.*, 145 F.4th at 992 (quoting *State v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021)). And in this case ICE said even less. Its bare acknowledgement of the 2021 guidance's existence and rescission does not constitute reasoned decisionmaking.

what [the] relevant substantive statute makes 'important.'" *Nat'l Urb. League v. Ross*, 977 F.3d 770, 777 (9th Cir. 2020) (*Or. Nat'l Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996)). So "[i]n the immigration context, the agency's 'approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system.'" *Immigr. Defs.*, 145 F.4th at 992 (quoting *Judulang v. Holder*, 565 U.S. 42, 55 (2011)).

Here, the government derives its authority to detain noncitizens during removal proceedings from § 1225 and § 1226 of the Immigration and Nationality Act (INA). *See* 8 U.S.C. §§ 1225(b), 1226(a)–(c). The INA and its implementing regulations make clear that civil immigration detention serves the purpose of ensuring that noncitizens appear for their removal proceedings in immigration court. For example, § 1226(c) provides that the government may "release an alien" subject to mandatory detention under that paragraph "only if … the alien satisfies the Attorney General that the alien … is likely to appear for any scheduled proceeding." *Id.* § 1226(c)(4). Similarly, the government is prohibited by regulation from releasing a noncitizen subject to detention under § 1225(b) or § 1226(a) unless it has first determined that the noncitizen is not likely to abscond. *See* 8 C.F.R. §§ 212.5(b), 236.1(c)(8), 1003.19(h)(3), 1236.1(c)(8). The INA thus reflects a fundamental concern with ensuring noncitizens' appearance and participation in immigration proceedings. That widespread civil arrests at immigration courts could have a chilling effect on noncitizens' attendance at removal proceedings (as common sense, the prior guidance, and the actual experience in immigration court since May 2025 make clear) and thereby undermine this central purpose is thus "an important aspect of the problem" that ICE was required, but failed, to consider.

Plaintiffs allege that this potential—which, as noted, has since been realized[61]—should have been obvious to ICE when issuing its 2025 policies. This potential is evident not only from common sense and the prior guidance, but also from the common law's centuries-long recognition

---

[61] *See* Declaration of Milli Atkinson, Dkt. No. 98 ¶ 43; Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶ 23; Declaration of Nikolas De Bremaeker, Dkt. No. 33-10 ¶ 18; Declaration of Martha Ruch, Dkt. No. 66 ¶ 15; Declaration of Sean Lai McMahon, Dkt. No. 99 ¶ 24; Declaration of Reena Arya, Dkt. No. 67 ¶ 11; Declaration of Shira Levine, Dkt. No. 100 ¶ 6.

United States District Court
Northern District of California

of "a privilege against civil arrest for individuals appearing in court" based in part on the concern that "civil arrest deterred parties from coming to court voluntarily." *Velazquez-Hernandez v. U.S. Immigr. & Customs Enf't*, 500 F. Supp. 3d 1132, 1142 (S.D. Cal. 2020) (citing *Walpole v. Alexander*, 99 Eng. Rep. 530, 531, 3 Dougl. 45, 46 (1782)); *see also* 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768). Even if this common-law privilege does not apply to civil immigration arrests, as the government argues at length, *see Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 19–28 (1st Cir. 2020), it nevertheless should have alerted ICE to the possibility that removing limits on civil arrests at immigration courts would chill attendance at removal proceedings and thereby vitiate a core purpose of the statutory and regulatory scheme governing noncitizens' detention. ICE's failure to even mention that possibility, which is both "an important aspect of the problem" in its own right and a factor underlying the prior policy, renders its 2025 courthouse-arrest policies likely arbitrary and capricious for APA purposes. Under the APA, ICE cannot choose to ignore the "costs" of its new policies—chilling the participation of noncitizens in their removal proceedings—and consider only the policies' purported "benefits" for immigration enforcement. *State Farm*, 463 U.S. at 54.

### ii.    ICE's courthouse-arrest policies are insufficiently reasoned as to immigration courts.

Plaintiffs have also established that ICE's courthouse-arrest policies are likely arbitrary and capricious because, while the policies' reasoning may be sound as to *criminal* courthouses, there is no "rational connection between the facts" on which the policies rely "and the choice made" to expand courthouse arrests at *immigration* courts. *See All. for the Wild Rockies*, 68 F.4th at 493.

The policies conclude that widespread courthouse arrests are appropriate based on three rationales that are largely inapplicable to immigration courts.

First, ICE justifies its courthouse-arrest policies based on its assertion that "[f]ederal, state, and local law enforcement agencies routinely engage in enforcement activities in or near courthouses because many individuals appear in courthouses for unrelated criminal or civil

violations."[62] That analogy does not make sense with respect to civil enforcement actions at immigration courts, where ICE is not arresting individuals who appear for criminal or civil violations "unrelated" to the arrest but instead arresting noncitizens based on the very immigration offenses for which the noncitizens are appearing in immigration court. So unlike ICE's civil enforcement activities at criminal courthouses, its arrests at immigration courthouses do not serve the purpose of apprehending individuals to initiate removal proceedings. Arrestees at immigration courthouses have already been placed in removal proceedings.

Second, ICE reasons that civil immigration enforcement actions at courthouses "can reduce safety risks to the public, targeted alien(s), and ICE officers."[63] The policies base that conclusion on the fact that "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband."[64] But if ICE has apprehended a noncitizen and placed her in removal proceedings without detaining her, it has necessarily already determined that the noncitizen is neither a flight risk nor a threat to the public. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).[65] ICE's policies do not explain why, in light of these prior determinations, there are significant "safety risks" that must be mitigated by the civil arrest of such noncitizens at immigration courts.[66] Nor do they explain why the prior guidance's approach, which allowed courthouse arrests of noncitizens deemed to threaten public safety if there was no "safe alternative location," would not sufficiently address any safety risks attendant to civil immigration arrests.

Third, the courthouse-arrest policies reason that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE, including when such jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE

---

[62] ICE Policy No. 11072.3, Dkt. No. 107, at 21; ICE Policy No. 11072.4, Dkt. No. 107, at 25.

[63] ICE Policy No. 11072.3, Dkt. No. 107, at 21; ICE Policy No. 11072.4, Dkt. No. 107, at 25.

[64] ICE Policy No. 11072.3, Dkt. No. 107, at 21; ICE Policy No. 11072.4, Dkt. No. 107, at 25.

[65] In the absence of such a determination, the applicable statutory and regulatory provisions bar such a release. *See* 8 C.F.R. §§ 212.5(b), 236.1(c)(8), 1003.19(h)(3), 1236.1(c)(8); 8 U.S.C. § 1226(c)(4).

[66] ICE Policy No. 11072.3, Dkt. No. 107, at 21; ICE Policy No. 11072.4, Dkt. No. 107, at 25.

United States District Court
Northern District of California

custody."[67] That reasoning applies only to noncitizens who are taken into state or local authorities' custody—that is, to noncitizens arrested for or convicted of criminal activity. There may well be a rational connection between state and local authorities' refusal to transfer custody of actual or suspected criminals to ICE and ICE's need to arrest such individuals when they appear in criminal court. But ICE fails to draw any rational connection between its need to arrest criminal noncitizens specifically and its use of civil arrests at immigration courthouses generally. To the extent ICE's new policies aim to enable apprehension of the narrow class of noncitizens who have been in state or local criminal custody, the agency could have used far more tailored means to target that class. For example, it could simply have amended its 2021 guidance to add a new exception to the general rule against courthouse arrests for noncitizens who would be subject to immigration detainers. While the APA does not require that ICE adopt a more tailored approach, it requires the agency to at least "consider the alternatives that are within the ambit of the existing policy." *Regents*, 591 U.S. at 30 (citation modified) (quoting *State Farm*, 463 U.S. at 51). ICE did not do so.

ICE might have explained the disconnect between its stated rationales and the use of civil arrests at immigration courthouses by reference to the policies' instruction that ICE officer "should generally avoid enforcement actions in or near courthouses … wholly dedicated to non-criminal proceedings."[68] ICE's courthouse-arrest policies require additional supervisory approvals for enforcement actions in such non-criminal courthouses.[69] But at the motion hearing, the government would not concede that this limiting language applies to immigration courthouses. Though it would not explain precisely how ICE interprets the limitation, the government stated that the agency has concluded that immigration courthouses are appropriate locations for civil enforcement actions, strongly suggesting that the limitation does not apply in that context. And in a similar case in the Southern District of New York, the government recently represented that ICE

---

[67] ICE Policy No. 11072.3, Dkt. No. 107, at 21; ICE Policy No. 11072.4, Dkt. No. 107, at 25.

[68] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26.

[69] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26.

1  "does not construe federal immigration courts to fall within the category of noncriminal or

2  specialized courts for which additional approvals are operationally needed."[70]

3        The government instead attempts to rationalize ICE's courthouse-arrest policies by

4  reference to a series of cases addressing ICE's earlier use of courthouse arrests pursuant to its

5  2018 guidance. The government suggested at the motion hearing that ICE's previous use of such

6  arrests demonstrates the existence of a rational basis for the agency's new policy authorizing

7  widespread civil enforcement actions at immigration courthouses. But none of the cases cited by

8  the government involved arrests at immigration courthouses. Each instead involved arrests made

9  at state courthouses or after criminal proceedings in federal district court. *See Ryan*, 974 F.3d at

10  14; *Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 680 (S.D.N.Y. 2020); *New York v.*

11  *U.S. Immigr. & Customs Enf't*, 466 F. Supp. 3d 439, 441 (S.D.N.Y. 2020), *vacated and remanded*,

12  No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023); *Velazquez-Hernandez*, 500 F. Supp. 3d

13  at 1137. If anything, the government's reliance on these cases further demonstrates that the

14  reasoning underlying ICE's new courthouse-arrest policies makes sense only with respect to *non*-

15  immigration courts.

16        In sum, nothing in ICE's courthouse-arrest policies or the case law identified by the

17  government explains the lack of a logical connection between ICE's rationales and its expansion

18  of civil arrests at immigration courthouses. This, too, likely makes ICE's courthouse-arrest

19  policies arbitrary and capricious.

20                    **b.      EOIR's courthouse-arrest policy**

21        Before 2025, EOIR also limited civil arrests at its immigration courthouses. After

22  forbidding most civil arrests in immigration courtrooms in 1996,[71] EOIR expanded the restriction

23  on civil arrests in 2023 to cover all spaces where immigration-court business took place.[72] EOIR's

24

25  [70] *See* Transcript of Preliminary Injunction Hearing, *Afr. Communities Together*, 2025 WL
    2633396 (No. 25-cv-6366), Dkt. No. 95-9 at 33.

26  [71] *See* Memorandum from Michael J. Creppy, Chief Immigration Judge, on "Arrests by INS
27  Officers In or Near Immigration Court Facilities," at 1, 3 (Sept. 30, 1996), https://perma.cc/55GA-
    Q9FA.

28  [72] *See* Operating Policies and Procedures Memorandum 23-01, Dkt. No. 95-2 at 3.

2023 guidance explained that civil enforcement actions at immigration courthouses would have a "chilling effect" that "would disincentivize noncitizens from appearing for their hearings, which in turn would create inefficiencies for all parties involved and hinder the ability of [the Office of the Chief Immigration Judge] to carry out the mission of the agency."[73] Such actions could also, the guidance reasoned, "create safety risks for those who may be present during such enforcement actions, including children and adults appearing for hearings."[74] Finally, the 2023 guidance reasoned that limiting civil immigration arrests at immigration courthouses would "reinforce the separate and distinct roles of [the Department of Homeland Security]," including ICE, "and [EOIR]."[75] EOIR therefore permitted civil immigration arrests at or near its courthouses only in the limited circumstances outlined by ICE's 2021 guidance.

EOIR issued its new courthouse-arrest policy rescinding the prior restrictions on civil enforcement actions in its immigration courthouses on the heels of ICE's interim courthouse-arrest policy.[76] EOIR stated that its earlier guidance had primarily stemmed from ICE's since-revoked 2021 guidance and that the rescission of ICE's 2021 guidance meant there was "no longer a basis to maintain" EOIR's 2023 guidance.[77] The new policy also reasoned that the prior guidance's concerns about a "vague, unspecified 'chilling effect'" or "disincentiviz[ing]" appearances at removal hearings was unsupported by data and "contrary to logic" because "aliens with valid claims to legal immigration status … ha[ve] no reason to fear any enforcement action by DHS."[78] As evidence, EOIR noted that many noncitizens failed to appear for hearings despite protections against courthouse arrests, suggesting that nonattendance resulted from other factors.[79] The new policy further stated that the 2023 guidance's safety concerns were illogical because the 2023

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *See* Operating Policies and Procedures Memorandum 25-06, Dkt. No. 107, at 29.

[77] *Id.*

[78] *Id.* at 29–30.

[79] *Id.* at 30

guidance permitted courthouse arrests in several circumstances that appeared to pose greater-than-average safety risks (e.g., in cases involving an "imminent risk of death, violence, or physical harm").[80] EOIR also reasoned that the 2023 guidance's desire to "reinforce the separate and distinct roles" of DHS and EOIR "in the eyes of the public" was misguided. According to EOIR, the distinction had already been blurred by EOIR's frequent interference with DHS's prosecutorial functions when administratively closing cases or identifying candidates for DHS's exercise of prosecutorial discretion.[81] Finally, EOIR reasoned that it lacked authority to prohibit ICE from taking lawful enforcement actions.[82]

Plaintiffs have established that EOIR's new courthouse-arrest policy is likely arbitrary and capricious because, as with ICE's policies, EOIR failed (1) to provide a rational explanation for its authorization of widespread arrests at immigration courthouses and (2) to address key considerations underlying the prior policy.[83]

### i.    EOIR failed to provide a reasoned explanation for its courthouse-arrest policy.

The primary rationale for EOIR's courthouse-arrest guidance was that "EOIR lacks the authority to prohibit DHS [and ICE] from conducting any action it is otherwise lawfully authorized to take" and that the rescission of ICE's 2021 guidance therefore left "no … basis" for EOIR's prior restrictions on arrests at its immigration courthouses.[84] This reasoning is likely deficient for two reasons.

First, EOIR's reasoning as to its own authority is internally inconsistent. Though EOIR's new courthouse-arrest policy rescinded the office's 2023 guidance based on its lack of authority to

---

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] As with the challenge to ICE's courthouse-arrest policies, the Court need not address plaintiffs' arguments concerning EOIR's failure to consider reliance interests because it concludes that EOIR's courthouse-arrest policy is arbitrary and capricious on these grounds alone.

[84] *See* Operating Policies and Procedures Memorandum 25-06, Dkt. No. 107, at 29–30 (emphasis added)

United States District Court
Northern District of California

restrict ICE's enforcement activities in EOIR spaces, the new policy elsewhere appears to acknowledge that EOIR has some authority to do so. The policy states that "[n]othing in [ICE's courthouse-arrest policies] *or this Policy Memorandum* authorizes DHS to conduct civil immigration enforcement actions in private EOIR space which is not customarily open to the public, such as offices of immigration judges."[85] This language suggests that EOIR's authorization would be required for ICE to conduct arrests in such spaces. EOIR does not explain why the same would not be true of other parts of its immigration courthouses. Such "an internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conserv. Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).

Second, EOIR's courthouse-arrest policy offers no support for its assertion that the office lacks power to regulate ICE's civil enforcement activity in immigration courthouses other than a citation to the entirety of Title 8 of the United States Code.[86] Plaintiffs have identified substantial authority suggesting that EOIR's assessment is legally incorrect. By statute, EOIR sits within the Department of Justice and "shall be subject to the direction and regulation of the Attorney General under section 1103(g) of Title 8." 6 U.S.C. § 521(a). Section 1103(g), in turn, grants the Attorney General authority to "establish such regulations … as the Attorney General determines to be necessary" with respect to EOIR. 8 U.S.C. § 1103(g)(2). Pursuant to that broad statutory grant of authority, the Department of Justice has promulgated regulations empowering EOIR's director to "[i]ssue operational instructions and policy" for the office and to "[p]rovide for appropriate administrative coordination … with the Department of Homeland Security," including ICE. 8 C.F.R. § 1003.0(b)(1)(i), (iii). And as a general matter, "[t]he head of an Executive department" like the Attorney General "may prescribe regulations for the government of his department," including "the custody, use, and preservation of its … property." 5 U.S.C. § 301. EOIR's courthouse-arrest policy does not address whether these or any other statutory or regulatory provisions would authorize a restriction on civil arrests in its immigration courthouses. Instead,

---

[85] *Id.* at 29 n.1 (emphasis added).

[86] *Id.* at 30.

EOIR simply rejected "[t]he suggestion that [it] can prohibit DHS from taking lawful enforcement action" on EOIR property as "an anathema to the administrative separation of functions between the two agencies and their fidelity to law."[87] EOIR thus "did not appear to appreciate"—or at the very least to consider—"the full scope of [its] discretion." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 26 (2020).

Both the internal inconsistency of and lack of support for EOIR's assessment of its authority to regulate ICE's enforcement activities in immigration courthouses—the primary basis for EOIR's courthouse-arrest policy—likely make the policy arbitrary and capricious.[88]

### ii.    EOIR failed to address key concerns of its prior policy.

Plaintiffs also argue that EOIR's courthouse-arrest policy is likely arbitrary and capricious for failing to provide "a reasoned explanation … for disregarding facts and circumstances that underlay … [its] prior policy," *Fox Television Stations*, 556 U.S. at 516. Plaintiffs contend that EOIR insufficiently addressed three core concerns underlying the office's 2023 guidance, at least the first of which likely renders EOIR's courthouse-arrest policy arbitrary and capricious.

First, plaintiffs argue EOIR's new courthouse-arrest policy fails to sufficiently address the 2023 guidance's concerns about chilling or otherwise disincentivizing attendance at removal hearings. The new policy dismisses these concerns as "vague" and "contrary to logic" because noncitizens with valid immigration claims have no reason to fear arrest at a courthouse.[89] To the extent the policy contends that such individuals face no possibility of arrest, ICE's policies make it clear that such a contention lacks any merit. ICE's policies do not exempt such individuals from arrest and, in fact, many such individuals have been arrested at immigration courthouses since May 2025.[90] To the extent the policy suggests that such individuals should not fear arrest because

---

[87] *Id.* at 30.

[88] Plaintiffs also argue that because ICE's new courthouse-arrest policies contain language limiting enforcement activities in non-criminal courthouses, EOIR's conclusion that ICE's policies compelled EOIR to remove restrictions on arrests at immigration courthouses was irrational. As discussed above, however, ICE appears to interpret its policies not to include immigration courthouses among the non-criminal courthouses to which this limitation applies.

[89] *See* Operating Policies and Procedures Memorandum 25-06, Dkt. No. 107, at 30.

[90] *See* supra note 26.

they will ultimately be released either after a bond hearing or upon the successful adjudication of their applications for relief, that suggestion presumes that noncitizens know whether or not they have valid immigration claims *before* deciding whether to attend their removal hearings—in other words, before any immigration judge has ever adjudicated their claims. EOIR's policy offers no reason to conclude that noncitizens would not be dissuaded by the threat of arrest—potentially resulting in a loss of physical liberty and all the consequent harms for the duration of their removal proceedings, *see Garro Pinchi*, 2025 WL 3691938, at *29, 31–32—merely because they believe their as-yet-unadjudicated claims to be meritorious.

Further, even if it were true that widespread courthouse arrests would not deter noncitizens with valid claims from attending their hearings, EOIR tacitly concedes that such arrests *will* disincentivize attendance by other noncitizens. The proper functioning of the immigration system, which is an "important aspect of the problem" that must be considered for the reasons explained above, depends on such noncitizens attending their scheduled removal proceedings. *See* 8 U.S.C. § 1226(c)(4); 8 C.F.R. §§ 212.5(b), 236.1(c)(8), 1003.19(h)(3), 1236.1(c)(8); *see also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Thus, the chilling effect of courthouse arrests could undermine the proper enforcement of immigration laws even if it affected only noncitizens likely to be removed at the end of the process. There is no evidence that EOIR considered this effect.

EOIR's new policy also reasons that no evidence supports the existence of any chilling effect because many noncitizens failed to appear in immigration court even when such arrests were not taking place.[91] This is a non sequitur. Multiple factors could independently affect noncitizens' participation in removal proceedings, and the fact that some noncitizens fail to appear for reasons other than a fear of being arrested at the courthouse does not suggest that the possibility of arrest could not also impact attendance. Unsurprisingly, the record before the Court shows that there has been a marked increase in non-appearances since EOIR began allowing arrests within its immigration courthouses.[92]

---

[91] *Id.*

[92] *See supra* notes 27–33.

1    Both of EOIR's attempts to provide the requisite "reasoned explanation" for rejecting its

2    prior concerns about chilling effects are thus likely to fail. *See Fox Television Stations*, 556 U.S. at

3    515. This provides another basis for finding the policy likely to be arbitrary and capricious under

4    the APA.

5    Second, plaintiffs insist that EOIR's new courthouse-arrest policy disregarded the prior

6    policy's concerns about safety risks without sufficient analysis. Unlike plaintiffs' other argument,

7    this argument is not likely to succeed. EOIR's 2023 guidance stated that limiting courthouse

8    arrests served to preserve the safety of both staff and individuals attending proceedings, but it

9    permitted ICE to make arrests in certain exigent circumstances.[93] EOIR's new policy rejects that

10   approach as irrational, noting that the circumstances in which the prior policy had authorized

11   courthouse arrests were those in which arrests were most likely to endanger the safety of nearby

12   individuals (e.g., where the arrestee posed a risk of imminent violence or a national security

13   threat).[94] In essence, EOIR's new policy reasoned that it makes little sense to limit courthouse

14   arrests in less dangerous circumstances based on safety concerns while allowing arrests in more

15   dangerous situations.

16   As plaintiffs note, EOIR's prior reasoning is not so flawed as EOIR's new policy might

17   suggest: The exigent circumstances in which the prior policy authorized arrests were those in

18   which the safety risk of not apprehending the targeted individual might be greater than the safety

19   risk attendant to making an arrest. For example, while an arrest at an immigration courthouse may

20   endanger passersby, failing to arrest a person who may commit imminent violence may pose a far

21   graver danger. Under the APA, however, the Court "is not to ask whether [EOIR's] decision is the

22   best one possible or even whether it is better than the alternatives," so long as EOIR articulated "a

23   rational connection." *Cal. Pub. Utilities Comm'n v. FERC*, 879 F.3d 966, 973 (9th Cir. 2018).

24   Because the view taken by EOIR's new policy is at least rational, it is not arbitrary and capricious.

25   Finally, plaintiffs argue that EOIR's new policy did not provide a reasoned explanation for

26

27   [93] *See* Operating Policies and Procedures Memorandum 23-01, Dkt. No. 95-2, at 3–4.

28   [94] *See* Operating Policies and Procedures Memorandum 25-06, Dkt. No. 107, at 30.

United States District Court
Northern District of California

1    rejecting the 2023 guidance's conclusion that limiting ICE enforcement actions in immigration

2    courthouses would serve to maintain the public perception that EOIR's adjudicatory function is

3    separate from DHS's investigative and prosecutorial functions.[95] Again, this argument is not likely

4    to succeed. EOIR's new policy suggests that such a distinction no longer exists in the public eye

5    because EOIR already interferes in DHS's prosecutorial functions by administratively closing

6    cases and identifying cases for DHS's exercise of prosecutorial discretion. While plaintiffs may

7    disagree with this assessment, it is not without a rational basis.

8        Still, because EOIR's new policy entirely failed to provide a reasoned explanation for

9    rejecting the 2023 guidance's concerns about chilling effects and access to justice, plaintiffs are

10   for this additional reason likely to succeed on their ultimate claim that the policy is arbitrary and

11   capricious.

12       **B.    Members of the courthouse-arrest class will likely suffer irreparable harm
          absent a stay.**
13

14       Plaintiffs have established a likelihood that members of the courthouse-arrest class will

15   suffer irreparable harm in the absence of a stay. As the Court has already detailed, ICE has

16   arrested large numbers of noncitizens at immigration courthouses in northern California pursuant

17   to the challenged courthouse-arrest policies, and it avows that it will continue doing so.

18       This circumstance presents noncitizens in removal proceedings with a Hobson's choice

19   between two irreparable harms. First, they may appear in immigration court and face likely arrest

20   and detention. Such a "[d]eprivation of physical liberty by detention constitutes irreparable

21   harm." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018). And for many class members

22   whom ICE arrests under the challenged policies, like Ms. Pablo Sequen and Ms. Garcia, such an

23   arrest would likely violate their rights under the Due Process Clause of the Fifth Amendment. *See*

24   *Pablo Sequen II*, 2025 WL 2650637, at *4–9; *Pablo Sequen IV*, 2025 WL 2935630, at *5–10;

25   *Bautista Pico v. Noem*, 2025 WL 3295382, at *2 (collecting cases from "[e]very court in this

26   district," and many outside this district, concluding that noncitizens re-detained by ICE in recent

27

28   [95] *See* Operating Policies and Procedures Memorandum 23-01, Dkt. No. 95-2, at 3.

1    months "established a likelihood of success on the merits ... of their procedural due process

2    claim"). "It is well established that the deprivation of constitutional rights 'unquestionably

3    constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir.

4    2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

5          Alternatively, noncitizens may choose not to appear and instead to forego their opportunity

6    to pursue their claims for asylum or other relief from removal. As the declarations of immigration

7    attorneys and former immigration judges establish, dozens of noncitizens are already taking this

8    path and receiving *in absentia* removal orders as a result.[96] These *in absentia* removal orders may

9    be rescinded only if a noncitizen failed to appear because she was in federal or state custody or did

10   not receive notice of the removal hearing, or due to "exceptional circumstances" such as "battery

11   or extreme cruelty …, serious illness …, or serious illness or death of the spouse, child, or parent

12   of the [noncitizen], but not including less compelling circumstances." *See* 8 U.S.C.

13   §§ 1229a(b)(5)(C), (e)(1); *Salta v. I.N.S.*, 314 F.3d 1076, 1078 (9th Cir. 2002). These provisions

14   do not appear to provide any means of relief for noncitizens who failed to appear due to their fear

15   of arrest. Accordingly, if noncitizens wish to avoid the irreparable harm of arrest and detention,

16   they must instead irrevocably give up their pursuit of potentially valid immigration claims and be

17   ordered removed. There can be little question that this permanent loss of noncitizen's opportunity

18   to have their claims heard, and their resulting removal, is an irreparable injury. *Cf. Ng Fung Ho v.*

19   *White*, 259 U.S. 276, 284 (1922) (explaining that deportation "may result … in loss of both

20   property and life, or of all that makes life worth living").

21          In contending that plaintiffs have not demonstrated irreparable harm, the government

22   argues only that Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio cannot be re-arrested

23   during the pendency of these proceedings as a result of the preliminary injunctions this Court has

24   issued. This argument parallels the government's arguments concerning justiciability and fails for

25

26   _____

27   [96] *See, e.g.*, Declaration of Milli Atkinson, Dkt. No. 98 ¶ 43–46; Declaration of Sean Lai
     McMahon, Dkt. No. 99 ¶ 24; Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶¶ 23–25; Declaration
     of Martha Ruch, Dkt. No. 66 ¶ 15; Declaration of Reena Arya, Dkt. No. 67 ¶ 11; Declaration of
28   Shira Levine, Dkt. No. 100 ¶ 6.

United States District Court
Northern District of California

1    the same reasons. ICE's "interim compliance with [this] Court's ... [preliminary injunction] order"

2    no more obviates the threat of plaintiffs' arrest than "render[s] [their] case moot." *See Maher*, 432

3    U.S. at 469 n.4. And in any event, plaintiffs "clearly" demonstrate a risk of irreparable harm

4    absent a stay where, as here, the record shows "that at least some individuals" in the class "would

5    be detained" without such preliminary relief. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir.

6    2013).

7          **C.    The balance of the equities and the public interest favor a stay.**

8          The final two factors—the balancing of harms and the public interest—merge because the

9    government is the opposing party. *See Nken*, 556 U.S. at 435. As discussed above, plaintiffs have

10   established that members of the courthouse-arrest class face an impossible choice between the

11   irreparable harms of detention and receiving *in absentia* removal orders, and the class

12   consequently has a strong interest in staying ICE and EOIR's courthouse-arrest policies. The

13   Supreme Court has also recognized a strong government (and therefore public) interest in ensuring

14   that noncitizens appear for their removal proceedings, which weighs in favor of staying the

15   challenged policies due to their chilling effects. *See Jennings v. Rodriguez*, 583 U.S. 281, 286

16   (2018); *Demore v. Kim*, 538 U.S. 510, 520–22 (2003); *Zadvydas*, 533 U.S. at 690. Further, "[t]he

17   public interest is served by compliance with the APA." *California v. Azar*, 911 F.3d 558, 581 (9th

18   Cir. 2018). And "it is always in the public interest to prevent the violation of a party's

19   constitutional rights," *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023), such as the likely

20   deprivation of countless class members' protected liberty interests without due process.

21          On the other side of the scale, the government argues that ICE "has a compelling interest in

22   the steady enforcement of its immigration laws." To be certain, courts must be wary of the

23   "serious, perhaps irreparable, consequences" that may flow from interference with "the

24   Executive's ability to implement immigration policy ... as it sees fit." *Immigr. Defs.*, 145 F. 4th at

25   985 (quoting *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025)). But here, the government offers no

26   "concrete evidence" of prejudice, arguing instead in "general terms" that a stay would prejudice

27   ICE by interfering with its enforcement of immigration laws, which amounts only to a "weak"

28   showing of governmental harm. *See id.* at 985, 994. And "the mere existence of the Executive

36

1    Branch's desire to enact a policy is not sufficient" to show that a stay would prejudice the

2    government. *Id.* at 985; *see also Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). While the

3    government asserts in passing that "state-by-state variance for immigration policy is untenable," it

4    does not explain why it would not be administratively feasible to implement a stay within a clearly

5    delineated geographic scope, such as ICE's San Francisco area of responsibility. That many of

6    ICE's courthouse arrests pursuant to the challenged policies likely violate noncitizens' due-

7    process rights further diminishes the weight of the governmental interest in avoiding a stay. *See*

8    *Rodriguez*, 715 F.3d at 1145 (holding that the government "cannot suffer harm from an injunction

9    that merely ends an unlawful practice" implicating "constitutional concerns").

10       On balance, these factors also weigh in favor of granting a stay. Plaintiffs have therefore

11   satisfied each of the *Winter* factors and established that the Court may grant a stay of ICE and

12   EOIR's courthouse-arrest policies pending a final ruling on plaintiffs' APA claims. The Court

13   exercises its discretion to do so.

**III.    The Court limits the scope of the stay to ICE's San Francisco area of responsibility.**

15       Though plaintiffs move to stay ICE and EOIR's courthouse-arrest policies in their entirety,

16   the government asks the Court to confine the stay to plaintiffs and members of the provisional

17   courthouse-arrest class. The government relies on the Supreme Court's recent decision in *Trump v.*

18   *CASA, Inc.*, which held that the Judiciary Act of 1789 authorizes injunctive relief only to the

19   extent necessary to remediate the injuries of the parties before the issuing court. *See* 606 U.S. 831,

20   852 (2025). As the Court recently explained, the Supreme Court expressly declined to extend its

21   holding in *CASA* to the APA context, and there is little textual or historical support for the

22   proposition that the APA authorizes only party-specific preliminary relief. *See Garro Pinchi*, 2025

23   WL 3691938, at *34–35. But the Ninth Circuit has held that *CASA's* "complete-relief principle for

24   crafting injunctive relief provides some useful guidance for crafting interim equitable relief" under

25   § 705. *Immigr. Defs.*, 145 F.4th at 995. As a result, a nationwide § 705 stay is appropriate only

26   where a narrower stay would not remediate the irreparable harm to plaintiffs or "is not a workable

27   solution under the [applicable] statute." *See Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1028 (9th Cir.

28   2025).

United States District Court
Northern District of California

United States District Court
Northern District of California

1       Plaintiffs have established irreparable harm to members of the courthouse-arrest class only

2   from ICE and EOIR's implementation of the challenged policies within ICE's San Francisco area

3   of responsibility, where all class members are located. A stay limited to that area will thus afford

4   complete relief to the parties for the demonstrated harms, and plaintiffs have not argued that such

5   a limited stay would be unworkable. The Court therefore stays ICE and EOIR's courthouse-arrest

6   policies only within ICE's San Francisco area of responsibility.

7   **CONCLUSION**

8       For the foregoing reasons, plaintiffs' motion for a stay of ICE's interim and final

9   courthouse-arrest guidance and EOIR's courthouse-arrest guidance is GRANTED. The effective

10  date of each of these agency actions—ICE Policy Number 11072.3, ICE Policy Number 11072.4,

11  and EOIR Operating Policies and Procedures Memorandum 25-06—is hereby postponed within

12  ICE's San Francisco area of responsibility until the entry of a final judgment in this action.

13      **IT IS SO ORDERED.**

14  Dated: December 24, 2025

15

16

17  P. Casey Pitts
    United States District Judge

18

19

20

21

22

23

24

25

26

27

28