1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    CARMEN ARACELY PABLO SEQUEN,          Case No.  25-cv-06487-PCP
     et al.,
8
                    Plaintiffs,            **ORDER GRANTING IN PART AND
9                                          DENYING IN PART MOTION TO
            v.                             DISMISS**
10
     SERGIO ALBARRAN, et al.,              Re: Dkt. No. 106
11
                    Defendants.
12

13          Plaintiffs Carmen Aracely Pablo Sequen, Yulisa Alvarado Ambrocio, Martin Hernandez

14   Torres, and Ligia Garcia challenge several recent policies promulgated by Immigration and

15   Customs Enforcement (ICE) and the Department of Justice's Executive Office for Immigration

16   Review (EOIR). The challenged policies authorize widespread arrests of noncitizens at

17   immigration courthouses and permit the detention of such noncitizens in short-term hold rooms for

18   more than 12 hours. Plaintiffs also challenge the conditions under which ICE detains noncitizens

19   in short-term hold rooms at its San Francisco field office, which is located at 630 Sansome Street.

20   Plaintiffs assert these challenges on behalf of two provisionally certified classes of noncitizens

21   subject to actual or potential arrest and detention by ICE. Now before the Court is the

22   government's motion to dismiss plaintiffs' amended complaint. For the reasons below, the Court

23   denies the motion as to Ms. Pablo Sequen, Ms. Alvarado Ambrocio, and Ms. Garcia and grants the

24   motion as to Mr. Hernandez Torres.

25                                    **BACKGROUND**

26          This case arises from recent changes to ICE and EOIR policies governing civil

27   immigration arrests at courthouses and detention in ICE's short-term hold facilities, as well as

28   resulting changes in the conditions of confinement at 630 Sansome. For the purposes of the

United States District Court
Northern District of California

government's motion to dismiss, the Court takes as true the allegations in plaintiffs' amended complaint unless the government has raised factual disputes concerning this Court's subject-matter jurisdiction. *See Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The Court also considers documents incorporated into the amended complaint by reference, *see United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003), including the challenged policies.

## I.    ICE and EOIR issue new guidance authorizing widespread civil immigration arrests at courthouses.

Prior to 2025, the federal government "[f]or decades … largely refrained from conducting civil immigration arrests at immigration courts … because conducting such arrests would deter noncitizens from attending proceedings and disrupt the proper functioning of courts." That practice was memorialized in guidance issued by ICE in 2021, which explained that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice."[1] "[S]o as not to unnecessarily impinge upon the core principle of preserving access to justice," ICE's 2021 guidance permitted such actions only if they involved "a national security threat," "an imminent risk of death, violence, or physical harm"; "hot pursuit" of a person who threatened public safety; "an immediate risk of destruction of [criminal] evidence"; or, subject to advance supervisory approval, if no "safe alternative location" for the arrest existed.[2]

EOIR, which oversees the nation's immigration courts, took a similar approach to civil arrests at its immigration courthouses. In 2023, EOIR issued guidance restricting civil arrests in all spaces where immigration-court business took place.[3] EOIR's 2023 guidance explained that

---

[1] Memorandum from Tae Johnson, Acting Director of ICE & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on "Civil Immigration Enforcement Actions in or near Courthouses" (Apr. 27, 2021), Dkt. No. 95, at 5. The amended complaint repeatedly refers to this document and relies on it to allege that ICE's new courthouse-arrest policies are arbitrary and capricious. The document is therefore incorporated by reference into the amended complaint. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

[2] Memorandum from Tae Johnson, Dkt. No. 95, at 5–6.

[3] *See* Operating Policies and Procedures Memorandum 23-01 from Sheily McNulty, Chief Immigration Judge, on "Enforcement Actions in or Near OCIJ Space" (Dec. 11, 2023), Dkt. No.

United States District Court
Northern District of California

allowing civil-enforcement actions in immigration courthouses would have a "chilling effect" by "disincentiviz[ing] noncitizens from appearing for their hearings" and might "create safety risks for those who may be present" in courthouses, "including children."[4] The 2023 guidance also reasoned that limiting civil immigration arrests at immigration courthouses would "reinforce the separate and distinct roles of [the Department of Homeland Security]," including ICE, "and [EOIR]."[5] To guard against these risks, EOIR permitted civil immigration arrests at or near its courthouses only in the exceptional circumstances outlined in ICE's 2021 guidance.[6]

That changed in 2025. In January of that year, ICE issued a new interim guidance on civil immigration arrests at courthouses in January 2025 and a final version in May 2025.[7] (ICE's interim and final courthouse-arrest policies are the same in all material respects, and the Court addresses them together unless otherwise specified.) The new courthouse-arrest policies acknowledge that "civil immigration enforcement actions in or near courthouses" are generally "against targeted aliens," like those who pose "[n]ational security or public safety threats," have "[s]pecific ... criminal convictions," are "gang members," or have remained in or re-entered the United States after being ordered removed.[8] But unlike ICE's prior guidance, ICE's new policies state that courthouse arrests are "not limited" to these groups and that other noncitizens "encountered ... in or near a courthouse ... may be subject to civil immigration enforcement

---

95-2, at 2–3. The amended complaint repeatedly refers to this document and relies on it to allege that EOIR's new courthouse-arrest policy is arbitrary and capricious. The document is therefore incorporated by reference into the amended complaint. *See Khoja*, 899 F.3d at 1002.

[4] Operating Policies and Procedures Memorandum 23-01, Dkt. No. 95-2, at 3.

[5] *Id.*

[6] *Id.* at 3–4.

[7] *See* ICE Policy No. 11072.3, Memorandum from Caleb Vitello, Acting ICE Director, on "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" (Jan. 21, 2025) [Interim Guidance], Dkt. No. 107, at 21–23; ICE Policy No. 11072.4, ICE Memorandum from Todd M. Lyons, Acting ICE Director, on "Civil Immigration Enforcement Actions In or Near Courthouses" (May 27, 2025) [Final Guidance], Dkt. No. 107, at 25–27. These policy documents are challenged in this action, so they necessarily form the basis for plaintiffs' claims and thus are incorporated into the amended complaint by reference. *See Khoja*, 899 F.3d at 1002.

[8] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26.

United States District Court
Northern District of California

action[s]" at courthouses "on a case-by-case basis considering the totality of the circumstances."[9] Under the guidance, "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses" whenever "credible information ... leads them to believe" that the noncitizen they seek to arrest "will be present" at a courthouse.[10] The policies discuss the benefits of courthouse arrests to the government's enforcement of immigration laws but do not directly address the concerns raised in earlier guidance concerning chilling effects, safety risks, and impacts on hearing attendance.

EOIR also issued new guidance on courthouse arrests in late January, and that policy remains in effect.[11] EOIR's new courthouse-arrest policy rescinds the office's prior restrictions on ICE civil enforcement actions in immigration courthouses.[12] EOIR states that its earlier policy primarily stemmed from ICE's since-revoked 2021 guidance and that "the other bases given ... were unpersuasive, inconsistent with current Executive Branch policy, pretextual, or unsubstantiated on any systematic basis."[13] EOIR's new policy also reasons that it lacks authority to prohibit ICE from taking lawful enforcement actions.[14] As a result, the policy places no

---

[9] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26.

[10] ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26. The interim guidance required that civil immigration enforcement actions not be "precluded by laws imposed by the jurisdiction in which the enforcement action will take place," ICE Policy No. 11072.3, Dkt. No. 107, at 22, but the final guidance removed this restriction, *see* ICE Policy No. 11072.4, Dkt. No. 107, at 26.

ICE's new courthouse-arrest policies instruct that ICE officers "should generally avoid enforcement actions in or near courthouses … wholly dedicated to noncriminal proceedings" and require additional supervisory approvals for such enforcement actions. *See* ICE Policy No. 11072.3, Dkt. No. 107, at 22; ICE Policy No. 11072.4, Dkt. No. 107, at 26. But while this language may on its face encompass immigration courthouses, the government strongly suggested at the motion hearing that ICE does not view immigration courthouses as subject to this limitation. *See Pablo Sequen v. Albarran* ("*Pablo Sequen VII*"), No. 25-CV-06487-PCP, 2025 WL 3724878, at *14 (N.D. Cal. Dec. 24, 2025).

[11] *See* Operating Policies and Procedures Memorandum 25-06 from Sirce E. Owen, Acting EOIR Director, on "Cancellation of Operating Policies and Procedures Memorandum 23-01" (Jan. 28, 2025), Dkt. No. 107, at 29. This policy document is challenged in this action, so it necessarily forms the basis for plaintiffs' claims and thus is incorporated into the amended complaint by reference. *See Khoja*, 899 F.3d at 1002.

[12] *Id.* at 30.

[13] *Id.* at 29

[14] *Id.* at 30.

1  independent limits on ICE's civil enforcement actions in immigration courthouses.

2  　　　In the wake of ICE and EOIR's new courthouse-arrest policies, ICE has sharply increased

3  its civil enforcement activity at immigration courthouses in its San Francisco area of

4  responsibility, which includes northern California, Hawai'i, Guam, and Saipan. According to the

5  amended complaint, "ICE's courthouse arrests have had a dramatic chilling effect on the

6  immigration court system" in ICE's San Francisco area of responsibility, resulting in "a marked

7  increase in absenteeism[] as immigrants grapple with the impossible choice of attending court and

8  risking arrest or missing their mandatory hearings and receiving an *in absentia* removal order."

9  Plaintiffs allege that, absent relief from this Court, "ICE will continue to arrest people who appear

10  for their immigration hearings in service of [a] self-imposed target of 3,000 arrests [of noncitizens]

11  per day."

12  **II.     ICE waives its 12-hour limit on detention in short-term holding facilities.**

13  　　　When ICE arrests an individual for an alleged immigration violation, it generally places the

14  individual in a holding facility in one of its field offices while ICE processes the individual for

15  long-term detention elsewhere. Because the hold rooms in such facilities "are primarily used for

16  … short-term confinement," ICE previously required its agents to "ensure that … holding

17  facilities are emptied upon the conclusion of daily operations" and instructed that, "[a]bsent

18  exceptional circumstances, no detainee should be housed in a holding facility for longer than 12

19  hours."[15] In June 2025, however, ICE waived the decade-old limit on hold-room detentions,

20  allowing the agency to keep detainees in holding facilities "for up to … 72 hours" or longer in

21  "exceptional circumstances."[16] The memorandum announcing the waiver explained that it was "a

22

23  _____

24  [15] ICE Office of Enforcement and Removal Operations Directive 11087.1, "Operations of ERO
    Holding Facilities," at 1, 4 (Sept. 22, 2014); see also ICE Office of Enforcement and Removal
    Operations Directive 11087.2, "Operations of ERO Holding Facilities," at 2, 7 (Jan. 31, 2024).

25  The amended complaint repeatedly refers to these documents and relies on them to allege that
    ICE's 12-hour-detention waiver violates the APA. The documents are therefore incorporated by

26  reference into the amended complaint. *See Khoja*, 899 F.3d at 1002.

27  [16] Memorandum from Monica S. Burke, ICE's Assistant Director of Custody Management, on
    "Nationwide Hold Room Waiver," at 1 (June 24, 2025), Dkt. No. 107, at 33. This policy document

28  is challenged in this action, so it necessarily forms the basis for plaintiffs' claims and thus is
    incorporated into the amended complaint by reference. *See Khoja*, 899 F.3d at 1002.

United States District Court
Northern District of California

result of increased enforcement efforts" that had "significantly increased" the number individuals in ICE detention and "put additional strain on finding and coordinating transfers of aliens to available beds" in long-term detention facilities within 12 hours.[17] The memorandum suggested that "holding aliens in holding facilities beyond the 12-hour limit" was the only way to accommodate the increase in detainees because it "no longer ha[d] the option to discretionarily release aliens" or "decline to take aliens into custody" from other agencies.[18] The 12-hour-detention waiver memorandum did not address the suitability of short-term hold rooms for overnight or multi-day detention. Nor did the memo discuss any modifications to other policies governing ICE's holding facilities, which "continue to apply" despite the waiver.[19] The waiver went into effect immediately upon issuance of the memo and remains in effect for one year from its issuance.[20] Plaintiffs allege that the 12-hour-detention waiver conflicts with ICE's existing Performance-Based National Detention Standards (PBNDS), which provide that "[n]o detainee shall be confined in a hold room for more than 12 hours."[21]

**III.     ICE allegedly deprives detainees at 630 Sansome of adequate hygiene and sanitation, sleep, medical care, and access to counsel.**

Plaintiffs allege that, in recent months, ICE has subjected noncitizens detained in hold rooms in the agency's San Francisco field office at 630 Sansome to unconstitutional conditions of confinement. These allegedly unconstitutional conditions relate to the deprivation of adequate hygiene and sanitation, sleep, medical care, and access to counsel.

---

[17] Memorandum from Monica S. Burke, Dkt. No. 107, at 34.

[18] *Id.*

[19] *Id.*

[20] *Id.* at 33.

[21] PERFORMANCE-BASED NATIONAL DETENTION STANDARDS, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT (2016), Dkt. No. 65-1 § 2.6(II)(2). The amended complaint repeatedly refers to these standards and relies on them to allege that ICE's 12-hour-detention waiver violates the APA. The standards are therefore incorporated by reference into the amended complaint. *See Khoja*, 899 F.3d at 1002.

United States District Court
Northern District of California

### A.    Hygiene and Sanitation

ICE detains noncitizens at 630 Sansome in overcrowded hold rooms with open toilets, which are separated from the rest of the cells by a low privacy wall. Detainees "are thus forced to urinate and defecate in front of each other while held in this crowded room for days at a time." According to the amended complaint, "ICE agents do not regularly clean the toilet or the cell," so noncitizens "have resorted to cleaning the toilet with wads of dry toilet paper when the stench becomes unbearable." Because of the overcrowding, some detainees allegedly must sleep "adjacent to the open toilet and trash can."

Noncitizens "typically are not given a change of clothes … regardless of the duration of their detention at 630 Sansome." "The holding cells have no showers," and "[a]s a matter of practice, [detainees] are not given regular access to shampoo, deodorant, sanitary wipes, feminine hygiene products, toothbrushes, toothpaste, or other similar personal hygiene items."

### B.    Sleeping Conditions

Plaintiffs allege that ICE keeps detainees at 630 Sansome in a state of "sleep deprivation." Although many noncitizens spend one or more nights in the hold rooms, "the cells do not have beds or cots," so noncitizens "must choose between sleeping on metal benches meant for short-term sitting" or "on the floor." ICE does not provide "pillows, blankets, sheets, or mattresses." Instead, the amended complaint alleges, "ICE's practice is to distribute disposable plastic or Mylar 'blankets'" that "are too small to adequately cover an adult-sized body." Even with these "blankets," detainees "feel the effects of cold temperatures in the cells," which can "cause sleep deprivation." Noncitizens' difficulty sleeping is made worse by ICE's practice of keeping the lights on in hold rooms at all times throughout the day and night. "As a result of the continuous light, freezing temperatures, and discomfort from sleeping on metal benches or the floor, detainees report getting little to no sleep during their detention," and some "have suffered lasting illness … persisting for weeks after their release from 630 Sansome."

### C.    Access to Medical Care

Plaintiffs allege that "[t]here is no standardized medical assessment or intake process 630 Sansome," and as a matter of practice "ICE does not inquire about medical issues of necessary

1    medications for detainees." There is also "no medical support" nor medical "services available at

2    630 Sansome." "ICE generally does not allow detainees to access prescribed medication, even if

3    family or friends are willing to provide it." And ICE frequently ignores detainees' complaints

4    about medical issues, particularly from the many detainees who have limited or no English

5    proficiency.

6         **D.    Access to Counsel**

7         Plaintiffs allege that "detainees' ability to have reasonable access to counsel" at 630

8    Sansome "is so restricted that [it] is tantamount to a denial of counsel." "To call their legal

9    representatives, or even seek legal representation, individuals detained at 630 Sansome are forced

10   to navigate a cumbersome phone system that requires payment from either the detainee or the

11   recipient of the call to proceed." Calls often drop, and the audio quality is poor, making it difficult

12   to communicate with counsel. And "there are no means to ensure that the phone calls are private,"

13   and detainees "are often not alone in the room where they are speaking on the phone."

14        ICE has also "refused to allow attorneys representing individuals detained at 630 Sansome

15   to meet with their clients … after 3:00 PM on weekdays" and "all day on weekends and holidays."

16   "Even when attorneys are able to meet with detained clients … , their ability to provide legal

17   counsel is severely hindered by the conditions of the visitation rooms," where "[a]ttorneys and

18   clients are separated by a Plexiglas barrier and must speak through a landline phone with very

19   poor audio quality." ICE has prohibited interpreters who are not counsel from accompanying

20   attorneys. Because "the room where attorneys may meet clients has two booths side-by-side with

21   only a narrow divider," maintaining confidentiality is difficult, if not impossible. And "[t]he only

22   way for attorneys and clients to share documents is for someone to press a document against the

23   Plexiglas" or "ask a guard to pass along the documents." "Neither method permits confidential

24   document sharing."

25        Plaintiffs allege that, for noncitizens detained at 630 Sansome "after Friday immigration

26   hearings," ICE's restrictions on evening and weekend legal visitation deprive them of counsel "all

27   weekend." And the amended complaint asserts that ICE's practices conflict with ICE's PBNDS,

28   which allegedly (1) require the agency to allow private legal visitations for a minimum of eight

United States District Court
Northern District of California

hours per day on weekdays and a minimum of four hours per day on weekends and holidays; (2) prohibit the agency from "restrict[ing] the number of calls a detainee places to his/her legal representatives"; and (3) require the agency to allow detainees to make free, direct, and private calls to their existing legal representatives or potential counsel.[22]

**IV.    Plaintiffs challenge ICE and EOIR's courthouse-arrest policies, ICE's 12-hour detention waiver, and the conditions of confinement at 630 Sansome.**

Ms. Pablo Sequen, an asylum-seeker from Guatemala, commenced this action by filing a petition for a writ of habeas corpus after ICE arrested her as she was leaving a routine hearing at the San Francisco immigration court and detained her at 630 Sansome. This Court issued a temporary restraining order, followed by a preliminary injunction, requiring Ms. Pablo Sequen's immediate release and enjoining the government from re-detaining her absent prior notice and a hearing before an immigration judge at which the government demonstrated a valid basis for her detention. *See Pablo Sequen v. Kaiser* ("*Pablo Sequen I*"), 793 F. Supp. 3d 1114, 1121 (N.D. Cal. 2025); *Pablo Sequen v. Kaiser* ("*Pablo Sequen II*"), No. 25-CV06487-PCP, 2025 WL 2650637, at *10 (N.D. Cal. Sept. 16, 2025).

Ms. Pablo Sequen then amended her complaint, adding Ms. Garcia, Ms. Alvarado Ambrocio, and Mr. Hernandez Torres as plaintiffs. Like Ms. Pablo Sequen, Ms. Garcia and Ms. Alvarado Ambrocio are both asylum-seekers. ICE arrested Ms. Garcia as she was leaving a hearing at the San Francisco immigration court. When plaintiffs filed the amended complaint, Ms. Garcia was detained at 630 Sansome. ICE agents attempted to arrest and detain Ms. Alvarado Ambrocio under circumstances similar to those encountered by Ms. Pablo Sequen and Ms. Garcia, but they refrained from doing so because Ms. Alvarado Ambrocio's nursing infant was with her. ICE suggested at the time, and the government later conceded to the Court, that ICE would likely arrest Ms. Alvarado Ambrocio at her next appearance in immigration court. Both Ms. Garcia and Ms. Alvarado Ambrocio sought individual relief through a habeas corpus petition, and the Court

---

[22] *Id.* at 33.

[22] These provisions of the PBNDS are not in the record before the Court.

United States District Court
Northern District of California

1   issued a temporary restraining order requiring Ms. Garcia's release followed by a preliminary

2   injunction enjoining the government from re-arresting either plaintiff without demonstrating a

3   valid basis for their detention to an immigration judge. *See Pablo Sequen v. Kaiser* ("*Pablo*

4   *Sequen III*"), No. 25-CV-06487-PCP, 2025 WL 2691143, at *4 (N.D. Cal. Sept. 19, 2025); *Pablo*

5   *Sequen v. Albarran* ("*Pablo Sequen IV*"), No. 25-CV-06487-PCP, 2025 WL 2935630, at *14

6   (N.D. Cal. Oct. 15, 2025). Mr. Hernandez Torres is a noncitizen from Mexico whom ICE arrested

7   after a reasonable-fear interview conducted as part of his removal proceedings, which culminated

8   in a final order of removal. At the time plaintiffs filed the amended complaint, Mr. Hernandez

9   Torres was detained at 630 Sansome. Mr. Hernandez Torres does not assert an individual habeas

10  claim and did not seek preliminary relief from custody. After the filing of the amended complaint,

11  the government removed him to Mexico.

12      In addition to the individual habeas claims, the amended complaint includes seven new

13  claims on behalf of two putative classes. First, Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado

14  Ambrocio seek to represent a "courthouse-arrest class" consisting of "[a]ll persons who have an

15  immigration court hearing in a proceeding on EOIR's non-detained docket in an immigration

16  courthouse in ICE's San Francisco Area of Responsibility." On behalf of the proposed class,

17  plaintiffs challenge ICE and EOIR's 2025 courthouse-arrest guidance as arbitrary, capricious, and

18  contrary to law in violation of the Administrative Procedure Act (APA). Second, Ms. Garcia and

19  Mr. Hernandez Torres seek to represent a "detention class" consisting of "[a]ll persons who are

20  now or will be detained in a holding cell in ICE's San Francisco Field Office" at 630 Sansome. On

21  behalf of the detention class, plaintiffs challenge ICE's 12-hour-detention waiver as arbitrary and

22  capricious in violation of the APA and allege that the conditions of confinement at 630 Sansome

23  violate the First and Fifth Amendments and federal immigration law.

24      The government moved to sever the additional claims and plaintiffs added to the amended

25  complaint from Ms. Pablo Sequen's original habeas claims, arguing that joinder was improper.

26  The Court concluded that joinder of all claims and plaintiffs was proper, but exercised its

27  discretion under Federal Rule of Civil Procedure 21 to sever the individual habeas claims from the

28  class claims. *See Pablo Sequen v. Albarran* ("*Pablo Sequen V*"), No. 25-CV-06487-PCP, 2025

United States District Court
Northern District of California

WL 3275602, at *2–5 (N.D. Cal. Nov. 24, 2025). Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio's habeas claims are now proceeding in three separate actions. Only the class claims remain in this case.

Plaintiffs moved for, and the Court granted, provisional certification of the courthouse-arrest and detention classes. *See Pablo Sequen v. Albarran* ("*Pablo Sequen VI*"), No. 25-CV-06487-PCP, 2025 WL 3283283, at *17–22 (N.D. Cal. Nov. 25, 2025). In the same motion, plaintiffs also requested that the Court (1) preliminary enjoin ICE from subjecting noncitizens detained at 630 Sansome to unconstitutional conditions of confinement related to sleep, hygiene, sanitation, and medical care and (2) pursuant to § 705 of the APA, stay ICE's 12-hour-detention waiver pending a final judgment in this action. The Court granted plaintiffs' requested preliminary injunction but denied their requested stay. *See id.* at *22–29.

Plaintiffs also separately moved for a § 705 stay of ICE and EOIR's courthouse-arrest policies pending the final resolution of their APA challenge to those policies. The Court granted that motion and stayed the courthouse-arrest policies. *See Pablo Sequen v. Albarran* ("*Pablo Sequen VII*"), No. 25-CV-06487-PCP, 2025 WL 3724878, at *20 (N.D. Cal. Dec. 24, 2025).

Now before the Court is the government's motion to dismiss plaintiffs' amended complaint for lack of subject-matter jurisdiction as to all claims and for failure to state APA claims as to the courthouse-arrest policies and 12-hour-detention waiver.

## LEGAL STANDARDS

### I. Rule 12(b)(1)

A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) challenge may be facial, contending that the complaint's allegations are insufficient to invoke federal jurisdiction, or factual, disputing the allegations that otherwise establish federal jurisdiction. *Safe Air for Everyone*, 373 F.3d at 1039. In reviewing a factual challenge, courts may "review evidence beyond the complaint" and "need not presume the truthfulness of the plaintiff's allegations." *Id.*

### II. Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain

statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil

Procedure 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim upon

which relief can be granted. Dismissal is required if the plaintiff fails to allege facts allowing the

court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only

where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable

legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To

survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the

complaint as true and construe the pleadings in the light most favorable" to the nonmoving

party. *Rowe*, 559 F.3d at 1029–30. While legal conclusions "can provide the [complaint's]

framework," the Court will not assume they are correct unless adequately "supported by factual

allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely

conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs.

Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d

979, 988 (9th Cir. 2001)).

Materials outside the complaint can be considered on a Rule 12(b)(6) motion if they are

incorporated by reference therein or otherwise judicially noticeable. *See United States v. Ritchie*,

342 F.3d 903, 908 (9th Cir. 2003). A document that is not attached to the complaint is

incorporated by reference therein if the complaint "refers extensively to the document" or if "the

document forms the basis" of a claim. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002

(9th Cir. 2018).

## DISCUSSION

### I.    The Court lacks jurisdiction only with respect to Mr. Hernandez Torres's claims.

The government moves to dismiss under Federal Rule of Procedure 12(b)(1) for lack of

subject-matter jurisdiction. The government argues that this Court lacks jurisdiction over

plaintiffs' claims because (1) plaintiffs lack standing; (2) plaintiffs' claims are not ripe; (3)

plaintiffs' claims are moot; and (4) plaintiffs may not assert claims challenging conditions of confinement in a habeas action.

The Court has already rejected most of the government's arguments with respect to standing, ripeness, and mootness. *See Pablo Sequen VI*, 2025 WL 3283283, at \*14–17. The Court incorporates that previous analysis here.

The Court has also rejected the government's argument that plaintiffs may not challenge the conditions of confinement at 630 Sansome because they previously also asserted habeas claims in this action. *See Pablo Sequen V*, 2025 WL 3275602, at \*4; *see also Zepeda Rivas v. Jennings*, 465 F. Supp. 3d 1028, 1036 (N.D. Cal. 2020) (allowing conditions-of-confinement claims asserted in a habeas petition to proceed pursuant to the court's non-habeas equitable authority). Further, "[b]ecause the Court has already granted the government's motion to sever the individual habeas claims from this action," the government's argument on this point is now moot. *Pablo Sequen VI*, 2025 WL 3283283, at n.109.

In addition to its already-rejected arguments, the government offers three new bases for its assertion that the Court lacks subject-matter jurisdiction.

First, the government argues that the Court should assess standing at the time Ms. Pablo Sequen filed her original habeas petition in this action, rather than at the time plaintiffs filed their amended complaint. The government further contends that, at that time, Ms. Garcia and Ms. Alvarado Ambrocio lacked standing. But the government offers no basis for determining standing by reference to the original, rather than operative, pleading. The Supreme Court's caselaw suggests the opposite. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (analyzing standing as of the time the "second amended complaint was filed"); *cf. Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 30 (2025) (instructing that the operative complaint, not the original complaint, governs federal courts' subject-matter jurisdiction over removed cases). And even at the time Ms. Pablo Sequen filed her original habeas petition, both Ms. Garcia and Ms. Alvarado Ambrocio faced a concrete and imminent threat of arrest, as ICE's subsequent arrest of Ms. Garcia and attempt to arrest Ms. Alvarado Ambrocio demonstrate.

Next, the government argues that the amended complaint does not allege that any of the

United States District Court
Northern District of California

named plaintiffs were denied access to counsel while detained at 630 Sansome, so plaintiffs lack standing to challenge that condition of confinement.[23] As an initial matter, plaintiffs' failure to allege that ICE denied them access to counsel at 630 Sansome would not destroy their standing because they still face a threat of detention and denial of such access in the future. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (explaining that plaintiff's past harm did not necessarily establish a sufficient threat of future harm to establish standing to pursue prospective relief). But that is beside the point because, even if the amended complaint does not specifically allege that any named plaintiff was denied access to counsel, it supports a reasonable inference that this occurred. *See Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004) (reasonable inferences may be de drawn in addressing a motion to dismiss). The amended complaint states that Ms. Pablo Sequen, Ms. Garcia, and Mr. Hernandez Torres "were arrested by ICE and detained at 630 Sansome." And as detailed above, the amended complaint alleges that ICE generally restricts attorney-client communications at 630 Sansome, suggesting that such restrictions have affected *all* detainees, including the named plaintiffs. The government has not raised a factual challenge to these allegations, so the Court must accept them as true. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (ruling that allegations in a complaint are treated as true when addressing a facial attack under Rule 12(b)(1)).

Finally, the government argues that Mr. Hernandez's claims are moot because he has been removed to Mexico and does not face any meaningful prospect of being arrested or detained by ICE. The Court previously rejected this argument when resolving plaintiffs' motion for provisional class certification because, in a class action, mooting a putative class representative's claim does not moot the class action if the putative class claims "are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the

---

[23] The government raised this argument only in its reply brief, and its motion to dismiss expressly disclaimed any challenge to the legal sufficiency of plaintiffs' conditions-of-confinement claims. Plaintiffs therefore contend that the government has forfeited the argument. Because courts "are required sua sponte to examine jurisdictional issues such as standing," *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2001), the Court must address this potential jurisdictional issue regardless of any forfeiture.

proposed representative's individual interest expires." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011) (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991)). As noted above, plaintiffs' class claims fall within this "inherently transitory" exception and therefore relate back to the filing of the amended complaint, *see id.*, at which point Mr. Hernandez Torres had not been removed. But after determining that Mr. Hernandez Torres's claims would not be moot if he were a class representative, the Court declined to certify him as a representative of the provisional detention class because he could not adequately represent the class's interests. The "inherently transitory" exception thus no longer applies to Mr. Hernandez Torres, rendering his claims moot. For that reason, the Court grants the government's motion to dismiss with respect to Mr. Hernandez Torres.

Having addressed the government's jurisdictional arguments, the Court turns to the government's motion to dismiss for failure to state a claim.

## II.    Plaintiffs state viable APA claims.

The government's motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the sufficiency only of plaintiffs' APA claims, not their conditions-of-confinement claims. The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). With limited exceptions, judicial review under the APA is available for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. And even "[a] preliminary, procedural, or intermediate agency action … is subject to review on the review of the final agency action." *Id.* Judicial review is available to any "person suffering legal wrong because of [the] agency action, or adversely affected or aggrieved by [such] action." *Id.* § 702. As relevant here, the APA requires courts to "hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

Plaintiffs allege that all of the challenged policies—(1) ICE's 2025 courthouse-arrest policies, (2) EOIR's 2025 courthouse-arrest policy, and (3) ICE's 12-hour-detention waiver—are final agency actions that are arbitrary and capricious or contrary to law. In its motion to dismiss,

15

1    the government does not dispute that these policies are final agency actions or that plaintiffs and

2    the provisional classes are "adversely affected or aggrieved" by the policies. Instead, the

3    government contends that each of the policies are unreviewable for other reasons and that none of

4    the policies are arbitrary or capricious. Each of the government's arguments fail.

5         **A.    The challenged policies are reviewable.**

6         "In general, there is a strong presumption that Congress intends judicial review of

7    administrative action.'" *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718–19 (9th Cir.

8    2011) (citation modified). The government nevertheless argues that each of the challenged policies

9    are unreviewable because (1) the Immigration and Nationality Act (INA) gives ICE unreviewable

10   discretion to decide the location of civil immigration arrests on a warrant, *see* 8 U.S.C. § 1226(e);

11   (2) "the INA, from which ICE's civil arrest authority derives, provides no 'meaningful standard'

12   by which a court can evaluate the appropriateness of ICE's discretionary choice of public locations

13   for targeted immigration enforcement actions"; and (3) plaintiffs have "[an]other adequate remedy

14   in a court." The Court has already rejected these arguments with respect to ICE and EOIR's

15   courthouse-arrest policies. *Pablo Sequen VII*, 2025 WL 3724878, at *8–10. And the first two

16   arguments do not bear on plaintiffs' challenge to the 12-hour-detention waiver: The arguments

17   concern the reviewability of ICE's decisions about the location of arrests, not about the duration of

18   noncitizens' detention in short-term hold rooms.[24] So the Court need only address the

19   government's third argument—that plaintiffs have another adequate remedy—with respect to the

20   12-hour-detention waiver.

21        Section 704 of the APA limits review to agency actions "for which there is no other

22   adequate remedy in a court." 5 U.S.C. § 704. But the Supreme Court has emphasized

23   that § 704 "should not be construed to defeat the [APA's] central purpose of providing a broad

24   spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

25   _____

26   [24] In its reply brief, the government raised additional arguments concerning the reviewability of
     the 12-hour-detention waiver specifically. The Court "need not" and will not "consider arguments
27   raised for the first time in [the] reply brief." *Youth 71Five Ministries v. Williams*, 160 F.4th 964,
     981 (9th Cir. 2025) (quoting *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007)).

28

United States District Court
Northern District of California

1   Instead, "Congress intended by that provision simply to avoid duplicating previously established

2   special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146

3   (1993).

4        The government has identified no procedures by which plaintiffs could have pursued their

5   challenge to the 12-hour-detention waiver outside the APA. It suggests that habeas offers such a

6   procedure, but habeas petitioners may challenge only the fact or duration of particular detainees'

7   confinement. Plaintiffs could not use habeas to challenge ICE's failure to provide a reasoned basis

8   for its overall policy of permitting detention longer than 12 hours in short-term hold rooms. And

9   though the government contends that plaintiffs have an adequate remedy in a "potential claim for

10  damages," it makes no effort to identify a cause of action for which plaintiffs could seek damages

11  resulting from the challenged policies. *See Goldey v. Fields*, 606 U.S. 942, 942 (2025) (explaining

12  that the Supreme Court has declined to imply any new constitutional cause of action for damages

13  against federal officers since 1980 and instructing that it would be improper to do so "in all but the

14  most unusual circumstances"); *see also Brown v. Gilliam*, No. EDCV-21-477, 2022 WL

15  19775026, at *3 (C.D. Cal. Dec. 6, 2022) ("Given the Supreme Court's recent guidance,

16  recognizing a new *Bivens* cause of action is plainly disfavored, if not insurmountable."). The

17  Court therefore concludes that there is no risk that "a legal remedy under the APA would

18  impermissibly provide for duplicative review" of the 12-hour-detention waiver. *Hyatt v. Off. of

19  Mgmt. & Budget*, 908 F.3d 1165, 1173 (9th Cir. 2018) (quoting *City of Oakland v. Lynch*, 798

20  F.3d 1159, 1165 (9th Cir. 2015)).

21        The challenged policies are therefore reviewable under the APA.

22        **B.      Plaintiffs plausibly allege that each of the challenged policies is arbitrary and
23                  capricious.**

24        Though the government argues otherwise, plaintiffs' amended complaint states viable

25  claims that each of the challenged policies is arbitrary and capricious in violation of the APA.

26        Section 706(2)(A) of the APA authorizes courts to "set aside" agency action that is

27  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

28  § 706(2)(A). "The touchstone of arbitrary and capricious review under the APA is reasoned

decisionmaking." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (citation modified). "That means an agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation modified). If "the agency has … entirely failed to consider an important aspect of the problem," the agency's decisionmaking is insufficiently reasoned. *Id.* at 492 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Important aspects include "the costs as well as the benefits" of the agency action. *State Farm*, 463 U.S. at 54; *cf. Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.")

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). At a minimum, an agency that "changes its existing position" must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)). An agency undertaking "policy change" must also provide "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Id.* at 222 (quoting *Fox Television Stations*, 556 U.S. at 515–16). "[A]n unexplained inconsistency in agency policy is a reason for holding [a new action] to be an arbitrary and capricious change from agency practice." *Id.* (citation modified) (quoting *National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 981 (2005)).

The Court previously determined that plaintiffs were likely to succeed on the merits of their claims that ICE and EOIR's courthouse-arrest policies are arbitrary and capricious because those policies are insufficiently reasoned on their face. *See Pablo Sequen VII*, 2025 WL 3724878, at *10–18. For the same reasons, plaintiffs' amended complaint—which incorporates the text of the policies by reference—plausibly alleges that ICE and EOIR's courthouse-arrest policies are arbitrary and capricious.

Plaintiffs also state a viable APA claim as to ICE's 12-hour-detention waiver. As detailed

1   above, ICE abandoned its decade-old limit on hold-room detentions based on ICE's assertion that

2   holding aliens in short-term facilities for more than 12 hours was the only way to accommodate

3   the increased number of individuals ICE began detaining in 2025. And the memorandum

4   announcing the 12-hour-detention waiver neither addressed the suitability of short-term hold

5   rooms for overnight or multi-day detention nor discussed any modifications to other policies

6   governing ICE's holding facilities.

7           Plaintiffs plausibly allege that the 12-hour-detention waiver is arbitrary and capricious

8   because ICE failed (1) to consider alternative options to address its capacity issues and (2) to

9   reconcile the waiver with existing policies governing hold rooms that ICE left in place. Plaintiffs

10  also plausibly allege that (3) the waiver is contrary to law because it necessarily leads to

11  constitutional violations.

12          First, plaintiffs assert that ICE was required to explain why a waiver of the 12-hour limit

13  "is the only option for addressing [ICE's] capacity problems." The amended complaint

14  specifically argues that ICE should have considered, as alternatives, "reinstatement of

15  discretionary release practices or … of the ability to decline taking custody of immigrants from

16  [other agencies]," or increased use of ICE's existing "Alternatives to Detention" program. An

17  agency is "not required to … consider all policy alternatives in reaching its decision." *Dept. of

18  Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020) (citation

19  modified) (quoting *State Farm*, 463 U.S. at 51). But "when an agency rescinds a prior policy its

20  reasoned analysis must consider the alternatives" that are "within the ambit of the existing policy."

21  *Id.* at 30 (citation modified) (quoting *State Farm*, 463 U.S. at 51). Here, it was clearly "within the

22  ambit" of ICE's prior 12-hour-limit on hold-room detention to manage capacity issues in detention

23  facilities using other means, whether by taking fewer noncitizens into custody or by releasing

24  noncitizens who could not be processed out of hold rooms within 12 hours.

25          The government argues that ICE's memorandum announcing the 12-hour-detention waiver

26  considered and rejected these alternatives, reasoning that they were foreclosed by recent executive

27

28

United States District Court
Northern District of California

orders.[25] Indeed, as the government explains, the cited executive orders appear to mandate that detained noncitizens remain in federal custody until the completion of their removal proceedings, seeming to prohibit discretionary release. But neither ICE's memorandum nor the government's motion identify any language in the executive orders, and the Court is aware of none, requiring ICE to take more noncitizens into custody than it has the capacity to hold in long-term detention facilities. So the executive orders do not provide a basis for ICE's rejection of that potential alternative. And while ICE may wish to arrest an increased numbers of noncitizens, it "cannot actively facilitate a breakdown in [its detention system], and then claim no responsibility or control over it" by at least considering a change of course. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 993 (9th Cir. 2025). Plaintiffs thus plausibly allege that ICE failed to give reasoned consideration to significant alternatives before waiving its 12-hour limit on detention in hold rooms.

Second, the amended complaint also plausibly alleges that the 12-hour-waiver memo is arbitrary and capricious because it leaves in place contradictory policies governing hold rooms. Plaintiffs allege that the PBNDS prohibit detention longer than 12 hours in holding facilities.[26] Because the 12-hour-waiver memo expressly provides that "[a]ll other hold room and hold facilities requirements continue to apply,"[27] the PBNDS prohibition remains in place, directly conflicting with the 12-hour-detention waiver's allowance for detention up to 72 hours. Such "an internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).

Finally, in addition to alleging that the 12-hour-detention waiver is arbitrary and capricious, the amended complaint alleges that it is not in accordance with law, a separate reason for setting the policy aside. As explained above, ICE expressly left in place all other existing policies concerning hold rooms. Plaintiffs allege that one of those policies, the PBNDS, provides

---

[25] *See* Memorandum from Monica S. Burke, Dkt. No. 107, at 33–34.

[26] *See* PERFORMANCE-BASED NATIONAL DETENTION STANDARDS, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT (2016), Dkt. No. 65-1 § 2.6(II)(2).

[27] Memorandum from Monica S. Burke, Dkt. No. 107, at 34.

United States District Court
Northern District of California

that "bunks, cots, beds and other sleeping apparatus are not permitted inside hold rooms."[28] Providing for overnight or multi-night detention in hold rooms while preserving a prohibition on "sleeping apparatus" is not just likely but certain to lead to violations of noncitizens' due-process rights to be free from punitive conditions of confinement. *See Pablo Sequen VI,* 2025 WL 3283283, at *24–25. The government argues that ICE will ensure detainees' "safety and security," but its motion does not argue that it is possible for ICE to provide constitutional conditions of confinement while detaining noncitizens without "sleeping apparatus" overnight or for more than 12 hours.

In sum, the amended complaint states a viable APA claim challenging the 12-hour-detention waiver as arbitrary, capricious, and contrary to law.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss is denied as to Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio and granted as to Mr. Hernandez Torres. The Clerk shall terminate Mr. Hernandez Torres as a party to this action.

**IT IS SO ORDERED.**

Dated: December 29, 2025

_____
P. Casey Pitts
United States District Judge

---

[28] *See* PERFORMANCE-BASED NATIONAL DETENTION STANDARDS, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT (2016), Dkt. No. 65-1 § 2.6(V)(5).