1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   PAMELA T. JOHANN (CABN 145558)
3  Chief, Civil Division

4  DOUGLAS JOHNS (CABN 314798)
   Assistant United States Attorney
5
        60 South Market Street, Suite 1200
6       San Jose, California 95113
        Telephone: (415) 846-8947
7       FAX: (408) 535-5081
        Douglas.Johns@usdoj.gov
8
   Attorneys for Defendants-Respondents
9

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14  CARMEN ARACELY PABLO SEQUEN,      )  CASE NO. 25-cv-06487-PCP
    YULISA ALVARADO AMBROCIO,         )
15  MARTIN HERNANDEZ TORRES, and LIGIA )
    GARCIA,                           )  **DEFENDANTS' NOTICE OF**
16                                    )  **FILING OF CERTIFIED**
                                      )  **ADMINISTRATIVE RECORD**
17        Plaintiffs,                 )  **FOR OPPM 25-06**
                                      )
18        v.                          )
                                      )
19  SERGIO ALBARRAN, MARCOS CHARLES,  )  Honorable P. Casey Pitts
    THOMAS GILES, MONICA BURKE, KRISTI )  United States District Judge
20  NOEM, U.S. DEPARTMENT OF          )
    HOMELAND SECURITY, TODD M. LYONS, )
21  SIRCE E. OWEN, PAMELA BONDI, U.S. )
    IMMIGRATION AND CUSTOMS           )
22  ENFORCEMENT, UNITED STATES        )
    DEPARTMENT OF JUSTICE, EXECUTIVE  )
23  OFFICE FOR IMMIGRATION AND        )
    REVIEW, UNITED STATES OF AMERICA, )
24                                    )
          Defendants.                 )
25  _____)

26

27

28

1

2

3

       Defendants herewith file a copy of the Administrative Record for January 28, 2025, OPPM 25-06, Cancellation of Operating Policies and Procedures Memorandum 23-01, which is at issue in this litigation. The Certification and Index of that Administrative Record are also attached to this Notice.

4    DATED: January 9, 2026                          Respectfully submitted,

5

6                                                    CRAIG H. MISSAKIAN
                                                     United States Attorney

7                                                    */s/ Douglas Johns*
                                                     DOUGLAS JOHNS

8                                                    Assistant United States Attorney

9                                                    *Attorneys for Respondents-Defendants*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARMEN ARACELY PABLO SEQUEN, | |
| Petitioner, | |
| v. | Case No. 25-CV-06487-PCP |
| SERGIO ALBARRAN, et al., | |
| Defendants. | |

## CERTIFICATION OF ADMINISTRATIVE RECORD

My name is Matthew Metz. I have been employed with the U.S. Department of Justice ("DOJ"),
as the Deputy Assistant Director ("DAD") of the Office of Policy since August 2025, in the
Executive Office for Immigration Review ("EOIR"). From July 2025 to August 2025, I served as
the Acting DAD of the Office of Policy. The Office of Policy is the custodian of a copy of the
administrative record for Policy Memorandum ("PM") 25-06, "Cancellation of Operating
Policies and Procedures Memorandum 23-01." I certify that, to the best of my knowledge,
information, and belief, the attached index contains all nonprivileged documents considered by
EOIR, and that these documents constitute the administrative record the agency considered in
issuing the PM.

Executed this 6th day of January 2026, in Falls Church, VA.

MATTHEW
METZ

Digitally signed by
MATTHEW METZ
Date: 2026.01.06
10:57:57 -05'00'

Matthew S. Metz

Deputy Assistant Director, Office of Policy

EOIR

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CARMEN ARACELY PABLO SEQUEN,

                Petitioner,

        v.

SERGIO ALBARRAN, et al.,

                Defendants.

Case No. 25-CV-06487-PCP

**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADMINISTRATIVE RECORD FOR JANUARY 28, 2025, OPPM 25-06, CANCELLATION OF OPERATING POLICIES AND PROCEDURES MEMORANDUM 23-01**

**INDEX TO CERTIFIED ADMINISTRATIVE RECORD**

| DOCUMENT | PAGE |
|---|---|
| 1. Memorandum from former Chief Immigration Judge Sheila McNulty, *Operating Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space* (Dec. 11, 2023) | **1-3** |
| 2. Memorandum from The Office of the Chief Immigration Judge, *Operating Policies and Procedures Memorandum 96-6: Arrests by INS Officers In or Near Immigration Court Facilities* (Sep. 30, 1996) | **4-5** |
| 3. Memorandum of Understanding (Sep. 19, 1996) | **6-7** |
| 4. Memorandum from former Acting USCIS Director Tae Johnson, *Civil Immigration Enforcement Actions in or near Courthouses* (April 27, 2021) | **8-10** |
| 5. Memorandum from former Acting ICE Director Caleb Vitello, *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (Jan. 21, 2025) | **11-13** |
| 6. Guidance to adjudicators on administrative closure from former EOIR Director David L. Neal (Nov. 22, 2021) | **14-17** |
| 7. Executive Order 14148, *Initial Recissions of Harmful Executive Orders and Actions* (Jan. 20, 2025) | **18-22** |

| | |
|---|---|
| 8. Executive Order 14157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists* (Jan. 20, 2025) | <u>**23-24**</u> |
| 9. Executive Order 14159, *Protecting the American People Against Invasion* (Jan. 20, 2025) | <u>**25-30**</u> |
| 10. Executive Order 14160, *Protecting the Meaning and Value of American Citizenship* (Jan. 20, 2025) | <u>**31-32**</u> |
| 11. Executive Order 14161, *Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats* (Jan. 20, 2025) | <u>**33-35**</u> |
| 12. Executive Order 14165, *Securing Our Borders* (Jan. 20, 2025) | <u>**36-38**</u> |
| 13. Memorandum from the Office of the Attorney General, *Sanctuary Jurisdiction Directives* (Feb. 5, 2025) | <u>**39-41**</u> |
| 14. Memorandum from the Office of the Attorney General, *General Policy Regarding Charing, Plea Negotiations, and Sentencing* (Feb. 5, 2025) | <u>**42-46**</u> |
| 15. Memorandum from the Office of the Attorney General, *Total Elimination of Cartels and Transitional Criminal Organizations* (Feb. 5, 2025) | <u>**47-51**</u> |
| 16. Memorandum from the Office of the Deputy Attorney General, *Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcements* (Jan. 21, 2025) | <u>**52-54**</u> |
| 17. Memorandum from the Office of the Deputy Attorney General, *Operation Take Back America* (March 6, 2025) | <u>**55-57**</u> |
| 18. Memorandum from the Office of the Deputy Attorney General, *U.S. Attorneys' Offices Staffing Priorities* (March 6, 2025) | <u>**58-60**</u> |
| 19. Memorandum from the Office of the Deputy Attorney General, *Renewal of Policy to Remove Bureaucratic Impediments to Aggressive Prosecutions as set forth in Attorney General Bondi's Memorandum on the Total Elimination of Cartels and Transational Criminal Organizations* (Aug. 21, 2025) | <u>**61**</u> |
| 20. Memorandum from the Office of the Deputy Attorney General, *Expansion of Joint Task Force Alpha and Prioritizing the Prosecution of UAC Offenses* (Sep. 24, 2025) | <u>**62-65**</u> |



**U.S. Department of Justice**
Executive Office for Immigration Review
Office of the Chief Immigration Judge

# MEMORANDUM

TO:        All Assistant Chief Immigration Judges

           All Immigration Judges

           All Court Administrators

           All Court Personnel

FROM:      Sheila McNulty    SHEILA MCNULTY  Digitally signed by SHEILA MCNULTY
                                             Date: 2023.12.11 16:16:58 -06'00'

           Chief Immigration Judge

DATE:      December 11, 2023

RECISSION: Operating Policies and Procedures Memorandum 96-6, *Arrests by INS Officers In or Near Immigration Court Facilities* (September 30, 1996)

**SUBJECT:    Operating Policies and Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space**

## I.    Introduction

This Operating Policies and Procedures Memorandum ("OPPM") is intended to provide updated guidance regarding enforcement actions by the Department of Homeland Security ("DHS") in or near Office of the Chief Immigration Judge ("OCIJ") space. This OPPM supersedes and rescinds OPPM 96-6, *Arrests by INS Officers in or Near Immigration Court Facilities*, dated September 30, 1996.

## II.    Definitions

For the purposes of this memorandum, the term "OCIJ space" refers to OCIJ offices, conference rooms, pro bono rooms, courtrooms, hallways, waiting areas, restrooms, elevator banks, or any other space on any floor of a federal or commercial building where OCIJ conducts business. "Near" OCIJ space means in the close vicinity of OCIJ space, including the entrance and exit of the building in which OCIJ conducts business, as well as adjoining or related areas such as adjacent parking lots or transportation points (e.g., a bus stop directly outside of the building). "Near" OCIJ space does not include adjacent buildings or structures that are not part of OCIJ space or otherwise are not used for court-related business.

1

The term "enforcement action" refers to law enforcement activities carried out by DHS personnel, including personnel from Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP"). Examples of enforcement actions include civil apprehensions, service of subpoenas, searches, seizures, interviews, and surveillance. The term "enforcement action" also includes attendance at immigration court hearings for the purpose of carrying out one of the actions described above. The term "enforcement action" does not include actions such as appearing on behalf of DHS before an immigration court, appearing as a witness before the court, or collecting or requesting records from court offices pursuant to established policies.

### III.    Prohibition on Enforcement Actions in or Near OCIJ Space

At the outset, OCIJ recognizes DHS's authority and responsibility to enforce the immigration laws of the United States, including, where appropriate, taking custody of noncitizens who have been ordered removed from the United States. In April 2021, ICE and CBP jointly issued a memorandum providing updated guidance regarding civil enforcement actions in or near courthouses, including immigration courts ("DHS Memorandum").[1] Pursuant to the DHS Memorandum, civil immigration enforcement actions may not be taken in or near an immigration court except in several limited circumstances described in Section IV, below.

For the following reasons, OCIJ concurs with the policies outlined in the DHS Memorandum prohibiting DHS officials from carrying out enforcement actions in or near OCIJ space. First, permitting enforcement actions in or near OCIJ space would inevitably produce a "chilling effect" on noncitizens who appear before our immigration courts. *See* DHS Memorandum ("Executing civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice."). Second, permitting enforcement actions in or near OCIJ space would disincentivize noncitizens from appearing for their hearings, which in turn would create inefficiencies for all parties involved and hinder the ability of OCIJ to carry out the mission of the agency. Third, allowing enforcement actions to take place in or near OCIJ space may create safety risks for those who may be present during such enforcement actions, including children and adults appearing for hearings, OCIJ employees, and other building or facilities personnel. Lastly, prohibiting enforcement actions from occurring in or near OCIJ space helps to reinforce the separate and distinct roles of DHS and the Executive Office for Immigration Review ("EOIR") in the eyes of the public.

### IV.    Exceptions

The guidance outlined in this memorandum does not apply to detained immigration court settings. Additionally, OCIJ recognizes that DHS may be required to effectuate enforcement actions in or near OCIJ space under limited exigent circumstances. Such exigent circumstances include situations involving: (1) a threat to national security; (2) imminent risk of death, violence, or physical harm to any person; (3) hot pursuit of an individual who poses a public safety threat; (4) imminent risk that evidence material to a criminal case will be destroyed; and (5) instances in

---

[1] Joint Memorandum by Tae Johnson, Acting Director, ICE, and Troy Miller, Acting Commissioner, CBP, *Civil Immigration Enforcement Actions in or near Courthouses* (April 27, 2021), available at https://www.cbp.gov/sites/default/files/assets/documents/2021-Apr/Enforcement-Actions-in-Courthouses-04-26-21.pdf.

which a safe alternative location for the enforcement action does not exist. When possible, DHS should communicate with OCIJ prior to effectuating such enforcement actions in or near OCIJ space and should provide security assistance as needed. Additionally, to the fullest extent possible, enforcement actions taken in or near OCIJ space under these exigent circumstances should be conducted: (1) in a nonpublic area of OCIJ space, outside of public view; (2) in collaboration with court security personnel; (3) utilizing the court's non-public entrances and exits; and (4) at the conclusion of the judicial proceeding that brought the individual to the court.

**V.     Reporting of Enforcement Actions**

OCIJ employees who observe enforcement actions being carried out in or near OCIJ space should inform the Assistant Chief Immigration Judge and Court Administrator at their respective court or adjudication center within twenty-four (24) hours of the incident.

AR-003

U.S. Department of Justice

Executive Office for Immigration Review

*Office of the Chief Immigration Judge*

---

Chief Immigration Judge

*5107 Leesburg Pike, Suite 2545*
*Falls Church, Virginia 22041*

September 30, 1996

## MEMORANDUM

TO:  All Assistant Chief Immigration Judges
    All Immigration Judges
    All Court Administrators
    All Court Personnel

FROM:  The Office of the Chief Immigration Judge

SUBJECT: Operating Policy and Procedures Memorandum No. 96-6:
     Arrests by INS Officers In or Near Immigration Court Facilities

   Pursuant to the concerns raised by several Immigration Judges, I have been negotiating with the General Counsel for the Immigration and Naturalization Service (INS) concerning the presence of INS officers in our courtrooms during non-detained hearings. There have been several recent instances where the presence of INS officers in the courtroom has produced a "chilling" effect on the conduct of the hearing. In addition, the INS's newly-instituted policy of arresting individuals denied relief at the conclusion of the individual calendar hearing, a policy fully supported by the Attorney General, necessitated an agreement between the two agencies.

   Attached hereto and incorporated herein is a Memorandum of Understanding (MOU) between the INS and the Immigration Courts concerning the presence of INS officers in non-detained hearings. Fundamental to this MOU is paragraph 1 -- that INS recognizes the authority of Immigration Judges to control their courtrooms. That authority includes excluding any person, including an INS officer, on a case-by-case basis that the judges feels is detrimental to the conduct of the proceeding. There will be no arrests in the courtroom, absent exigent circumstances. See MOU, paragraph 3.

   Nevertheless, we must be mindful that the INS has an obligation to remove from the United States aliens against whom final orders of exclusion or deportation are entered. This may require arresting such aliens in close proximity to our courtrooms. The MOU includes specific safeguards to ensure the safety of court personnel and to minimize disruption to the court process.

   I expect full compliance with the reporting requirements in cases where INS officers are

removed. The judge should report an incident, in writing, to his or her Assistant Chief Immigration Judge within twenty-four (24) hours. <u>See</u> MOU paragraph 2. This may be accomplished by facsimile or via e-mail. Similarly, the Court Administrator should use the same procedure to report violent incidents. <u>See</u> MOU, paragraph 7.

It is the primary responsibility of the INS, and not the Immigration Court, to inform friends and family of the arrested person what is occurring. The notice referred to in paragraph 5 of the MOU will be developed in the near future and will be made available for distribution, where necessary, in each courtroom.

I am confident that adherence to this OPPM and MOU will resolve any future conflicts relating to this issue. If you have any questions, please contact your supervisor.


Michael J. Creppy
Chief Immigration Judge

Attachment

2

AR-005

# MEMORANDUM OF UNDERSTANDING

## I. Preamble

This memorandum of understanding between the Immigration and Naturalization Service (INS) and the Executive Office for Immigration Review (EOIR) sets forth guidelines relating to the exercise of arrest authority by INS officers in or near EOIR court facilities.

## II. Terms

1. INS recognizes the authority of the immigration judge to control his or her courtroom. The immigration judge has the authority to take action he or she deems necessary in order to conduct a fair hearing. This includes the authority to remove anyone from the courtroom who is out of order or disrespectful to the court, or whose presence may be detrimental to the conduct of a fair hearing.

2. EOIR recognizes the authority and responsibility of INS officers to enforce the immigration laws, including, where appropriate, taking custody of individuals believed to be unlawfully in the United States. Accordingly, there will be no prohibition against the presence of INS officers in the courtroom during part or all of the immigration judge hearing unless the judge specifically determines, on a case-by-case basis, that the presence of the officer is having a chilling effect on the respondent's ability to present his or her case. Any removal of an INS officer from a courtroom will be documented and forwarded by the immigration judge to the Office of the Chief Immigration Judge within 24 hours. The INS attorney at the hearing will also report the removal promptly to the Office of the General Counsel.

3. There will be no arrests in the courtroom, except in exigent circumstances. INS will make its best efforts to inform the court administrator when an officer will be present for the possible purpose of making an arrest outside the courtroom.

4. Duly trained and certified INS officers may be armed while in the courtroom in their official capacities, but may not unnecessarily display their weapons.

5. INS and EOIR will jointly develop a written statement that can be given to friends and family members concerning what to do if an alien they are accompanying is arrested by the INS after an immigration hearing. The statement, in English and Spanish, will make it clear that all questions with regard to an arrest should be raised to the INS and not to the immigration judge or immigration court. It will also provide an INS telephone number which friends and family may call for information concerning an arrested alien. Small handbill sized versions of this statement will be carried by INS officers and by officials or employees of the court, and where feasible will be provided to friends and family at the time of arrest if immediate questions arise.

6. If an arrest near the courtroom gives rise to immediate risks to the safety of the immigration judge or court staff, the INS officers involved will provide security assistance to the immigration court when requested.

7. Any violent incidents that occur as a result of an INS arrest at the court shall be reported by the court administrator to the Office of the Chief Immigration Judge, and by the INS attorney to the Office of the General Counsel, within 24 hours of the incident.

8. The INS General Counsel and the Chief Immigration Judge will meet and evaluate this agreement in 90 days to determine whether modification is necessary.


David A. Martin
General Counsel
Immigration and Naturalization Service

Date: Sept. 19, 1996


Michael J. Creppy
Chief Immigration Judge
Executive Office for Immigration Review

Date: Sept. 24, 1996

AR-007



**U.S. Department of Homeland Security**
Washington, DC 20528

April 27, 2021

MEMORANDUM FOR     U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE)
                   U.S. CUSTOMS AND BORDER PROTECTION (CBP)

FROM:              Tae Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Troy Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

SUBJECT:           Civil Immigration Enforcement Actions in or near Courthouses

---

**Purpose**: This memorandum provides interim guidance that governs our civil immigration enforcement actions in or near courthouses. It is effective immediately and will be replaced after the Secretary issues his final guidance after engaging with you.

This memorandum supersedes and revokes ICE Directive 11072.1, entitled "Civil Immigration Enforcement Inside Courthouses," that was issued on January 30, 2018.

## I.     Core Principle

The courthouse is a place where the law is interpreted, applied, and justice is to be done. As law enforcement officers and public servants, we have a special responsibility to ensure that access to the courthouse – and therefore access to justice, safety for crime victims, and equal protection under the law – is preserved.

Executing civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice. At the same time, there may be legitimate need to execute a civil immigration enforcement action in or near a courthouse. This memorandum is designed to address these interests, which can sometimes be in tension with one another. It provides guidance as to when and how civil immigration enforcement actions can be executed in or near a courthouse so as not to unnecessarily impinge upon the core principle of preserving access to justice.

AR-008

## II.    Scope of this Memorandum

This memorandum does not apply to criminal immigration enforcement actions.[1]  It applies to any civil immigration enforcement action in or near a courthouse that involves an enforcement encounter between ICE or CBP personnel and an individual in the courthouse other than a courthouse official or employee.  It applies, for example, to civil apprehensions, service of subpoenas, searches, seizures, interviews, and surveillance.  It does not apply, for example, to the collection of records from court offices or participation in community meetings held in the courthouse.  This policy also does not apply to arrests that occur in jails connected to courthouses where the individual arrested is being released from the custody of state, local, or federal law enforcement partners at the conclusion of any criminal sentence.  This policy does not preclude arrests conducted at DHS facilities/offices regardless of their location.
For the purposes of this memorandum, a courthouse includes any municipal, county, state, federal, tribal, or territorial courthouse, including immigration courts.

"Near" the courthouse means in the close vicinity of the courthouse, including the entrance and exit of a courthouse, and in adjoining or related areas such as an adjacent parking lot or transportation point (such as a bus stop right outside a courthouse).  It does not include adjacent buildings or houses that are not part of the courthouse or otherwise are not used for court-related business.

## III.    Limited Circumstances for Courthouse Enforcement

A civil immigration enforcement action may be taken in or near a courthouse if (1) it involves a national security threat, or (2) there is an imminent risk of death, violence, or physical harm to any person, or (3) it involves hot pursuit of an individual who poses a threat to public safety, or (4) there is an imminent risk of destruction of evidence material to a criminal case.[2]

In the absence of hot pursuit, a civil immigration enforcement action also may be taken in or near a courthouse against an individual who poses a threat to public safety if: (1) it is necessary to take the action in or near the courthouse because a safe alternative location for such action does not exist or would be  too difficult to achieve the enforcement action at such a location, and (2) the action has been approved in advance by a Field Office Director, Special Agent in Charge, Chief Patrol Agent, or Port Director.[3]

---

[1] While this memorandum does not apply to criminal immigration enforcement actions, personnel should determine whether such an action truly needs to be taken in or near the courthouse given its potentially adverse impact upon access to justice.

[2] For purposes of determining whether an enforcement action pertains to an individual who is a national security or public safety enforcement and removal priority, department personnel are directed to consider the interim guidance issued by ICE Acting Director Tae Johnson on February 18, 2021, titled, "Interim Guidance: Civil Immigration Enforcement and Removal Priorities."

[3] DHS personnel shall continue to follow the certification compliance requirement in INA Section 239(e) and DHS Instruction 002-02-001.1, *Implementation of Section 1367 Information Provisions* when a noncitizen's appearance at a courthouse involves a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, human trafficking, or stalking in which the noncitizen has been battered or subject to extreme cruelty, or if the noncitizen may be eligible for T or U nonimmigrant status. Please refer to DHS Instruction 002-02-001.1, Section VI.A.3 for specific instructions for how DHS personnel shall comply with this requirement.

AR-009

A "safe alternative location for such action" means one that is safe for DHS personnel, the subject of the enforcement action, and the public.

To the fullest extent possible, an enforcement action in the courthouse will be taken in a non-public area of the courthouse, outside of public view, be conducted in collaboration with courthouse security personnel, utilize the courthouse's non-public entrances and exits, and be conducted at the conclusion of the judicial proceeding that brought the individual to the courthouse.

## IV.    Training

Each Field Office Director, Special Agent in Charge, Chief Patrol Agent, and/or Port Director must ensure that all employees under his or her supervision are trained annually on this policy and that such training is documented and reviewed by agency counsel.

## V.    Reporting

Civil immigration enforcement actions that are planned or have been taken in or near a courthouse will be documented in relevant ICE or CBP electronic systems of record, which can be searched and validated.

ICE and CBP will each provide a monthly report to the Secretary, and to the Office for Civil Rights and Civil Liberties upon request, detailing all planned or executed civil immigration enforcement actions in or near courthouses, including the basis under this policy for each enforcement action.

## VI.    No Private Right of Action

The guidance set forth in this memorandum is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

This memorandum provides management guidance to ICE and CBP personnel exercising discretionary law enforcement functions and does not affect the statutory authority of ICE or CBP employees. Nor is this memorandum to be construed as indicating tolerance for any violation of law in or near a courthouse.

AR-010

FOR OFFICIAL USE ONLY

Policy Number: 11072.3

*Office of the Director*

**U.S. Department of Homeland Security**
500 12ᵗʰ Street, SW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR:       All ICE Employees

FROM:                 Caleb Vitello
                      Acting Director

SUBJECT:              Interim Guidance: Civil Immigration Enforcement Actions
                      in or near Courthouses

---

Purpose

This memorandum provides interim guidance governing U.S. Immigration and Customs
Enforcement (ICE) civil immigration enforcement actions in or near courthouses. In accordance
with Memorandum from the Acting Secretary of Homeland Security Benjamine Huffman,
*Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025),[1] the April 27, 2021, *Civil
Immigration Enforcement Actions in or near Courthouses* memorandum from Acting ICE
Director Tae Johnson and Acting U.S. Customs and Border Protection Commissioner Troy
Miller is now rescinded for ICE and is superseded by this interim guidance.

This guidance is effective immediately and remains in effect until superseded.

Background

Federal, state, and local law enforcement agencies routinely engage in enforcement activities in
or near courthouses because many individuals appear in courthouses for unrelated criminal or
civil violations. Individuals entering courthouses are typically screened by law enforcement
personnel to search for weapons and other contraband. Accordingly, when ICE engages in civil
immigration enforcement actions in or near courthouses it can reduce safety risks to the public,
targeted alien(s), and ICE officers and agents. Finally, enforcement activities in or near
courthouses are often required when jurisdictions refuse to cooperate with ICE, including when
such jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE
custody.

---

[1] The Acting Secretary's Memorandum also supersedes and rescinds Alejandro Mayorkas's October 27, 2021
memorandum entitled, Guidelines for Enforcement Actions in or Near Protected Areas.

FOR OFFICIAL USE ONLY

AR-011

FOR OFFICIAL USE ONLY

Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses
Page 2 of 3

Implementation

For purposes of this guidance, a civil immigration enforcement action is any action taken by an
ICE officer or agent to apprehend, arrest, interview, or search an alien in connection with
enforcement of administrative immigration violations. This policy does not apply to criminal
immigration enforcement actions inside courthouses.

*Aliens Subject to Enforcement Actions*

Generally, ICE's civil immigration enforcement actions in or near courthouses include actions
against targeted aliens, including but not limited to:

- National security or public safety threats;
- Specific aliens with criminal convictions;
- Gang members;
- Aliens who have been ordered removed from the United States but have failed to depart;
  and/or
- Aliens who have re-entered the country illegally after being removed.

Other aliens encountered during a civil immigration enforcement action in or near a courthouse,
such as family members or friends accompanying the target alien to court appearances or serving
as a witness in a proceeding, may be subject to civil immigration enforcement action on a case-
by-case basis considering the totality of the circumstances.[2]

*Procedures*

ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses
when they have credible information that leads them to believe the targeted alien(s) is or will be
present at a specific location, and where such action is not precluded by laws imposed by the
jurisdiction in which the enforcement action will take place. ICE officers or agents must
coordinate with the relevant local Office of the Principal Legal Advisor (OPLA) office before
conducting enforcement actions in or near courthouses to determine whether jurisdiction-specific
legal limitations apply.

Additionally, civil immigration enforcement actions in or near courthouses should, to the extent
practicable, continue to take place in non-public areas of the courthouse, be conducted in
collaboration with court security staff, and utilize the court building's non-public entrances and
exits. When practicable, ICE officers and agents will conduct civil immigration enforcement
actions against targeted aliens discreetly to minimize their impact on court proceedings.

---

[2] ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal
law and consistent with U.S. Department of Homeland Security and ICE policy.

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses
Page 3 of 3

*Non-Criminal or Specialized Courts*

ICE officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings (e.g., family court, small claims court). When an enforcement action in the above situations is operationally necessary, the approval of the respective Field Office Director (FOD), Special Agent in Charge (SAC), or his or her designee is required prior to conducting the enforcement action.

*Responsibilities*

Each FOD or SAC, in consultation with OPLA, must ensure that all employees under their supervision comply with this policy by providing guidance to officers and agents on the approval process and procedures for civil immigration enforcement actions in or near courthouses within their area of responsibility. This includes ensuring all civil immigration enforcement actions in or near courthouses are properly documented[3] and recorded in the applicable ICE system of record, which can be searched and validated.

As with any planned enforcement action, ICE officers and agents should exercise sound judgment when enforcing federal law and make substantial efforts to avoid unnecessarily alarming the public or disrupting court operations. ICE officers and agents will make every effort to limit their time at courthouses while conducting civil immigration enforcement actions.

No Private Right

This memorandum provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE.

---

[3] ICE officers and agents will document the physical address of planned civil immigration enforcement actions in accordance with standard procedures for completing operational plans, noting that the target address is a courthouse.

FOR OFFICIAL USE ONLY



OOD
DM 22-03

Issued:      Nov. 22, 2021
Effective:   Immediately

## ADMINISTRATIVE CLOSURE

| | |
|---|---|
| PURPOSE: | Provide guidance to adjudicators on administrative closure in light of *Matter of Cruz-Valdez*, 28 I&N Dec. 326 (A.G. 2021) |
| OWNER: | David L. Neal, Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | None |

## I.    Introduction

On July 15, 2021, the Attorney General issued a precedential decision in *Matter of Cruz-Valdez*, 28 I&N Dec. 326 (A.G. 2021). In that decision, the Attorney General restored the authority of immigration judges and the Board of Immigration Appeals (Board) to administratively close cases. This memorandum discusses the practical implications of the Attorney General's decision, particularly in light of the Executive Office for Immigration Review's (EOIR) pending caseload.

## II.    Administrative Closure to Date

Administrative closure "is a docket management tool that is used to temporarily pause removal proceedings." *Matter of W-Y-U-*, 27 I&N Dec. 17, 18 (BIA 2017). An immigration judge's or appellate immigration judge's administrative closure of a case "temporarily remove[s] [the] case from [the] Immigration Judge's active calendar or from the Board's docket." *Matter of Avetisyan*, 25 I&N Dec. 688, 692 (BIA 2012). Administrative closure came into widespread use by EOIR adjudicators in the 1980s. Cases have been administratively closed for a variety of reasons over the years, and the Board has issued several decisions addressing when administrative closure is appropriate. The Board's two most recent such decisions are *Matter of Avetisyan* and *Matter of W-Y-U-*, issued in 2012 and 2017, respectively.

In 2018, Attorney General Sessions issued *Matter of Castro-Tum*, 27 I&N Dec. 271 (A.G. 2018). He held that, with limited exceptions, "immigration judges and the Board do not have the general authority" to administratively close cases. *Matter of Castro-Tum*, 27 I&N Dec. at 272. The Third, Fourth, Sixth, and Seventh Circuits subsequently ruled on challenges to *Matter of Castro-Tum*. A circuit split emerged, with the Third, Fourth, and Seventh Circuits holding that

1

adjudicators have the general authority to administratively close cases,[1] but with the Sixth Circuit holding that adjudicators have the authority to administratively close cases only in limited circumstances.[2] In 2020, the Department of Justice (Department) promulgated a final rule that essentially codified *Matter of Castro-Tum*, restricting EOIR adjudicators' ability to administratively close cases. *See* "Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure," 85 Fed. Reg. 81588 (Dec. 16, 2020). However, this rule has been preliminarily enjoined nationwide. *See Centro Legal de La Raza v. Exec. Office for Immigration Review*, 524 F.Supp.3d 919 (N.D. Cal. Mar. 10, 2021).

In *Matter of Cruz-Valdez*, the Attorney General noted that *Matter of Castro-Tum* "departed from long-standing practice" by prohibiting administrative closure in the vast majority of circumstances. *Matter of Cruz-Valdez*, 28 I&N Dec. at 329. He also noted that the Department is "engaged in a reconsideration" of the enjoined 2020 rule. *Id.* Given these factors, the Attorney General, in *Matter of Cruz-Valdez*, "overrule[d] [*Matter of Castro-Tum*] in its entirety," and he "restore[d] administrative closure" pending the current rulemaking. *Id.* He specified that, in deciding whether to administratively close cases pending the rulemaking, "except when a court of appeals has held otherwise, immigration judges and the Board should apply the standard for administrative closure set out in *Avetisyan* and *W-Y-U-*." *Id.*

## III.    Administrative Closure after *Matter of Cruz-Valdez*

With administrative closure restored, EOIR adjudicators have the authority, under the Board's case law, to administratively close a wide variety of cases. Going forward, pending the promulgation of a regulation addressing administrative closure, adjudicators must evaluate requests to administratively close cases under *Matter of Avetisyan* and *Matter of W-Y-U-*, as well under as the Board's case law predating those decisions, to the extent that case law is consistent with those decisions. Adjudicators should accordingly familiarize themselves with *Matter of Avetisyan*, *Matter of W-Y-U-*, and the Board's prior case law addressing administrative closure.

The restoration of administrative closure will assist EOIR adjudicators in managing their dockets given EOIR's caseload. In *Matter of Cruz-Valdez*, the Attorney General recognized that administrative closure has in the past "served to facilitate the exercise of prosecutorial discretion, allowing government counsel to request that certain low-priority cases be removed from immigration judges' active calendars or the Board's docket, thereby allowing adjudicators to focus on higher-priority cases." *Matter of Cruz-Valdez*, 28 I&N Dec. at 327. EOIR has finite resources and a daunting caseload. Given this reality, it is important that adjudicators focus on two categories of cases: those in which the Department of Homeland Security (DHS) deems the respondent to be an immigration enforcement priority,[3] and those in which the respondent

---

[1] *See Arcos Sanchez v. Att'y Gen.*, 997 F.3d 113, 121-24 (3d Cir. 2021); *Meza Morales v. Barr*, 973 F.3d 656, 667 (7th Cir. 2020); *Romero v. Barr*, 937 F.3d 282, 292-94 (4th Cir. 2019).

[2] Specifically, the Sixth Circuit initially held that the regulations do not delegate to immigration judges or the Board the general authority to administratively close cases. *Hernandez-Serrano v. Barr*, 981 F.3d 459, 466 (6th Cir. 2020) . But the Sixth Circuit later held that the regulations provide adjudicators "the authority for administrative closure" to allow respondents to apply with U.S. Citizenship and Immigration Services for provisional unlawful presence waivers. *Garcia-DeLeon v. Garland*, 999 F.3d 986, 991 (6th Cir. 2021).

[3] Effective November 29, 2021, DHS's immigration enforcement priorities are noncitizens DHS deems to pose risks to national security, public safety, and border security. *See* Memorandum from Alejandro N. Mayorkas, Secretary,

desires a full adjudication of his or her claim or claims. Being able to administratively close low priority cases will help adjudicators do this.

Under case law, where DHS requests that a case be administratively closed because a respondent is not an immigration enforcement priority, and the respondent does not object, the request should generally be granted and the case administratively closed. *See Matter of Yewondwosen*, 21 I&N Dec. 1025, 1026 (BIA 1997) (stating that the parties' "agreement on an issue or proper course of action should, in most instances, be determinative"); *Matter of Cruz-Valdez*, 28 I&N Dec. at 327 (recognizing the role of administrative closure in "facilitat[ing] the exercise of prosecutorial discretion").

Administrative closure is appropriate in many other situations as well. For example, it can be appropriate to administratively close a case to allow a respondent to file an application or petition with an agency other than EOIR. *See Matter of Avetisyan*, 25 I&N Dec. at 696 (identifying "the likelihood the respondent will succeed on any petition, application, or other action he or she is pursuing outside of removal proceedings" as a factor for adjudicators "to weigh" in evaluating requests for administrative closure); 8 C.F.R. § 212.7(e)(4)(iii) (permitting a respondent in removal proceedings to file a Form I-601A, *Application for Provisional Unlawful Presence Waiver*, with U.S. Citizenship and Immigration Services where the "proceedings are administratively closed and have not yet been recalendared at the time of filing the application"). It can also be appropriate to administratively close a case while an agency adjudicates a previously filed application or petition, or, if a visa petition has been approved, while waiting for the visa to become available. *See Matter of Avetisyan*, 25 I&N Dec. at 696. It is generally appropriate to administratively close a case where a respondent has been granted temporary protected status. *See Matter of Sosa Ventura*, 25 I&N Dec. 391, 396 (BIA 2010). This is only a partial list; administrative closure can be appropriate in other situations not mentioned here. *See Matter of Avetisyan*, 25 I&N Dec. at 696 (stating that each request for administrative closure "must be evaluated under the totality of the circumstances of the particular case").

Where a respondent requests administrative closure, whether in a scenario described above or another scenario where administrative closure is appropriate, and DHS does not object, the request should generally be granted and the case administratively closed. *See Matter of Yewondwosen*, 21 I&N Dec. at 1026. Where a request for administrative closure is opposed, "the primary consideration . . . is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits." *Matter of W-Y-U-*, 27 I&N Dec. at 20. But adjudicators should bear in mind that "neither party has 'absolute veto power over administrative closure requests.'" *Id.* at n. 5 (quoting *Matter of Avetisyan*, 25 I&N Dec. at 692).

Where at all possible, issues involving administrative closure should be resolved in advance of individual calendar hearings and not at hearings. Immigration judges are therefore encouraged to send scheduling orders to parties well before the hearing takes place, inquiring of DHS whether the respondent is an immigration enforcement priority, and otherwise soliciting the parties' positions on administrative closure and other issues related to prosecutorial discretion. Where

---

*Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021), *available at* https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.

such issues have not been resolved in advance of an individual calendar hearing, the immigration judge should ask DHS counsel on the record at the beginning of the hearing whether the respondent is an immigration enforcement priority. Where DHS counsel responds that the respondent is not a priority, the immigration judge should further ask whether DHS intends to exercise some form of prosecutorial discretion in the case. As part of this colloquy, the immigration judge should ask whether the parties want the case administratively closed.[4]

## IV.    Conclusion

Administrative closure is a longstanding, and valuable, tool for EOIR adjudicators. As the Attorney General noted in *Matter of Cruz-Valdez*, the Department is currently engaged in rulemaking that will address adjudicators' authority to administratively close cases. Pending that rulemaking, adjudicators have the authority under *Matter of Cruz-Valdez* to administratively close many cases before them when warranted under Board case law. Adjudicators should familiarize themselves with the situations in which administrative closure is appropriate, and adjudicators should be proactive in inquiring whether parties wish for cases to be administratively closed. If you have any questions, please contact your supervisor.[5]

---

[4] There is one potential caveat to the guidance and instructions in this section. As noted above, the Attorney General stated that, pending the promulgation of a regulation addressing administrative closure, immigration judges and the Board should apply the Board's case law "except when a court of appeals has held otherwise." *Matter of Cruz-Valdez*, 28 I&N Dec. at 329. For cases arising in the Sixth Circuit, adjudicators must determine to what extent administrative closure is permitted given that court's case law, and they must handle issues involving administrative closure accordingly. *See Garcia-DeLeon*, 999 F.3d 986; *Hernandez-Serrano*, 981 F.3d 459.

[5] This memorandum does not create any legal rights or benefits for either party, and it does not mandate that a particular motion for administrative closure be granted or denied. In all cases, immigration judges and appellate immigration judges must exercise their independent judgment and discretion in adjudicating motions for administrative closure consistent with the law. *See* 8 C.F.R. §§ 1003.1(d)(1)(ii), 1003.10(b).

AR-017

Federal Register / Vol. 90, No. 17 / Tuesday, January 28, 2025 / Presidential Documents     8237

# Presidential Documents

Executive Order 14148 of January 20, 2025

## Initial Rescissions of Harmful Executive Orders and Actions

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1. *Purpose and Policy*. The previous administration has embedded deeply unpopular, inflationary, illegal, and radical practices within every agency and office of the Federal Government. The injection of "diversity, equity, and inclusion" (DEI) into our institutions has corrupted them by replacing hard work, merit, and equality with a divisive and dangerous preferential hierarchy. Orders to open the borders have endangered the American people and dissolved Federal, State, and local resources that should be used to benefit the American people. Climate extremism has exploded inflation and overburdened businesses with regulation.

To commence the policies that will make our Nation united, fair, safe, and prosperous again, it is the policy of the United States to restore common sense to the Federal Government and unleash the potential of the American citizen. The revocations within this order will be the first of many steps the United States Federal Government will take to repair our institutions and our economy.

Sec. 2. *Revocation of Orders and Actions*. The following executive actions are hereby revoked:

(a) Executive Order 13985 of January 20, 2021 (Advancing Racial Equity and Support for Underserved Communities Through the Federal Government).

(b) Executive Order 13986 of January 20, 2021 (Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial Census).

(c) Executive Order 13987 of January 20, 2021 (Organizing and Mobilizing the United States Government To Provide a Unified and Effective Response To Combat COVID–19 and To Provide United States Leadership on Global Health and Security).

(d) Executive Order 13988 of January 20, 2021 (Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation).

(e) Executive Order 13989 of January 20, 2021 (Ethics Commitments by Executive Branch Personnel).

(f) Executive Order 13990 of January 20, 2021 (Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis).

(g) Executive Order 13992 of January 20, 2021 (Revocation of Certain Executive Orders Concerning Federal Regulation).

(h) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities).

(i) Executive Order 13995 of January 21, 2021 (Ensuring an Equitable Pandemic Response and Recovery).

(j) Executive Order 13996 of January 21, 2021 (Establishing the COVID–19 Pandemic Testing Board and Ensuring a Sustainable Public Health Workforce for COVID–19 and Other Biological Threats).

(k) Executive Order 13997 of January 21, 2021 (Improving and Expanding Access to Care and Treatments for COVID–19).

AR-018

(l) Executive Order 13999 of January 21, 2021 (Protecting Worker Health and Safety).

(m) Executive Order 14000 of January 21, 2021 (Supporting the Reopening and Continuing Operation of Schools and Early Childhood Education Providers).

(n) Executive Order 14002 of January 22, 2021 (Economic Relief Related to the COVID–19 Pandemic).

(o) Executive Order 14003 of January 22, 2021 (Protecting the Federal Workforce).

(p) Executive Order 14004 of January 25, 2021 (Enabling All Qualified Americans To Serve Their Country in Uniform).

(q) Executive Order 14006 of January 26, 2021 (Reforming Our Incarceration System To Eliminate the Use of Privately Operated Criminal Detention Facilities).

(r) Executive Order 14007 of January 27, 2021 (President's Council of Advisors on Science and Technology).

(s) Executive Order 14008 of January 27, 2021 (Tackling the Climate Crisis at Home and Abroad).

(t) Executive Order 14009 of January 28, 2021 (Strengthening Medicaid and the Affordable Care Act).

(u) Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border).

(v) Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families).

(w) Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans).

(x) Executive Order 14013 of February 4, 2021 (Rebuilding and Enhancing Programs To Resettle Refugees and Planning for the Impact of Climate Change on Migration).

(y) Executive Order 14015 of February 14, 2021 (Establishment of the White House Office of Faith-Based and Neighborhood Partnerships).

(z) Executive Order 14018 of February 24, 2021 (Revocation of Certain Presidential Actions).

(aa) Executive Order 14019 of March 7, 2021 (Promoting Access to Voting).

(bb) Executive Order 14020 of March 8, 2021 (Establishment of the White House Gender Policy Council).

(cc) Executive Order 14021 of March 8, 2021 (Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity).

(dd) Executive Order 14022 of April 1, 2021 (Termination of Emergency With Respect to the International Criminal Court).

(ee) Executive Order 14023 of April 9, 2021 (Establishment of the Presidential Commission on the Supreme Court of the United States).

(ff) Executive Order 14027 of May 7, 2021 (Establishment of the Climate Change Support Office).

(gg) Executive Order 14029 of May 14, 2021 (Revocation of Certain Presidential Actions and Technical Amendment).

(hh) Executive Order 14030 of May 20, 2021 (Climate-Related Financial Risk).

(ii) Executive Order 14031 of May 28, 2021 (Advancing Equity, Justice, and Opportunity for Asian Americans, Native Hawaiians, and Pacific Islanders).

(jj) Executive Order 14035 of June 25, 2021 (Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce).

(kk) Executive Order 14037 of August 5, 2021 (Strengthening American Leadership in Clean Cars and Trucks).

(ll) Executive Order 14044 of September 13, 2021 (Amending Executive Order 14007).

(mm) Executive Order 14045 of September 13, 2021 (White House Initiative on Advancing Educational Equity, Excellence, and Economic Opportunity for Hispanics).

(nn) Executive Order 14049 of October 11, 2021 (White House Initiative on Advancing Educational Equity, Excellence, and Economic Opportunity for Native Americans and Strengthening Tribal Colleges and Universities).

(oo) Executive Order 14050 of October 19, 2021 (White House Initiative on Advancing Educational Equity, Excellence, and Economic Opportunity for Black Americans).

(pp) Executive Order 14052 of November 15, 2021 (Implementation of the Infrastructure Investment and Jobs Act).

(qq) Executive Order 14055 of November 18, 2021 (Nondisplacement of Qualified Workers Under Service Contracts).

(rr) Executive Order 14057 of December 8, 2021 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).

(ss) Executive Order 14060 of December 15, 2021 (Establishing the United States Council on Transnational Organized Crime).

(tt) Executive Order 14069 of March 15, 2022 (Advancing Economy, Efficiency, and Effectiveness in Federal Contracting by Promoting Pay Equity and Transparency).

(uu) Executive Order 14070 of April 5, 2022 (Continuing To Strengthen Americans' Access to Affordable, Quality Health Coverage).

(vv) Executive Order 14074 of May 25, 2022 (Advancing Effective, Accountable Policing and Criminal Justice Practices To Enhance Public Trust and Public Safety).

(ww) Executive Order 14075 of June 15, 2022 (Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals).

(xx) Executive Order 14082 of September 12, 2022 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022).

(yy) Executive Order 14084 of September 30, 2022 (Promoting the Arts, the Humanities, and Museum and Library Services).

(zz) Executive Order 14087 of October 14, 2022 (Lowering Prescription Drug Costs for Americans).

(aaa) Executive Order 14089 of December 13, 2022 (Establishing the President's Advisory Council on African Diaspora Engagement in the United States).

(bbb) Executive Order 14091 of February 16, 2023 (Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government).

(ccc) The Presidential Memorandum of March 13, 2023 (Withdrawal of Certain Areas off the United States Arctic Coast of the Outer Continental Shelf from Oil or Gas Leasing).

(ddd) Executive Order 14094 of April 6, 2023 (Modernizing Regulatory Review).

(eee) Executive Order 14096 of April 21, 2023 (Revitalizing Our Nation's Commitment to Environmental Justice for All).

(fff) Executive Order 14099 of May 9, 2023 (Moving Beyond COVID–19 Vaccination Requirements for Federal Workers).

(ggg) Executive Order 14110 of October 30, 2023 (Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence).

(hhh) Executive Order 14115 of February 1, 2024 (Imposing Certain Sanctions on Persons Undermining Peace, Security, and Stability in the West Bank).

(iii) Executive Order 14124 of July 17, 2024 (White House Initiative on Advancing Educational Equity, Excellence, and Economic Opportunity Through Hispanic-Serving Institutions).

(jjj) Executive Order 14134 of January 3, 2025 (Providing an Order of Succession Within the Department of Agriculture).

(kkk) Executive Order 14135 of January 3, 2025 (Providing an Order of Succession Within the Department of Homeland Security).

(lll) Executive Order 14136 of January 3, 2025 (Providing an Order of Succession Within the Department of Justice).

(mmm) Executive Order 14137 of January 3, 2025 (Providing an Order of Succession Within the Department of the Treasury).

(nnn) Executive Order 14138 of January 3, 2025 (Providing an Order of Succession Within the Office of Management and Budget).

(ooo) Executive Order 14139 of January 3, 2025 (Providing an Order of Succession Within the Office of the National Cyber Director).

(ppp) The Presidential Memorandum of January 3, 2025 (Designation of Officials of the Council on Environmental Quality to Act as Chairman).

(qqq) The Presidential Memorandum of January 3, 2025 (Designation of Officials of the Office of Personnel Management to Act as Director).

(rrr) The Presidential Memorandum of January 3, 2025 (Designation of Officials of the Office of Science and Technology Policy to Act as Director).

(sss) The Presidential Memorandum of January 3, 2025 (Designation of Officials of the United States Agency for Global Media to Act as Chief Executive Officer).

(ttt) The Presidential Memorandum of January 3, 2025 (Designation of Officials of the United States Agency for International Development to Act as Administrator).

(uuu) The Presidential Memorandum of January 3, 2025 (Designation of Officials of the United States International Development Finance Corporation to Act as Chief Executive Officer).

(vvv) The Presidential Memorandum of January 6, 2025 (Withdrawal of Certain Areas of the United States Outer Continental Shelf from Oil or Natural Gas Leasing).

(www) The Presidential Memorandum of January 6, 2025 (Withdrawal of Certain Areas of the United States Outer Continental Shelf from Oil or Natural Gas Leasing).

(xxx) The Presidential Memorandum of January 14, 2025 (Certification of Rescission of Cuba's Designation as a State Sponsor of Terrorism).

(yyy) The Presidential Memorandum of January 14, 2025 (Revocation of National Security Presidential Memorandum 5).

(zzz) Executive Order 14143 of January 16, 2025 (Providing for the Appointment of Alumni of AmeriCorps to the Competitive Service).

Sec. 3. *Implementation*. (a) To effectuate the revocations described in section 2 of this order, the heads of each agency shall take immediate steps to end Federal implementation of unlawful and radical DEI ideology.

(b) The Director of the Domestic Policy Council (DPC) and the Director of the National Economic Council (NEC) shall review all Federal Government actions taken pursuant to the orders, memoranda, and proclamations listed in section 2 of this order and take necessary steps to rescind, replace, or amend such actions as appropriate. Within 45 days of the date of this order, the Director of the DPC and the Director of the NEC shall submit to the President an additional list of orders, memoranda, and proclamations issued by the prior administration that should be rescinded, as well as a list of replacement orders, memoranda, or proclamations, to increase American prosperity.

(c) The National Security Advisor (NSA) shall immediately begin a complete and thorough review of all National Security Memoranda (NSMs) issued from January 20, 2021, through January 20, 2025, for harm to national security, domestic resilience, and American values. No later than 45 days from the date of this order, the NSA shall recommend to the President NSMs for rescission.

Sec. 4. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01901
Filed 1–27–25; 8:45 am]
Billing code 3395–F4–P

# Presidential Documents

Executive Order 14157 of January 20, 2025

## Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. 1701 *et seq.* it is hereby ordered:

**Section 1.** *Purpose.* This order creates a process by which certain international cartels (the Cartels) and other organizations will be designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended.

(a) International cartels constitute a national-security threat beyond that posed by traditional organized crime, with activities encompassing:

(i) convergence between themselves and a range of extra-hemispheric actors, from designated foreign-terror organizations to antagonistic foreign governments;

(ii) complex adaptive systems, characteristic of entities engaged in insurgency and asymmetric warfare; and

(iii) infiltration into foreign governments across the Western Hemisphere. The Cartels have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs.

The Cartels functionally control, through a campaign of assassination, terror, rape, and brute force nearly all illegal traffic across the southern border of the United States. In certain portions of Mexico, they function as quasi-governmental entities, controlling nearly all aspects of society. The Cartels' activities threaten the safety of the American people, the security of the United States, and the stability of the international order in the Western Hemisphere. Their activities, proximity to, and incursions into the physical territory of the United States pose an unacceptable national security risk to the United States.

(b) Other transnational organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS–13) pose similar threats to the United States. Their campaigns of violence and terror in the United States and internationally are extraordinarily violent, vicious, and similarly threaten the stability of the international order in the Western Hemisphere.

(c) The Cartels and other transnational organizations, such as TdA and MS–13, operate both within and outside the United States. They present an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. I hereby declare a national emergency, under IEEPA, to deal with those threats.

**Sec. 2.** *Policy.* It is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States

through their extraterritorial command-and-control structures, thereby protecting the American people and the territorial integrity of the United States.

**Sec. 3**. *Implementation.* (a) Within 14 days of the date of this order, the Secretary of State shall take all appropriate action, in consultation with the Secretary of the Treasury, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to make a recommendation regarding the designation of any cartel or other organization described in section 1 of this order as a Foreign Terrorist Organization consistent with 8 U.S.C. 1189 and/or a Specially Designated Global Terrorist consistent with 50 U.S.C. 1702 and Executive Order 13224.

(b) Within 14 days of the date of this order, the Attorney General and the Secretary of Homeland Security shall take all appropriate action, in consultation with the Secretary of State, to make operational preparations regarding the implementation of any decision I make to invoke the Alien Enemies Act, 50 U.S.C. 21 *et seq.,* in relation to the existence of any qualifying invasion or predatory incursion against the territory of the United States by a qualifying actor, and to prepare such facilities as necessary to expedite the removal of those who may be designated under this order.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02004

Filed 1–28–25; 11:15 am]

Billing code 3395–F4–P

AR-024

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    8443

# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4.** *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5.** *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6.** *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7.** *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8.** *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

Sec. 9. *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

Sec. 10. *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

Sec. 11. *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

Sec. 12. *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

Sec. 13. *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' accept-ance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner con-sistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called ''sanc-tuary'' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19.** *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20.** *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22.** *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

AR-030

# Presidential Documents

Executive Order 14160 of January 20, 2025

## Protecting the Meaning and Value of American Citizenship

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* The privilege of United States citizenship is a priceless and profound gift. The Fourteenth Amendment states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." That provision rightly repudiated the Supreme Court of the United States's shameful decision in *Dred Scott* v. *Sandford,* 60 U.S. (19 How.) 393 (1857), which misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race.

But the Fourteenth Amendment has never been interpreted to extend citizenship universally to everyone born within the United States. The Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not "subject to the jurisdiction thereof." Consistent with this understanding, the Congress has further specified through legislation that "a person born in the United States, and subject to the jurisdiction thereof" is a national and citizen of the United States at birth, 8 U.S.C. 1401, generally mirroring the Fourteenth Amendment's text.

Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

**Sec. 2**. *Policy.* (a) It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons: (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

(b) Subsection (a) of this section shall apply only to persons who are born within the United States after 30 days from the date of this order.

(c) Nothing in this order shall be construed to affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship.

**Sec. 3**. *Enforcement.* (a) The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies

of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order.

(b) The heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities.

**Sec. 4**. *Definitions*. As used in this order:

(a) ''Mother'' means the immediate female biological progenitor.

(b) ''Father'' means the immediate male biological progenitor.

**Sec. 5**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02007
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

AR-032

Federal Register

Vol. 90, No. 19

Thursday, January 30, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14161 of January 20, 2025

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1.** *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2.** *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3.** *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

# Presidential Documents

**Executive Order 14165 of January 20, 2025**

## Securing Our Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

Deadly narcotics and other illicit materials have flowed across the border while agents and officers spend their limited resources processing illegal aliens for release into the United States. These catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States.

We have limited information on the precise whereabouts of a great number of these illegal aliens who have entered the United States over the last 4 years.

This cannot stand. A nation without borders is not a nation, and the Federal Government must act with urgency and strength to end the threats posed by an unsecured border.

One of my most important obligations is to protect the American people from the disastrous effects of unlawful mass migration and resettlement.

My Administration will marshal all available resources and authorities to stop this unprecedented flood of illegal aliens into the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to take all appropriate action to secure the borders of our Nation through the following means:

(a) Establishing a physical wall and other barriers monitored and supported by adequate personnel and technology;

(b) Deterring and preventing the entry of illegal aliens into the United States;

(c) Detaining, to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time as they are removed from the United States;

(d) Removing promptly all aliens who enter or remain in violation of Federal law;

(e) Pursuing criminal charges against illegal aliens who violate the immigration laws, and against those who facilitate their unlawful presence in the United States;

(f) Cooperating fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities; and

(g) Obtaining complete operational control of the borders of the United States.

**Sec. 3**. *Physical Barriers.* The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States.

**Sec. 4**. *Deployment of Personnel.* (a) The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate and lawful action to deploy sufficient personnel along the southern border of the United States to ensure complete operational control; and

(b) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to supplement available personnel to secure the southern border and enforce the immigration laws of the United States through the use of sections 1103(a)(2) and (4)–(6) of the INA (8 U.S.C. 1103(a)(2) and (4)–(6)).

**Sec. 5**. *Detention.* The Secretary of Homeland Security shall take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States. The Secretary shall, consistent with applicable law, issue new policy guidance or propose regulations regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch-and-release," whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law.

**Sec. 6**. *Resumption of Migrant Protection Protocols.* As soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

**Sec. 7**. *Adjusting Parole Policies.* The Secretary of Homeland Security shall, consistent with applicable law, take all appropriate action to:

(a) Cease using the "CBP One" application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States;

(b) Terminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans."

(c) Align all policies and operations at the southern border of the United States to be consistent with the policy of Section 2 of this order and ensure that all future parole determinations fully comply with this order and with applicable law.

**Sec. 8**. *Additional International Cooperation.* The Secretary of State, in coordination with the Attorney General and the Secretary of Homeland Security, shall take all appropriate action to facilitate additional international cooperation and agreements, consistent with the policy of Section 2, including entering into agreements based upon the provisions of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)) or any other applicable provision of law.

**Sec. 9**. *DNA and Identification Requirements.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to fulfill the requirements of the DNA Fingerprint Act of 2005, title X of Public Law 109–162, for all aliens detained under the authority of the United States; and

(b) The Secretary of Homeland Security shall take all appropriate action to use any available technologies and procedures to determine the validity of any claimed familial relationship between aliens encountered or apprehended by the Department of Homeland Security.

**Sec. 10**. *Prosecution of Offenses.* The Attorney General and the Secretary of Homeland Security shall take all appropriate action to prioritize the

prosecution of offenses that relate to the borders of the United States, including the investigation and prosecution of offenses that involve human smuggling, human trafficking, child trafficking, and sex trafficking in the United States.

**Sec. 11**. *Additional Measures.* Within 14 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall provide recommendations to the President regarding the use of any other authority to protect the United States from foreign threats and secure the southern border.

**Sec. 12**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02015
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P



**Office of the Attorney General**
**Washington, D. C. 20530**

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                THE ATTORNEY GENERAL

SUBJECT:             SANCTUARY JURISDICTION DIRECTIVES[1]

Unlawful border crossings and illegal migration into the United States have reached record levels, resulting in a substantial and unacceptable threat to our national security and public safety. To protect the American people from the effects of unlawful mass migration, President Trump has prioritized securing our Nation's borders and enforcing federal immigration laws. In furtherance of that objective, the Department of Justice will ensure that, consistent with law, "sanctuary jurisdictions" do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate.[2] In carrying out this directive, each component shall comply with any notice and procedural requirements in the award, agreement, or other instrument.

**I.      End Funding to State and Local Jurisdictions That Unlawfully Interfere with Federal Law Enforcement Operations**

Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice. The Department will exercise its own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations. *See New York v. Dep't of Justice*, 951 F.3d 84, 111 (2d Cir. 2020) ("Because 8 U.S.C. § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to impose the challenged Certification Condition and did not violate either the APA or separation of powers by doing so.").

Federal law provides that state and local jurisdictions "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officers] information regarding the citizenship or immigration status, lawful or unlawful, of any

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

[2] This memorandum rescinds, effective today, any inconsistent previous memoranda, policies, or guidance documents of the Department of Justice.

individual." 8 U.S.C. § 1373(a). So-called "sanctuary jurisdictions" include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws. Consistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a). Within 30 days, the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to which this requirement applies.

Additionally, to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration, and to reduce efforts by state or local jurisdictions to undermine a lawful system of immigration. The Department will also seek to take any appropriate enforcement action where state or local practices violate federal laws, regulations, or grant conditions.

## II.     Identify and Evaluate All Funding Agreements with Non-Governmental Organizations That Provide Support to Illegal Aliens

All Department components that provide federal funding to non-governmental organizations shall immediately identify all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens. For any such agreement, each component shall, to the extent consistent with applicable statutes, regulations, court orders, and terms:

(1) Pause any further distribution of funds for 60 days after complying with any notice and procedural requirements.

(2) Identify non-governmental organization(s) receiving funding from the Department and describe the support or services provided. The component shall direct each organization to report whether the disbursed funds: (a) were provided in accordance with applicable laws; (b) resulted in the provision of any funds or services to removable or illegal aliens; (c) resulted in or were the subject of waste, fraud, or abuse; and (d) promoted or facilitated violations of our immigration laws. The component shall further direct each organization to certify that it will not use any remaining funds to promote or facilitate the violation of Federal immigration law.

(3) Compile information set forth at (2) above and submit it to the Associate Attorney General within 45 days of this memorandum.

Upon completion of this process, the Associate Attorney General, in consultation with the Deputy Attorney General, shall determine which (if any) agreements to terminate and whether to resume funding of any remaining agreements, consistent with applicable statutes, regulations, and terms.

Effective immediately, consistent with applicable law, the Department of Justice shall not enter into any new contract, grant, or other agreement to provide Federal funding to non-

Memorandum for all Department Employees                                                    Page 3
Subject:  Sanctuary Jurisdiction Directives

governmental organizations that support or provide services, either directly or indirectly (*e.g.*, through sub-contracting or other arrangements), to removable or illegal aliens.

### III.   Pursue Enforcement Actions Against Jurisdictions That Facilitate Violations of Federal Immigration Laws or Impede Lawful Federal Immigration Operations

Actions that impede federal efforts to enforce immigration law threaten public safety and national security.  State and local jurisdictions must comply with applicable immigration-related federal laws.  State and local actors may not impede, obstruct, or otherwise fail to comply with lawful immigration-related directives pursuant to the President's Article II authority to ensure national security, the Immigration and Nationality Act, or other authorities.

All litigating components of the Department of Justice and each U.S. Attorney's Office shall investigate incidents involving any such misconduct and shall, where supported by the evidence, prosecute violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373.  All declination decisions with respect to any effort to obstruct or fail to comply with a lawful immigration-related directive from the Executive Branch shall be promptly reported pursuant to Justice Manual § 1-13.130.

The Civil Division shall, in coordination with the Sanctuary Cities Enforcement Working Group, identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations.  Where appropriate, the Civil Division shall take legal action to challenge such laws, policies, or practices.  Attorneys tasked to the Sanctuary Cities Enforcement Working Group shall regularly report to the Associate Attorney General and the Deputy Attorney General their progress regarding the review of state and local laws, policies, and practices, and shall promptly report any decisions not to pursue enforcement actions against state and local jurisdictions found to be facilitating violations of federal immigration laws or impeding lawful federal immigration operations.



**Office of the Attorney General**

**Washington, D. C. 20530**

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:             THE ATTORNEY GENERAL

SUBJECT:         GENERAL     POLICY     REGARDING     CHARGING,     PLEA
                 NEGOTIATIONS, AND SENTENCING[1]

The Department of Justice is the only federal agency with a name that includes a moral imperative: to do justice. Pursuant to that mission, prosecutors are tasked with protecting the public, enforcing the law in a fair and consistent fashion, and conducting themselves in a manner that promotes respect for the legal system and the rule of law. These tasks require the exercise of discretion. However, prosecutorial discretion is bounded by the Constitution, statutes and case law, state and local ethical requirements, and policy decisions set forth by the President. To highlight those boundaries, this memorandum sets forth the Department's general charging, plea bargaining, and sentencing policy, effective immediately.

### I.     Charging Decisions

Prosecutors in all components and U.S. Attorneys' Offices make charging decisions in two steps. At the first step, the question is *whether* federal charges are appropriate. At the second step, the question is *what* charges are appropriate.

At step one, when determining *whether* federal charges are appropriate, prosecutors must consider a variety of factors, including whether there is probable cause to believe that a federal crime has been committed within the prosecutor's jurisdiction, whether the prosecution would serve a substantial federal interest, and alternatives to prosecution. Justice Manual § 9-27.220. Critically, in determining whether to commence or recommend prosecution or take other action against a person, a prosecutor "may not be influenced"—in any respect—by the person's "political association, activities, or beliefs." *Id.* § 9-27.260(1). There is no place in the decision-making process for animosity or careerism, *i.e.*, the "possible effect of the decision on the attorney's own professional or personal circumstances." *Id.* § 9-27.260(2)-(3). These types of considerations, which previously led to the improper weaponization of the criminal justice system at the federal

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

and state levels, as President Trump observed in Executive Order 14147, 90 FR 8235, have no place in the Department.

At step two, when a prosecutor must decide *what* federal charges are appropriate, "considerable care is required to ensure selection of the proper charge or charges." Justice Manual § 9-27.300.  Prosecutors must conduct "an individualized assessment of all the facts and circumstances of each particular case." *Id.*  During that assessment, prosecutorial discretion shall be guided by the core principle set forth in the Attorney General's *Memorandum on the Department Charging and Sentencing Policy* (May 10, 2017).  Specifically, in the absence of unusual facts, prosecutors should charge and pursue the most serious, readily provable offense.  The most serious offenses are those punishable by death, or those with the most significant mandatory minimum sentences (including under the Armed Career Criminal Act and 21 U.S.C. § 851) and the most substantial recommendation under the Sentencing Guidelines.

It bears repeating that the core principle applies **in the absence of unusual facts**.  Thus, there may be circumstances in which good judgment would lead a prosecutor to conclude that a strict application of this policy is not warranted or would be inconsistent with the investigative and charging priorities of the Department.  However, any decision to vary from the core principle of this policy must be approved by a United States Attorney or Assistant Attorney General, or a supervisor designated by the United States Attorney or Assistant Attorney General, and the reasons must be documented in the file.

## II.    Plea Bargaining

Plea bargaining and plea agreements are governed by the same fundamental considerations that apply to step two of charging decisions.  There is no room in plea bargaining for political animus or other hostility.

Prosecutors may not use criminal charges to exert leverage to induce a guilty plea.  Nor may a prosecutor abandon pending charges to achieve a plea bargain that is inconsistent with the prosecutor's assessment of the seriousness of the defendant's conduct at the time the charges were filed.  For example, absent significant mitigating or intervening circumstances, it will rarely be appropriate for a prosecutor to seek racketeering or terrorism charges at the outset of a case but abandon those charges in connection with a plea deal.

## III.    Sentencing

As with other steps in the criminal justice process, sentencing requires complete candor with the court, the defendant, the probation office, and the public.  Prosecutors must alert the court and the defendant to all known relevant facts and criminal history.

Prosecutors' sentencing recommendations must be based on an individualized assessment of the nature and circumstances of the offense and the history and characteristics of the defendant. Justice Manual § 9-27.730.  In most cases, if charged appropriately based on the considerations set forth in Part II, a sentence within the applicable recommended range of the U.S. Sentencing Guidelines will also be consistent with the factors listed in Section 9-27.730 of the Justice Manual.

## IV.    Investigative And Charging Priorities

The Nation faces historic threats from widespread illegal immigration, dangerous cartels, transnational organized crime, gangs, human trafficking and smuggling, fentanyl and opioids, violence against law enforcement, terrorism, hostile nation states, and other sources.  This section describes the Department's priorities and guidance in addressing these threats, including by revising previous priorities to make additional resources available.  Further detailed guidance regarding these priorities, and others, will follow.

Immigration Enforcement.  The Department of Justice shall use all available criminal statutes to combat the flood of illegal immigration that took place over the last four years, and to continue to support the Department of Homeland Security's immigration and removal initiatives.

Consistent with the core principle of pursuing the most serious, readily provable offense, U.S. Attorney's Offices and the other Department components shall pursue charges relating to criminal immigration-related violations when such violations are presented by federal, state, or local law enforcement or the Intelligence Community.  *See, e.g.*, 8 U.S.C. §§ 1324(c), 1252c (authorizing certain immigration-related arrests by state and local law enforcement officials); *see also* 18 U.S.C. § 3041.  This includes, where supported by evidence, and consistent with applicable law, prosecutions for violations of 8 U.S.C. §§ 1304, 1306, 1324-1328, 1373 and 18 U.S.C. § 922(g)(5).

Federal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests.  The U.S. Attorneys' Offices and other litigating components of the Department shall investigate incidents involving any such misconduct for potential prosecution, including for obstructing federal functions in violation of 18 U.S.C. § 371, and violations of other statutes, such as 8 U.S.C. §§ 1324, 1373.

Any declinations of immigration-related offenses shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.  On a quarterly basis, each U.S. Attorney's Office shall report statistics to EOUSA, broken down by law enforcement agency, regarding the number of immigration-related cases referred to the Office, the number of pending immigration-related investigations and prosecutions, the number of immigration-related convictions, and the resulting sentences and removals.

Human Trafficking and Smuggling.  Illegal trafficking and smuggling of children and other humans are a horrific byproduct of illegal immigration.  The Department of Justice must continue to respond forcefully to these crimes.  Joint Task Force Alpha, which was created in partnership with the Department of Homeland Security to enhance enforcement efforts against human smuggling and trafficking groups in Central and South America, will be elevated to the Office of the Attorney General, while still coordinating with the Criminal and National Security Divisions. Personnel from the Joint Task Force will support investigations and prosecutions at U.S. Attorney's Offices around the country, and deploy to U.S. Attorneys' Offices on the southern border to focus resources in those critical Districts.

    <u>Transitional Organized Crime, Cartels, and Gangs</u>.    President Trump has tasked the Department of Justice with an ambitious and historic mission: total elimination of Tren de Aragua (TdA), La Mara Salvatrucha (MS-13), and international drug cartels from the United States.  The time is now.  The U.S. Attorney's Offices and their federal law enforcement partners, supported by Main Justice, are up to this mission.

    Joint Task Force Vulcan, an initiative launched in 2019 to destroy MS-13, which was wrongly deprioritized by prior Department leadership and improperly allowed to languish, will be reconstituted, expanded to address TdA in addition to MS-13, and reelevated to the Office of the Attorney General.  I will issue further guidance regarding more specific measures to be taken by the Department to target TdA, MS-13, transnational organized crime, and international drug cartels.

    <u>Protecting Law Enforcement Personnel</u>.    One of the Department of Justice's top priorities is protecting law enforcement at the federal, state, and local levels who protect us all.  This includes aggressively investigating the all-too-common instances of violence against and obstruction of law enforcement, seeking the death penalty for those who perpetrate capital crimes against law enforcement, and backing and promoting the efforts of law enforcement when they are subjected to unfair criticism or attack.

    <u>Shifting Resources in the National Security Division</u>.    To free resources to address more pressing priorities, and end risks of further weaponization and abuses of prosecutorial discretion, the Foreign Influence Task Force shall be disbanded.  Recourse to criminal charges under the Foreign Agents Registration Act (FARA) and 18 U.S.C. § 951 shall be limited to instances of alleged conduct similar to more traditional espionage by foreign government actors.  With respect to FARA and § 951, the Counterintelligence and Export Control Section, including the FARA Unit, shall focus on civil enforcement, regulatory initiatives, and public guidance.

    The National Security Division's Corporate Enforcement Unit is also disbanded.  Personnel assigned to the Unit shall return to their previous posts.

    <u>Shifting ATF Resources</u>.    To free resources to address more pressing priorities, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) shall shift resources from its Alcohol and Tobacco Enforcement Programs to focus on matters relating to the other priorities set forth herein.  No resources shall be diverted from the ATF's regulatory responsibilities, such as federal firearms licenses and background checks.

*     *     *

    Any inconsistent previous policy of the Department of Justice relating to charging, plea negotiations, and sentencing is rescinded, effective today.[2]  Each U.S. Attorney and Assistant

---

[2] The previous policies and guidance rescinded include: "Guidance Regarding Charging, Pleas, and Sentencing in Cases Involving Crack Cocaine" (January 13, 2023); "General Department Policies Regarding Charging, Pleas, and Sentencing" (December 16, 2022); "Interim Guidance on Prosecutorial Discretion, Charging, and Sentencing" (January 29, 2021); "Department Policy on

Memorandum for all Department Employees
Subject:  General Policy Regarding Charging, Plea Negotiations, and Sentencing                              Page 5

Attorney General is responsible for ensuring that this policy is followed, and that deviations from the core principle are justified by unusual facts.  The Deputy Attorney General will oversee implementation of this policy and issue any clarification and guidance deemed appropriate for its just and consistent application.

---

Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases" (August 12, 2013); and "Guidance Regarding § 851 Enhancements in Plea Negotiations" (September 24, 2014); Justice Manual §§ 9-27.310, 9-27.311, 9-27.400.



# Office of the Attorney General
## Washington, D. C. 20530

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:              THE ATTORNEY GENERAL

SUBJECT:       TOTAL ELIMINATION OF CARTELS AND TRANSNATIONAL
                         CRIMINAL ORGANIZATIONS[1]

On January 20, 2025, President Trump directed the federal government to revise existing national security and counter-narcotics strategies to pursue *total elimination* of Cartels and Transnational Criminal Organizations (TCOs). This policy requires a fundamental change in mindset and approach. We must do more than try to mitigate the enormous harms these groups cause in America. It is not enough to stem the tide of deadly poisons, such as fentanyl, that these groups distribute in our homeland. Rather, we must harness the resources of the Department of Justice and empower federal prosecutors throughout the country to work urgently with the Department of Homeland Security and other parts of the government toward the goal of eliminating these threats to U.S. sovereignty. This memorandum sets forth directives and initiatives to promptly commence those efforts.

## I.     Charging Priorities

Achieving total elimination of Cartels and TCOs will require additional resources and thoughtful charging decisions by federal prosecutors based on coordination with law enforcement partners.

For leaders and managers of Cartels and TCOs, the most serious, readily provable offenses under the Department's general charging policy will typically include capital crimes, terrorism charges, racketeering charges, Continuing Criminal Enterprise offenses under 21 U.S.C. § 848, violations of the Foreign Narcotics Kingpin Designation Act under 21 U.S.C. § 1906, violations of the International Emergency Economic Powers Act under 50 U.S.C. § 1705 (IEEPA), and machinegun charges under 18 U.S.C. §§ 924(c)(1)(B)(ii) and 924(o).

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

On the other hand, under the total-elimination policy, it will often be prudent to pursue removal from the United States of a low-level investigative target without immigration status, rather than incurring the time and resource costs associated with criminal prosecution.  Similarly, because the Department is working toward elimination of these threats from the homeland, it will rarely be consistent with this policy to pursue foreign arrests and extraditions of targets who may be eligible for safety-valve relief or minor role adjustments.  This includes foreign arrests of low-level narcotics offenders pursuant to the Maritime Drug Law Enforcement Act under Chapter 705 of Title 46.  Resources currently devoted to such arrests, including at the Maritime Unit of the Narcotics and Dangerous Drug Section, shall be redirected toward investigations involving inspections, interdictions, seizures, and forfeitures of commercial shipping vessels transporting narcotics, precursor chemicals, petroleum products, and/or human trafficking and smuggling victims.  These activities support the operations of Cartels and TCOs, often in violation of U.S. sanctions.

More generally, while charging decisions must be based on case-specific assessments of the facts and evidence, the following factors should be evaluated when considering whether to pursue charges, arrests, and/or extraditions of a Cartel or TCO target:

- Whether the target is a manager or a leader of the organization;

- Whether the target has significant ties to the United States, including physical presence or directing action in the United States;

- Whether the target's conduct resulted in death of or injuries to U.S. citizens;

- Whether the target's conduct involved international terrorism under 18 U.S.C. § 2331(1)(A)-(B);

- The availability of non-criminal responses to the target's conduct, including removal from the United States and economic sanctions; and

- Any known or suspected prior violent crimes committed by the target.

## II.    Removing Bureaucratic Impediments to Aggressive Prosecutions

In most cases, U.S. Attorneys' Offices, partnering with federal, state, and local law enforcement, will lead the charge against Cartels and TCOs.  Those teams must have full and immediate access to the most serious and broad charges that Congress has made available for the types of conduct at issue.  For example, some terrorism charges and violations of IEEPA targeting Specially Designated Global Terrorists (SDGTs) allow prosecutors to proceed against members and associates of Cartels and TCOs in the absence of a specific nexus to drug trafficking or importation of contraband to the United States.  Therefore, the changes set forth below will be

implemented for a period of 90 days[2] and renewed or made permanent thereafter as deemed appropriate by the Office of the Attorney General and the Office of the Deputy Attorney General:

        Capital Crimes.  Mandatory pre-indictment review for capital-eligible offenses pursuant to Justice Manual § 9-10.060 is suspended for cases involving defendants alleged to be members or associates of Cartels or TCOs.  Such cases present "extenuating circumstances" within the meaning of that provision because they "address public safety concerns."

        The U.S. Attorney or Assistant Attorney General authorizing the filing of such charges should comply with all other aspects of Justice Manual § 9-10.060, including by providing a pre-indictment notice to the Capital Case Section and submitting the case for review prior to filing a notice of intent to seek the death penalty.

        Terrorism And IEEPA.  The approval requirements administered by the National Security Division (NSD) are suspended for the filing of most terrorism charges[3] and IEEPA charges, seeking search warrants relating to such charges, and applying for material witness warrants in connection with investigations targeting members or associates of any Cartel or TCO designated as a Foreign Terrorist Organization or SDGT pursuant to the President's January 20, 2025 Executive Order entitled, "Designating Cartels And Other Organizations As Foreign Terrorist Organizations And Specially Designated Global Terrorists."

        While approval requirements are suspended for these types of cases, consultation with NSD and the Office of International Affairs continues to be encouraged to facilitate coordination and uniform treatment of any diplomatic sensitivities.  U.S. Attorneys' Offices shall provide NSD with 24 hours' advance notice of the intention to seek charges or apply for warrants, and they shall make available to NSD upon request any existing memoranda relating to the contemplated actions.  No new or additional paperwork will be required by NSD in connection with these notices and consultation.  However, NSD's concurrence is still required prior to making plea offers, sentencing recommendations, and motions under the Classified Information Procedures Act.

        This policy does not expand (or contract) policies relating to investigations and cases involving classified information.  Any prudential search requests or use authorizations deemed necessary under existing policy should be coordinated with NSD and completed prior to the filing of charges.

        Racketeering.  Approval requirements administered by the Violent Crime and Racketeering Section of the Criminal Division (VCRS), as described in Sections 9-110.000, *et seq.*, of the Justice

---

[2] The National Security Division and the Criminal Division are directed to notify the Office of the Deputy Attorney General regarding any modifications believed to be necessary to the Justice Manual and existing regulations to effectuate this policy.

[3] This policy exempts from NSD's approval and concurrence requirements cases involving 18 U.S.C. §§ 2332a, 2332b, 2339, 2339A, 2339B, 2339C, 2339D, 21 U.S.C. § 960A, and 50 U.S.C. § 1705.  This policy does not exempt from NSD's approval and concurrence requirements cases involving 18 U.S.C. §§ 175, 175b, 219, 793, 794, 831, 951, and 1030(a)(1).

Manual, are suspended for filing racketeering charges and violent crimes in aid of racketeering targeting all Cartels and TCOs.

Consultation with VCRS and the Office of International Affairs is encouraged to facilitate coordination and uniform treatment of any diplomatic sensitivities. U.S. Attorneys' Offices shall provide VCRS with 24 hours' advance notice of the intention to seek charges and make available to VCRS upon request any existing memoranda relating to the contemplated charges. No new or additional paperwork will be required by VCRS in connection with these notices and consultations.

Within one week of the issuance of this memorandum, NSD and VCRS shall jointly propose standardized language to be used by federal prosecutors across the country to describe Tren de Aragua (TdA), La Mara Salvatrucha (MS-13), the Sinaloa Cartel, and the Jalisco New Generation Cartel in charging instruments and search warrants.

Foreign Corrupt Practices Act. The Criminal Division's Foreign Corrupt Practices Act Unit shall prioritize investigations related to foreign bribery that facilitates the criminal operations of Cartels and TCOs, and shift focus away from investigations and cases that do not involve such a connection. Examples of such cases include bribery of foreign officials to facilitate human smuggling and the trafficking of narcotics and firearms.

The requirements in Justice Manual § 9-47.110 requiring authorization by the Criminal Division for an investigation or prosecution of a case under the Foreign Corrupt Practices Act and Foreign Extortion Prevention Act, as well as the requirement that such investigations and prosecutions be conducted by trial attorneys of the Fraud Section, are suspended for all matters relating to foreign bribery associated with Cartels and TCOs. U.S. Attorney's Offices shall provide the Foreign Corrupt Practices Act Unit with 24 hours' advance notice of the intention to seek charges and make available to the Unit upon request any existing memoranda relating to the contemplated charges. No new or additional paperwork will be required by the Foreign Corrupt Practices Act Unit in connection with these notices and consultations.

Money Laundering and Asset Forfeiture. The Criminal Division's Money Laundering and Asset Recovery Section shall prioritize investigations, prosecutions, and asset forfeiture actions that target activities of Cartels and TCOs.

Task Force KleptoCapture, the Department's Kleptocracy Team, and the Kleptocracy Asset Recovery Initiative, shall be disbanded. Attorneys assigned to those initiatives shall return to their prior posts, and resources currently devoted to those efforts shall be committed to the total elimination of Cartels and TCOs.

## III.    Joint Task Forces Vulcan and Alpha

Joint Task Force (JTF) Vulcan, an initiative launched in 2019 to destroy MS-13, and JTF Alpha, which was created in partnership with the Department of Homeland Security to enhance enforcement efforts against human smuggling and trafficking groups, will also be empowered to increase their contributions to this fight. JTF Vulcan's mission is expanded to target TdA, in

addition to MS-13. JTF Alpha will continue to target human trafficking and smuggling networks, with a focus on trafficking and smuggling by Cartels and TCOs.

Both JTFs will be elevated to the Office of the Attorney General and jointly supervised by the Office of the Deputy Attorney General. The Directors of JTFs Vulcan and Alpha will be situated in the Office of the Attorney General. Both JTFs will be supported by NSD and the Criminal Division, and their staffs will include additional AUSAs from around the country. The JTFs will engage and utilize each of the Department's law enforcement components, including Federal Bureau of Investigations, Drug Enforcement Administration, Bureau of Alcohol Tobacco, Firearms and Explosives, and United States Marshals Service, and coordinate within existing legal frameworks with DHS's Homeland Security Investigations, Immigration and Customs Enforcement, and Customs and Border Patrol.

## IV.     Pursuing Legislative Changes to Improve Counter-Narcotics Efforts

While there are powerful tools available to combat Cartels and TCOs, greater authorities are needed to target these groups' manufacturing and distribution of fentanyl and other deadly drugs. Therefore, the Drug Enforcement Agency, the Office of Legal Policy and the Office of Legislative Affairs are directed to evaluate and, if deemed appropriate, advocate for the following legislative reforms:

- Permanently placing fentanyl-related substances on Schedule I of the Controlled Substances Act;

- Adding xylazine, which has no legitimate human use and makes fentanyl even more lethal, to Schedule III of the Controlled Substances Act;

- Broadening 21 U.S.C. § 843 to cover manufacturing and other conduct relating to fentanyl and fentanyl-related substances;

- Broadening 21 U.S.C. § 333 to cover devices and materials used to make counterfeit pills, such as imprinting drugs and drug containers; and

- Requiring serialization of pill-press machines and the machines' critical parts to facilitate tracking and investigation by law enforcement.

**U.S. Department of Justice**

Office of the Deputy Attorney General

_____

*Washington, DC 20530*

January 21, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                      THE ACTING DEPUTY ATTORNEY GENERAL 𝔊𝔅?

SUBJECT:                 Interim Policy Changes Regarding Charging, Sentencing, And
                         Immigration Enforcement

    Following President Trump's second inauguration yesterday, I write regarding interim
decisions and policy changes pending confirmation of the Attorney General.[1]  These interim
changes are necessary as an initial response to Executive Orders that President Trump issued
yesterday, critical to the Justice Department's mission, and part of the response to three of the
most serious threats facing the American people.  First, Cartels and other Transnational Criminal
Organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS-13), are a scourge
on society resulting in an unstable and unsafe border and huge flows of illegal immigration in
violation of U.S. law.  Second, brutal and intolerable violent crime by members of these
organizations and illegal aliens is escalating rapidly across the country.  Third, the fentanyl crisis
and opioid epidemic are poisoning our communities and have inflicted an unprecedented toll of
addiction, suffering, and death.

    The Justice Department must, and will, work to eradicate these threats.  Indeed, it is the
responsibility of the Justice Department to defend the Constitution and, accordingly, to lawfully
execute the policies that the American people elected President Trump to implement.  The
Justice Department's responsibility, proudly shouldered by each of its employees, includes
aggressive enforcement of laws enacted by Congress, as well as vigorous defense of the
President's actions on behalf of the United States against legal challenges.  The Department's
personnel must come together in the offices that taxpayers have funded to do this vitally
important work.

**I.    Core Principle: Pursuing The Most Serious, Readily Provable Offense**

    Interim changes to the Justice Department's policy regarding charging and sentencing are
necessary in order to implement policies articulated in President Trump's January 20, 2025
Executive Orders relating to the elimination of Cartels and other Transnational Criminal
Organizations, and securing our borders against illegal immigration and drug trafficking.
Therefore, effective today, the Justice Department's interim policy regarding charging and

_____

[1] This interim guidance is not intended to, does not, and may not be relied upon to create, any
right or benefit, substantive or procedural, enforceable at law or in equity by any party against
the United States, its departments, agencies, or entities, its officers, employees, or agents, or any
other person.

sentencing is set forth in the May 10, 2017 Memorandum entitled, "Department Charging and Sentencing Policy," which applies to all charging decisions at the Department of Justice and the U.S. Attorney's Offices. Any inconsistent previous policy of the Department of Justice relating to charging and sentencing policy is rescinded, effective today.[2]

Specifically, in the absence of unusual facts, prosecutorial discretion at the Department of Justice and the U.S. Attorney's Offices is bounded by the core principle that prosecutors should charge and pursue the most serious, readily provable offenses. The most serious offenses are those punishable by death where applicable, and offenses with the most significant mandatory minimum sentences (including under the Armed Career Criminal Act and 21 U.S.C. § 851) and the most substantial recommendation under the Sentencing Guidelines.

Each United States Attorney and Assistant Attorney General is responsible for ensuring that this interim policy is implemented and followed. Any deviations from the interim policy's core principle require significant extenuating circumstances, shall be carefully considered, and must be approved consistent with the process described in the May 10, 2017 Memorandum.

## II.    Faithful Execution of the Immigration Laws

Consistent with President Trump's January 20, 2025 Executive Order entitled, "Protecting The American People Against Invasion," the Department of Justice will take all steps necessary to protect the public and secure the American border by removing illegal aliens from the Country and prosecuting illegal aliens for crimes committed within U.S. jurisdiction. These steps shall include, but not be limited to, the following:

Consistent with the core principle of pursuing the most serious, readily provable offense, U.S. Attorney's Offices and the other components shall pursue charges relating to criminal immigration-related violations when such violations are presented by federal, state, or local law enforcement or the Intelligence Community. *See, e.g.*, 8 U.S.C. §§ 1324(c), 1252c (authorizing certain immigration-related arrests by State and local law enforcement officials). This includes, where supported by evidence, prosecutions for violations of 8 U.S.C. §§ 1304, 1306, 1324-1328, 1373 and 18 U.S.C. § 922(g)(5). Each U.S. Attorney's Office shall coordinate as appropriate with the federal courts to inform the courts of this interim policy and develop processes for handling the increased number of prosecutions that will result. Declination decisions relating to immigration-related conduct shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130. On a quarterly basis, the U.S. Attorney's Offices shall report statistics to EOUSA, broken down by law enforcement agency, regarding the number of immigration-related cases referred to the Office, the number of pending immigration-related investigations and prosecutions, the number of immigration-related convictions, and the resulting sentences and removals.

---

[2] The previous policies and guidance rescinded include: "General Department Policies Regarding Charging, Pleas, and Sentencing" (December 16, 2022); "Interim Guidance on Prosecutorial Discretion, Charging, and Sentencing" (January 29, 2021); "Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases" (August 12, 2013); and "Guidance Regarding § 851 Enhancements in Plea Negotiations" (September 24, 2014).

The Organized Crime Drug Enforcement Task Force (OCDETF) and the Project Safe Neighborhoods (PSN) program shall establish national initiatives to provide focused resources and attention to immigration-related prosecutions at the federal, state, and local levels. OCDETF and PSN will focus on facilitating access by U.S. Attorney's Offices to existing structures in which the Justice Department participates, such as Joint Task Force Vulcan, which targets MS-13 and will be expanded to target TdA, and Joint Task Force Alpha, which targets human trafficking. The regional OCDETF Strike Forces shall prioritize the investigation and prosecution of immigration offenses, including by requiring OCDETF-funded AUSAs to devote significant time and attention to the investigation and prosecution of these crimes. The new OCDETF and PSN national initiatives shall also prioritize enhanced statistical tracking of these efforts.

Pending implementation of the Homeland Security Task Forces announced by President Trump on January 20, 2025, the FBI's Joint Terrorism Task Forces are directed to coordinate with DHS, as well as state and local members, to assist in the execution of President Trump's immigration-related initiatives. The FBI, DEA, ATF, USMS, and BOP shall review their files for identifying information and/or biometric data relating to non-citizens located illegally in the United States. All such information and data shall be disclosed to DHS, for the sole purpose of facilitating appropriate removals, enforcement actions, and immigration-related investigations and prosecutions, unless the agency possessing the information and data determines that a particular disclosure would compromise a significant law enforcement investigation and the U.S. Attorney's Office participating in the investigation concurs in writing with the agency's non-disclosure determination. The agencies' reviews and disclosures shall be completed in 60 days. Concurrences by U.S. Attorney's Offices in non-disclosure determinations shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

The Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives. Federal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests pursuant to, for example, the President's extensive Article II authority with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act. The U.S. Attorney's Offices and litigating components of the Department of Justice shall investigate incidents involving any such misconduct for potential prosecution, including for obstructing federal functions in violation of 18 U.S.C. § 371, and violations of other statutes, such as 8 U.S.C. §§ 1324, 1373. Declination decisions with respect to resistance, obstruction, or other non-compliance with lawful immigration-related commands and requests from federal authorities shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

Finally, laws and actions that threaten to impede Executive Branch immigration initiatives, including by prohibiting disclosures of information to federal authorities engaged in immigration-enforcement activities, threaten public safety and national security. The Civil Division shall work with the newly established Sanctuary Cities Enforcement Working Group, within the Office of the Associate Attorney General, to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws.

U.S. Department of Justice

Office of the Deputy Attorney General

_____

The Deputy Attorney General                    *Washington, D.C. 20530*
                                               March 6, 2025


MEMORANDUM FOR        ALL DEPARTMENT EMPLOYEES

FROM:                 THE DEPUTY ATTORNEY GENERAL

SUBJECT:              Operation Take Back America

        Since January 20, 2025, the Justice Department has taken numerous steps to empower prosecutors and law enforcement operating in Districts around the country to protect their communities from the ongoing threats and risks that the American people elected President Trump to address. The Organized Crime Drug Enforcement Task Forces (OCDETF) and the Project Safe Neighborhood (PSN) Program have long been central to these types of efforts in the field. This memorandum establishes a single initiative, called "Operation Take Back America," that will use OCDETF and PSN resources to implement core policy objectives established by President Trump and the Attorney General:

        Repelling The Invasion Of Illegal Immigration. Executive Order 14159, entitled *Protecting the American People Against Invasion*, describes the invasion of criminal aliens under the previous Administration. Those aliens "present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans," and have "engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities."

        Achieving Total Elimination Of Cartels And Transnational Criminal Organizations (TCOs). Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, directs the government to "ensure the total elimination" of Cartels and TCOs from the United States.

        Establishing Homeland Security Task Forces. Executive Order 14159 also directs the Department of Justice to participate in the establishment of Homeland Security Task Forces in every State. These Task Forces will work to "end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, and end the scourge of human smuggling and trafficking."

        Charging The Most Serious, Readily Provable Offense. In a February 5, 2025 memorandum, the Attorney General established a charging policy around a core principle: in the absence of unusual facts, prosecutors should charge and pursue the most serious, readily provable offense. The memorandum noted the Department's focus on illegal immigration, human trafficking and smuggling, and crimes by Cartels and TCOs such as Tren de Aragua (TdA) and Mara Salvatrucha (MS-13)—including through Joint Task Forces Alpha and Vulcan.

Restoring The Death Penalty. Executive Order 14164, entitled *Restoring the Death Penalty and Protecting Public Safety*, restored the death penalty as "an essential tool for deterring and punishing those who would commit the most heinous crimes and acts of lethal violence against American citizens"—with particular emphasis on capital crimes by illegal aliens and against law enforcement.

## I.    Creation Of Operation Take Back America

Operation Take Back America requires that OCDETF surge existing resources to address the Justice Department's core enforcement priorities: stopping illegal immigration, eliminating Cartels and TCOs, and ending illegal trafficking of dangerous drugs and human beings.  The performance of Operation Take Back America will be measured, in part, by the ability of OCDETF personnel to use criminal justice tools and resources to help with the removal of criminal aliens and to support other aspects of President Trump's immigration agenda. The Operation will include investigations and prosecutions relating to immigration enforcement, such as cases involving obstruction of immigration objectives by sanctuary jurisdictions.  Operation Take Back America will also include all efforts to target TdA, MS-13, the Sinaloa Cartel, Jalisco New Generation Cartel (CJNG), the Northeast Cartel (Los Zetas), New Michoacán Family, United Cartels, the Gulf Cartel, and any other Cartel or TCO designated pursuant to the process established in Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*.

All OCDETF-funded personnel and OCDETF Strike Forces must contribute to Operation Take Back America.  OCDETF-funded AUSAs must devote a significant number of their weekly hours to the Operation, and report those hours for tracking purposes.  All existing OCDETF National and Regional Strategic Initiatives within the scope of Operation Take Back America shall be consolidated and brought under the Operation.  All existing OCDETF operations and investigations that involve the same Consolidated Priority Organization Targets (CPOTs) and Regional Priority Organization Targets (RPOTs) shall be consolidated and brought under the Operation.  All of these consolidation efforts shall be completed by two weeks from the date of this memo.

AUSAs and law enforcement participating in Operation Take Back America shall act in accordance with current DOJ guidance regarding charging the most serious, readily provable offense—including capital crimes where available.  AUSAs prosecuting cases relating to Operation Take Back America shall seek detention as appropriate to protect the public, including temporary detention of aliens pursuant to 18 U.S.C. § 3142(d)(1)(B), and pursue appeals of adverse bail determinations.

## II.    Operation Take Back America Supporting Homeland Security Task Forces

Operation Take Back America will support the Homeland Security Task Forces established in Executive Order 14159, entitled *Protecting the American People Against Invasion*.  Each OCDETF Regional Director and Lead Task Force Attorney will be assigned to the local Homeland

Security Task Force, and additional OCDETF-funded AUSAs will support that work on an as-needed basis.

### III.   PSN Coordination With Operation Take Back America

AUSAs acting as PSN Coordinators in their Districts must fully participate in Operation Take Back America. This shall include coordination with OCDETF to obtain support for federal PSN cases that focus on the Operation's priorities. PSN will also partner with federal, state, and local law enforcement to advance the Operation by establishing protocols that ensure a rapid federal response to incidents within the Operation's scope—including responding and investigating instances of obstruction in sanctuary jurisdictions that endanger the residents of those jurisdictions.

PSN Coordinators shall work with state and local prosecutors and law enforcement to identify cases that should be investigated and prosecuted federally under Operation Take Back America to maximize the cases' impact in support of the Department's priorities. AUSAs working on Operation Take Back America shall conduct monthly meetings with state and local law enforcement to identify and investigate these cases. USAOs are directed to report to EOUSA on a quarterly basis the number of state and local referrals to Operation Take Back America, the number of cases adopted, the number of cases declined, and the rationale for the declination.

U.S. Department of Justice

Office of the Deputy Attorney General

The Deputy Attorney General                        *Washington, D.C. 20530*

March 6, 2025

MEMORANDUM FOR    ALL DEPARTMENT EMPLOYEES

FROM:                        THE DEPUTY ATTORNEY GENERAL

SUBJECT:                  U.S. Attorneys' Offices Staffing Priorities

U.S. Attorneys' Offices operate on the front lines of the Justice Department's fights against illegal immigration, Cartels and Transnational Criminal Organizations (TCOs), and illegal trafficking of dangerous drugs and human beings. This memorandum sets forth guidance to ensure that U.S. Attorneys' Offices are appropriately staffed to win those fights, subject to the hiring freeze that has been appropriately imposed in furtherance of the need to achieve greater efficiency with the funds taxpayers make available to their government.

Please rest assured that the Department is taking all steps available to advocate for the retention of AUSAs in probationary status so that they can make crucial contributions to national security and public safety. Moreover, existing guidance regarding the hiring freeze is not intended to limit other staffing options at U.S. Attorneys' Offices, such as hiring, appointing, or accepting uncompensated Special Assistant United States Attorneys, or employing unpaid law student externs, law student volunteers, college interns, and administrative interns.

## I.    Hiring In Border Districts

President Trump and the Attorney General have emphasized the need for increased criminal enforcement efforts on the border. They are correct, and I share their. U.S. Attorneys' Offices in Districts on the southern border,[1] and in all Florida Districts, are critical to the implementation of the policies established by President Trump, including in Executive Order 14159, entitled *Protecting the American People Against Invasion*, and Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*. The threat of illegal immigration and associated crime at our northern border is also escalating, as President Trump pointed out in Executive Order 14193. This is particularly true in the Western and Northern Districts of New York and the District of Vermont, including within the Swanton Sector.

---

[1] For purposes of this guidance, the southern border Districts are all Districts in Arizona, New Mexico, and Texas, as well as the Southern District of California.

AR-058

Consistent with the charging priorities identified by the Attorney General on February 5, 2025, AUSAs must commit to investigations and prosecutions targeting all of the insidious results of the four-year invasion of illegal immigration that we are now working to repel. AUSAs must continue to charge more cases involving aliens who illegally entered or reentered the United States, *see, e.g.*, 8 U.S.C. §§ 1325, 1326; aliens who illegally possess firearms, *see, e.g.*, 18 U.S.C § 922(g)(5); and aliens who fail to timely register, depart, or make other required filings, 8 U.S.C §§ 1253, 1306. Because unlawful impediments to President Trump's immigration policy will not be tolerated—including by state and local law enforcement, as well as misguided advocacy groups operating against the public interest—AUSAs must also charge cases involving efforts to obstruct removals and other immigration enforcement efforts in sanctuary city jurisdictions and elsewhere, *see, e.g.*, 18 U.S.C. §§ 371, 1505; trespassing and damage to federal facilities used for immigration purposes, *see, e.g.*, 18 U.S.C. § 1382; and harboring or concealing aliens, including at prison facilities and work places, *see e.g.*, 8 U.S.C. § 1324.

Border Districts have a unique role to play in these efforts. They have been empowered to bring racketeering charges and impose the death penalty to eliminate Cartels and TCOs that infiltrated the unacceptably porous border before President Trump took decisive action to seal it. They must bring terrorism and sanctions charges against illegal aliens who provide material support to Cartels and TCOs designated as Foreign Terrorist Organizations (FTOs) and Specially Designated Global Terrorists (SDGTs) pursuant to Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*. Prosecutors operating in Border Districts must evaluate use of these charges, now unfettered by approval obligations at Main Justice, in connection with all aspects of illegal immigration. In addition to using these types of charges in drug- and weapons-trafficking cases, this obligation requires bringing terrorism and sanctions charges against aliens who pay or otherwise provide support to Cartels and TCOs for help entering the country, or assistance in trafficking in minors and other humans. Finally, in addition to operating on the front lines, these U.S. Attorneys' Offices must charge aliens who committed crimes in their Districts and then migrated into the Nation's interior—where we will work tirelessly with our partners to apprehend and remove them.

To do this important work, the relevant U.S. Attorneys' Offices must be staffed appropriately. Accordingly, U.S. Attorneys' Offices operating in the Districts identified in this section are authorized to hire AUSAs for the purpose of working on investigations and prosecutions relating to illegal immigration, illegal trafficking of dangerous drugs and human beings, and targeting the Cartels and TCOs designated as FTOs and SDGTs pursuant to the process established in Executive Order 14157. These Districts will be provided funding to fill a specific number of direct-funded attorney FTE vacancies in the District. The number of funded attorney FTE vacancies will be established in implementation guidance issued by EOUSA.

In addition to authorized direct hiring, attorneys throughout the Department—and especially those assigned to Main Justice—are encouraged to voluntarily pursue details or permanent transfers to U.S. Attorneys' Offices in border districts.[2] Such details and transfers are not subject to the hiring freeze, and JMD and EOUSA are directed to effectuate them as soon as is practicable. For all details pursuant to this paragraph, the sending District or Main Justice component will bear the salary cost of the attorney while on the detail, and EOUSA will fund travel costs associated with the detail. Detailed employees will not count against the receiving District's allocated number of FTEs for the first two years of the attorney's detail to the receiving District. For all permanent transfers, the receiving District will assume the cost of the attorney's salary, the transfer will count as the filling of a vacant FTE position, and EOUSA will provide a subsidy to cover up to $15,000 in eligible relocation costs.

For U.S. Attorneys' Offices in Districts not referenced in this section, the Department will evaluate on a case-by-case basis whether a hiring request is consistent with existing guidance relating to the hiring freeze. Exemption requests should be made via a memorandum to EOUSA that explains (i) the reason why the exception from the hiring freeze is required, (ii) why the need cannot be filled by an existing employee or employees, and (iii) the Office's vacancy percentage. EOUSA shall transmit those requests, with an accompanying recommendation, to the Office of the Deputy Attorney General for approval through the Justice Management Division. Exemptions are more likely to be granted where the application includes an undertaking that the attorneys and/or support staff to be hired will be specifically focused on the priorities set forth above.

## II.    Hiring To Support Priority Task Force Efforts

President Trump and the Attorney General have created four Task Forces that will enforce the priorities of the Administration and the Justice Department. The Homeland Security Task Force established in Executive Order 14159 will establish a presence in every State in order to "end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, [and] end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children." Joint Task Force Alpha is targeting human trafficking and human smuggling. Joint Task Force Vulcan is targeting Tren de Aragua (TdA) and Mara Salvatrucha (MS-13). Joint Task Force 10-7 is targeting those responsible for the October 7, 2023 terrorist attack in Israel, addressing the ongoing threat posed by Hamas and its affiliates, and combatting antisemitic acts of terrorism and civil rights violations in the homeland.

Any U.S. Attorney's Office that details an AUSA to one of these four Task Forces may backfill the temporary vacancy with an AUSA hire. These backfills are authorized exceptions from the hiring freeze. EOUSA will centrally fund the salary and travel costs of the detail for USAOs.

---

[2] In the absence of voluntary attorney participation in efforts to support districts on the Border, the ongoing national emergency may require that attorneys be detailed or reassigned from their current duties at Main Justice to support these efforts.

**U.S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General                    *Washington, D.C. 20530*

August 21, 2025

MEMORANDUM FOR      ALL DEPARTMENT EMPLOYEES

FROM:                          THE DEPUTY ATTORNEY GENERAL

SUBJECT:                     Renewal of Policy to Remove Bureaucratic Impediments to
                                       Aggressive Prosecutions as set forth in Attorney General Bondi's
                                       Memorandum on the Total Elimination of Cartels and Transnational
                                       Criminal Organizations[1]


       On January 20, 2025, President Trump signed Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, directing the federal government to "ensure the total elimination" of Cartels and Transnational Criminal Organizations from the United States. On February 5, 2025, the Attorney General issued a Memorandum for all Department of Justice employees, entitled *Total Elimination of Cartels and Transnational Criminal Organizations*. Section II ("Removing Bureaucratic Impediments to Aggressive Prosecutions") of this Memorandum enumerates Department-wide policy changes that – after a period of 90 days – may be "renewed or made permanent thereafter as deemed appropriate by the Office of the Attorney General and the Office of the Deputy Attorney General." The enumerated policies in Section II of the Attorney General's Memorandum are hereby renewed for a period of 365 days.

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

AR-061



U.S. Department of Justice

Office of the Deputy Attorney General

_____

The Deputy Attorney General                         *Washington, D.C. 20530*
                                                    September 24, 2025


MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:            THE DEPUTY ATTORNEY GENERAL

SUBJECT:         Expansion of Joint Task Force Alpha and Prioritizing the Prosecution of
                 UAC Offenses[1]


        Cartels and other Transnational Criminal Organizations (TCOs) pose a substantial threat
to the security of the United States. These groups commit brutal and intolerable violent crimes
and are responsible for massive flows of illegal immigration and narcotics into the United States
through our Southern and Northern borders, acting in concert with co-conspirators throughout
North and South America. Indeed, as President Trump has made clear, these entities "threaten the
safety of the American people, the security of the United States, and the stability of the
international order in the Western Hemisphere," posing "an unacceptable national security risk"
to our country.[2]

        This situation is untenable. The Department of Justice (Department) and its law
enforcement partners are committed to protecting the United States against invasion, working to
secure the total elimination of Cartels and TCOs, protecting human life, and aggressively enforcing
our criminal laws. Joint Task Force Alpha (JTFA) is critical to this mission.

        On September 4, 2025, Attorney General Bondi announced the expansion of JTFA, the
Department's taskforce dedicated to combating human smuggling and trafficking committed by
cartels and TCOs. A highly successful partnership with the Department of Homeland Security
(DHS), JTFA investigates and prosecutes human smuggling and trafficking and related
immigration crimes that impact public safety and border security. JTFA has shown that dedicated
prosecutorial resources, along with robust investigative and other case support, can have an
outsized impact on deterrence and holding to account those who commit these terrible crimes.
JTFA's work has expanded to districts along the country's northern and maritime borders, in
addition to districts along our southwest border, strengthened partnerships with federal law

_____

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit,
substantive or procedural, enforceable at law or in equity by any party against the United States, its
departments, agencies, or entities, its officers, employees, or agents, or any person.

[2] *See* "Designating Cartels And Other Organizations As Foreign Terrorist Organizations and Specially
Designated Global Terrorists," Executive Order § 1(a) (Jan. 20, 2025).

Case 5:25-cv-06487-PCP   Document 163   Filed 01/09/26   Page 69 of 71

Memorandum from the Deputy Attorney General                                      Page 2
Subject: Expansion of Joint Task Force Alpha and Prioritizing the Prosecution of UAC Offenses

enforcement agencies and foreign law enforcement counterparts. Additionally, JTFA will lead and support a Department-wide focus on crimes involving unaccompanied children.

This memorandum: (1) describes JTFA's enhanced and elevated mission, including to serve as the focal point for significant smuggling matters, and (2) directs Department prosecutors, including JTFA and U.S. Attorneys' Offices, to dedicate resources to prosecuting and to prioritize prosecuting crimes relating to the fraudulent sponsorship of Unaccompanied Alien Children (UACs).

## I.      Expansion of Joint Task Force Alpha

The Department must use all tools at its disposal to keep America safe.[3] This includes targeting and eliminating the leaders and organizers of Cartels and TCOs involved in smuggling and trafficking people into our country. Given the importance of this mission and the successes JTFA has had in prosecuting these crimes, JTFA is elevated to the Office of the Attorney General and will be jointly supervised by my Office.

JTFA must also expand its geographic footprint to confront the increasing threat of human smuggling and trafficking along all of our borders. Accordingly, JTFA will now also consist of federal prosecutors from the U.S. Attorneys' Offices for the Southern District of Texas, Western District of Texas, District of New Mexico, District of Arizona, Southern District of California, Southern District of Florida, Northern District of New York, and the District of Vermont. Additional prosecutorial resources will be provided from the Criminal Division and Civil Rights Division to partner on these investigations and cases.

JTFA will also expand its partnerships with law enforcement agencies. In addition to law enforcement agents and analysts from DHS's Immigration and Customs Enforcement, Homeland Security Investigations, Customs and Border Protection, and Border Patrol, JTFA will utilize investigative resources from the Federal Bureau of Investigation, Drug Enforcement Agency, and Bureau of Alcohol, Tobacco, Firearms and Explosives. Through these partnerships, JTFA will rely on data analysis to focus on the highest priority targets, including members of Cartels and TCOs that are responsible for the most prolific or egregious human smuggling and trafficking offenses.

JTFA will continue to work closely with foreign partners to effectively enhance coordination in transnational law enforcement efforts against human smuggling and trafficking and target those operating outside of the United States who violate our laws. These partnerships are critical to ensuring the total elimination of Cartels and TCOs that wreak havoc across the region and preventing illegal migration to the United States. JTFA has directly supported the arrests in foreign countries of numerous TCOs members and co-conspirators to ensure justice and accountability reach beyond our borders. The primary focus, however, is bringing those leaders and organizers to justice in the United States. Recently, the Government of Mexico transferred to

---

[3] See AG Bondi Memo., "Total Elimination of Cartels and Transnational Criminal Organizations" (Feb. 5, 2025), at 1 ("[W]e must harness the resources of the Department of Justice and empower federal prosecutors throughout the country to work urgently with the Department of Homeland Security and other parts of the government toward the goal of eliminating these threats to U.S. sovereignty.").

AR-063

Memorandum from the Deputy Attorney General                                    Page 3
Subject: Expansion of Joint Task Force Alpha and Prioritizing the Prosecution of UAC Offenses

the United States a JTFA defendant who was the leader of an organization responsible for smuggling thousands of illegal aliens into the United States from Iran, Afghanistan, Uzbekistan, Pakistan, Kazakhstan, Turkey, Somalia, Cameroon, Senegal, Mauritania, Ethiopia, Egypt, and other countries. JTFA will aggressively prosecute this type of unlawful conduct.

Although JTFA is a key component of the Department's mission to tackle human smuggling, all Department prosecutors must use all available criminal statutes to combat the flood of illegal immigration.[4] Targeting Cartel and TCO members responsible for human smuggling and trafficking must and will be a priority for the Department and all of its law enforcement partners. Accordingly, U.S. Attorneys' Offices are directed to consult with JTFA on any significant human smuggling and trafficking matters to ensure that all available Department resources are brought to bear for the highest priority cases.

In certain circumstances, JTFA may have matters that align with other law enforcement priority initiatives, such as the Homeland Security Task Forces (HSTFs) established throughout the United States.[5] JTFA's whole-of-Department, prosecutor-led network and other dedicated Department and DHS headquarters resources are well-positioned to complement the work of HSTFs. JTFA will work side-by-side with HTSFs to manage efficient use of resources and maximize the overall enforcement impact. The JTFA director will coordinate with the HSTF National Executive Steering Committee and the Regional Executive Steering Committees to ensure that all available law enforcement tools and the Department's resources are fully leveraged to investigate and prosecute jointly designated cases.

## II.     UAC-Related Offenses

The harms caused by illegal immigration are not limited to human smuggling and trafficking. Among the millions of people who attempted to enter the United States illegally in recent years were hundreds of thousands of Unaccompanied Alien Children (UACs). Shortly after UACs are apprehended at the border, they are transferred to the custody of the U.S. Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR). Pending immigration proceedings, HHS ORR is responsible for the care and custody of UACs, which includes placing UACs in the care of qualified sponsors. For years, sponsors were not vetted adequately, nor was the welfare of UACs ensured. Consequently, UACs have been more vulnerable to and, in some instances, have fallen prey to smuggling, trafficking, sexual assault, and forced labor.

Accordingly, JTFA will lead and support U.S. Attorneys' Offices in the prosecution of crimes related to UACs. JTFA prosecutors are engaged with an interagency law enforcement task force that is assembling leads for potential crimes related to UACs, and investigators are presenting these cases to U.S. Attorneys' Offices for prosecution review. Each U.S. Attorney's Office shall designate a UAC coordinator to streamline communication with law enforcement agencies and facilitate prosecution of UAC cases in the district. U.S. Attorneys' Offices shall pursue charges

---

[4] See AG Bondi Memo., "General Policy Regarding Charging, Plea Negotiations, and Sentencing" (Feb. 5, 2025).

[5] See "Protecting the American People Against Invasion" Executive Order § 6 (Jan. 20, 2025).

Memorandum from the Deputy Attorney General                                   Page 4
Subject: Expansion of Joint Task Force Alpha and Prioritizing the Prosecution of UAC Offenses

relating to UAC sponsor fraud, immigration-related violations by UAC sponsors, and other crimes involving UACs, consistent with the then-Acting Deputy Attorney General's January 21, 2025 Memorandum on Interim Policy Changes Regarding Charging, Sentencing, and Immigration Enforcement.  In addition to charges related to labor or sex trafficking (18 U.S.C. ch. 77, part I), other charges may include offenses, such as making false statements (18 U.S.C. § 1001), aggravated identity theft (18 U.S.C. § 1028A), or bringing in or harboring aliens (8 U.S.C. § 1324). Sponsors themselves may be in the United States illegally, and Districts should consider charges relating to illegal entry or reentry, or importation of aliens for illicit purposes (8 U.S.C. §§ 1325, 1326, 1328).

    In UAC cases involving significant sponsor fraud, sex trafficking, or forced labor, U.S. Attorneys' Offices should consult with JTFA to ensure appropriate information sharing across judicial districts and to determine if additional prosecutorial resources are needed to hold accountable those involved in UAC-related crimes.  Moreover, declination decisions relating to UACs shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.  On a quarterly basis, U.S. Attorneys' Offices shall report statistics to EOUSA, broken down by law enforcement agency, regarding the number of UAC-related cases referred to the Office, the number of pending UAC-related investigations and prosecutions, the number of UAC-related convictions, and the resulting sentences.