UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARMEN ARACELY PABLO SEQUEN, et al.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>SERGIO ALBARRAN, et al.,<br><br>                    Defendants. | Case No.  25-cv-06487-PCP<br><br>**ORDER RE: MOTIONS FOR CLASS CERTIFICATION AND SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 172, 175, 176, 185, 186 |

For 80 years, Congress has commanded federal agencies to think before they act. That instruction—codified in the Administrative Procedures Act—does not require an agency to make the choice that a reviewing court might deem preferable. But it demands that an agency at least provide sound reasons for following its chosen course. In this putative class action, a group of noncitizens assert that several recent policies issued by Immigration and Customs Enforcement (ICE) and the Department of Justice's Executive Office for Immigration Review (EOIR) contravene the APA's reasoned-decisionmaking requirement. The challenged policies eliminate previous limits on ICE agents' civil enforcement activities (i.e., arrests) at immigration courthouses and the duration of noncitizens' subsequent detention in ICE's short-term holding facilities. Plaintiffs also bring a constitutional challenge to the conditions under which ICE detains noncitizens in the holding facilities at its San Francisco field office, which is located at 630 Sansome Street.

Now before the Court are plaintiffs' motion for certification of two provisionally certified classes and the parties' cross-motions for partial summary judgment as to plaintiffs' APA claims. Because the provisionally certified classes satisfy the requirements of Rule 23, the Court grants plaintiffs' motion for class certification. And because the record before the Court demonstrates

United States District Court
Northern District of California

that ICE and EOIR failed to provide reasoned explanations for their actions, the Court concludes that each of the challenged policies is arbitrary and capricious in contravention of the APA. The Court therefore grants plaintiffs' motions for partial summary judgment and vacates the challenged policies in full.

## BACKGROUND

This case arises from recent changes to ICE and EOIR policies governing civil immigration arrests at courthouses and detention in ICE's short-term hold facilities, as well as resulting changes in the conditions of confinement at 630 Sansome.[1]

### I. ICE and EOIR issue new guidance authorizing widespread civil immigration arrests at courthouses.

For at least a decade prior to 2025, ICE limited the circumstances in which its officers and agents could conduct civil immigration arrests in or near courthouses. In both 2014 and 2015, ICE issued internal guidance stating that civil enforcement actions at or near courthouses would be undertaken only against noncitizens whom ICE had a heightened interest in detaining immediately because, for example, they were "suspected of terrorism or espionage," had been convicted of crimes, "participated in organized criminal gangs," or "otherwise pose[d] a serious risk to public safety."[2] In 2018, ICE issued a formal directive that again authorized "civil enforcement actions inside courthouses" against certain high-priority categories of noncitizens, like "gang members" and those "with criminal convictions." The directive instructed that other noncitizens whom ICE encountered in courthouses would not be subject to arrest "absent special circumstances, such as where the individual poses a threat to public safety."[3]

---

[1] Unless otherwise noted, the Court relies on information outside the administrative records designated by the government only for the purposes of providing relevant background, describing the parties' arguments, or resolving plaintiffs' motion for final class certification.

[2] Message from Philip T. Miller, ICE's Assistant Director for Field Operations, on "Enforcement Actions at or Near Courthouses" (Mar. 19, 2014), Dkt. No. 107, at 5; Message from Philip T. Miller, ICE's Assistant Director for Field Operations, on "Guidance Update: Enforcement Actions at or Near Courthouses" (Jan. 26, 2015), Dkt. No. 107, at 7.

[3] ICE Directive 11072.1, "Civil Immigration Enforcement Actions Inside Courthouses" (Jan. 10, 2018), Dkt. No. 146, at 21.

None of these early policies specifically limited ICE's civil enforcement activities at *immigration* courthouses, and the government argues that the 2018 directive's formal limitations on courthouse arrests did not apply to arrests at or near immigration courts. But whether or not these early policies formally restricted civil arrests at immigration courthouses, plaintiffs have provided evidence that ICE limited such arrests as a matter of custom or practice. Multiple immigration attorneys who frequently practiced in northern California while these earlier policies were in effect attested that they rarely (if ever) witnessed or learned of ICE engaging in civil enforcement activities in immigration courthouses.[4]

In 2021, ICE unequivocally extended its restrictions on courthouse arrests to immigration courthouses. In that year, ICE revoked the 2018 directive and issued new guidance explaining that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice."[5] "[S]o as not to unnecessarily impinge upon the core principle of preserving access to justice," ICE's 2021 guidance permitted such actions only if they involved "a national security threat"; "an imminent risk of death, violence, or physical harm"; "hot pursuit" of a person who threatened public safety; "an immediate risk of destruction of [criminal] evidence"; or, subject to advance supervisory approval, if no "safe alternative location" existed for the arrest of "an individual who pose[d] a threat to public safety."[6] The 2021 guidance expressly noted that its restrictions applied to "immigration courts."[7]

---

[4] *See, e.g.*, Declaration of Shira Levine, Dkt. No. 100 ¶¶ 2, 4; Declaration of Milli Atkinson, Dkt. No. 98 ¶ 12; Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶¶ 7, 11. Though the government objects to the Court's consideration of certain statements in these declarations on hearsay and foundation grounds, none of those objections apply to the statements cited above, which either recount attorneys' personal observations of the absence of ICE agents in immigration courthouses or attest that the attorneys did *not* hear others speak about the presence of ICE agents in the courthouses. *See United States v. Haines*, 766 F. App'x 443, 448 (9th Cir. 2019) ("Testimony that a declarant did *not* say something is not hearsay.").

[5] Memorandum from Tae Johnson, Acting Director of ICE & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on "Civil Immigration Enforcement Actions in or near Courthouses" (Apr. 27, 2021), Dkt. No. 146, at 25.

[6] *Id.* at 26.

[7] *Id.*

Soon thereafter, EOIR, which oversees the nation's immigration courts, imposed similar limitations on civil arrests at its immigration courthouses. EOIR had issued guidance in 1996 forbidding arrests in immigration courtrooms "except in exigent circumstances" after finding that the presence of immigration officers in courtrooms "ha[d] produced a 'chilling' effect on the conduct of" several hearings.[8] In 2023, EOIR expanded the restriction on civil arrests in its courtrooms to cover all spaces where immigration-court business took place.[9] EOIR's 2023 guidance explained that, in addition to having a "chilling effect," allowing civil-enforcement actions in immigration courthouses "would disincentivize noncitizens from appearing for their hearings" and "may create safety risks for those who may be present" in courthouses, "including children."[10] The 2023 guidance also reasoned that limiting civil immigration arrests at immigration courthouses would "reinforce the separate and distinct roles of [the Department of Homeland Security]," including ICE, "and [EOIR]."[11] To guard against these risks, EOIR permitted civil immigration arrests at or near its courthouses only in the exceptional circumstances identified in ICE's 2021 guidance.[12]

ICE reversed course in January 2025. That month, the President revoked existing guidance regarding civil immigration-enforcement priorities and instructed federal agencies "to ensure the faithful execution of the immigration laws ... against *all* inadmissible and removable aliens." Exec. Order 14,159, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025) (emphasis added). Based on that executive order, ICE rescinded its 2021 guidance and issued a new interim policy on civil immigration arrests at courthouses in January 2025, followed by a final version in May 2025.[13] The new

---

[8] Operating Policies and Procedures Memorandum (OPPM) 96-6 from Michael J. Creppy, Chief Immigration Judge, on "Arrests by INS Officers In or Near Immigration Court Facilities" (Sept. 30, 1996), Dkt. No. 163, at 4.

[9] *See* OPPM 23-01 from Sheily McNulty, Chief Immigration Judge, on "Enforcement Actions in or Near OCIJ Space" (Dec. 11, 2023), Dkt. No. 163, at 1–2.

[10] *Id.* at 2.

[11] *Id.*

[12] *Id*. at 2–3.

[13] *See* ICE Policy No. 11072.3, Memorandum from Caleb Vitello, Acting ICE Director, on "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" (Jan. 21, 2025) [Interim Guidance], Dkt. No. 146, at 1–3; ICE Policy No. 11072.4, ICE Memorandum from

United States District Court
Northern District of California

courthouse-arrest policies acknowledge that "civil immigration enforcement actions in or near courthouses" are generally "against targeted aliens," like those who pose "[n]ational security or public safety threats," have "[s]pecific ... criminal convictions," are "gang members," or have remained in or re-entered the United States after being ordered removed.[14] But in a departure from ICE's prior guidance, the new policies state that courthouse arrests are "not limited" to these groups and that other noncitizens "encountered … in or near a courthouse … may be subject to civil immigration enforcement action[s]" at courthouses "on a case-by-case basis considering the totality of the circumstances."[15] Under the policies, "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses" whenever "credible information ... leads them to believe" that the noncitizen they seek to arrest "will be present" at a courthouse.[16] But the new policies continue to instruct agents, "to the extent practicable," to conduct enforcement actions "discreetly," "in non-public areas of the courthouse," "in collaboration with court security staff," and "utiliz[ing] … non-public entrances and exits" in order "to minimize the[] impact on court proceedings."[17] The policies discuss the benefits of courthouse arrests to the government's enforcement of immigration laws but do not directly address the concerns raised in earlier guidance concerning chilling effects, safety risks, and impacts on hearing attendance.

Unlike the 2021 guidance, ICE's 2025 courthouse-arrest policies do not discuss immigration courts specifically. But for more than a year after the issuance of the interim guidance in January 2025, the government explicitly and implicitly represented that ICE's new policies

---

Todd M. Lyons, Acting ICE Director, on "Civil Immigration Enforcement Actions In or Near Courthouses" (May 27, 2025) [Final Guidance], Dkt. No. 146, at 51–53. The interim and final policies are the same in all material respects, and the Court addresses them together unless otherwise specified.

[14] ICE Policy No. 11072.3, Dkt. No. 146, at 52; ICE Policy No. 11072.4, Dkt. No. 146, at 2.

[15] ICE Policy No. 11072.3, Dkt. No. 146, at 52; ICE Policy No. 11072.4, Dkt. No. 146, at 2.

[16] ICE Policy No. 11072.3, Dkt. No. 146, at 52; ICE Policy No. 11072.4, Dkt. No. 146, at 2. The interim guidance required that civil immigration enforcement actions not be "precluded by laws imposed by the jurisdiction in which the enforcement action will take place," ICE Policy No. 11072.3, Dkt. No. 146, at 52, but the final guidance removed this restriction, *see* ICE Policy No. 11072.4, Dkt. No. 146, at 2.

[17] ICE Policy No. 11072.3, Dkt. No. 146, at 52; ICE Policy No. 11072.4, Dkt. No. 146, at 2.

apply with full force to immigration courthouses. In a separate case challenging the 2025 courthouse-arrest policies in the Southern District of New York, the government "unequivocally" and "forcefully" argued that the policies extend to immigration courts, maintaining that position "[a]s recently as January 7, 2026[.]" *Afr. Comtys. Together v. Lyons* ("*Afr. Comtys. II*"), No. 25-CV-6366, 2026 WL 1382944, at *2 (S.D.N.Y. May 18, 2026). When this Court asked in December 2025 how ICE's new courthouse-arrest policies apply to immigration courts, the government "would not explain precisely how ICE interprets" the policies' scope but "strongly suggest[ed]" that they authorize civil arrests in immigration courthouses. *Pablo Sequen VII*, 814 F. Supp. 3d at 1034. And throughout this case, including in its summary-judgment briefing, the government defended ICE's 2025 courthouse-arrest policies on the ground that the policies' reasoning is sound even as applied to arrests in immigration courthouses.[18]

In March 2026, the government learned that it was mistaken with respect to the scope of ICE's new courthouse-arrest policies. As the government disclosed in *African Communities*, ICE had "specifically informed" its DOJ counsel in 2025 that the agency's new guidance "applied to immigration courthouse arrests."[19] On March 19, 2026, however, ICE sent an internal e-mail memorandum instructing its personnel that the new policies "do[] not apply to [EOIR] (Immigration) courts, regardless of their location."[20] A few days later, ICE informed its DOJ attorneys in *African Communities* that the new policies "do[] not and ha[ve] never applied to civil immigration enforcement actions in or near [EOIR] immigration courts."[21] Based on these developments, and after conferring with ICE, the government's counsel in this action has since

---

[18] *See* Defendants' Counter-Motion and Opposition to Plaintiffs' Motion for Summary Judgment – Courthouse Enforcement Actions, Dkt. No. 186, at 16–19; *see also id.* at 13 (referring to the challenged policies as "ICE's guidance to conduct widespread civil arrests at immigration courthouses").

[19] Letter from Tomoko Onozawa and Jeffrey Oestericher, Assistant United States Attorneys, to the Honorable Kevin P. Castel (Mar. 24, 2026), Dkt. No. 195-1, at 2.

[20] E-mail memorandum from Liana J. Castano, Assistant Director of Field Operations for ICE Enforcement and Removal Operations (ERO), to all ERO personnel (Mar. 19, 2025), Dkt. No. 195, at 7.

[21] Letter from Tomoko Onozawa and Jeffrey Oestericher, Assistant United States Attorneys, to the Honorable Kevin P. Castel (Mar. 24, 2026), Dkt. No. 195, at 4.

confirmed that ICE's 2025 courthouse-arrest policies do not apply to immigration courts. Yet, as the government acknowledges, ICE's 2025 courthouse-arrest policies rescinded the 2021 guidance in its entirety, including with respect to immigration courthouses, and thereby "lift[ed] the prior restrictions on civil immigration enforcement action at immigration courthouses." The result of the new policies has thus been to leave ICE agents without any internal guidance or limitations concerning civil arrests at immigration courthouses.

EOIR also issued new guidance on courthouse arrests in late January 2025, and that policy remains in effect.[22] EOIR's 2025 courthouse-arrest policy rescinds the office's prior restrictions on ICE civil enforcement actions in immigration courthouses.[23] EOIR states that its earlier policy primarily stemmed from ICE's since-revoked 2021 guidance and that "the other bases given ... were unpersuasive, inconsistent with current Executive Branch policy, pretextual, or unsubstantiated on any systematic basis."[24] EOIR's new policy also reasons that it lacks authority to prohibit ICE from taking lawful enforcement actions.[25] As a result, the policy places no independent limits on ICE's civil enforcement actions in immigration courthouses.

In the wake of ICE and EOIR's 2025 courthouse-arrest policies, ICE sharply increased its civil enforcement activity at immigration courthouses in northern California.[26] The government

---

[22] *See* Operating Policies and Procedures Memorandum (OPPM) 25-06 from Sirce E. Owen, Acting EOIR Director, on "Cancellation of Operating Policies and Procedures Memorandum 23-01" (Jan. 28, 2025), Dkt. No. 107, at 29. Because the designated administrative record for OPPM 25-06 does not include the text of OPPM 25-06 itself, the Court cites to the copy of OPPM 25-06 attached as an exhibit to the declaration of the government's counsel in support of the government's motion to dismiss.

[23] *Id.* at 30

[24] *Id.* at 29.

[25] *Id.* at 30.

[26] *See* Declaration of Graeme Blair, Dkt. No. 173 ¶¶ 13–14 (reporting calculations based on EOIR data that weekly arrests in EOIR courthouses in ICE's San Francisco area of responsibility increased from "very few" before 2025 to "nearly 50" after the implementation of the challenged courthouse-arrest policies). To the extent the government objects to the above-cited portions of the expert declaration of Grame Blair, those objections are overruled. The government argues that Blair is unqualified to provide expert analysis of EOIR data because he "has not worked in the immigration system" or "in roles analyzing immigration policies." But "there is no requirement that an expert be a specialist in a given field, and any lack of particularized expertise goes to the weight accorded to h[is] testimony, not to the admissibility of h[is] opinion as an expert." *Chavez v. S.F. Bay Area Rapid Transit Dist.*, 22-cv-06119, 2024 WL 3092153, at *3 (N.D. Cal. June 21, 2024) (citation modified) (quoting *Marshall v. RS 2018 Float, LLC*, No. 22-35899, 2024 WL

United States District Court
Northern District of California

previously "conceded ... [that] nothing in the record suggests that the arrests have targeted only noncitizens in high-priority groups." *Pablo Sequen VII*, 814 F. Supp. 3d at 1020. And a former immigration judge who sat in San Francisco from September 2021 to September 2025 attested that, after the increase in courthouse arrests, she "noticed a dramatic decline in attendance at master calendar hearings in [her] courtroom."[27]

## II.    ICE waives its 12-hour limit on detention in short-term holding facilities.

When ICE arrests an individual for an alleged immigration violation, it generally places the individual in a holding facility in one of its field offices while ICE processes the individual for long-term detention elsewhere. Because the hold rooms in such facilities "are primarily used for … short-term confinement," ICE previously required its agents to "ensure that … holding facilities are emptied upon the conclusion of daily operations" and instructed that, "[a]bsent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours."[28]

In early 2025, however, ICE began receiving requests from individual field offices to waive the 12-hour limit on hold-room detentions. Many of the requesting field offices explained that, due to ICE's increased enforcement activities after January 2025, there was a nationwide dearth of available long-term detention space for recently arrested noncitizens, necessitating extended stays in short-term hold rooms.[29] Some also attributed the lack of long-term detention

637487, at *1 (9th Cir. Feb. 15, 2024)). As a university professor who has taught and published on the subjects of research design and data analysis, and the co-director of a project that collects and analyzes U.S. government immigration enforcement datasets, Blair has sufficiently established his expertise in data analysis to qualify him for the limited purpose of analyzing EOIR's datasets. And the government offers no method-based objections to Blair's testimony concerning the increase in ICE arrests at immigration courthouses.

[27] Declaration of Shira Levine, Dkt. No. 100 ¶ 6. To the extent the government objects to Levine's testimony concerning her personal observations as to the effect of ICE's increased arrests on noncitizens' attendance at immigration-court proceedings, the objection is overruled.

[28] ICE Office of Enforcement and Removal Operations Directive 11087.2, "Operations of ERO Holding Facilities" (Jan. 31, 2024), Dkt. No. 145, at 13, 18.

[29] *See* Memorandum from the Deputy Field Office Director of ERO Baltimore to Monica Burke, ICE's Assistant Director of Custody Management, "ERO Baltimore Field Office Hold Room – Waiver Request," (Jan. 30, 2025), Dkt. No. 145, at 29; Memorandum from the Acting Field Office Director of ERO New York City to Monica Burke, ICE's Assistant Director of Custody Management, "ERO New York City Field Office Hold Room – Waiver Request" (Feb. 20, 2025),

United States District Court
Northern District of California

space to recently enacted state policies precluding ICE's placement of noncitizen-detainees in state facilities.[30] Other field offices requested waivers so that ICE agents could use their holding facilities to "stage" noncitizens detained in mass-arrest operations for up to 24 hours while those noncitizens were "await[ing] ICE Air Operations … removal flights destined for El Salvador, Guatemala, and Honduras."[31] The field offices therefore requested temporary relief from the 12-hour limit, with most seeking an additional 48 hours to detain noncitizens in hold rooms.[32] ICE granted waivers for field offices in at least five cities.[33]

Based on the volume of these requests, ICE "establishe[d] a streamlined process to submit detention standard waiver requests" in March 2025.[34] The process allowed ICE field offices to request, among other things, "[t]emporary waivers" of standards like the 12-hour limit on hold-

---

Dkt. No. 145, at 40–41; "Detention Contract Management Requests (DCM, Item #233" (Feb. 27, 2025), Dkt. No. 145, at 146; "Detention Contract Management Requests (DCM, Item #307" (Mar. 21, 2025), Dkt. No. 145, at 90.

[30] *See* Memorandum from the Deputy Field Office Director of ERO Baltimore to Monica Burke, ICE's Assistant Director of Custody Management, "ERO Baltimore Field Office Hold Room – Waiver Request," (Jan. 30, 2025), Dkt. No. 145, at 29; "Detention Contract Management Requests (DCM, Item #233" (Feb. 27, 2025), Dkt. No. 145, at 145.

[31] Memorandum from Assistant Director of ICE ERO Field Operations to Monica Burke, ICE's Assistant Director of Custody Management, "Hold Room Waiver Request – HLG, MIA, and SNA," (Feb. 10, 2025), Dkt. No. 145, at 33.

[32] Memorandum from Deputy Field Office Director of ERO Baltimore to Monica Burke, ICE's Assistant Director of Custody Management, "ERO Baltimore Field Office Hold Room – Waiver Request," (Jan. 30, 2025), Dkt. No. 145, at 29; Memorandum from Assistant Director of ICE ERO Field Operations to Monica Burke, ICE's Assistant Director of Custody Management, "Hold Room Waiver Request – HLG, MIA, and SNA," (Feb. 10, 2025), Dkt. No. 145, at 33; Memorandum from the Acting Field Office Director of ERO New York City to Monica Burke, ICE's Assistant Director of Custody Management, "ERO New York City Field Office Hold Room – Waiver Request" (Feb. 20, 2025), Dkt. No. 145, at 41; "Detention Contract Management Requests (DCM, Item #233" (Feb. 27, 2025), Dkt. No. 145, at 145; "Detention Contract Management Requests (DCM, Item #307" (Mar. 21, 2025), Dkt. No. 145, at 90.

[33] E-mail from Monica Burke, ICE's Assistant Director of Custody Management, "RE: ERO BAL Hold Room Waiver" (Feb. 5, 2025), Dkt. No. 145, at 25 (Baltimore); E-mail from Monica Burke, ICE's Assistant Director of Custody Management, "RE: Field Ops Waiver – 12-Hour Hold Room Waiver Request – HLG, MIA, and SNA" (Feb. 10, 2025), Dkt. No. 145, at 31; E-mail from Monica Burke, ICE's Assistant Director of Custody Management, "RE: Requesting waiver of 12 hour hold room directive / self reporting – Exceeding 12 Hours Holding Facility" (Feb. 27, 2025), Dkt. No. 145, at 35.

[34] E-mail to ICE ERO Field Office Directors, Deputy Field Office Directors, and Assistant Field Office Directors, "Detention Standard Waiver Request Submission and Review Process" (Mar. 24, 2025), Dkt. No. 145, at 42.

United States District Court
Northern District of California

room detentions "due to various resource constraints or operational demands."[35] But to ensure "overall compliance with the requirements set forth by ICE national detention standards," ICE required field offices requesting waivers to "provide articulable facts with supporting evidence justifying why a waiver is necessary for the good order of the facility without diminishing service delivery or detention care and custody."[36] ICE also advised that "[r]equests to temporarily waive … hold times must justify what systems will be implemented to ensure good order of the facility while the waiver is in place."[37] And "[f]ield offices [we]re expected to ensure facilities have explored all potential alternative means of compliance prior to submitting a waiver request."[38] Due to ICE's "operational tempo" at the time, however, the agency authorized field offices to detain noncitizens in hold rooms for up to 48 hours without seeking a formal waiver of the usual 12-hour limit, "so long as the practice d[id] NOT exceed 30 days."[39] Pursuant to this waiver-request process, ICE field offices in both Dallas and San Francisco requested waivers of the 12-hour limit on hold-room detentions.[40]

In June 2025, ICE dispensed with its case-by-case evaluation of requests for waivers of the 12-hour limit on hold-room detentions. In its place, the agency issued a blanket waiver of the limit, allowing all field offices nationwide to keep detainees in holding facilities "for up to … 72 hours" or longer in "exceptional circumstances."[41] The memorandum announcing the waiver explained that it was "a result of increased enforcement efforts" that had "significantly increased" the number of individuals in ICE detention and "put additional strain on finding and coordinating

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* at 42.

[40] *See* "Detention Contract Management Requests (DCM, Item #366" (Apr. 17, 2025), Dkt. No. 145, at 71; "Detention Contract Management Requests (DCM, Item #449" (June 4, 2025), Dkt. No. 145, at 45.

[41] Memorandum from Monica S. Burke, ICE's Assistant Director of Custody Management, on "Nationwide Hold Room Waiver" (June 24, 2025), Dkt. No. 145, at 1.

United States District Court
Northern District of California

transfers of aliens to available beds" in long-term detention facilities within 12 hours.[42] The memorandum suggested that "holding aliens in holding facilities beyond the 12-hour limit" was the only way to accommodate the increase in detainees because it "no longer ha[d] the option to discretionarily release aliens" or "decline to take aliens into custody" from other agencies.[43] The 12-hour-detention waiver memo did not address the suitability of short-term hold rooms for overnight or multi-day detention. Nor did the memo discuss any modifications to other policies governing ICE's holding facilities, which "continue to apply" despite the waiver.[44] The waiver went into effect immediately upon issuance of the memo and remains in effect for one year from its issuance.[45] Plaintiffs allege that the 12-hour-detention waiver conflicts with ICE's existing Performance-Based National Detention Standards, which provide that "[n]o detainee shall be confined in a hold room for more than 12 hours."[46]

As a result of the waiver, ICE has held some detainees at 630 Sansome for more than 12 hours, sometimes overnight or for multiple days.[47] Other detainees are held for less than 12 hours.[48] Because the length of an detainee's stay at 630 Sansome depends on the changing availability of beds at long-term detention facilities, they do not know at the outset how long they will remain in the hold rooms.[49]

---

[42] *Id.* at 2.

[43] *Id.*

[44] *Id.*

[45] *Id.* at 1.

[46] PERFORMANCE-BASED NATIONAL DETENTION STANDARDS, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT (2016), Dkt. No. 65-1, § 2.6(II)(2); *see also id.* § 2.6(I), (V)(B).

[47] *See, e.g.*, Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶ 9 (recounting declarant's detention for three days); Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶¶ 3–4 (same).

[48] *See, e.g.*, Declaration of David Rafael Colon Solano, Dkt. No. 71 ¶ 5; Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 4; Declaration of Keymaris Alvarez Miranda, Dkt. No. 76 ¶ 4; Declaration of Yessica Alejandra Malagon Torres, Dkt. No. ¶ 4.

[49] *See* Declaration of Andrew Kaskanlian, Dkt. No. 110 ¶¶ 15–16.

**III.    ICE allegedly deprives detainees at 630 Sansome of adequate hygiene and sanitation, sleep, medical care, and access to counsel.**

ICE's holding facility at 630 Sansome consists of six large cells with a maximum overnight capacity of ten people and three small cells with a maximum overnight capacity of one person each.[50] Each cell contains one or more metal benches, but no permanent beds, and a single toilet and sink that are separated from the rest of the room by a "mid-height privacy wall."[51] Plaintiffs assert that, since the summer of 2025, ICE has created "inhumane" conditions in these cells that "humiliate[] and degrade[]" detainees by treating them like "trash" or "animal[s]."[52] As evidence of these conditions, plaintiffs previously submitted declarations from over a dozen individuals who were detained at 630 Sansome and from five attorneys representing individuals detained there.[53] As the Court has explained, these declarations "document consistently inadequate

---

[50] *Id.* ¶ 9.

[51] *Id.* ¶ 14.

[52] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶¶ 5, 14; Declaration of David Rafael Colon Solano, Dkt. No. 71 ¶ 14; Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶ 5.

[53] Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶¶ 6–11; Declaration of David Rafael Colon Solano, Dkt. No. 71 ¶ 7; Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶¶ 6–10; Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶¶ 5, 12–19; Declaration of Jose Carlos Cordero Pelico, Dkt. No. 74 ¶¶ 5–14; Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶¶ 9–16; Declaration of Keymaris Alvarez Miranda, Dkt. No. 76 ¶ 4; Declaration of Ligia Garcia, Dkt. No. 77 ¶¶ 9–17; Declaration of Martin Hernandez Torres, Dkt. No. 78 ¶¶ 4–27; Declaration of Mayra Mendez, Dkt. No. 79 ¶¶ 12–15; Declaration of Odtman Alfonso Cardenas Castellanos, Dkt. No. 80 ¶¶ 8–12; Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶¶ 8–11; Declaration of Yessica Alejandra Malagon Torres, Dkt. No. 82 ¶¶ 8–9; Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶¶ 6–14; Declaration of Ammy Vargas Baquedando, Dkt. No. 118 ¶¶ 5–13; Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶¶ 4–9; *see also* Declaration of Martha Ruch, Dkt. No. 66 ¶ 23; Declaration of Reena Arya, Dkt. No. 67 ¶¶ 14–15; Declaration of Stephanie Quintero, Dkt. No. 68 ¶¶ 8–9, 13–15; Declaration of Victoria Sun, Dkt. No. 69 ¶ 7; Declaration of Dalia Blevins, Dkt. No. 119 ¶¶ 4–6. The government objects to the Court's consideration of the declarations of attorneys Reena Arya, Stephanie Quintero, Victoria Sun, Marth Ruch, and Dalia Blevins, which the government argues are inadmissible under the Federal Rules of Evidence. But the Court relies on these declarations only in resolving plaintiffs' motion for final class certification. The Ninth Circuit has squarely held that "the 'evidentiary proof' a plaintiff … submit[s] in support of class certification … need not be admissible evidence." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004–05 (9th Cir. 2018). The government also previously objected to the Court's consideration of the declarations of Ammy Vargas Baquedando, Jorge Rivera Larios, and Dalia Blevins because plaintiffs submitted those declarations with their reply brief in support of their motion for provisional class certification. As the Court explained in its order granting that motion, "the government had ample opportunity to respond to the declarations at the hearing" on provisional class certification. *Pablo Sequen VI*, 810 F. Supp. 3d at 1104 n.34. The government has since had several additional months to respond to these declarations. The Court therefore exercises its discretion to consider them.

12

sleeping conditions, unsanitary conditions, lack of basic hygiene resources, substandard medical care, and significant restrictions on attorney-client communications." *Pablo Sequen VI*, 810 F. Supp. 3d at 1105; *see also id.* at 1127–28.

**IV.   Plaintiffs challenge ICE and EOIR's courthouse-arrest policies, ICE's 12-hour-detention waiver, and the conditions of confinement at 630 Sansome.**

Carmen Aracely Pablo Sequen, an asylum-seeker from Guatemala, commenced this action by filing a petition for a writ of habeas corpus after ICE arrested her as she was leaving a routine hearing at the San Francisco immigration court and detained her at 630 Sansome. This Court issued a temporary restraining order, followed by a preliminary injunction, requiring Ms. Pablo Sequen's immediate release and enjoining the government from re-detaining her absent prior notice and a hearing before an immigration judge at which the government demonstrated a valid basis for her detention. *See Pablo Sequen v. Kaiser* ("*Pablo Sequen I*"), 793 F. Supp. 3d 1114, 1121 (N.D. Cal. 2025); *Pablo Sequen v. Kaiser* ("*Pablo Sequen II*"), 800 F. Supp. 3d 998, 1015 (N.D. Cal. 2025).

Ms. Pablo Sequen then amended her complaint, adding Ligia Garcia and Yulisa Alvarado Ambrocio as plaintiffs. Like Ms. Pablo Sequen, Ms. Garcia and Ms. Alvarado Ambrocio are both asylum-seekers. ICE arrested Ms. Garcia as she was leaving a hearing at the San Francisco immigration court. When plaintiffs filed the amended complaint, Ms. Garcia was detained at 630 Sansome. ICE agents attempted to arrest and detain Ms. Alvarado Ambrocio under circumstances similar to those encountered by Ms. Pablo Sequen and Ms. Garcia but refrained from doing so because Ms. Alvarado Ambrocio's nursing infant was with her. ICE suggested at the time, and the government later conceded to the Court, that ICE would likely arrest Ms. Alvarado Ambrocio at her next appearance in immigration court. Both Ms. Garcia and Ms. Alvarado Ambrocio sought individual relief through a habeas corpus petition, and the Court issued a temporary restraining order requiring Ms. Garcia's release followed by a preliminary injunction enjoining the government from re-arresting either plaintiff without demonstrating a valid basis for their detention to an immigration judge. *See Pablo Sequen v. Kaiser* ("*Pablo Sequen III*"), No. 25-CV-06487-PCP, 2025 WL 2691143, at *4 (N.D. Cal. Sept. 19, 2025); *Pablo Sequen v. Albarran*

United States District Court
Northern District of California

13

United States District Court
Northern District of California

("*Pablo Sequen IV*"), 806 F. Supp. 3d 1069, 1093 (N.D. Cal. 2025).

The amended complaint also added a fourth plaintiff, Martin Hernandez Torres, who is no longer a party to this action. Mr. Hernandez Torres is a noncitizen from Mexico whom ICE arrested after a reasonable-fear interview conducted as part of his removal proceedings, which culminated in a final order of removal. At the time plaintiffs filed the amended complaint, Mr. Hernandez Torres was detained at 630 Sansome. Mr. Hernandez Torres did not assert an individual habeas claim and did not seek preliminary relief from custody. After the filing of the amended complaint, the government removed him to Mexico.

In addition to the individual habeas claims, the amended complaint included new claims on behalf of two putative classes.

First, Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio sought to represent a "courthouse-arrest class" consisting of "[a]ll persons who have an immigration court hearing in a proceeding on EOIR's non-detained docket in an immigration courthouse in ICE's San Francisco Area of Responsibility." On behalf of the proposed class, these three plaintiffs challenged ICE and EOIR's 2025 courthouse-arrest guidance as arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act (APA).

Second, Ms. Garcia and Mr. Hernandez Torres sought to represent a "detention class" consisting of "[a]ll persons who are now or will be detained in a holding cell in ICE's San Francisco Field Office" at 630 Sansome. On behalf of the detention class, these two plaintiffs challenged ICE's 12-hour-detention waiver as arbitrary and capricious in violation of the APA and alleged that the conditions of confinement at 630 Sansome violated the First and Fifth Amendments and federal immigration law.

The government moved to sever the additional claims and plaintiffs added to the amended complaint from Ms. Pablo Sequen's original habeas claims, arguing that joinder was improper. The Court concluded that joinder of all claims and plaintiffs was proper but exercised its discretion under Federal Rule of Civil Procedure 21 to sever the individual habeas claims from the class claims. *See Pablo Sequen v. Albarran* ("*Pablo Sequen V*"), 810 F. Supp. 3d 1076, 1081–84 (N.D. Cal. 2025). Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio's habeas claims are

now proceeding in three separate actions. Only the class claims remain in this case.

Plaintiffs moved for, and the Court granted, provisional certification of the courthouse-arrest and detention classes. *See Pablo Sequen v. Albarran* ("*Pablo Sequen VI*"), 810 F. Supp. 3d 1084, 1120–26 (N.D. Cal. 2025). As to the detention class, the Court provisionally certified only Ms. Garcia as a representative because Mr. Hernandez Torres's removal obviated any risk of his future detention at 630 Sansome, such that Mr. Hernandez Torres was no longer a class member. *Id.* at 1124–25.

In the same motion, plaintiffs also requested that the Court (1) preliminarily enjoin ICE from subjecting noncitizens detained at 630 Sansome to unconstitutional conditions of confinement related to sleep, hygiene, sanitation, and medical care and (2) pursuant to § 705 of the APA, stay ICE's 12-hour-detention waiver pending a final judgment in this action. The Court granted plaintiffs' requested preliminary injunction but denied their requested stay. *See id.* at 1126–1134.

Plaintiffs separately moved for a § 705 stay of ICE and EOIR's courthouse-arrest policies pending the final resolution of their APA challenge to those policies. The Court granted that motion and stayed the courthouse-arrest policies within ICE's San Francisco area of responsibility. *See Pablo Sequen v. Albarran* ("*Pablo Sequen VII*"), 814 F. Supp. 3d 1005, 1042 (N.D. Cal. 2025).

The government moved to dismiss plaintiffs' amended complaint for both lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The Court denied that motion in substantial part. *See Pablo Sequen v. Albarran* ("*Pablo Sequen VIII*"), 814 F. Supp. 3d 1042, 1057–62 (N.D. Cal. 2025). But the Court granted the motion as to Mr. Hernandez Torres, concluding that his removal to Mexico rendered his claims moot. *Id.* at 1058.

The government has appealed several of the Court's rulings, including the preliminary injunction concerning Ms. Garcia and Ms. Alvarado Ambrocio's detention, the provisional certification of the courthouse-arrest and detention classes, the preliminary injunction as to the conditions of confinement at 630 Sansome, and the stay of the courthouse-house arrest policies.

15

Notwithstanding those pending appeals, the government has continued to actively litigate this case. For example, several weeks after the Court issued the last of the orders now on appeal and after the government had filed all but one of its pending appeals, the government agreed to a briefing schedule on plaintiff's motions for summary judgment as to their APA claims. And the government moved to stay only one of the Court's orders—the conditions-of-confinement injunction—pending the appeal thereof. The Court denied that motion. *See Pablo Sequen v. Albarran* ("*Pablo Sequen IX*"), 814 F. Supp. 3d 1068, 1072 (N.D. Cal. 2025).

Now before the Court are the plaintiffs' motions for final certification of the courthouse-arrest and detention classes and the parties' cross-motions for partial summary judgment as to plaintiffs' APA claims challenging the courthouse-arrest policies and 12-hour-detention waiver.

## ANALYSIS

### I.     The government's threshold arguments fail.

Before reaching the heart of the parties' motions, the Court must address several threshold arguments raised by the government, all of which fail.[54]

### A.     The government's appeals of the Court's prior orders do not divest the Court of jurisdiction to resolve the instant motions.

As noted above, the government has appealed the Court's prior orders provisionally certifying the courthouse-arrest and detention classes, staying the courthouse-arrest policies, and enjoining the government from subjecting detainees at 630 Sansome to likely unconstitutional conditions of confinement. The government contends that, while these appeals are pending, the Court lacks authority to grant final class certification and summary judgment. The government is wrong.

---

[54] In addition to the arguments addressed below, the government "reserve[s]" its prior arguments that plaintiffs lack standing to pursue any of their constitutional or APA claims, that all such claims are both unripe and moot, and that 8 U.S.C. § 1252(e)(1)(B) bars certification of plaintiffs' proposed classes. But the government does not advance any new arguments concerning these jurisdictional issues, instead relying on the positions set forth in their briefing on plaintiffs' motions for provisional class certification and preliminary relief. The Court has already addressed and rejected those arguments. *See Pablo Sequen VI*, 810 F. Supp. 3d at 1113–15, 1117–1120; *Pablo Sequen VII*, 814 F. Supp. 3d at 1022–23. The Court will not revisit its analysis here.

United States District Court
Northern District of California

To be sure, "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 790 (9th Cir. 2018) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)).[55] But the Ninth Circuit has long held "that an appeal from an order granting or denying [preliminary relief]," like the Court's preliminary-injunction and stay orders, "does not divest the district court of jurisdiction to proceed with the action on the merits—i.e., the merits are not matters 'involved in the appeal.'" *G & M, Inc. v. Newbern*, 488 F.2d 742, 746 (9th Cir. 1973); *see also Plotkin v. Pac. Tel. & Tel. Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982). That is because appeals of such interlocutory orders concern only plaintiffs' *likelihood* of success on the merits based on an underdeveloped factual record, which "may be materially different" from "the fully developed factual record" available when determining *actual* success on the merits. *Melendres v. Arpaio*, 695 F.3d 990, 1003 (9th Cir. 2012) (quoting *Sports Form, Inc. v. United Press Int'l, Inc.,* 686 F.2d 750, 753 (9th Cir. 1982)). Indeed, because the disposition of appeals from orders granting preliminary relief "may provide little guidance as to the appropriate disposition on the merits," the Ninth Circuit "ha[s] repeatedly admonished district courts not to delay [proceedings] to await an interim ruling on a preliminary injunction." *California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018) (quoting *Melendres*, 695 F.3d at 1003).[56]

Recognizing that its appeals of the Court's preliminary-injunction and stay orders do not

---

[55] While courts have often "referred to th[is] 'divestiture rule' as jurisdictional," the Ninth Circuit has explained that it is "a judge made rule" that does not affect "a lower federal court's subject-matter jurisdiction" and is "more accurately characterized as [a] mandatory claim-processing rule[]." *Rodriguez*, 891 F.3d at 790 (citation modified).

[56] Though the government argues otherwise, *Coinbase, Inc. v. Bielski* is not to the contrary. *See* 599 U.S. 736 (2023). There, the Supreme Court held that a district court must stay its proceedings pending an interlocutory appeal of an order denying a motion to compel arbitration pursuant to § 16(a) of the Federal Arbitration Act (FAA). *See id.* at 740. As the Ninth Circuit has since explained, "the issues and briefing presented [in *Coinbase*] concerned only stays in the context of arbitration and the unique aspects of the Federal Arbitration Act. Nearly every paragraph of the *Coinbase* opinion specifically references 'arbitrability' or the provisions of the FAA." *California by & through Harrison v. Express Scripts, Inc.*, 139 F.4th 763, 768 (9th Cir. 2025), *cert. denied sub nom. Express Scripts, Inc. v. California*, 223 L. Ed. 2d 507 (Jan. 12, 2026). Because the Ninth Circuit has "limit[ed] the *Coinbase* holding to the arbitration context," *id.*, that decision offers no guidance as the propriety of a stay in these distinct circumstances.

17

United States District Court
Northern District of California

divest the Court of jurisdiction, the government focuses instead on its appeal of the Court's provisional certification of the courthouse-arrest and detention classes. Because the Rule 23 analysis is the same for provisional and final class certification, *see Mercado v. Noem*, 800 F.Supp.3d 526, 559 (S.D.N.Y. Sept. 17, 2025), the government argues that the issues underlying plaintiffs' requests for final class certification (and permanent class-wide relief) are necessarily "involved in th[at] appeal." *See Griggs*, 459 U.S. at 58. This argument fails for two reasons.

First, the Court's provisional certification of the courthouse-arrest and detention classes was ancillary to its grant of a preliminary injunction and stay. *See Pablo Sequen V*, 810 F.Supp 3d 1084, 1121 (N.D. Cal. 2025) (noting that "provisional class certification" serves the "purpose[] of entering injunctive relief prior to a final ruling on class certification" and that such certification "will dissolve if the injunction does"); *see also Vasquez Perdomo v. Noem*, 148 F.4th 656, 688 n.15 (9th Cir. 2025). In effect, the provisional certification was part of the Court's analysis of plaintiffs' likelihood of success on the merits of their claims. *Dickinson v. Trump*, No. 26-1609, 2026 WL 1133353, at *9 (9th Cir. Apr. 27, 2026) (framing provisional class certification as part of the likelihood-of-success inquiry on review of an order granting preliminary injunctive relief). And as already explained, an appeal concerning a party's likelihood of success on the merits at the preliminary-relief stage "does not divest the trial court of jurisdiction to continue with other phases of the case." *Plotkin*, 688 F.2d at 1293.

Second, in *Melendres*, the Ninth Circuit "applaud[ed] how the district court ha[d] expedited th[e] … case and moved with appropriate speed towards a final disposition" pending a preliminary-injunction appeal that required the Ninth Circuit "to review the district court's decision to certify the plaintiff class." 695 F.3d at 999, 1002. This statement contradicts the government's theory that an interlocutory appeal concerning the class certification underlying preliminary relief divests a district court of jurisdiction to award final class-wide relief.

The government's appeals therefore have not divested the Court of jurisdiction to resolve the parties' motions for final class certification and summary judgment.

### B.    The Court declines to grant a discretionary stay.

The government argues that even if the Court is not required to stay proceedings in this

action, the Court should exercise its discretion to do so. Again, doing so would run counter to the Ninth Circuit's instruction not to await resolution of interlocutory appeals before proceeding to a final disposition in most cases. *See California*, 911 F.3d at 583. And at least three other factors weigh against granting a discretionary stay here.

First, the government waited two months to request a stay. The government's request for a discretionary stay focuses entirely on its appeal of the Court's order provisionally certifying the courthouse-arrest and detention classes. The government filed that appeal on December 23, 2025. Three days later, it filed an emergency motion in this Court to stay the preliminary injunction concerning conditions of confinement at 630 Sansome pending the appeal, but it did not seek to stay further proceedings in this Court. Instead, on January 23, 2026, defendants stipulated to a briefing schedule for the parties' cross-motions for partial summary judgment on plaintiffs' class APA claims, suggesting its willingness to proceed to the final resolution of those claims. Only on February 12, 2026, in its opposition to plaintiffs' subsequent motion for final class certification, did the government reverse course and ask the Court to stay all proceedings in this case. Such a delay weighs against staying this action. *See, e.g.*, *Sec. & Exch. Comm'n v. Sripetch*, No. 20-CV-01864, 2024 WL 4030679, at *4 (S.D. Cal. Sept. 3, 2024) (citing *PersonalWeb Techs., LLC v. Apple Inc.*, 69 F. Supp. 3d 1022, 1030 (N.D. Cal. 2014)).

Second, it is unclear when (or if) the government's appeal will be resolved. As the government recently explained to the Ninth Circuit, its notice of appeal was purely "protective," and the Solicitor General has yet to decide whether to proceed with the appeal. For that reason, the government has not filed an opening brief in its appeal and has requested three extensions of its deadline to do so. If the government decides to pursue its appeal, its opening brief will be filed no sooner than July 21, 2026, six months after it first appealed the provisional class-certification order. A final ruling by the Ninth Circuit may be more than a year away. That uncertainty and delay also counsels against granting a stay. *See Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (explaining that "a stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time" and that, "[g]enerally, stays should not be indefinite in nature").

Third, the government has not "ma[d]e out a clear case of hardship or inequity in being required to go forward," as is required to justify a discretionary stay "if there is even a fair possibility that the stay … will work damage to some one else." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). Here, there is "a fair possibility" that staying proceedings in this action pending the government's appeal "will work damage" to the many noncitizens outside ICE's San Francisco area of responsibility who remain subject to the challenged policies absent vacatur of those policies. *See Pablo Sequen VI*, 814 F. Supp. 3d at 1039–40, 1042 (detailing the irreparable harms inflicted by the policies and limiting relief to ICE's San Francisco area of responsibility). But the government offers only one sentence suggesting hardship, arguing that it "will be harmed absent a stay because [its] law enforcement operations to enforce the immigration laws of the United States would continue to be negatively impacted while their appeal is going." Such a conclusory statement falls far short of the clear showing required by *Landis*.

The government's request for a stay is therefore denied.

### C.    Plaintiffs have standing to pursue nationwide vacatur of the challenged policies.

The government also argues that plaintiffs lack standing to challenge the implementation of the courthouse-arrest policies and 12-hour-detention waiver outside the confines of 630 Sansome.[57] This argument mistakes "the concept of standing," which "asks who has a right to sue," with "the scope of an appropriate remedy." *Suzie's Brewery Co. v. Anheuser-Busch Companies, LLC*, 519 F. Supp. 3d 839, 850 (D. Or. 2021). Standing requires a "personal stake" in the litigation sufficient to create a "case or controversy" within the meaning of Article III of the Constitution. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A plaintiff can establish that personal stake by showing an injury in fact, caused by the defendant, that would likely be redressable by "relief that federal courts are *capable* of granting." *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 958 (9th Cir. 2025) (quoting *Kirola v. City & Cnty. of S.F.*, 860

---

[57] Because plaintiffs' constitutional conditions-of-confinement claims seek relief only related to ICE's holding facility at 630 Sansome, this argument does not apply to those claims.

F.3d 1164, 1176 (9th Cir. 2017)), *cert. dismissed sub nom. Google LLC v. Epic Games, Inc.*, 146 S. Ct. 1051 (2026). As explained in the Court's prior orders, plaintiffs have established such a stake here. *See Pablo Sequen VI*, 810 F. Supp. 3d at 1117–1118; *Pablo Sequen VII*, 814 F. Supp. 3d at 1022. The question of what relief a court ultimately provides—for example, whether an injunction is geographically limited—is a "merits determination" that is "distinct" from standing. *In re Google Play Store*, 147 F.4th at 958. Thus, "despite [the government]'s efforts to cloak it as a jurisdictional issue," the geographically limited nature of plaintiffs' injuries "goes to the scope of the [relief]," not their standing. *Id.* at 957. And for the reasons explained below, the presumptive and proper relief in this APA action is vacatur of the challenged policies.

## II.    The Court grants certification of plaintiffs' proposed classes.

Plaintiffs seek certification of the two classes that the Court provisionally certified in November 2025:

> ***Courthouse-Arrest Class:*** All persons who have an immigration court hearing in a proceeding on EOIR's non-detained docket in an immigration courthouse in ICE's San Francisco Field Office Area of Responsibility.
>
> ***Detention Class:*** All persons who are now or will be detained in a holding cell in ICE's San Francisco Field Office.

All three named plaintiffs propose to represent the courthouse-arrest class, and Ms. Garcia proposes to represent the detention class.

Under Rule 23, plaintiffs seeking to certify a class must first show that they satisfy four "prerequisites":

> (1) the class is so numerous that joinder of all members is impracticable ["numerosity"];
>
> (2) there are questions of law or fact common to the class ["commonality"];
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

Fed. R. Civ. P. 23(a). If these prerequisites are satisfied, plaintiffs must also demonstrate that they satisfy at least one requirement of Rule 23(b). *See Olean Wholesale Grocery Coop., Inc. v. Bumble*

United States District Court
Northern District of California

*Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). Here, plaintiffs seek certification under Rule 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"Before it can certify a class, a district court must conduct a 'rigorous analysis' to ensure that the[se] requirements … are satisfied," and "[p]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 862 (9th Cir. 2025) (first quoting *Olean*, 31 F. 4th at 664; and then quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)). The Court undertook this "full Rule 23 analysis" when resolving plaintiffs' motion for provisional class certification and determined that plaintiffs had satisfied the requirements of Rule 23(a) and (b)(2) for both proposed classes. *Pablo Sequen VI*, 810 F. Supp. 3d at 1121. For the same reasons, the Court now grants final certification of the courthouse-arrest and detention classes.

### A.    Class Definitions

As an initial matter, the Court must determine the scope of the proposed classes. The government does not contest the definition of the proposed detention class. But it argues that the proposed definition of the courthouse-arrest class "[l]acks [c]lear, [w]orkable [b]oundaries." In the government's view, this deficiency requires the Court to deny certification of the courthouse-arrest class without reaching the Rule 23 analysis. The Court disagrees.

First, Rule 23 contains no express requirement that a class have "[c]lear, [w]orkable boundaries." Nor does the government cite any authority suggesting that Rule 23 implicitly requires as much. To the contrary, the Ninth Circuit has rejected the "argument … that identification of class members must be 'administratively feasible,'" holding instead "that there is no free-standing requirement above and beyond the requirements specifically articulated in Rule 23." *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018) (quoting *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017)).

Second, even if Rule 23 imposed a "workability" requirement, the courthouse-arrest class

United States District Court
Northern District of California

definition would satisfy it. The government suggests that the class definition is unclear because it includes the "broad" and undefined phrases "immigration court hearing" and "non-detained docket.'" Even assuming that these phrases are ambiguous, which plaintiffs dispute, that would not make the class definition unworkable. Because plaintiffs seek only prospective relief pursuant to Rule 23(b)(2), there is no current need to identify every person who falls within the courthouse-arrest class, as plaintiffs need not provide notice to class members. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011). Nor will the relief plaintiffs seek on behalf of the courthouse-arrest class ever require the identification of class members. Plaintiffs move to vacate ICE and EOIR's 2025 courthouse-arrest policies under the APA. As discussed in greater detail below, the remedy of vacatur operates on the challenged policy as a whole, "not … [its] application to the individual petitioners." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (citation omitted). Because vacatur invalidates the challenged policies in full, including as to individuals outside the courthouse-arrest class, it obviates the need to identify class members.

The government's remaining arguments about the definition of the courthouse-arrest class do not concern "workability" at all. In essence, the government protests that the class definition sweeps in some noncitizens whom ICE should be able to arrest at immigration courthouses and to whom the Court therefore should not grant relief. That is an argument about the merits of plaintiffs' challenge to the courthouse-arrest policies, not about class certification.[58]

The government's arguments as to the proposed courthouse-arrest class definition fail.

**B.      Rule 23(a)**

Both the proposed courthouse-arrest class and the proposed detention classes satisfy the Rule 23(a) prerequisites.

---

[58] As a merits argument, it fails. Plaintiffs do not challenge ICE and EOIR's authority to authorize civil arrests at immigration courthouses. Rather, they challenge the sufficiency of the reasoning underlying the agencies' 2025 courthouse-arrest policies. That sound reasons may exist to conduct certain civil enforcement actions at immigration courthouses does not bear on whether the specific policies challenged here are arbitrary and capricious. *See Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 688 (9th Cir. 2007) (explaining that courts "must look to [an agency]'s reasoning in making its decision …, and not to other reasons for its decision that [the agency] might marshal before [the court]").

23

### 1.    Numerosity

Plaintiffs have demonstrated that both of their proposed classes are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Determining whether joinder is impracticable "requires examination of the specific facts of each case and imposes no absolute limitations." *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). The Ninth Circuit has held that a proposed class is sufficiently numerous where joinder of all class members "would impose very substantial logistical burdens." *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022). The Ninth Circuit has also "recognized that when … a class's membership changes continually over time, that factor weighs in favor of concluding that joinder of all members is impracticable." *Id.* at 838.

The proposed courthouse-arrest class is sufficiently numerous because joinder of its membership "would impose very substantial logistical burdens." *A.B.*, 30 F.4th at 837. The proposed courthouse-arrest class consists of all noncitizens with upcoming immigration hearings on EOIR's non-detained docket at an immigration courthouse in ICE's San Franciso Area of Responsibility, which covers northern California, Hawai'i, Guam, and Saipan. That group of noncitizens is presumably large in number and is spread across northern California and several Pacific islands. Joining such a group as individual plaintiffs would clearly be logistically impracticable, and the government has not argued otherwise.

The detention class is also sufficiently numerous. That proposed class includes "all persons who are now or will be detained in a holding cell" at 630 Sansome. The membership of the class is both potentially very large in number and, critically, "changes continually over time," which "weighs in favor of concluding that joinder of all members is impracticable." *A.B.*, 30 F.4th at 838. Again, the government has not argued otherwise. Plaintiffs therefore satisfy the numerosity requirement.

### 2.    Commonality

Plaintiffs have also demonstrated commonality. "Commonality mandates there be a common question of law or fact among the class members where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-

24

wide proof." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1198 (9th Cir. 2024) (citation modified). In other words, commonality exists where "the evidence establishes that a common question is capable of class-wide resolution." *Noohi*, 146 F.4th at 863. "To satisfy commonality, even a single common question is enough." *Small*, 122 F.4th at 1198 (citation modified) (quoting *Wal-Mart*, 564 U.S. at 359).

Each of the proposed courthouse-arrest class's APA claims turns on a common question: whether ICE and EOIR's 2025 courthouse-arrest guidance is arbitrary and capricious. The answer to that question "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

The government argues that the proposed courthouse-arrest class lacks commonality because it includes noncitizens "at various stages of the immigration process" whose arrest and detention may be governed by different statutes and some of whom ICE may choose not to arrest. But these differences do not bear on the "common issue, with a common answer, as to whether a sufficiently reasoned explanation was provided" for the policies the courthouse-arrest class seeks to challenge. *Thakur v. Trump*, 787 F. Supp. 3d 955, 1003 (N.D. Cal. 2025), *rev'd in part on other grounds by* No. 25-4249, 2026 WL 1466303 (9th Cir. May 26, 2026). "[E]ither each of the policies" is insufficiently reasoned and "is unlawful as to every [class member] or it is not. That inquiry does not require [the Court] to determine the effect of those policies … upon any individual class member (or class members) or to undertake any other kind of individualized determination." *Parsons v. Ryan*, 754 F,3d 657, 678 (9th Cir. 2014).

The government also argues that the courthouse-arrest class lacks a common question because it includes noncitizens across northern California, Hawai'i, Guam, and Saipan, yet the named plaintiffs "have not proffered any evidence that they have had experience with [ICE and EOIR's] challenged policies at any … courthouse" outside San Francisco. But by their own terms, ICE and EOIR's 2025 courthouse-arrest policies rescind prior limits that had applied to *all* immigration courthouses nationwide. So the policies impact every immigration courthouse in which class members are scheduled to appear and may be arrested. The record reflects that scope: Plaintiffs have submitted multiple declarations from immigration attorneys attesting that ICE

25

began widescale civil enforcement actions at immigration courthouses outside San Francisco in the months after the 2025 courthouse-arrest policies took effect.[59]

At least one common question also underlies the proposed detention class's APA claim challenging ICE's 12-hour-detention waiver—namely, whether that waiver is sufficiently reasoned or whether it is arbitrary and capricious in violation of the APA. And the proposed detention class shares common questions as to whether the policies and practices governing conditions of confinement at 630 Sansome, to which all members of the class have been or will be subjected, are constitutional. For example, plaintiffs' claims challenging the conditions at 630 Sansome relating to sleep, hygiene, and medical care turn on a determination of whether those conditions are punitive in nature. *See Pablo Sequen VI*, 810 F. Supp. 3d at 1128. That inquiry, in turn, asks whether detainees at 630 Sansome are subject to conditions that are motivated by an intent to punish, are similar to or more restrictive than the conditions imposed upon criminal detainees, and serve legitimate government interests. *See Jones v. Blanas*, 393 F.3d 918, 933–34. (9th Cir. 2004). The detention class's conditions-of-confinement claims will thus involve common factual questions concerning the intent and interests underlying ICE's alleged practices of leaving lights in hold cells on at all times and not providing detainees held overnight with mattress pads, pillows, or blankets.[60] The claims also require the resolution of common questions concerning the similarity of such conditions to those in criminal detention settings. "The court's broad … answer

[59] *See* Declaration of Nicole Zanardi, Dkt. No. 33-9 ¶¶ 12–14 (reporting at least 39 civil immigration arrests at the Sacramento immigration court between May 27 and September 19, 2025); Declaration of Sean Lai McMahon, Dkt. No. 99 ¶ 23 (documenting 23 arrests at the Concord immigration court "between late May and the beginning of September); Declaration of Nikolas De Bremaeker, Dkt. No. 33-10 ¶ 13 (discussing arrests at immigration courts across northern California). The government objects to the Court's consideration of these declarations on hearsay grounds. But "in evaluating a motion for class certification, … [t]he court's consideration should not be limited to only admissible evidence." *Sali*, 909 F.3d at 1005.

[60] *See, e.g.*, Declaration of Carmen Aracely Pablo Sequen, Dkt. No. 70 ¶ 6 (describing such conditions in the hold rooms at 630 Sansome); Declaration of Jacqueline Karina Mendoza Nunez, Dkt. No. 72 ¶ 6 (same); Declaration of Jorge Willy Valera Chuquillanqui, Dkt. No. 73 ¶¶ 12, 14 (same); Declaration of Juan Edelmar Alva Alva, Dkt. No. 75 ¶ 9 (same); Declaration of Ligia Garcia, Dkt. No. 77 ¶¶ 14–15 (same); Declaration of Mayra Mendez, Dkt. No. 79 ¶¶ 12–13 (same); Declaration of Paula Andrea Salcedo Aceros, Dkt. No. 81 ¶¶ 8 (same); Declaration of Ismael David Caicedo Ruiz, Dkt. No. 92 ¶¶ 6, 10 (same); Declaration of Jorge Rivera Larios, Dkt. No. 120 ¶¶ 4–5 (same).

United States District Court
Northern District of California

to th[ose] question[s] is 'apt to drive the resolution of the litigation' because it determines whether [p]laintiffs' constitutional rights have been violated and whether an injunction directing [the government] to remedy the constitutional violations is appropriate." *Hernandez v. County of Monterey*, 305 F.R.D. 132, 155 (N.D. Cal. 2015) (quoting *Wal-Mart*, 564 U.S. at 350).

The government asserts that plaintiffs "cannot establish commonality" for the detention class because "experiences at 630 Sansome vary based on individual circumstances." Certainly, the record reflects that some detainees at 630 Sansome are held for fewer than 12 hours and may not be subjected to the full panoply of conditions challenged in this action. But "[p]laintiffs challenge the overall conditions in which they were detained … [and] need not prove that every single class member was subjected to every single adverse condition to establish a custom or practice of unconstitutional conditions." *Aichele v. City of Los Angeles*, 314 F.R.D. 478, 490 (C.D. Cal. 2013). "What all members of the putative class … have in common is their alleged exposure" to "specified [ICE] policies and practices that govern the overall conditions of … confinement," which are unreasoned and unconstitutionally punitive as to all or as to none. *Parsons*, 754 F.3d at 678. Though the challenged waiver and conditions "may ultimately result in different future harm for different [detainees] … every [detainee] suffers exactly the same constitutional injury when he is exposed to a single [facility-]wide [ICE] policy or practice that" is arbitrary and capricious, punitive in nature, or denies access to counsel. *Id.*; *see also Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) ("Differences among the class members with respect to the merits of their actual [experiences] … are simply insufficient to defeat the propriety of class certification"); *Hernandez*, 305 F.R.D. at 156 (finding commonality where "[p]laintiffs have produced adequate evidence of specific system-wide policies and practices exposing inmates to a substantial risk of serious harm, violating their constitutional or statutory rights; and they have clearly defined the class claims").

Plaintiffs have therefore demonstrated commonality for both the proposed courthouse-arrest class and the proposed detention class.

### 3.    Typicality

Plaintiffs have established that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under Rule 23's

27

"permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d at 685. "Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class." *Small*, 122 F.4th at 1201–02. "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* at 1202.

Plaintiffs are typical of the proposed classes for the same reasons they share common questions of law and fact with the classes. *See Wal-Mart*, 564 U.S. at 349 n.2 (noting that, in the context of Rule 23(b)(2) classes, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge"). Each of the plaintiffs declares that, like the members of the proposed classes, they were subject to actual or threatened arrest pursuant to policies that are arbitrary and capricious or were subjected to unconstitutional conditions of confinement resulting from ICE's policies and practices. "The named plaintiffs thus allege the same or a similar injury as the rest of the putative class; they allege that this injury is a result of a course of conduct that is not unique to any of them; and they allege that the injury follows from the course of conduct at the center of the class claims." *Parsons*, 754 F.3d at 685.

The government contends that the existence of some differences among class members and the plaintiffs destroys typicality. The government notes, for example, that Ms. Alvarado Ambrocio has never been arrested at an immigration courthouse yet seeks to represent the courthouse-arrest class. But that does not make Ms. Alvarado Ambrocio atypical. The courthouse-arrest class includes many individuals who have not *yet* been arrested at an immigration courthouse but, like Ms. Alvarado Ambrocio, face a substantial risk of arrest at future removal hearings. In any case, "[i]t does not matter that the named plaintiffs may have in the past suffered varying injuries … Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other or to every class member." *Id.* at 686; *see also Ellis*, 657 F.3d at 985 n. 9 ("Differing factual scenarios resulting in a claim of the same nature as other class members does

28

not defeat typicality.").

As to the courthouse-arrest class, the government also argues that "whether a putative class member should be arrested at a courthouse requires an individualized assessment …, not a common course of conduct suffered uniformly by all members," so "[p]laintiffs cannot represent a cohesive group with aligned injuries or legal claims." This argument either misunderstands or misconstrues the nature of plaintiffs' claims on behalf of the courthouse-arrest class. Plaintiffs do not challenge ICE's decisions to arrest particular noncitizens at immigration courthouses; they challenge the parameters ICE and EOIR have placed (or removed) on ICE's discretion to conduct such arrests. In other words, plaintiffs' claims concern the framework governing ICE's decisionmaking rather than the decisions themselves. Like all members of the proposed courthouse-arrest class, plaintiffs are subject to that overarching framework. That suffices to demonstrate typicality.

### 4.    Adequacy

Plaintiffs have established that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry is addressed by answering two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? If either answer is no, the representative is inadequate." *Small*, 122 F.4th at 1202 (citation modified). To satisfy these criteria, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).

As to the proposed class counsel, plaintiffs assert that counsel has no conflicts with the interests of the class and is competent to vigorously prosecute the action on behalf of the class. The government does not argue otherwise.

For purposes of representing the courthouse-arrest class, Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio all assert that they are members of the class, have no conflicts with the class's interests, and will vigorously prosecute this action on behalf of the class. For purposes of representing the detention class, Ms. Garcia similarly asserts that she is a member of the class,

has no conflicts with the class's interests, and will vigorously prosecute this action on behalf of the class. The Court finds no reason to doubt these representations.

The government insists that plaintiffs are inadequate representatives based on many of the arguments already rejected above or in the Court's prior orders. So it should be little surprise that the arguments fail here too.

First, the government argues that plaintiffs' interests differ from the proposed classes because they do not face the same injuries (i.e., a risk of arrest at an immigration courthouse or detention at 630 Sansome) due to this Court's issuance of preliminary injunctions prohibiting the government from re-detaining plaintiffs without prior notice and a bond hearing. As the Court has previously explained, however:

> The relief granted by this Court is temporary in nature, prohibiting the re-detention of Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio without a pre-detention hearing only "during the pendency of these proceedings." *Pablo Sequen [II]*, 800 F. Supp. 3d at 1015; *Pablo Sequen [IV]*, 806 F. Supp. 3d at 1092–93. … And the preliminary injunctions permit the government to re-detain Ms. Pablo Sequen, Ms. Garcia, and Ms. Alvarado Ambrocio if the government first demonstrates at a bond hearing that they present dangers to the community or flight risks and that such harms cannot be prevented through means other than detention. *See Pablo Sequen [II]*, 800 F. Supp. 3d at 1015; *Pablo Sequen [IV]*, 806 F. Supp. 3d at 1092-93. In that case, as the government conceded …, Ms. Garcia would again be subject to detention at 630 Sansome and the conditions of confinement there. There thus remains a strong possibility that the government will re-detain one of the plaintiffs either after a final judgment in the government's favor or after a bond hearing.

*Pablo Sequen VI*, 810 F. Supp. 3d at 1119. "For that reason," like other members of the proposed classes, "plaintiffs retain a[n] … interest in permanently [vacating]" the courthouse-arrest policies and 12-hour-detention waiver and in "enjoining the allegedly unconstitutional conditions of confinement at 630 Sansome." *Id.*

Next, the government argues that Ms. Alvarado Ambrocio "is not an adequate class representative of the [c]ourthouse [a]rrest [c]lass because she has never been subject to a courthouse arrest." As discussed above, many members of the proposed courthouse-arrest class have not yet been arrested at an immigration courthouse. Such past luck neither obviates their risk

United States District Court
Northern District of California

30

United States District Court
Northern District of California

of future arrest by ICE nor destroys their attendant interest in vacating the 2025 courthouse-arrest policies. That is particularly true for Ms. Alvarado Ambrocio, who escaped arrest at 630 Sansome only because she was accompanied by her nursing infant and whom the government conceded would likely be arrested at her next immigration hearing absent injunctive relief. *See Pablo Sequen IV*, 806 F. Supp. 3d at 1090.

Finally, the government argues that plaintiffs cannot adequately represent members of the courthouse-arrest class "across all of [n]orthern California, Hawai['] i, Guam, and Saipan" because "[t]here is no evidence that [p]laintiffs have ever been to Hawai['] i, Guam, Saipan, or any other facility in [n]orthern California other than 630 Sansome." Plaintiffs need not fly to Honolulu to adequately represent class members who reside there. Because the proposed courthouse-arrest class challenges ICE and EOIR policies that apply with equal force across the United States, plaintiffs' risk of exposure to and interest in vacating the challenged policies is the same as members of the proposed courthouse-arrest class regardless of those class members' locations.

Accordingly, both proposed classes and all proposed class representatives satisfy the Rule 23(a) prerequisites.

### C.    Rule 23(b)(2)

Plaintiffs also satisfy the requirements of Rule 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360; *see also id.* ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (citation modified). "These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688. That is the case here. The putative courthouse-arrest class seeks to vacate ICE and EOIR's 2025 courthouse-arrest policies as to every member of the class. The putative detention class similarly seeks uniform relief regarding ICE's 12-hour-detention waiver and the conditions of confinement at 630 Sansome, where every member of the class is or will be detained.

31

The government's arguments to the contrary are unavailing.

First, the government argues that the Court cannot grant an injunction that would provide relief to each member of the proposed classes because 8 U.S.C. § 1252(f)(1) bars relief as to at least some class members. Section 1252(f)(1) prohibits federal courts other than the Supreme Court from "enjoin[ing] or restrain[ing] the operation of" certain provisions of the Immigration and Nationality Act (INA), including 8 U.S.C. § 1225(b). The government contends that the class-wide relief plaintiffs seek would "enjoin or restrain the operation of" § 1225(b), which mandates the detention of certain noncitizens, by interfering with the government's arrest and detention of noncitizens subject to that subsection. The Court has already rejected this argument, *see Pablo Sequen VI*, 810 F. Supp. 3d at 1116, and has not changed its view. In short, plaintiffs' APA claims on behalf of the proposed classes are not subject to § 1252(f)(1) because that provision applies narrowly to "injunctive relief"—a judicial mandate that governs the conduct of particular persons or parties. *See Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 989–90 (9th Cir. 2025). Relief under the APA operates directly on a challenged policy rather than the parties executing the policy, so it does not constitute "injunctive relief." *See id.* at 990; *Nat'l TPS Alliance v. Noem*, 166 F.4th 739, 759–60 (9th Cir. 2026) ("[S]et-aside relief under § 706 [of the APA] is not barred by 8 U.S.C. § 1252(f)(1)."). While plaintiffs' constitutional conditions-of-confinement claims on behalf of the proposed detention class undisputedly seek injunctive relief, those claims do not seek to "enjoin or restrain the operation of" § 1225(b) because they do not contest the government's interpretation of § 1225(b). *See Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1125–28 (9th Cir.), *cert. granted sub nom. Noem v. Al Otro Lado*, 146 S. Ct. 604 (2025). "Instead, plaintiffs argue that regardless of the statutory authority governing ICE's detention of class members, the conditions at 630 Sansome violate class members' constitutional rights under the First and Fifth Amendments and their statutory right to consult counsel under 8 U.S.C. §§ 1229a and 1362." *Pablo Sequen VI*, 810 F. Supp. 3d at 1116. Thus, § 1252(f)(1) does not apply to any of the proposed class claims.

Second, the government argues that the Court could not craft appropriate class-wide injunctive relief on plaintiffs' due-process claims challenging conditions of confinement because detained noncitizens' constitutional due-process rights vary based on individualized factors,

United States District Court
Northern District of California

including the statutory provisions governing the noncitizen's detention. It is true that individuals' *procedural* due-process rights under the Fifth Amendment may change depending on the statute that governs their detention and the attendant statutory procedures to which they are entitled. *See Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (noting variance in the "procedural protections" required in different situation); *Diaz v. Garland*, 53 F.4th 1189, 1213 (9th Cir. 2022) (similar). But plaintiffs here assert only *substantive* due-process claims concerning the conditions of confinement at 630 Sansome. *See Jones*, 393 F.3d at 931 (explaining that such claims invoke substantive due-process protections). The government offers no authority, and the Court is aware of none, suggesting that substantive due-process rights concerning confinement vary depending on the statutory basis for an individual's detention.

Accordingly, plaintiffs have established that they satisfy all the prerequisites of Rule 23(a) and the requirements of Rule 23(b)(2) with respect to the courthouse-arrest and detention classes. The Court therefore certifies both classes. *See Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 691 (N.D. Cal. 2020). Ms. Pablo Sequen, Ms. Alvarado Ambrocio, and Ms. Garcia shall represent the courthouse-arrest class, and Ms. Garcia shall represent the detention class. Plaintiffs' counsel are appointed as class counsel for both classes.

**III.    The Court grants plaintiffs' motions for partial summary judgment and vacates the challenged policies.**

Plaintiffs challenge ICE and EOIR's 2025 courthouse-arrest policies and ICE's 12-hour-detention waiver under the APA, which "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). With limited exceptions, judicial review under the APA is available for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "A preliminary, procedural, or intermediate agency action ... is subject to review on the review of the final agency action." *Id.* Judicial review is available to any "person suffering legal wrong because of [the] agency action, or adversely affected or aggrieved by [such] action." *Id.* § 702. As relevant here, the APA requires courts to "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." *Id.* § 706(2)(A).

Both plaintiffs and the government move for summary judgment as to plaintiffs' APA claims. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is material if it "might affect the outcome of the suit under the governing law." *Id.* The moving party bears the burden of demonstrating that there is no genuine factual dispute, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and all justifiable inferences of fact must be drawn in the nonmovant's favor, *see Anderson*, 477 U.S. at 255. While courts may not resolve genuine issues of fact at the summary-judgment stage, courts may resolve any purely legal questions. *See N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 772 (9th Cir. 2011).

"It is well-settled in this circuit and others that the filing of cross-motions for summary judgment ... does not vitiate the court's responsibility to determine whether disputed issues of material fact are present." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978)). Instead, "[w]here ... the parties have both filed summary judgment motions," the Court "considers each party's evidence to evaluate whether" a genuine factual dispute exists. *Herrera v. Command Sec. Corp.*, 837 F.3d 979, 985 (9th Cir. 2016) (citation modified).

Here, plaintiffs have established that there are no genuine factual disputes material to their APA claims and that they are entitled to judgment as a matter of law. The Court therefore grants their motions for partial summary judgment, denies the government's countermotions, and vacates the challenged policies.

### A.     The challenged policies are reviewable under the APA.

"In general, there is a strong presumption that Congress intends judicial review of administrative action.'" *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718–19 (9th Cir. 2011) (citation modified). The government nevertheless argues that ICE and EOIR's courthouse-arrest policies and ICE's 12-hour-detention waiver are not reviewable because (1) the challenged

*United States District Court*
*Northern District of California*

policies are not "final agency action," 5 U.S.C. § 704; (2) the challenged policies are "committed to agency discretion by law," *id.* § 701(a)(2); (3) the INA "preclude[s] judicial review" of the challenged policies, *id.* § 701(a)(1); and (4) plaintiffs have other "adequate remed[ies] in court," *id.* § 704. Each argument fails.

**1.      The challenged policies are reviewable "agency action" under § 704.**

Each of the challenged policies constitutes reviewable "agency action" within the meaning of the APA.

***ICE's Courthouse-Arrest Policies.*** The government contends that plaintiffs may not challenge ICE's interim courthouse-arrest policy because it is not "*final* agency action." 5 U.S.C. § 704 (emphasis added). While "[a] preliminary, procedural, or intermediate agency action or ruling [is] not directly reviewable," the APA provides for review of such an interim action "on the review of the final agency action" that supersedes it. 5 U.S.C. § 704. So if ICE's final courthouse-arrest policy is "final agency action," the interim policy is also "subject to review." 5 U.S.C. § 704; *see also Clark v. Busey*, 959 F.2d 808, 811 (9th Cir. 1992).

ICE's final courthouse-arrest policy is unquestionably "final agency action." Agency action is final under the APA "if it both (1) marks the consummation of the agency's decisionmaking process," i.e., is not "of a merely tentative or interlocutory nature," and "(2) is one by which rights or obligations have been determined, or from which legal consequences will flow." *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (citation modified) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). In assessing whether these criteria are satisfied, courts "look to whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party." *Id.* "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Tohono O'odham Nation v. U.S. Dep't of the Interior*, 138 F.4th 1189, 1200 (9th Cir. 2025) (quoting *Franklin*, 505 U.S. at 797).

Here, ICE's final courthouse-arrest policy clearly reflects that the agency has completed its decisionmaking process. The policy "stat[ed] a definitive position" that ICE agents' discretion to

conduct civil arrests at immigration courthouses was no longer subject to any limitations. *S.F. Herring Ass'n*, 946 F.3d at 579. The result of ICE's decisionmaking process "is one that will directly affect the parties," as evidenced by Ms. Pablo Sequen and Ms. Garcia's arrests at immigration court. *Tohono O'odham Nation*, 138 F.4th at 1200 (quoting *Franklin*, 505 U.S. at 797). That the final courthouse-arrest policy had an "immediate effect on [ICE's] day-to-day operations" in authorizing arrests at immigration courthouses across ICE's San Francisco area of responsibility further establishes that the policy is final agency action.[61] *Ctr. for Biological Diversity*, 58 F.4th at 417.

The government suggests that ICE's final courthouse-arrest policy is not "agency action" at all, let alone "final agency action," and instead stems from individual officers' discretionary enforcement decisions. The APA defines "agency action" to "includ[e] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also id.* § 701(b)(2). "This definition 'is meant to cover comprehensively every manner in which an agency may exercise its power." *S.F. Herring Ass'n*, 946 F.3d at 576 (quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). As relevant here, the term "'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4); *see also id.* § 701(b)(2). ICE's challenged policies fall well within this capacious definition—they are written "agency statement[s]" that prospectively "prescribe" ICE's new policy of removing any limits on agents' pursuit of civil enforcement actions in covered courthouses.

Because the final courthouse-arrest policy is a "final agency action," the interim policy is reviewable as the preliminary agency action that preceded it.

***EOIR Courthouse-Arrest Policy.*** The government asserts that "there is no EOIR 'Courthouse Arrest Policy'" subject to APA review. That is, it asserts that EOIR's courthouse-

---

[61] *See* Declaration of Graeme Blair, Dkt. No. 173 ¶¶ 13–14 (reporting that weekly arrests in EOIR courthouses jumped from almost none to "nearly 50" after the implementation of the challenged courthouse-arrest policies).

36

arrest policy "was somehow a non-event under the APA" and is therefore not "agency action." *S.F. Herring Ass'n*, 946 F.3d at 575. In essence, the government's theory is that EOIR's 1996 and 2023 guidance purporting to limit ICE's enforcement activities in immigration courthouses was legally void, such that EOIR's 2025 policy rescinding that guidance does not have any meaningful effect. The government contends that EOIR's 2025 courthouse-arrest policy "merely recognize[s] that EOIR lacks authority to prohibit DHS from conducting civil immigration enforcement actions at or near courthouses." This argument is impossible to square with the APA's definition of a reviewable "rule," which includes "an agency statement … designed to … interpret … law or policy." 5 U.S.C. § 551(4); *see also id.* § 701(b)(2). A written assessment of an agency's authority to take certain action, like EOIR's determination that it lacks statutory or other legal authority to restrict ICE enforcement activities, is such a statement. And the government makes no effort to argue that the EOIR courthouse-arrest policy is not "final," nor could it given the policy's "definitive" nature and "immediate effect" in permitting ICE agents' courthouse arrests. *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025), *cert. granted sub nom. Dep't of Air Force v. Prutehi Guahan*, 224 L. Ed. 2d 174 (Mar. 9, 2026).

*12-Hour-Detention Waiver.* The government argues that the 12-hour-detention waiver is not "final agency action" because it merely confers discretion upon ICE individual field offices to detain noncitizens for up to 72 hours without determining how long to detain any particular noncitizen. But in removing the prior limits on field offices' discretion, the waiver "prescribe[s] … policy" for the agency as a whole with "future effect," constituting agency action. *Prutehi Litekyan*, 128 F.4th at 1107. While the government is correct that the waiver is not the "final step" in the process of determining the precise length of noncitizens' detentions, the waiver is nevertheless "final" within the meaning of the APA because it "mark[s] the consummation of the agency's decisionmaking process" as to the extent of field offices' discretion and "amounts to a definitive statement of [ICE's] position" about the maximum length of detentions in hold rooms. *Id.* at 108 (citation modified).

**2.    The challenged policies are not "committed to agency discretion" within the meaning of § 701(a)(2).**

Under § 701(a)(2) of the APA, judicial review is not available where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The government incorrectly argues that ICE's courthouse-arrest policies and 12-hour-detention waiver fall within this narrow exception.

"[T]he APA's basic presumption of judicial review can only be overcome if there is clear and convincing evidence that Congress intended to preclude judicial review." *Washington v. U.S. Dep't of State*, 996 F.3d 552, 560 (9th Cir. 2021). So "where substantial doubt about the congressional intent exists, th[at] general presumption ... is controlling." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984). Accordingly, "[s]ection 701(a)(2)'s exception for action committed to agency discretion is read 'quite narrowly.'" *Johnson Tr. of Charley E. Johnson Revocable Living Tr. v. United States*, 145 F.4th 1158, 1163 (9th Cir. 2025) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). "[A]gency action is 'committed to agency discretion' only in 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019)). In other words, "judicial review is unavailable when there is 'no law to apply.'" *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). And the Supreme Court "generally limit[s] the exception to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Dep't of Com.*, 588 U.S. at 772 (citation modified).

Here, there is no evidence—let alone clear and convincing evidence—that Congress intended to preclude APA review of the challenged policies. And though the government argues otherwise, this is not one of "one of those rare instances … in which there is truly no law to apply." *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1014 (9th Cir. 2024) (citation modified). To the contrary, as set forth in detail below, well-established principles of APA review guide the Court's analysis of plaintiffs' claims.

***ICE's Courthouse-Arrest Policies.*** The government contends that "the INA … leaves

38

open to ICE's discretion when and where to enforce the INA's detention provisions," such that "there is no meaningful standard by which a court can evaluate the appropriateness of ICE's discretionary choice of public locations" for civil immigration arrests.[62] To be sure, the INA grants ICE wide discretion in deciding the circumstances under which it carries out arrests. *See, e.g.*, 8 U.S.C. § 1226(a) (authorizing ICE to "arrest[]" noncitizens "[o]n a warrant"); *id.* § 1357(a)(5) (authorizing warrantless arrests of noncitizens for suspected immigration offenses if they are "likely to escape before a warrant can be obtained"). But "'[e]ven if a determination is discretionary, it may still be rooted in a set of requirements or standards' that courts can use to assess whether an agency wielded its discretion in a permissible manner." *Jajati*, 102 F.4th at 1017 (quoting *Perez Perez v. Wolf*, 943 F.3d 853, 862–63 (9th Cir. 2019)).

One such source of "law to apply," even in cases "where statutory language grants an agency 'unfettered discretion,'" is "agency practice." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) (quoting *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003)). The Supreme Court explained as much in *INS v. Yueh-Shaio Yang*, another action challenging an agency's exercise of discretion under the INA. *See* 519 U.S. 26, 32 (1996). There, the Supreme Court reasoned that:

> Though the agency's discretion is unfettered at the outset, if it announces and follows … a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion within the meaning of the [APA].

*Id.* (quoting 5 U.S.C. § 706(2)(A)). "This follows because judicial review under the APA concerns not only the particular outcome the agency reaches, but also the process in which the agency

---

[62] Puzzlingly, the government also suggests that ICE's courthouse-arrest policies are committed to agency discretion because "certain provisions [of the INA] *require* ICE to arrest an alien at an immigration courthouse under certain circumstances." The existence of such a statutory mandate would show a lack of agency discretion, not the near-absolute discretion necessary to avoid APA review. This is really an argument that good reasons exist to authorize arrests at immigration courthouses in at least some circumstances. Whatever the argument's merit, the Court cannot consider it because it was not among the reasons ICE and EOIR gave for their actions when issuing the courthouse-arrest policies. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020).

39

engages and the reasoning the agency articulates when it reaches that outcome." *Jajati*, 102 F.4th at 1017. Existing agency practices "provide a benchmark against which to measure whether each agency justified its choice on specious grounds, failed to satisfy the general requirements of reasoned agency decisionmaking, or failed to comply with its own regulations." *Pablo Sequen VI*, 814 F. Supp. 3d at 1027 (citation modified) (quoting *Jajati*, 102 F.4th at 1017).

Here, ICE's prior policy—i.e., its 2021 guidance—provides a meaningful benchmark for judicial review of its 2025 courthouse-arrest policies. Even if ICE's "discretion [wa]s unfettered at the outset," it subsequently "announce[d] and follow[ed] … a general policy" governing "its exercise of discretion" by limiting the circumstances under which agents could conduct civil arrests at immigration courthouses. *See Yueh-Shaio Yang*, 519 U.S. at 31. As detailed below, ICE's 2025 courthouse-arrest policies are "an irrational departure" from, not "an avowed alteration of," that existing practice concerning immigration courthouses. *Id.* That is because the 2025 policies "failed to display a conscious awareness that [they were] rescinding an arrest policy applicable to immigration courts" and therefore "failed to offer even a rudimentary reason" for that departure. *Afr. Comtys. II*, 2026 WL 1382944, at *5. Under these circumstances, the 2025 courthouse-arrest policies are subject to arbitrary-and-capricious review under the APA. *See id.*; *Yueh-Shaio Yang*, 519 U.S. at 31.

***12-Hour-Detention Waiver.*** There is also "law to apply" in reviewing ICE's 12-hour-detention waiver. As just discussed, an agency's own policies and practices can supply "a meaningful standard by which this [C]ourt may review its exercise of discretion." *ASSE Int'l*, 803 F.3d at 1068 (quoting *Spencer Enters.*, 345 F.3d at 688). Here, ICE's longstanding practice of prohibiting hold-room detentions for longer than 12 hours absent exceptional circumstances provides such a standard. That practice predates ICE—the U.S. Immigration and Naturalization Service, ICE's predecessor agency, imposed a 12-hour limit on hold-room detentions in its 2000 national detention standards.[63] ICE's current Performance-Based National Detention Standards

---

[63] INS DETENTION STANDARDS: HOLD ROOMS IN DETENTION FACILITIES, U.S. IMMIGRATION AND NATURALIZATION SERVICE (2000), Dkt. No. 177-2, at 4 ("The maximum aggregate time an individual may be held in a hold room is 12 hours."). Plaintiffs request that the Court take judicial notice of this document, which is publicly available on ICE's website. The government does not

United States District Court
Northern District of California

(PBNDS), which were issued in 2011 and revised in 2016, similarly provide that "[n]o detainee shall be confined in a hold room for more than 12 hours."[64] And the 2024 policy to which the 12-hour-detention waiver applies instructed that, "[a]bsent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours."[65]

The government argues that this longstanding practice, embodied in the still-effective PBNDS, provides no meaningful standard because it conferred discretion on individual field offices to determine the precise length of individual noncitizens' detentions. But as already explained, the fact that an agency's policies or practices confer some discretion does not mean that the limits on that discretion do not supply a standard. *See Pinnacle Armor*, 648 F.3d at 719.

The government also argues that resolving plaintiffs' challenge to the 12-hour-detention waiver would require the Court to determine whether certain executive orders preceding the waiver constitute "exceptional circumstances" that would permit extended hold-room detentions even under ICE's usual practice.[66] "Exceptional circumstances" is not, in the government's view, a meaningful standard. *Cf. Ekimian v. INS.*, 303 F.3d 1153, 1156–59 (9th Cir. 2002) (holding that a requirement of "exceptional situations," without any definition of that phrase, did not supply a sufficiently meaningful standard to enable judicial review). But nothing in the memorandum announcing the waiver suggests that ICE understood the 12-hour-detention waiver to be the

oppose that request. "It is appropriate to take judicial notice of this information, as it was made publicly available by [a] government entit[y] …, and neither party disputes the authenticity of the [document] or the accuracy of the information displayed therein." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

[64] PERFORMANCE-BASED NATIONAL DETENTION STANDARDS, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT (2016), Dkt. No. 65-1, § 2.6(II)(2); *see also id.* § 2.6(I), (V)(B). Plaintiffs filed a copy of the relevant PBNDS provisions in support of their motion to stay the 12-hour-detention waiver, which are also publicly available online, and the government has not objected to the Court's consideration thereof. The Court therefore finds it appropriate to take judicial notice of the PBNDS. *See Daniels-Hall*, 629 F.3d at 998–99.

[65] ICE Office of Enforcement and Removal Operations Directive 11087.2, "Operations of ERO Holding Facilities" (Jan. 31, 2024), Dkt. No. 145, at 18.

[66] As plaintiffs argue, ICE's 2024 policy contains such language, but the PBNDS do not. Still, plaintiffs' motion for partial summary judgment as to the 12-hour-detention waiver concedes that allowing detention longer than 12 hours in exceptional circumstances is "[c]onsistent with the … PBNDS." So for purposes of the parties' cross-motions for summary judgment, the Court treats the PBNDS as authorizing such detention notwithstanding the lack of an express provision to that effect.

41

United States District Court
Northern District of California

product of such circumstances. Though the memorandum noted that ICE's prior policy had authorized hold-room detentions exceeding 12 hours only in "exceptional circumstances," the memorandum did not invoke that language to justify the agency's choice to extend the permissible duration of hold-room detentions.[67] And if it were true that ICE understood the executive orders to constitute "exceptional circumstances" within the meaning of the agency's prior policy, ICE would not have needed to "waive" that policy at all—it would simply have applied the existing exception. Further, to the extent the memorandum announcing the waiver invoked "exceptional circumstances," it did so only to highlight the lack of such circumstances: The memorandum specified that its newly prescribed limit on hold-room detentions applied only "*absent* exceptional circumstances."[68] Because the Court's review of the 12-hour-detention waiver under the APA is limited to the reasons provided at the time that policy was issued, *see Regents*, 591 U.S. at 19, there is no possibility that the Court's review will turn on its application of an exceptional-circumstances standard.

Thus, neither the challenged courthouse-arrest policies nor the 12-hour-detention waiver are "committed to agency discretion" by law within the meaning of § 701(a)(2).

### 3. 8 U.S.C. § 1226(e) does not "preclude judicial review" of plaintiffs' claims.

Section 701(a)(1) of the APA provides that relief from agency action is not available where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The government argues that 8 U.S.C. § 1226(e) "preclude[s] judicial review" of ICE's courthouse-arrest policies because it states that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review" and "[n]o court may set aside any action or decision ... under this section regarding the detention of any alien." But as the Supreme Court has explained, § 1226(e) merely "precludes an alien from challenging a discretionary judgment by the Attorney General or a decision that the Attorney General has made regarding his detention or release." *Jennings v.*

---

[67] Memorandum from Monica S. Burke, ICE's Assistant Director of Custody Management, on "Nationwide Hold Room Waiver" (June 24, 2025), Dkt. No. 145, at 1.

[68] *Id.* (emphasis added).

*Rodriguez*, 583 U.S. 281, 295 (2018) (plurality op.) (citation modified) (quoting *Demore v. Kim*, 538 U.S. 510, 516 (2003)). In other words, "this limitation applies only to discretionary decisions about the application of § 1226 to particular cases," *Nielsen v. Preap*, 586 U.S. 392, 401 (2019) (plurality op.), such as discretionary decisions about whether to release a particular noncitizen whose detention is governed by 8 U.S.C. § 1226(a). But plaintiffs here do not seek review of ICE's discretionary decisions about whether, where, or how to detain noncitizens in "particular cases." *Nielsen*, 586 U.S. at 401. "Rather, they challenge an overarching agency policy as unlawful" under the APA, arguing that ICE acted "*outside* the bounds of its delegated discretion" by failing to engage in the reasoned decisionmaking required by the APA when issuing its courthouse-arrest policies. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 176 (D.D.C. 2015). The Supreme Court has repeatedly held that "§ 1226(e) does not preclude challenges to the statutory framework" governing the extent of an agency's discretion concerning detention. *Jennings*, 583 U.S. at 295 (quoting *Demore*, 538 U.S. at 517) (holding that § 1226(e) did not preclude review of constitutional challenge to provision prohibiting a noncitizen's release on bond pending removal proceedings). Similarly, § 1226(e) does not bar review of plaintiffs' challenge to policies setting the overarching framework within which ICE agents make discretionary detention decisions in particular cases. *See R.I.L-R*, 80 F. Supp. 3d at 177.

### 4.    Plaintiffs have no other adequate remedy in court.

Section 704 limits APA review to agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. But the Supreme Court has emphasized that § 704 "should not be construed to defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Instead, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). Thus, § 704's "other adequate remedy" provision simply means that "[w]here Congress has enacted a special statutory review process for administrative action, that process applies to the exclusion of the APA." *Wilson v. Commissioner*, 705 F.3d 980, 990 (9th Cir. 2013) (citing *Bowen*, 487 U.S. at 903).

The government argues that plaintiffs have other adequate remedies in court for all their APA claims, but it has not identified any other procedures by which plaintiffs could have pursued their challenges to the courthouse-arrest policies or 12-hour-detention waiver.

As to the courthouse-arrest policies, the government suggests in a single sentence that "[p]laintiffs have another remedy available for allegedly unlawful arrests in the form of a habeas [corpus] action." But habeas petitioners may challenge only the fact or duration of confinement. Plaintiffs could not use habeas to challenge the location of their arrests (i.e., at immigration courthouses). The government has repeatedly argued as much in this and other cases.

As to the 12-hour-detention waiver, the government contends that plaintiffs could instead pursue (and have pursued) claims to remedy the unsafe and unhygienic conditions to which the waiver has allegedly given rise at 630 Sansome. Such claims are grounded in broad constitutional protections against punitive civil confinement. Those broad rights are not the sort of "precisely drawn, detailed statute" setting forth "a special … review process" for agency action that might constitute an "adequate remedy" for plaintiffs' APA claims. *See Wilson*, 705 F.3d at 990 (first quoting *Hinck v. United States*, 550 U.S. 501, 506 (2007); and then citing *Bowen*, 487 U.S. at 903). Accordingly, there is no risk that "a legal remedy under the APA would impermissibly provide for duplicative review" of the 12-hour-detention waiver. *Hyatt v. Off. of Mgmt. & Budget*, 908 F.3d 1165, 1173 (9th Cir. 2018) (quoting *City of Oakland v. Lynch*, 798 F.3d 1159, 1165 (9th Cir. 2015)).

The challenged policies are therefore reviewable under the APA.

**B.      Each of the challenged policies is arbitrary and capricious.**

Section 706(2)(A) of the APA authorizes courts to "set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The touchstone of arbitrary and capricious review under the APA is reasoned decisionmaking." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (citation modified). "That means an agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation modified). If "the agency has ... entirely failed

44

to consider an important aspect of the problem," the agency's decisionmaking is insufficiently reasoned. *Id.* at 492 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Important aspects include "the costs as well as the benefits" of the agency action. *State Farm*, 463 U.S. at 54; *cf. Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.").

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). At a minimum, an agency that "changes its existing position" must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). An agency undertaking "policy change" must also provide "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests" stemming from the prior policy. *Id.* at 221–22 (quoting *Fox Television Stations*, 556 U.S. at 515–16). "[A]n unexplained inconsistency in agency policy is a reason for holding [a new action] to be an arbitrary and capricious change from agency practice." *Id.* (citation modified) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

### 1.    ICE's Courthouse-Arrest Policies

As detailed above, ICE issued guidance in 2021 that limited the circumstances in which ICE agents were authorized to conduct civil enforcement actions in or near courthouses, "including immigration courts," because such actions "may chill individuals' access to courthouses" and thereby "impair the fair administration of justice."[69] The 2021 guidance authorized civil arrests at courthouses only where concerns about such chilling effects were outweighed by ICE's "heightened interest in apprehending an individual, either due to increased time pressure (e.g., because a failure to arrest the individual immediately would allow them to

---

[69] Memorandum from Tae Johnson, Acting Director of ICE & Troy Miller, Acting Comm'r of U.S. Customs and Border Protection, on "Civil Immigration Enforcement Actions in or near Courthouses" (Apr. 27, 2021), Dkt. No. 146, at 25–26.

United States District Court
Northern District of California

escape hot pursuit, destroy evidence, threaten national security, or result in imminent violence or self-harm) or because apprehension elsewhere would expose officers to an unacceptable and unavoidable risk (i.e., there was no safe alternative location to arrest a person who threatened public safety)." *Pablo Sequen VII*, 814 F. Supp. 3d at 1029.

ICE's 2025 courthouse-arrest policies rescinded the 2021 guidance.[70] The new policies—which do not specifically address immigration courthouses—created a far more permissive regime for ICE's civil enforcement actions at courthouses. While the policies note that "ICE's civil immigration enforcement actions in or near courthouses" will "[g]enerally" target noncitizens in specified high-priority groups, the policies instruct that ICE agents are "not limited" to arresting those groups and may target other noncitizens.[71] The 2025 policies authorize ICE agents to "conduct civil immigration enforcement actions in or near courthouses" whenever "credible information ... leads them to believe [a] targeted alien[] is or will be present" at a courthouse.[72] And ICE agents may also arrest "[o]ther aliens encountered … in or near a courthouse" while pursuing a predetermined target.[73] Still, the new policies continue to instruct that ICE agents should, "to the extent practicable, … minimize their impact on court proceedings" by conducting arrests "discreetly," "in non-public areas of the courthouse," "in collaboration with court security staff," and using "non-public entrances and exits."[74]

The government spent more than six months arguing to this Court that ICE's 2025 courthouse-arrest policies represented an intentional and reasoned choice to expand arrests at immigration courthouses. The argument was unconvincing. As the Court explained in its order staying the policies, ICE's stated reasons "may be sound as to [*non*-immigration] courthouses," but "there is no 'rational connection between the facts' on which the policies rely" and the expansion of arrests at *immigration* courthouses. *Id.* at 1033 (quoting *All. for the Wild Rockies*, 68

---

[70] ICE Policy No. 11072.3, Dkt. No. 146, at 51.

[71] ICE Policy No. 11072.3, Dkt. No. 146, at 52; ICE Policy No. 11072.4, Dkt. No. 146, at 2.

[72] ICE Policy No. 11072.3, Dkt. No. 146, at 52; ICE Policy No. 11072.4, Dkt. No. 146, at 2.

[73] ICE Policy No. 11072.3, Dkt. No. 146, at 52; ICE Policy No. 11072.4, Dkt. No. 146, at 2.

[74] ICE Policy No. 11072.3, Dkt. No. 146, at 52; ICE Policy No. 11072.4, Dkt. No. 146, at 2.

F.4th at 493). For example, the policies reason that other "law enforcement agencies routinely engage in enforcement activities in or near courthouses" against individuals who appear in a courthouse for "criminal or civil violations" that are "unrelated" to the offense for which the authorities seek to arrest them."[75] "That analogy does not make sense with respect to civil enforcement actions at immigration courts, where ICE is not arresting individuals who appear for criminal or civil violations 'unrelated' to the arrest but instead arresting noncitizens based on the very immigration offenses for which the noncitizens are appearing in immigration court." *Id.* The policies also cite a need to "reduce safety risks," [76] yet they fail to explain how public safety is improved by unfettered arrests at immigration courthouses of the many noncitizens whom ICE has determined do *not* endanger public safety. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017) (noting that ICE's release of a noncitizen pending removal proceedings "reflects a determination … that the noncitizen is not a danger to the community"), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). And the policies reason that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE, including when such jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE custody."[77] "That reasoning applies only to noncitizens who are taken into state or local authorities' custody—that is, to noncitizens arrested for or convicted of criminal activity" in state or local court. *Pablo Sequen VII*, 814 F. Supp. 3d at 1034.

It is now clear that the lack of connection between ICE's stated rationales for the 2025 courthouse-arrest policies and the expansion of arrests at immigration courthouses results not from merely *unreasoned* decisionmaking but a complete *lack* of decisionmaking. As the government recently revealed, contrary to its prior representations, ICE's 2025 courthouse-arrest policies do not cover immigration courthouses at all.[78] Thus, the 2025 policies rescind the 2021 guidance's

---

[75] ICE Policy No. 11072.3, Dkt. No. 146, at 51; ICE Policy No. 11072.4, Dkt. No. 146, at 1.

[76] ICE Policy No. 11072.3, Dkt. No. 146, at 51; ICE Policy No. 11072.4, Dkt. No. 146, at 1.

[77] ICE Policy No. 11072.3, Dkt. No. 146, at 51; ICE Policy No. 11072.4, Dkt. No. 146, at 1.

[78] E-mail memorandum from Liana J. Castano, Assistant Director of Field Operations for ICE Enforcement and Removal Operations (ERO), to all ERO personnel (Mar. 19, 2025), Dkt. No.

express restrictions on immigration-courthouse arrests without providing any replacement, leaving no restrictions whatsoever on ICE agents' civil enforcement actions at immigration courthouses. Even the scant limitations imposed by the 2025 policies on ICE's actions at other courthouses—like the instruction for ICE agents to "minimize their impact on court proceedings"—have no application to immigration courthouses.

As applied to arrests at immigration courthouses, ICE's 2025 courthouse-arrest policies are arbitrary and capricious for three overlapping reasons.

First, ICE failed to "at least 'display awareness that it [wa]s changing position'" with respect to arrests at immigration courthouses. *Encino Motorcars*, 579 U.S. at 221 (quoting *Fox Television Stations*, 556 U.S. at 515). Nothing on the face of ICE's 2025 courthouse-arrest policies or in the administrative record suggests that ICE recognized it was removing all prior limitations on civil enforcement activities at immigration courthouses without any substitute guidance. Indeed, the 2025 courthouse-arrest policies do not mention immigration courthouses at all. And for more than a year after the rescission of the 2021 guidance, ICE itself represented to its DOJ counsel that the 2025 courthouse-arrest policies apply to immigration courthouses, suggesting that ICE only belatedly realized the scope of the change it had effected.[79] Such an unacknowledged change in policy necessarily violates the APA's dictates. *See Fox Television Stations*, 556 U.S. at 515 ("An agency may not … depart from a prior policy *sub silentio*…").

Second, ICE's new policies "disregard[] facts and circumstances that underlay … the prior policy"—namely, the 2021 guidance's concerns about the impact of widespread arrests on the functioning of immigration courts—without the requisite "reasoned explanation." *See id.* at 516. Again, the 2025 policies entirely fail to address immigration courts despite rescinding the guidance that previously limited civil enforcement activities there.

Third, and similarly, ICE's 2025 courthouse-arrest policies make no attempt to

---

195, at 7; Letter from Tomoko Onozawa and Jeffrey Oestericher, Assistant United States Attorneys, to the Honorable Kevin P. Castel (Mar. 24, 2026), Dkt. No. 195, at 4.

[79] *See* Letter from Tomoko Onozawa and Jeffrey Oestericher, Assistant United States Attorneys, to the Honorable Kevin P. Castel (Mar. 24, 2026), Dkt. No. 195-1, at 1–2.

48

United States District Court
Northern District of California

"articulate[] a satisfactory explanation" for the agency's new approach to civil arrests at immigration courthouses. *All. for the Wild Rockies*, 68 F.4th at 493 (citation modified). As the court in *African Communities* explained, the policies "offer[] no explanation of why the exercise of unfettered discretion by ICE officers with no guidance whatsoever [i]s a better option for civil enforcement actions in or near immigration courthouses than the … 2021 [guidance] or even the 2025 [p]olicies as applied to courthouses other than immigration courthouses." *Afr. Cmtys. II*, 2026 WL 1382944, at *6. Because ICE's 2025 courthouse-arrest policies "fail[] to 'show that there are good reasons for the new [approach],'" and because the Court cannot reasonably discern such reasons, the policies are arbitrary and capricious. *Id.* (first quoting *Encino Motorcars*, 579 US. at 221; and then quoting *Fox Television Stations*, 556 U.S. at 513–14).

For the avoidance of doubt, simply extending the 2025 courthouse-arrest policies to cover immigration courthouses would not cure those policies' fatal defects. As the Court has previously detailed, the policies entirely fail to address the chilling effect of courthouse arrests on noncitizens' attendance at court proceedings, which is both a critical factor underlying ICE's 2021 guidance and an "important aspect of the problem" in its own right. *See Pablo Sequen VII*, 814 F. Supp. 3d at 1030–33 (quoting *Nat'l Urb. League v. Ross*, 977 F.3d 770, 777 (9th Cir. 2020)). And even if the 2025 policies applied to immigration courts, ICE's stated rationales for those policies do not logically explain the expansion of civil arrests at immigration courthouses for the reasons noted above. But because the government now concedes that the 2025 policies rescinded the prior limits on immigration courthouse arrests without providing any reasoning whatsoever in support of that specific rescission, the 2025 policies fail APA review for an even more fundamental reason.

In sum, ICE's 2025 courthouse-arrest policies are devoid of rational explanation for (or even acknowledgement of) the agency's choices (1) to remove its earlier restrictions on civil arrests at immigration courthouses and (2) not to extend the new policies' limitations to immigration courthouses. The 2025 courthouse-arrest policies thus fall far short of the reasoned decisionmaking required by the APA and are "arbitrary" and "capricious" within the meaning of

§ 706(2)(A).[80]

### 2.    EOIR's Courthouse-Arrest Policies

Before 2025, EOIR also limited civil arrests at its immigration courthouses. After forbidding most civil arrests in immigration courtrooms in 1996,[81] EOIR expanded the restriction on civil arrests in 2023 to cover all spaces where immigration-court business took place.[82] EOIR's 2023 guidance explained that civil enforcement actions at immigration courthouses would have a "chilling effect" that "would disincentivize noncitizens from appearing for their hearings, which in turn would create inefficiencies for all parties involved and hinder the ability of [the Office of the Chief Immigration Judge] to carry out the mission of the agency."[83] Such actions could also, the guidance reasoned, "create safety risks for those who may be present during such enforcement actions, including children and adults appearing for hearings."[84] Finally, the 2023 guidance reasoned that limiting ICE arrests at immigration courthouses would "reinforce the separate and distinct roles of DHS," including ICE, "and [EOIR]."[85] EOIR therefore permitted civil immigration arrests at or near its courthouses only in the limited circumstances outlined by ICE's 2021 guidance.[86]

EOIR issued its new policy on the heels of ICE's interim 2025 courthouse-arrest policy.[87] EOIR stated that its earlier guidance had primarily stemmed from ICE's since-revoked 2021 guidance. According to EOIR, the rescission of ICE's 2021 guidance meant there was "no longer a basis to maintain" EOIR's 2023 guidance because EOIR "lacks the authority to prohibit

---

[80] Because the Court concludes that ICE's 2025 courthouse-arrest policies are arbitrary and capricious on these bases, it need not address plaintiffs' additional argument that ICE failed to address "serious reliance interests." *Encino Motorcars*, 579 U.S. at 222.

[81] OPPM 96-6, Dkt. No. 163, at 4.

[82] *See* OPPM 23-01, Dkt. No. 163, at 1–2.

[83] *Id.* at 2.

[84] *Id.*

[85] *Id.*

[86] *Id.* at 2–3.

[87] *See* OPPM 25-06, Dkt. No. 107, at 29.

[ICE] from conducting any action it is otherwise lawfully authorized to take."[88] The new policy also reasoned that the prior guidance's concerns about a "vague, unspecified 'chilling effect'" or "disincentiviz[ing]" appearances at removal hearings was unsupported by data and "contrary to logic" because "aliens with valid claims to legal immigration status ... ha[ve] no reason to fear any enforcement action by DHS."[89] As evidence, EOIR noted that many noncitizens failed to appear for hearings despite protections against courthouse arrests, suggesting that nonattendance resulted from other factors.[90] The new policy further stated that the 2023 guidance's safety concerns were illogical because the 2023 guidance permitted courthouse arrests in several circumstances that appeared to pose greater-than-average safety risks (e.g., in cases involving an "imminent risk of death, violence, or physical harm").[91] Finally, EOIR reasoned that the 2023 guidance's desire to "reinforce the separate and distinct roles" of DHS and EOIR "in the eyes of the public" was misguided. That was because, EOIR believed, the distinction had already been blurred by EOIR's frequent interference with DHS's prosecutorial functions when administratively closing cases or identifying candidates for DHS's exercise of prosecutorial discretion.[92] EOIR's new courthouse-arrest policy therefore rescinded the agency's 2023 guidance in full.

EOIR's 2025 courthouse-arrest policy is arbitrary and capricious for three reasons. First, it is based on a false premise. Second, even crediting EOIR's assumptions, the policy fails to provide a rational explanation for its removal of all prior limits on civil enforcement actions at EOIR's immigration courthouses. Third, it disregards at least one key factor underlying EOIR's 2023 guidance without reason.[93]

---

[88] *Id.* at 29–30.

[89] *Id.*

[90] *Id.* at 30.

[91] *Id.*

[92] *Id.*

[93] As with the challenge to ICE's courthouse-arrest policies, the Court need not address plaintiffs' arguments concerning EOIR's failure to consider reliance interests because it concludes that EOIR's courthouse-arrest policy is arbitrary and capricious on these grounds alone.

### a. EOIR's 2025 courthouse-arrest policy is based on a false premise.

The primary rationale provided for EOIR's 2025 courthouse-arrest policy was that "EOIR lacks the authority to prohibit [ICE] from conducting any action it is otherwise lawfully authorized to take," and the rescission of ICE's 2021 guidance left "no ... basis" for EOIR's prior restrictions on arrests at its immigration courthouses.[94] Plaintiffs argue that EOIR's assessment of its own legal authority (or lack thereof) is incorrect and that EOIR's new policy therefore lacks a reasoned basis. But the Court need not resolve this dispute.[95] Even if EOIR is correct that it lacks authority to restrict enforcement activities in its own courthouses, EOIR's new policy is arbitrary and capricious because it is based on the false premise that ICE had validly rescinded its 2021 guidance. As discussed above, ICE's new policies rescinding its 2021 guidance are arbitrary and capricious, and as detailed below, those policies must be vacated. The result is that one of the core assumptions underlying EOIR's own 2025 courthouse-arrest policy—i.e., that ICE's rescission of its 2021 guidance left "no … basis to maintain" EOIR's prior restrictions on immigration-courthouse arrests—was wrong.[96] Agency action premised on "the incorrect assumption that it is compelled by" other executive-branch action "stands on a faulty legal premise" and "is arbitrary and capricious." *Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) (citation modified).

---

[94] *Id.* at 30.

[95] The Court notes that plaintiffs appear to have the better argument. Apart from a general citation to the entirety of Title 8 of the United States code, neither EOIR's 2025 courthouse-arrest policy nor the government's brief point to any authority suggesting that EOIR lacks power to regulate ICE's civil enforcement activity in immigration courthouses. Conversely, plaintiffs have identified substantial authority suggesting that EOIR's assessment is legally incorrect. By statute, EOIR sits within the Department of Justice and "shall be subject to the direction and regulation of the Attorney General under section 1103(g) of Title 8." 6 U.S.C. § 521(a). Section 1103(g), in turn, grants the Attorney General authority to "establish such regulations ... as the Attorney General determines to be necessary" with respect to EOIR. 8 U.S.C. § 1103(g)(2). Pursuant to that broad statutory grant of authority, the Department of Justice has promulgated regulations empowering EOIR's director to "[i]ssue operational instructions and policy" for the office and to "[p]rovide for appropriate administrative coordination ... with the Department of Homeland Security," including ICE. 8 C.F.R. § 1003.0(b)(1)(i), (iii). And as a general matter, "[t]he head of an Executive department" like the Attorney General "may prescribe regulations for the government of his department," including "the custody, use, and preservation of its ... property." 5 U.S.C. § 301.

[96] *See* OPPM 25-06, Dkt. No. 107, at 29.

52

**b.    EOIR failed to understand the scope of its discretion even under its own view of the relevant circumstances.**

Even if EOIR's understanding of the relevant circumstances had been correct, its 2025 courthouse-arrest policy would be arbitrary and capricious because the agency failed to appreciate the scope of its own discretion in responding to the perceived illegality of its 2023 guidance. As the Supreme Court explained in *Regents*, "deciding how best to address a finding of illegality … can involve important policy choices[.]" 591 U.S. at 25. Where an agency does not "appreciate the full scope of [its] discretion" in addressing the illegality of a prior policy and therefore fails to provide a reasoned explanation for choosing one solution over other available options, the agency's decision is arbitrary and capricious. *Id.* at 26–28. Of course, an agency need not expressly consider *every* option that falls within its discretion. But at a minimum, it "must consider the 'alternatives' that are 'within the ambit of the existing policy." *Id.* at 30 (quoting *State Farm*, 463 U.S. at 42).

Here, as plaintiffs argue, EOIR's 2025 courthouse-arrest policy fails to recognize the extent of the agency's discretion under its own view of the relevant law. Three factors informed EOIR's understanding of its own discretion. The first was EOIR's belief that it lacks authority to place independent limits on ICE's enforcement activities in immigration courthouses.[97] The second was that ICE had validly rescinded the 2021 guidance on which EOIR had based the contours of its own 2023 guidance.[98] And the third was that, in the place of ICE's 2021 guidance, ICE had issued a new 2025 policy that applied to immigration courthouses and authorized arrests in a wider (but not unlimited) set of circumstances.[99] (ICE only later clarified that its 2025 courthouse-arrest policy does not apply to immigration courthouses.) Thus, EOIR's understanding

---

[97] OPPM 25-06, Dkt. No. 107, at 30.

[98] *See id.* at 29.

[99] *See id.* (explaining that ICE's 2025 policy "does not impose a *blanket* restriction on civil immigration enforcement actions" and thereby suggesting that ICE's 2025 policy instead imposes narrower restrictions on such actions (emphasis added)); *see also* Defendants' Counter-Motion and Opposition to Plaintiffs' Motion for Summary Judgment – Courthouse Enforcement Actions, Dkt. No. 186, at 13 (counsel for EOIR referring to the challenged ICE policies as "ICE's guidance to conduct widespread civil arrests at immigration courthouses" more than a year after EOIR issued its 2025 courthouse-arrest policy).

at the time it issued its 2025 policy was that ICE continued to limit civil enforcement actions at immigration courthouses to some degree—e.g., by requiring that ICE agents conduct such actions only if they had "credible information" that a "targeted alien[] is or will be present" at the courthouse[100]—and that EOIR had no authority to impose independent limits.

Based on this understanding, EOIR concluded that there was "no basis to retain" *any* of its past restrictions on ICE's civil enforcement activities at immigration courthouses.[101] But lifting all of the limitations imposed by EOIR's 2023 guidance was not the only way to bring the agency back within its self-understood bounds. EOIR might instead have permitted civil immigration arrests at its courthouses under the same circumstances it believed ICE's 2025 courthouse-arrest policies permitted such arrests—for example, only when ICE agents had credible information that a targeted alien would be present. Doing so would comport both with EOIR's understanding of the limits placed on immigration-courthouse arrests by ICE's new policy and EOIR's view that it lacked authority to impose independent limits beyond ICE's policy. And such an approach was "within the ambit" of EOIR's existing 2023 guidance, *Regents*, 591 U.S. at 30 (citation modified), which itself had adopted the limits prescribed by ICE at the time the 2023 guidance took effect.[102]

Under EOIR's own view of the relevant circumstances, EOIR was free either to withdraw all limits on civil enforcement actions at immigration courthouses or to retain those limits it understood ICE to have retained. But EOIR was not free to take the former course "without any consideration whatsoever" of the latter. *Id.* (quoting *State Farm*, 463 U.S. at 51). EOIR's failure to recognize and explain its choice not to adopt an alternative approach that was within the ambit of its prior guidance "alone renders [its] decision arbitrary and capricious." *Id.*

#### c.    EOIR failed to address a key concern of its prior policy.

EOIR's 2025 courthouse-arrest policy is also arbitrary and capricious because it fails to provide "a reasoned explanation ... for disregarding facts and circumstances that underlay ... [the

---

[100] ICE Policy No. 11072.3, Dkt. No. 146, at 52.

[101] OPPM, Dkt. No. 107, at 30.

[102] *See* OPPM 23-01, Dkt. No. 163, at 2.

United States District Court
Northern District of California

agency's] prior policy." *Fox Television Stations*, 556 U.S. at 516. Specifically, EOIR's new policy fails to articulate a rational basis for rejecting the 2023 guidance's concerns about chilling or otherwise disincentivizing attendance at removal hearings.

EOIR's new policy dismisses concerns about a "chilling effect" as "vague" and "contrary to logic" because noncitizens with meritorious immigration claims have no reason to fear arrest at a courthouse.[103] To the extent the new policy contends that such individuals face no possibility of arrest, ICE's policies make clear that this is not the case, as nothing in the policies exempts individuals with meritorious claims from arrest. To the extent the policy suggests that individuals with meritorious claims should not fear arrest because they will ultimately be released either after a bond hearing or upon the successful adjudication of their applications for relief, that suggestion presumes that noncitizens know whether or not they have valid immigration claims *before* deciding whether to attend their removal hearings—in other words, before any immigration judge has ever adjudicated their claims. EOIR's policy offers no reason to conclude that noncitizens would not be dissuaded by the threat of arrest—potentially resulting in a loss of physical liberty and all the consequent harms for the duration of their removal proceedings, *see Garro Pinchi v. Noem*, 813 F.Supp.3d 973, 1032–34, 1035–36 (N.D. Cal. 2025)—merely because they believe their as-yet-unadjudicated claims to be meritorious.

Further, even if it were true that widespread arrests at immigration courthouses would not deter noncitizens with meritorious claims from attending removal proceedings, EOIR tacitly concedes that such arrests *will* disincentivize attendance by other noncitizens. The proper functioning of the immigration system depends on such noncitizens attending their scheduled removal proceedings. That is why, as the Supreme Court has recognized, "ensuring the appearance of aliens at future immigration proceedings" is one of two primary goals of the INA and its implementing regulations. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also* 8 U.S.C. § 1226(c)(4); 8 C.F.R. §§ 212.5(b), 236.1(c)(8), 1003.19(h)(3), 1236.1(c)(8). Thus, the chilling effect of courthouse arrests could undermine the proper enforcement of immigration laws even if it

---

[103] OPPM 25-06, Dkt. No. 107, at 29.

United States District Court
Northern District of California

affected only noncitizens likely to be removed at the end of the process. Though that concern motivated EOIR's 2023 guidance,[104] there is no evidence that EOIR considered it when issuing its 2025 courthouse-arrest policy.

EOIR's new policy also reasons that no evidence supports the existence of any chilling effect because many noncitizens failed to appear in immigration court even when such arrests were not taking place.[105] This is a non sequitur. Multiple factors could independently affect noncitizens' participation in removal proceedings. The fact that some noncitizens fail to appear for reasons other than a fear of being arrested at the courthouse does not suggest that the possibility of arrest could not also impact attendance. Neither EOIR's 2025 courthouse-arrest policy nor the administrative record before the Court provide a reason to think otherwise.

Both of the new policy's attempts to provide a "reasoned explanation" for rejecting the prior policy's concerns about chilling effects thus fail. *See Fox Television Stations*, 556 U.S. at 515. While the government offers additional criticisms of the prior policy's approach in its briefing before this Court, the Court cannot consider such *post hoc* rationalizations. *See Regents*, 591 U.S. at 19.

Plaintiffs also argue that EOIR's 2025 policy irrationally disregarded two other concerns underlying the 2023 guidance: (1) the safety risks attendant to courthouse arrests and (2) the need to maintain public perceptions of the separation between EOIR's adjudicatory functions and DHS's investigative and prosecutorial functions. These arguments fail for the reasons already explained in the Court's order granting a preliminary stay of the 2025 policy. *See Pablo Sequen VII*, 814 F. Supp. 3d at 1038–39. In short, as to safety risks, EOIR's new policy reasons the 2023 guidance's approach was irrational because it permitted courthouse arrests in *less* dangerous circumstances while allowing arrests in *more* dangerous circumstances, such as where an arrestee posed a national security threat. And the new policy rejects the 2023 guidance's concerns about

---

[104] *See* OPPM 23-01, Dkt. No. 163, at 2 ("[P]ermitting enforcement actions in or near OCIJ space would disincentivize noncitizens from appearing for their hearings, which in turn would create inefficiencies for all parties involved and hinder the ability of OCIJ to carry out the mission of the agency.")

[105] OPPM 25-06, Dkt. No. 107, at 30.

distinguishing EOIR and DHS because, in EOIR's view, other circumstances have already destroyed any meaningful distinction between the two agencies' roles in the public eye. These explanations are at least rational. While plaintiffs may prefer the 2023 guidance's approach, it is not the Court's role under the APA to assess whether an agency's decision "is the best one possible or even whether it is better than the alternatives." *See Cal. Pub. Utilities Comm'n v. FERC*, 879 F.3d 966, 973 (9th Cir. 2018).

Still, EOIR's failure to provide a reasoned explanation for rejecting the 2023 guidance's concerns about chilling effects and access to justice independently renders EOIR's 2025 courthouse-arrest policy arbitrary and capricious.

### 3.     ICE's 12-Hour-Detention Waiver

Before 2025, ICE required agents to ensure that the short-term holding rooms in ICE field offices were "emptied upon the conclusion of daily operations" and, "[a]bsent exceptional circumstances," to not detain any noncitizen "in a holding facility for longer than 12 hours."[106] But after the rapid uptick in arrests for alleged immigration offenses in January 2025, ICE began granting waivers of that policy for individual field offices upon request, allowing detention in hold rooms for up to 48 additional hours.[107] ICE then "establishe[d] a streamlined process to submit detention standard waiver requests" in March 2025, which required requesting field offices to

---

[106] ICE Directive 11087.2, Dkt. No. 145, at 13, 18.

[107] Memorandum from Deputy Field Office Director of ERO Baltimore to Monica Burke, ICE's Assistant Director of Custody Management, "ERO Baltimore Field Office Hold Room – Waiver Request," (Jan. 30, 2025), Dkt. No. 145, at 29; Memorandum from Assistant Director of ICE ERO Field Operations to Monica Burke, ICE's Assistant Director of Custody Management, "Hold Room Waiver Request – HLG, MIA, and SNA," (Feb. 10, 2025), Dkt. No. 145, at 33; Memorandum from the Acting Field Office Director of ERO New York City to Monica Burke, ICE's Assistant Director of Custody Management, "ERO New York City Field Office Hold Room – Waiver Request" (Feb. 20, 2025), Dkt. No. 145, at 41; "Detention Contract Management Requests (DCM, Item #233)" (Feb. 27, 2025), Dkt. No. 145, at 145; "Detention Contract Management Requests (DCM, Item #307)" (Mar. 21, 2025), Dkt. No. 145, at 90; E-mail from Monica Burke, ICE's Assistant Director of Custody Management, "RE: ERO BAL Hold Room Waiver" (Feb. 5, 2025), Dkt. No. 145, at 25 (Baltimore); E-mail from Monica Burke, ICE's Assistant Director of Custody Management, "RE: Field Ops Waiver – 12-Hour Hold Room Waiver Request – HLG, MIA, and SNA" (Feb. 10, 2025), Dkt. No. 145, at 31; E-mail from Monica Burke, ICE's Assistant Director of Custody Management, "RE: Requesting waiver of 12 hour hold room directive / self reporting – Exceeding 12 Hours Holding Facility" (Feb. 27, 2025), Dkt. No. 145, at 35.

"provide articulable facts with supporting evidence justifying why a waiver is necessary for the good order of the facility without diminishing service delivery or detention care and custody," "justify what systems will be implemented to ensure good order of the facility while the waiver is in place," and "ensure facilities have explored all potential alternative means of compliance prior to submitting a waiver request."[108] ICE also permitted individual field offices to extend the duration of hold-room detentions for up to 48 hours "so long as the practice d[id] NOT exceed 30 days" at that field office.[109]

In June 2025, ICE replaced its case-by-case process for evaluating waiver requests with a blanket, nationwide waiver of the 12-hour limit on hold-room detentions. This 12-hour-detention waiver allows all ICE field offices to keep detainees in holding facilities "for up to … 72 hours" or longer in "exceptional circumstances."[110] ICE justified the waiver as "a result of increased enforcement efforts" that had "significantly increased" the number of individuals in ICE detention and "put additional strain on finding and coordinating transfers of aliens to available beds" in long-term detention facilities within 12 hours.[111] When issuing the waiver, ICE suggested that "holding aliens in holding facilities beyond the 12-hour limit" was necessary because ICE "no longer has the option to discretionarily release aliens" or "decline to take aliens into custody" from other agencies.[112] The memorandum announcing the 12-hour-detention waiver did not address the suitability of short-term hold rooms for overnight or multi-day detention, nor did it discuss any modifications to other policies governing such holding facilities, which "continue to apply."[113]

The 12-hour-detention waiver is arbitrary and capricious for three reasons.

---

[108] E-mail to ICE ERO Field Office Directors, Deputy Field Office Directors, and Assistant Field Office Directors, "Detention Standard Waiver Request Submission and Review Process" (Mar. 24, 2025), Dkt. No. 145, at 42.

[109] *Id.* at 42.

[110] Memorandum from Monica S. Burke, ICE's Assistant Director of Custody Management, on "Nationwide Hold Room Waiver" (June 24, 2025), Dkt. No. 145, at 1.

[111] *Id.* at 2.

[112] *Id.*

[113] *Id.*

United States District Court
Northern District of California

####      a.      ICE failed to consider alternatives within the ambit of its existing policy.

First, ICE failed to consider alternative options to address its capacity issues, which were the driving force behind the 12-hour-detention waiver. Plaintiffs assert, and the government does not dispute, that many of the individuals whom ICE detains in holding facilities are arrested by ICE itself. Thus, ICE had another tool at its disposal to manage the lack of available long-term detention space—rather than increasing the duration of detention in short-term hold rooms, ICE might simply have arrested fewer people until it procured additional long-term detention space. While an agency is "not required to ... consider all policy alternatives in reaching its decision," it was clearly "within the ambit" of ICE's prior policy not to arrest more people than ICE had the capacity to process out of hold rooms within 12 hours. *Regents*, 591 U.S. at 30, 33 (citation modified).

The memorandum announcing the 12-hour-detention waiver evinces no consideration of this alternative. As the government notes, the memorandum considers and rejects *other* alternatives, such as the possibilities that ICE would release noncitizens after their arrest or decline to take noncitizens into custody from other agencies within DHS.[114] The memorandum reasoned, and the government argues before this Court, that these possibilities are foreclosed by recent executive orders.[115] Indeed, at least one of the executive orders cited in the memorandum appears to mandate that detained noncitizens remain in federal custody until the completion of their removal proceedings, seeming to prohibit discretionary release.[116] But neither ICE's memorandum

---

[114] *Id.*

[115] *See id.* at 1. Plaintiffs insist that the memorandum did not, in fact, "state that the [executive orders] ban discretionary release." While it is true that the memorandum did not use those words, the memorandum states that ICE "field offices no longer have the option to discretionarily release aliens, nor decline to take aliens into custody from our counterparts in Homeland Security Investigations (HSI) or U.S. Customs and Border Protection (CBP)" shortly after the memorandum discusses the executive orders. And no other authority is offered for the memorandum's assertion. In the Court's view, the only plausible reading of that statement is that ICE understood the executive orders to limit its discretion concerning discretionary release and refusals of custody.

[116] *See* Proclamation No. 14165, 90 Fed. Reg. 8467, 8468 (Jan. 30, 2025), Dkt. No. 145, at 10. (instructing DHS to "take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States" and to "terminat[e] … the practice commonly known as 'catch-and-release,' whereby illegal aliens are routinely released into the United States shortly after their apprehension

nor the government's briefing argue that the executive orders require ICE itself to arrest more noncitizens into custody than it has the capacity to hold in long-term detention facilities, nor is the Court aware of any such language in the executive orders. So the executive orders do not provide a basis for ICE's rejection of that potential alternative. And while ICE may wish to arrest an increased number of noncitizens, it "cannot actively facilitate a breakdown in [its detention system], and then claim no responsibility or control over it" by at least considering a change of course. *Immigr. Defs.*, 145 F.4th at 993. ICE therefore failed to satisfy the APA's mandate that it give reasoned consideration to known alternatives before waiving its 12-hour limit on hold-room detentions.

### b.   The 12-hour-detention waiver is inconsistent with existing ICE policy.

Second, the 12-hour-waiver memo is arbitrary and capricious because it expressly leaves in place contradictory policies governing hold rooms. ICE's Performance-Based National Detention Standards (PBNDS) prohibit detention longer than 12 hours in holding facilities.[117] Because the 12-hour-waiver memo provides that "[a]ll other hold room and hold facilities requirements continue to apply,"[118] the PBNDS prohibition remains in place, directly conflicting with the 12-hour-detention waiver's allowance for detention up to 72 hours. Such "an internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).

The government does not dispute that the PBNDS remain in place and generally forbid detention in hold rooms for longer than 12 hours. Instead, the government argues that the 12-hour-detention waiver is consistent with the PBNDS because the PBNDS permit extended hold-room

---

for violations of immigration law"). Plaintiffs contend that this executive order does not prohibit the discretionary release of noncitizens. But it was at least not irrational for ICE to interpret an express instruction to "terminat[e]" its practice of releasing noncitizens after their apprehension as a prohibition on discretionary release.

[117] PERFORMANCE-BASED NATIONAL DETENTION STANDARDS, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT (2016), Dkt. No. 65-1, § 2.6(II)(2); *see also id.* § 2.6(I), (V)(B).

[118] Memorandum from Monica S. Burke, ICE's Assistant Director of Custody Management, on "Nationwide Hold Room Waiver" (June 24, 2025), Dkt. No. 145, at 2.

United States District Court
Northern District of California

detentions in "exceptional circumstances."[119] In the government's view, the lack of available long-term detention space for ICE detainees is an exceptional circumstance, such that the PBNDS does not prohibit the extended hold-room detentions permitted by the 12-hour-detention waiver. As already discussed, however, nothing in the memorandum announcing the 12-hour-detention waiver suggested that the waiver was based on any "exceptional circumstances." Had that been the agency's rationale, no "waiver" of the existing policy would have been necessary because that policy already authorized hold-room detentions exceeding 12 hours in "exceptional circumstances," as the memorandum expressly recognized.[120] And the memorandum specifies that the newly extended 72-hour limit on hold-room detention applies only "absent exceptional circumstances," further suggesting that ICE did not consider the influx of detainees and resulting capacity issues to constitute such circumstances.[121] Though the government now attempts to explain the 12-hour-detention waiver as the product of exceptional circumstances, the Court's review under the APA is limited to the reasons provided at the time ICE implemented the policy. *See Regents*, 591 U.S. at 19.

ICE's failure to reconcile the 12-hour-detention waiver with its existing and still-applicable policies independently renders the waiver arbitrary and capricious.

**c.     ICE failed to consider the "important factor" of constitutional protections against punitive conditions of confinement.**

Third, the 12-hour-detention waiver is arbitrary and capricious due to ICE's failure to consider an "important aspect of the problem" when issuing the waiver. *All. for the Wild Rockies*, 68 F.4th at 492 (quoting *State Farm*, 463 U.S. at 43). Whether something is an important factor

---

[119] As noted above, and as plaintiffs argue in their reply, the PBNDS contain no such language. But plaintiffs state in their motion that it is nevertheless "[c]onsistent with the 2011 PBNDS" to "limit[] use of holding facilities to 12-hours or less, absent exceptional circumstances." Dkt. No. 175 at 9 (citation modified). Given that concession, the Court treats the PBNDS as allowing extended hold-room detentions in exceptional circumstances for the purposes of plaintiffs' motion for partial summary judgment.

[120] Memorandum from Monica S. Burke, ICE's Assistant Director of Custody Management, on "Nationwide Hold Room Waiver" (June 24, 2025), Dkt. No. 145, at 1.

[121] *Id.*

that must be considered "turns on what [the] relevant substantive [law] makes 'important.'" *Nat'l Urb. League v. Ross*, 977 F.3d 770, 777 (9th Cir. 2020) (first alteration in original) (quoting *Or. Nat'l Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996)). The Ninth Circuit has made clear that the relevant substantive law includes agencies' constitutional obligations. *See id.* (holding that "the Enumeration Clause demonstrates a 'strong constitutional interest in accuracy'" that the Census Bureau was required to consider) (quoting *Utah v. Evans*, 536 U.S. 452, 478 (2002)). Here, ICE's obligation under the Fifth Amendment not to subject civil immigration detainees to punitive conditions of confinement was an "important aspect of the problem" that ICE was required—but failed—to consider.

Because "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law," *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), "a civil detainee awaiting adjudication is entitled to conditions of confinement that are not punitive," *Jones v. Blanas*, 393 F.3d 918, 933. (9th Cir. 2004). "A restriction is punitive where it is intended to punish, or where it is excessive in relation to its non-punitive purpose, or is employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636, 648 (9th Cir. 2021) (quoting *Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004)). "[A] presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held." *Id.* at 648 (quoting *Jones*, 393 F.3d at 934). "But if a particular condition or restriction of [civil] detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Id.* (quoting *Wolfish*, 441 U.S. at 539).

Nothing in the memorandum announcing the 12-hour-detention waiver or in the administrative record suggest that ICE engaged in reasoned consideration of its obligation to avoid creating punitive conditions of confinement. Before the 12-hour-detention waiver, ICE had required individual field offices seeking relief from the 12-hour limit to "provide articulable facts with supporting evidence" showing that the limit could be extended "without diminishing service delivery or detention care and custody" and detailing "what systems will be implemented to ensure

United States District Court
Northern District of California

good order of the facility."[122] The 12-hour-detention waiver, by contrast, authorizes extended hold-room detentions even absent such a showing. In other words, ICE previously recognized and took steps to mitigate the risk that extending the time limit might result in deteriorating conditions of confinement in its hold rooms, yet it omitted any mention of similar measures from the 12-hour-detention waiver memorandum. Instead, the memorandum announcing the 12-hour-detention waiver offered only conclusory statements that ICE would "ensure the safety, security and humane treatment of those in custody in hold rooms," without considering whether or how it would be possible for the agency to do so.[123] Such conclusory statements do not evince reasoned consideration of ICE's constitutional obligations. *See Nat'l TPS All.*, 166 F.4th at 773 (Mendoza, J., concurring, joined by Wardlaw, J.).

ICE's lack of reasoned consideration about how to comply with its constitutional obligations is apparent from the agency's choice to retain all existing policies governing hold-room detention other than the 12-hour limit. As discussed above, the PBNDS are among those existing policies. And the PBNDS provide that "bunks, cots, beds and other sleeping apparatus are not permitted inside hold rooms."[124] Multiple courts have held that "a jail's failure to provide [pretrial criminal] detainees with a mattress and bed or bunk runs afoul of" constitutional due-process protections. *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989), *overruled on other grounds by Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010). So depriving civil immigration detainees held overnight of basic sleeping needs is presumptively punitive. *See Fraihat*, 16 F.4th at 648 (assuming that this presumption applies in the context of federal immigration detention). No evidence in the administrative record suggests that ICE considered whether such deprivation serves any "legitimate governmental objective"

---

[122] E-mail to ICE ERO Field Office Directors, Deputy Field Office Directors, and Assistant Field Office Directors, "Detention Standard Waiver Request Submission and Review Process" (Mar. 24, 2025), Dkt. No. 145, at 42.

[123] Memorandum from Monica S. Burke, ICE's Assistant Director of Custody Management, on "Nationwide Hold Room Waiver" (June 24, 2025), Dkt. No. 145, at 2.

[124] *See* PERFORMANCE-BASED NATIONAL DETENTION STANDARDS, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT (2016), Dkt. No. 65-1, § 2.6(V)(5).

such that it would not be punitive in nature. *See id.* (quoting *Bell*, 441 U.S. at 539). Again, that silence evinces a failure to give consideration to the important factor of detainees' constitutional rights.

The government's arguments to the contrary fail.

The government contends that concerns about punitive conditions are "speculati[ve]," suggesting that individual ICE field offices "retain[] the discretion about how to hold aliens safely for more than 12 hours" and therefore may not deprive detainees of beds or mattresses. That argument runs headlong into the PBNDS's clear command—which the 12-hour-detention waiver expressly leaves in place—that "sleeping apparatus are not permitted inside hold rooms" in *any* ICE field office.[125] In any event, the fact that some field offices may not in fact subject hold-room detainees to punitive conditions does not obviate ICE's duty to give reasoned consideration to the risk that its 12-hour-detention waiver would create such conditions.

The government also argues that, because the 12-hour-detention waiver applies nationwide, ICE had no obligation to consider the risk that its waiver would result in conditions of confinement that are unconstitutional under Ninth Circuit case law. But constitutional protections against punitive conditions of civil confinement apply nationwide. *See Bell*, 441 U.S. at 535–37. It may be true that ICE was not required to base its consideration of its constitutional obligations under the law of any particular circuit, but it at least needed to provide a reasoned consideration of the nationally applicable principle that punitive civil detention is inconsistent with due process. It did not do so.

For this additional reason, the 12-hour-detention waiver is arbitrary and capricious.[126]

**C.    Vacatur of the challenged policies is the proper remedy.**

Having concluded that ICE and EOIR's 2025 courthouse-arrest policies and the 12-hour-

---

[125] *See* PERFORMANCE-BASED NATIONAL DETENTION STANDARDS, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT (2016), Dkt. No. 65-1, § 2.6(V)(5).

[126] Because the Court concludes that the 12-hour-detention waiver must be set aside as arbitrary and capricious, the Court need not address plaintiffs' related claim that the waiver is "not in accordance with law" because it necessarily results in punitive conditions of confinement in hold rooms. 5 U.S.C. § 706(2)(A).

detention waiver are arbitrary and capricious, the Court must determine the appropriate remedy. The government asks the Court to enjoin enforcement of the policies only as to members of the courthouse-arrest and detention classes. But plaintiffs argue, and the Court agrees, that vacatur of the policies is proper.

Section 706 of the APA instructs that a "reviewing court *shall* … set aside agency action" that it finds to be "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A) (emphasis added). "When Congress enacted the APA in 1946, the phrase 'set aside' meant 'cancel, annul, or revoke[,]'" i.e., to vacate. *Nat'l TPS All.*, 166 F.4th at 760 (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring)). Accordingly, the Ninth Circuit has instructed that "vacatur and remand is the default remedy under the APA[.]" *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). And while the Supreme Court has not squarely addressed the meaning of "set aside" as used in § 706, it has "[o]ver the decades … affirmed countless decisions that vacated agency actions ... rather than merely providing … relief that enjoined enforcement of the rules against the specific plaintiffs." *Corner Post*, 603 U.S. at 830–31 (Kavanaugh, J., concurring) (collecting cases); *see also Regents*, 591 U.S. at 9, 36 n.7; *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 486 (2001); *Board of Governors, FRS v. Dimension Financial Corp.*, 474 U.S. 361, 364–365 (1986).

The government nevertheless suggests that this Court *cannot* vacate the challenged policies and is authorized, at most, to enjoin the enforcement of the challenged policies only against members of the detention and courthouse-arrest classes. In other words, the government contends that the Court must limit relief from the courthouse-arrest policies to ICE's San Francisco area of responsibility and limit relief from the 12-hour-detention waiver to 630 Sansome. None of the authorities on which the government relies support that position.

The government first points to a three-Justice concurrence suggesting that § 706 may not authorize vacatur. *United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., concurring). But the concurrence does not bind this Court and, indeed, the concurrence was not entirely committed to the government's view as to the propriety of vacatur. *See id.* at 701 ("I do not pretend that the matter is open and shut."). Other Justices have expressed significant skepticism of the

65

United States District Court
Northern District of California

concurrence's arguments. *See, e.g.*, *id.* at 721 (Alito, J., dissenting) ("[T]his would be a sea change in administrative law as currently practiced in the lower courts."); *Corner Post*, 603 U.S. at 826 (Kavanaugh, J., concurring) ("[T]he APA authorizes vacatur of agency rules."). More importantly, the Ninth Circuit has confirmed that vacatur remains the "default remedy" under § 706. *Mont. Wildlife Fed'n*, 127 F.4th at 50. The Court remains bound to follow that precedent.

The government next insists that this Court lacks authority to vacate the courthouse-arrest policies and 12-hour-detention waiver in light of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). There, the Supreme Court considered "whether Congress has granted federal courts the authority to universally enjoin the enforcement of an executive or legislative policy." *Id.* at 839. To answer that question, the Court examined the Judiciary Act of 1789, the statutory source of federal courts' authority to issue equitable remedies. *Id.* at 841. Because the Judiciary Act of 1789 "endow[s] federal courts with jurisdiction over 'all suits ... in equity,'" the Supreme Court concluded that the statute authorizes injunctive relief only to the extent such relief was "'traditionally accorded by courts of equity' at our country's inception." *Id.* (first quoting § 11, 1 Stat. 78; and then quoting *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Looking to the equitable authority possessed "by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act," as well as by "founding-era courts of equity," the Supreme Court held that the Judiciary Act of 1789 authorizes only party-specific relief. *Id.* at 841–47 (quoting *Grupo Mexicano*, 527 U.S. at 318–19). In other words, injunctive relief covered by *CASA* may sweep only as broadly as needed to "offer complete relief to the plaintiffs before the court." *Id.* at 852 (emphasis omitted).

The reasoning and holding in *CASA* were grounded in and limited to the statute at issue there. The opinion says nothing that calls into question the longstanding practice of vacating agency action under the APA. To the contrary, *CASA* expressly declined to address "the distinct question whether the [APA] authorizes federal courts to vacate federal agency action." *Id.* at 847 n.10; *see also id.* at 873 (Kavanaugh, J., concurring) (explaining that traditional APA relief remains available even where it is "the functional equivalent of a universal injunction").

The Ninth Circuit has neither held nor suggested that *CASA* limits vacatur under the APA.

United States District Court
Northern District of California

In *Immigrant Defenders*, the Ninth Circuit explained that although *CASA* "explicitly declined to extend its holding to the APA context, its complete-relief principle for crafting injunctive relief provides some useful guidance for crafting *interim* equitable relief" under § 705. 145 F.4th at 995 (emphasis added; citation omitted). But the Ninth Circuit reasoned that *CASA*'s "guidance is informative" in the § 705 context only "because the factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Id.* Those equitable factors do not govern vacatur under § 706, *see Bautista v. Santacruz*, 813 F. Supp. 3d 1084, 1115 (C.D. Cal. 2025), so the reasoning of *Immigrant Defenders* does not suggest that *CASA*'s complete-relief principle bears on vacatur. The Ninth Circuit has since recognized that whether courts may grant "universal vacatur extending to non-parties" in the wake of *CASA* is an open question in the circuit. *Nat'l TPS Alliance*, 166 F.4th at 767. In *National TPS Alliance*, the Ninth Circuit explained that it had no need to resolve that question because there was no way to grant complete relief to the parties before it without vacating the challenged agency actions in full. *Id.* Thus, contrary to the government's assertion that *National TPS Alliance* impliedly instructed district courts to consider the complete-relief principle in the § 706 context, the case simply highlights the lack of binding authority on this issue.

By contrast, there is significant persuasive authority suggesting that *CASA*'s complete-relief principle does not limit the scope of relief under § 706. Multiple district courts in this circuit have concluded that full vacatur remains an available remedy in the wake of *CASA*. *See, e.g.*, *Abdulraheemzai v. Noem*, No. 25-CV-05098, 2026 WL 1113722, at *10 (N.D. Cal. Apr. 24, 2026); *Bautista*, 813 F. Supp. 3d at 1116; *Kāpaʻa v. Trump*, 794 F. Supp. 3d 793, 823 (D. Haw. 2025); *New York v. U.S. Dep't of Energy*, No. 6:25-CV-01458, 2025 WL 3140578, at *17 (D. Or. Nov. 10, 2025), *appeal dismissed*, No. 26-214, 2026 WL 1049169 (9th Cir. Apr. 13, 2026). And at least two courts of appeals have suggested that *CASA*'s complete-relief principle does not apply to vacatur under § 706 of the APA. *See Louisiana by & through Murrill v. Food & Drug Admin.*, 175 F.4th 310, 323 (5th Cir. 2026) (concluding that *CASA* does not affect "remedies under the APA"); *id.* at 323 n.10 ("Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to parties." (citation modified));

67

United States District Court
Northern District of California

*Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) (concluding after *CASA* that interim relief under § 705 need not be confined to parties and analogizing to the availability of universal relief under "Section 705's statutory neighbor, Section 706").

This conclusion reflects the fact that Congress has already determined the appropriate remedy for arbitrary and capricious agency decisionmaking. As already noted, § 706 states that a reviewing court "*shall … set aside*" (i.e., vacate) a policy found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A) (emphasis added). Prohibiting the enforcement of the challenged policies only against particular individuals would not comply with that Congress's instruction to "set aside" the policies themselves. *See Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring) ("Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA … go[es] further by empowering the judiciary to act directly against the challenged agency action." (quoting J. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Vᴀ. L. Rᴇᴠ. 933, 1012 (2018))); *cf. Make the Rd. N.Y.*, 2025 WL 3563313, at *35 (explaining that APA stays under § 705 "operate on the legal source of authority for an agency to act at all" and "generally do not simply insulate certain parties from enforcement measures"). The government "may question the wisdom of holding federal agencies accountable" in the manner the APA prescribes, "[b]ut Congress's judgment commands [the Court's] respect and the law it has adopted speaks clearly." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 64 (2024).

The government argues that even if the Court has authority to vacate the challenged policies, the Court should decline to do so as a matter of discretion and instead grant relief only to the detention and courthouse-arrest classes. But the government's proposal would effectively require the Court to rewrite the policies, which by their own terms apply nationwide, to cover only a particular region or facility. Rewriting a deficient policy is the agency's role, not the Court's. *See Rose v. Becerra*, No. 19-CV-2848, 2024 WL 3202342, at *29 (D.D.C. June 27, 2024) (explaining that the APA ordinarily does not authorize a reviewing court "to judicially re-write what the agency did so that it somehow does not apply to a narrow group of people or so that it persists piecemeal"), *appeal dismissed sub nom. Rose v. Kennedy*, 169 F.4th 294 (D.C. Cir. 2026). Nor has

68

the government argued that any deficient aspect of the challenged policies can be severed from the remainder.[127]

To be certain, while the APA includes no textual exception to the requirement that unreasoned agency action be set aside, the Ninth Circuit has instructed that equitable considerations may "in limited circumstances" warrant remanding a policy to the agency without vacatur "while the agency corrects its errors." *Mont. Wildlife Fed'n*, 127 F.4th at 50; *see also All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). The government argues that this is one of the "rare" cases warranting remand without vacatur. *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). As the government concedes, however, remand without vacatur is appropriate only "when [the] agency may be able readily to cure a defect in its explanation of a decision." *Id.* (quoting *Heartland Reg'l Med. Ctr. v. Sebelius,* 566 F.3d 193, 198 (D.C. Cir. 2009)). The Ninth Circuit also requires that courts determining

---

[127] While the APA does not provide for rewriting an agency's policy to except particular individuals, the statute does contemplate that the "agency action" subject to vacatur may include only "a part of an agency rule[.]" 5 U.S.C. § 551(13). Thus, "[c]ourts may set aside part of an agency action … if it is severable from the rest of the agency's action." *Wood v. Betlach*, No. CV-12-08098, 2012 WL 4762466, at *4 (D. Ariz. Oct. 5, 2012) (citing *Arizona Pub. Serv. Co. v. EPA,* 562 F.3d 1116, 1122 (10th Cir. 2009)). Because the government has not argued that any the specific agency actions challenged here are severable from the broader policies of which they are a part, it has waived any such argument. *See Ass'n of Am. Univs. v. Dep't of Def.*, 806 F. Supp. 3d 79, 121 n.118 (D. Mass. 2025). Nor can the Court determine an "obvious way to divvy up the [challenged policies] to vacate only that 'part' that is applicable to [p]laintiffs." *New York v. U.S. Dep't of Energy*, No. 6:25-CV-01458, 2025 WL 3140578, at *16 (D. Or. Nov. 10, 2025) (quoting *Ass'n of Am. Univs.*, 806 F. Supp. 3d at 121), *appeal dismissed*, No. 26-214, 2026 WL 1049169 (9th Cir. Apr. 13, 2026). Plaintiffs challenge EOIR's courthouse-arrest policy and the 12-hour-detention waiver in their entirety. And while plaintiffs' challenge to ICE's 2025 courthouse-arrest policies focuses specifically on immigration courthouses, there is no clear way to vacate only the portion of those policies that impacts immigration courthouses. That is because ICE's interim 2025 courthouse-arrest policy rescinds the agency's 2021 guidance *in toto*, eliminating the prior restrictions on enforcement actions at both immigration and non-immigration courthouses in one fell swoop. Because the 2025 policies' elimination of prior limits on arrests at immigration courthouses and non-immigration courthouses are not "wholly independent," the Court must "invalidate the action as a whole." *Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 24 F.4th 666, 674 (D.C. Cir. 2022). To do otherwise would require the Court to insert new language into the 2025 policies specifying that the 2021 guidance is rescinded except as to immigration courthouses. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 692 (2012) (Scalia, J., dissenting) (warning against severance that would effectively "rewrit[e] a statute" (citation modified)); *Nat'l Shooting Sports Found. v. Bonta*, No. 23-CV-0945, 2025 WL 1012326, at *2 (S.D. Cal. Mar. 31, 2025) (noting the lack of "any severability caselaw that suggests this Court may jot new words in a statute's margins" rather than merely "*removing* language").

United States District Court
Northern District of California

whether to remand without vacatur "consider the disruptive effect of vacatur." *Mont. Wildlife Fed'n*, 127 F.4th at 51. Because vacatur is the default remedy under the APA, the government bears the burden of establishing that the ICE and EOIR could cure the defects in their decisionmaking and that vacatur would be so disruptive that the challenged policies should be left in place in the meantime. *See Coal. to Protect Puget Sound Habitat v. U.S. Army Corps. of Eng'rs*, 466 F. Supp. 3d 1217, 1219 (W.D. Wash. 2020), *aff'd* 843 F. App'x 77 (9th Cir. 2021); *see also Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019).

The government has not borne that burden. It offers only conclusory assertions that ICE and EOIR "can cure any defects identified by the Court," without any attempt to explain how the agencies might do so. Similarly, the government speculates in general terms that vacatur "*could* produce disruptive consequences to the Executive's implementation and enforcement of immigration laws" and "*potentially* encompasses a breadth of enforcement action necessary to execute the immigration laws of the United States." Yet the government does not articulate with any specificity what those disruptive consequences will be. To the contrary, the government concedes that "vacatur of the [12-hour-detention waiver] would still allow [ICE] field offices to hold aliens longer than 12 hours" so long as field offices "apply for individualized waivers as they did before ICE issued the [waiver]." And it is far from obvious that vacating the courthouse-arrest policies will significantly hinder ICE's operations. Vacatur does not preclude ICE from conducting civil enforcement actions at courthouses; it merely reinstates ICE's 2021 guidance and EOIR's 2023 guidance, which authorized courthouse arrests in defined circumstances. Were it true that vacatur of the 2025 courthouse-arrest policies would be hugely disruptive, as the government insists, surely the government could point to some evidence of disruption resulting from the suspension of those policies within ICE's San Francisco area of responsibility since December 2025 or to evidence of disruption during the time period that the prior policies were in place. It has not done so.

Accordingly, in compliance with the text of the APA and Congress's judgment regarding the appropriate remedy for arbitrary and capricious agency actions, vacatur of the challenged policies is the proper remedy here.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motions for final class certification and partial summary judgment as to their APA claims are GRANTED, and the government's counter-motions for partial summary judgment are DENIED. Pursuant to 5 U.S.C. § 706(2)(A), the Court VACATES both the courthouse-arrest policies (i.e., ICE Policy No. 11072.3, ICE Policy No. 11072.4, and EOIR Operating Policies and Procedures Memorandum 25-06) and the 12-hour-detention waiver (i.e., ICE's June 24, 2025 memorandum titled "Nationwide Hold Room Waiver").

**IT IS SO ORDERED.**

Dated: June 23, 2026

P. Casey Pitts
United States District Judge