Mark L. Hejinian (SBN 281417)
ef-mlh@cpdb.com
Marcia V. Valente (SBN 321852)
ef-mvv@cpdb.com
David C. Beach (SBN 226972)
ef-dcb@cpdb.com
Charmaine G. Yu (SBN 220579)
ef-cgy@cpdb.com
Evan G. Campbell (SBN 342223)
ef-egc@cpdb.com
Darien Lo (SBN 347244)
ef-dxl@cpdb.com
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800

Marissa Hatton (SBN 348678)
mhatton@lccrsf.org
Andrew Ntim (SBN 347084)
antim@lccrsf.org
Jordan Wells (SBN 326491)
jwells@lccrsf.org
Nisha Kashyap (SBN 301934)
nkashyap@lccrsf.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 543-9444

Neil K. Sawhney (SBN 300130)
nsawhney@aclunc.org
Adriana Herrera (SBN 368812)
aherrera@aclunc.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

Laura Victoria Sanchez (SBN 253736)
laura@carecensf.org
Tala Berardi Hartsough (SBN 230204)
tala@carecensf.org
CARECEN SF
3101 Mission Street, Suite 101
San Francisco, CA 94110
Telephone: (415) 642-4402

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

CARMEN ARACELY PABLO SEQUEN, YULISA ALVARADO AMBROCIO, and LIGIA GARCIA,

Plaintiffs,

v.

SERGIO ALBARRAN, MARCOS CHARLES, THOMAS GILES, MONICA BURKE, MARKWAYNE MULLIN, U.S. DEPARTMENT OF HOMELAND SECURITY, TODD M. LYONS, SIRCE E. OWEN, TODD BLANCHE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION AND REVIEW, UNITED STATES OF AMERICA,

Defendants.

Case No. 5:25-CV-06487-PCP-NC

<u>**CLASS ACTION**</u>

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION**

Trial Date: None Set

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

## TABLE OF CONTENTS

Page

INTRODUCTION ....................1

BACKGROUND ....................2

A. Preliminary Injunction and Non-Compliance ....................2

B. Preliminary Injunction Compliance Discovery ....................4

C. Meet and Confer Efforts Regarding Preliminary Injunction Compliance ....................5

LEGAL STANDARD ....................6

ARGUMENT ....................7

I. Defendants Have Violated the Preliminary Injunction by Refusing to Provide Onsite Medical Care, Medication Access, Provision of Hygiene Items, Notice of Class Members' Rights, and Language Access ....................7

A. Defendants Refuse to Provide Onsite Medical Care at 630 Sansome ....................7

1. The Preliminary Injunction Requires a Sufficient Medical Screening and Initial Medical Care Provided Onsite at 630 Sansome ....................8

2. Defendants Refuse to Provide Onsite Medical Screenings, and Their Substandard Screenings Put Class Members at Unnecessary Risk ....................11

3. Defendants Fail to Provide Medical Care Upon Request ....................14

4. Defendants Deprive Class Members of Medication Access ....................15

5. Defendants Fail to Conduct Adequate Communicable Disease Screenings ....................16

6. Defendants Have Made No Attempt to Comply with the Court's Order Requiring Medically-Necessary Diets, Mental Health Care, and Disability Accommodations ....................17

B. Defendants Continuously Violate the Court's Order Regarding Language Translation and a One-Hour Notice of Rights ....................19

C. Defendants Continuously Violate the Court's Order Regarding Provision of Hygiene Items ....................20

II. This Court Should Find Defendants in Violation of the Preliminary Injunction, Set Tiered Deadlines for Compliance, and Order Periodic Compliance Reporting ....................21

A. The Court Should Find Defendants in Violation on the Present Record. ....21

B. The Court Should Order Compliance on a Tiered Schedule....21

C. The Court Should Order Periodic Compliance Reporting ....22

D. Plaintiffs Request a Status Conference and Reserve Their Right to Seek Contempt, Sanctions, and Fees....22

CONCLUSION ....23

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdeltawab v. Armant*,
No. EDCV 26-cv-01520-MWF (DTB), 2026 WL 1710301 (C.D. Cal. June 4, 2026) ............ 7

*Armstrong v. Brown*,
857 F. Supp. 2d 919 (N.D. Cal. 2012), *order enforced* (Aug. 28, 2012), *aff'd*, 732 F.3d 955 (9th Cir. 2013) ............ 7, 21

*Barco Mercado v. Noem*,
No. 1:25-cv-06568-LAK, ECF No. 97 ............ 9, 10, 16

*Coal. on Homelessness v. City & Cnty. of San Francisco*,
No. 22-cv-05502-DMR, 2024 WL 3669475 (N.D. Cal. Aug. 5, 2024) ............ 6, 22

*D.N.N. v. Liggins*,
No. 1:25-cv-01613-JRR, ECF No. 231 (D. Md. Sept. 28, 2026) ............ 22

*FTC v. Affordable Media, LLC*,
179 F.3d 1228 (9th Cir. 1999) ............ 6

*Gen. Signal Corp. v. Donallco, Inc.*,
787 F.2d 1376 (9th Cir. 1986) ............ 6

*Gonzalez v. Noem*,
No. 25 C 13323, 2025 WL 3170784 (N.D. Ill. Nov. 5, 2025) ............ 10, 22

*Graves v. Arpaio*,
48 F. Supp. 3d 1318 (D. Ariz. 2014) ............ 8, 9

*Jensen v. Thornell*,
825 F. Supp. 3d 949 (D. Ariz. 2026) ............ 9

*Nat'l Org. For the Reform of Marijuana Laws v. Mullen*,
828 F.2d 536 (9th Cir. 1987) ............ 6, 22

*Plata v. Schwarzenegger*,
No. C01-1351-TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ............ 9

*Shillitani v. United States*,
384 U.S. 364 (1966) ............ 6, 21

*Stone v. City & Cnty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992) ............ 6, 21

*United States v. New York Tel. Co.*,
434 U.S. 159 (1977) ............ 6

*United States v. Suquamish Indian Tribe*,
901 F.2d 772 (9th Cir. 1990) ............ 6, 22

*UV RML NL Assets LLC v. Coulter Ventures, LLC*,
No. 2:21-cv-04913-VAP-ASx, 2021 WL 6882160 (C.D. Cal. Dec. 15, 2021) ..................... 10

**Statutes & Rules**

28 U.S.C. § 1651(a) ........................................................................................................ 6, 21

28 U.S.C. § 2412 .............................................................................................................. 22

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

## INTRODUCTION

In November 2025, this Court entered a Preliminary Injunction to remedy likely unconstitutional conditions experienced by the Detention Class at ICE's San Francisco Field Office located at 630 Sansome Street ("630 Sansome"). *See* ECF No. 138 ("the Preliminary Injunction," "PI," or "PI Order").

In contravention of the PI Order, however, Defendants never implemented many of the required procedures, particularly those regarding adequate medical care, prescription medication access, hygiene items, and a mandatory "notice of rights" meant to be provided to Class Members within one hour of their arrival at the facility. Defendants do not have a single medical professional onsite at 630 Sansome, do not provide medical care upon request, do not provide mental health screening or disability accommodations, and have no process for ensuring that Class Members with chronic conditions have access to prescription medications. Cursory medical screenings are performed via laptop primarily by nurses who are not licensed in California. These out-of-state telehealth nurses clear people for detention without conducting a physical examination, and they frequently ignore Class Members' medical risks and obvious physical symptoms. Class members have reported being ignored by nurses after vomiting blood, while visibly bleeding from their violent arrest, and while in extreme pain from a bulging stomach ulcer.

As a practical matter, the medical screenings conducted by Defendants have no obvious purpose, as there is no medical equipment or medical professional onsite to begin necessary medical treatment. Plaintiffs have retained a medical expert who has identified numerous ways that Defendants risk Class Members' health and safety by failing to fully comply with the Court's order. Onsite medical care is feasible, and indeed, the San Francisco Enforcement and Removal Operations ("ERO") office is uniquely resistant to implementing onsite medical care: the New York and Chicago ERO offices have recently implemented onsite medical care in their hold rooms after being enjoined by orders similar to this Court's Preliminary Injunction.

More than nine months have passed since this Court ordered immediate changes to ICE's practices at 630 Sansome, and more than eight months have passed since this Court reiterated the scope and meaning of the Preliminary Injunction—including the expectation that medical

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

professionals be available onsite—during a December 22, 2025, status conference. Plaintiffs have conferred with Defendants numerous times over the last eight months, but Defendants have flatly refused to provide medical care onsite at 630 Sansome. This Court should issue an order to enforce compliance with the PI, set tiered compliance deadlines and order compliance reporting, and hold a status conference after sixty days. If at that status conference disputes remain as to Defendants' compliance, the Court should set a schedule for contempt proceedings.

## BACKGROUND

### A. Preliminary Injunction and Non-Compliance

On October 10, 2025, Plaintiffs sought a preliminary injunction to temporarily remedy the detention conditions at 630 Sansome. *See* ECF No. 64 ("PI Mem."). In support of their motion, Plaintiffs submitted numerous declarations—including from over a dozen people formerly detained at 630 Sansome—showing that for months, immigrants had been routinely detained there for days at a time without access to medical care in inhumane, unsafe, and unsanitary conditions. *See* PI Mem. at 19–27; ECF Nos. 70–82, 93. This Court issued the Preliminary Injunction on November 25, 2025, which ordered Defendants to implement specific changes to safeguard Class Members' health, safety, and legal rights at 630 Sansome. *See* PI Order at 50–51.

Immediately after the PI Order was issued, ICE's response was to ignore its requirements and instead continue business as usual—albeit on the fifth floor rather than sixth floor of 630 Sansome. Now operating one floor down in the facility, ICE made no attempt to provide medical care, hygienic conditions, or suitable sleeping conditions for immigrants, despite this Court's findings that such deprivations likely violate the Constitution. As a threadbare and opportunistic excuse for their circumvention of the Court's order, Defendants argued a semantic distinction between the "hold rooms" on the sixth floor of the building versus the unnamed rooms used to hold people on the fifth floor. *See* ECF No. 148, Joint Status Conference Statement at 8 ("There are no hold rooms on the fifth floor. Plaintiffs' action concerns hold rooms on the sixth floor.").

The parties sought guidance from this Court regarding Defendants' unilateral and dubious interpretations of the Preliminary Injunction, many of which contradicted the plain terms of the PI Order. *See, e.g.*, ECF No. 148 at 3. The Court held a status conference on December 22, 2025.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

During the status conference, the Court reiterated what was clear from the plain terms of the PI Order: that Defendants were enjoined from inflicting unconstitutional conditions on Class Members at 630 Sansome, regardless of their location in the building or detention length. *See* Declaration of Marissa Hatton ("Hatton Decl."), Ex. 1, Transcript of December 22, 2025 Status Conference ("Status Conf. Tr."), at 3–8 (noting Defendants' interpretations contradicted "clear" and "specific[]" terms of injunction and seemed to be "trying to find an easy escape route from actually ensuring that there is compliance with the constitutional rights of the individuals."). The Court also made the PI's requirement of onsite medical care exceedingly clear to Defendants, explaining: "Under the terms of the order there does need to be an availability of someone who could begin treatment[,] perhaps of that first individual identified[,] there's a need for treatment[,] and *you have to have someone there on site to initially manage that*." Status Conf. Tr. at 44 (emphasis added).

The Court instructed Defendants to seek modification of the Preliminary Injunction if a significant operational impediment existed to providing the medical care that had been outlined in the PI Order and during the status conference. *See id.* ("[What] is required is screening by a medical professional. I did not have evidence of the inability for that to be done. . . . If that is administratively unworkable, then I think the answer is for the government to come back and propose a modification."). Defendants never sought modification of the PI or clarification of the Court's guidance during the status conference.

Defendants shut down detention operations at 630 Sansome for two months following the status conference. On January 29 and January 30, 2026, Defendants provided policy documents outlining their plan to reopen 630 Sansome to Plaintiffs. On February 2, 2026, Plaintiffs sent a letter to Defendants raising several issues with the plan, including that the plan did not contemplate onsite medical providers or a process for requesting medical care. *See* Hatton Decl., Ex. 2 at 1–2. Plaintiffs' counsel and Defendants' counsel conferred by phone on February 3, 2026. On February 6, 2026, Defendants' counsel responded by email, objecting to the concept of [redacted] and continuing to maintain that no onsite medical care was required. *See* Hatton Decl., Ex. 3 at 8. On February 18, 2026, Defendants informed Plaintiffs that 630 Sansome had reopened

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

despite the Parties' ongoing disputes over proper implementation of the Preliminary Injunction. *Id.* at 1.

**B. Preliminary Injunction Compliance Discovery**

On March 3, 2026, Plaintiffs served their first set of document requests. Hatton Decl., Ex. 4, Plaintiffs' First Set of Requests for Production to Defendants ("RFPs," or individually by number, "RFP"). Defendants responded on May 4, 2026, after an extension.

Plaintiffs requested documents showing the medical equipment and supplies available for provision of medical care. *See* RFP 15. In response, ICE identified nine documents—seven posters on the walls of the hold room, one receipt for glucose monitoring strips, and one receipt for silicone breast pumps. *See* Hatton Decl., Ex. 5, Documents Responsive to RFP 15; *compare also* Hatton Decl., Ex. 4, RFP 15 *with* Ex. 6, Defendants' Chart of Responsive Documents by Bates Number ("Def. Bates Chart"). Plaintiffs also sought documentation showing Class Members' access to medical care from licensed medical providers upon request, including documents showing actual medical care provided. *See* RFP 19. Defendants produced five documents: their medical policy for 630 Sansome titled "Operation Golden Gate Concept of Operations" ("OGG Policy"), a blank medical screening form, a telehealth nurse roster, telehealth nurse scheduling, and a single completed medical intake form. *See* Hatton Decl., Ex. 7. The OGG Policy describes initial medical screenings but does not explain how Class Members can request medical care, what care will be provided upon request, or who will provide such care. *See id.* at 30. The policy otherwise states that nurses will be on-call [redacted] *Id.* at 34. The only medical "equipment" onsite is ICE officers' laptops, cameras, and microphones. *Id.* at 35. Healthcare staff are meant to use the [redacted] however, messages from that channel do not indicate that 630 Sansome staff have ever communicated about Class Members' requests for medical care. *See* Hatton Decl., Ex. 8.

In addition to medical screening forms, Plaintiffs sought "intake forms used for mental health screening and disability accommodations." *See* RFP 10. Defendants provided no responsive documents. *See* Def. Bates Chart. Plaintiffs also sought documents showing that Class Members had received clean clothes and personal hygiene items, consistent with the PI. *See* RFPs 24, 26.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Defendants located no responsive documents. *See* Hatton Decl., Ex. 9, Def. Responses to RFPs 24, 26. Plaintiffs sought proof that Class Members had received written materials informing them of their rights under the Preliminary Injunction within the one-hour time limit set by the Court. *See* RFPs 30, 31. Defendants provided no responsive documents. *See* Def. Bates Chart. Plaintiffs sought details of any in-person and telephonic translation provided to Class Members who did not speak English or Spanish. RFP 22. Defendants provided a flyer advertising language translation, but no evidence that any non-Spanish translation had ever been provided to Class Members, including to inform them of their rights under the PI. *See* Def. Bates Chart at 12.

On June 2, 2026, Plaintiffs sent a deficiency letter to Defendants outlining the missing documents and noting "otherwise, the absence of records of regularly conducted activity in compliance with the PI will be treated as evidence of the non-existence of compliance with the provision of the PI." *See* Hatton Decl., Ex. 10 at 6. Plaintiffs specifically highlighted the lack of documents regarding mental health treatment, disability accommodations, medically-necessary diets, medical supplies, prescription medications logs, provision of hygiene supplies, and a "notice of rights" provided within one hour of arrival. *See id.* at 7–8, Items 6(a)–(h).

The parties met and conferred on June 5, 2026. On July 2, 2026, Defendants responded to Plaintiffs' deficiency letter. Defendants admitted that [redacted] and that [redacted] Defendants do not accommodate them, but rather [redacted] *See* Hatton Decl., Ex. 11 at 1. Defendants appeared to suggest that Class Members would not receive medications at 630 Sansome. *See id.* Defendants did not provide documents regarding notice of Class Members' rights under the PI or documents showing that hygiene items were being distributed. *See id.* at 2. Defendants provided four photographs of posters on a wall in an undisclosed location. These posters outlined the process for requesting medical care, albeit in English only. *See* Hatton Decl., Ex. 12.

**C. Meet and Confer Efforts Regarding Preliminary Injunction Compliance**

On July 7, 2026, Plaintiffs contacted Defendants to indicate that they would move to enforce the Preliminary Injunction. The Parties conferred on July 9, 2026, wherein Plaintiffs

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

explained the risks posed by inadequate telehealth screenings and raised the Court's comments requiring onsite medical care during the December 22, 2025 status conference. On July 15, Defendants' counsel responded: "the availability of facility staff to call an ambulance or take a detainee to a hospital when so recommended by the medical screener is sufficient to comply with this language from the transcript." Hatton Decl., Ex. 13 at 2. Plaintiffs contacted Defendants on September 24, 2026 regarding their intent to file the instant motion. The Parties met and conferred on September 28, 2026, but were unable to come to resolution.

## LEGAL STANDARD

Courts have inherent authority to monitor and enforce their prior orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966); 28 U.S.C. § 1651(a); *see also United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) (federal courts can issue all orders that "may be necessary or appropriate to effectuate and prevent the frustration of orders"). These inherent powers include the ability to issue enforcement orders that impose additional monitoring and reporting requirements. *See, e.g., United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990).

To establish a violation of an injunction, the moving party must show by clear and convincing evidence that the enjoined party violated a specific and definite order of the court. *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). The court may exercise its inherent enforcement powers even without a finding of intentional non-compliance with prior orders. *Nat'l Org. For the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 543 (9th Cir. 1987). The moving party need not show that the violating party's failure to comply was intentional. *Id.*; *Stone*, 968 F.2d at 856 n.9. Nor must the moving party establish that compliance was possible. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239–40 (9th Cir. 1999). The court may find a violation if it concludes that the violating party failed to take "all reasonable steps" to comply with the order. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). Once that showing is made, the burden shifts to the enjoined party to demonstrate a legally valid reason for noncompliance. *Id.* at 1239–41*; Stone*, 968 F.2d at 856 n.9.

Enforcement of a preliminary injunction is appropriate where the party subject to the injunction violates its terms, frustrates its purpose, or circumvents its requirements. *See, e.g.*, *Coal.*

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

*on Homelessness v. City & Cnty. of San Francisco*, No. 22-cv-05502-DMR, 2024 WL 3669475, at *6 (N.D. Cal. Aug. 5, 2024) (enforcing preliminary injunction because "the evidence submitted in connection with this motion that suggests ongoing violations of the policy."). A court may enforce an injunction where a Defendant's subsequent actions amount to the same or similar conduct that was originally enjoined. *See Abdeltawab v. Armant*, No. EDCV 26-cv-01520-MWF (DTB), 2026 WL 1710301, at *2 (C.D. Cal. June 4, 2026) (enforcing injunction requiring immigrant's release from custody because federal officials subsequently subjected him to GPS monitoring, and the "new conditions amount[ed] to custody"). Where Plaintiffs submit "additional evidence of ongoing harm to class members" in detention "in conjunction with the instant motion to enforce," such evidence serves as "prima facie evidence that class members continue to suffer harm as Defendants delay their compliance with the Court's order." *Armstrong v. Brown*, 857 F. Supp. 2d 919, 950–51 (N.D. Cal. 2012) (issuing nine-point enforcement order on disability accommodation in California prisons), *order enforced* (Aug. 28, 2012), *aff'd*, 732 F.3d 955 (9th Cir. 2013).

## ARGUMENT

### I. Defendants Have Violated the Preliminary Injunction by Refusing to Provide Onsite Medical Care, Medication Access, Provision of Hygiene Items, Notice of Class Members' Rights, and Language Access

This Court should enforce its Preliminary Injunction because Defendants have continuously violated the Court's order by (A) refusing to provide the required onsite medical care at 630 Sansome, (B) failing to provide language translation for non-English speakers and a "notice of rights" to Class Members, and (C) failing to provide hygiene items to Class Members.

#### A. Defendants Refuse to Provide Onsite Medical Care at 630 Sansome

Defendants have failed to comply with the Preliminary Injunction because (1) Defendants do not have onsite providers and do not provide adequate medical screenings, (2) Defendants do not provide any on-request medical care beyond initial screenings, (3) Defendants deprive Class Members of prescription and over-the-counter medication access, (4) Defendants fail to conduct adequate infectious disease screenings, and (5) Defendants continuously violate the Court's order requiring medically-necessary meals, mental health care, and disability accommodations.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

### 1. The Preliminary Injunction Requires a Sufficient Medical Screening and Initial Medical Care Provided Onsite at 630 Sansome

The Preliminary Injunction necessitates basic medical functions to be carried out by medical professionals onsite at 630 Sansome—a requirement reiterated at the December 22, 2025 status conference. *See* Status Conf. Tr. at 44. In issuing the PI, the Court ordered changes to the operations at 630 Sansome in part because ICE systematically failed to provide medical care onsite at the facility. *See* PI Order at 15 ("ICE agents said they would *bring a doctor*, but they never did.") (emphasis added); *id.* at 15 ("After the detainee *returned from the hospital*, he continued to experience pain and again requested medical help, but ICE provided none.") (emphasis added). In issuing the injunction, the Court highlighted that ICE was not carrying out basic in-person medical assessments, such as taking vital signs. *See id*. at 13 (describing experience of Class Member for whom ICE failed to "take [his] blood pressure … while [he] was being processed into the detention space"). Specifically, the PI Order required that Defendants:

> Conduct a basic medical screening by a medical professional on each Detention Class member prior to placing them in a hold room. Screening will be sufficient to identify and begin necessary treatment of those with mental or physical illness and injury; to provide access to prescription medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically handicapped.

- *Id*. at 50. The order also requires that Defendants "[p]rovide prompt access to medical care when requested . . . including access to the services of licensed medical personnel, without charge, between the hours of 7 a.m. and 9:30 p.m." *Id.* The language of the medical screening provision is virtually identical to the language of the injunction issued in *Graves v. Arpaio*.[1] The injunctive relief in

---

[1] There, the court required: "Defendants shall provide a receiving screening of each pretrial detainee, prior to placement of any pretrial detainee in the general population. The screening will be sufficient to identify and begin necessary segregation, and treatment of those with mental or physical illness and injury; to provide necessary medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically handicapped." *Graves v.*

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

> *Graves* did not explicitly state that medical care needed to be provided onsite, but the district court subsequently explained the plain meaning of "access" to medical care: "Ready access to care to meet serious medical and mental health needs means that pretrial detainees with serious medical and mental health needs will be *seen face-to-face by a medical or mental health provider*." *Id.* at 1346 (emphasis added). Other courts have similarly explained that lack of face-to-face medical care and overuse of telehealth can result in lack of meaningful access to medical care. *See, e.g.*, *Jensen v. Thornell*, 825 F. Supp. 3d 949, 963 (D. Ariz. 2026) ("[T]he fundamental underpinning of the Injunction for establishing a minimally safe mental health system has been substantially unmet because of the use of nurses and LPNs as first line healthcare, [and] over- and mis-use of telehealth") (internal quotation marks omitted); *Plata v. Schwarzenegger*, No. C01-1351-TEH, 2005 WL 2932253, at *13 (N.D. Cal. Oct. 3, 2005) ("[A]t some prisons face-to-face triage is nonfunctional . . . . As a result, patients do not receive timely access to care").

Defendants have not suggested that it would be infeasible to have medical personnel onsite at an ERO office, nor could they. In at least two other jurisdictions, DHS and ICE have implemented orders similar to the Preliminary Injunction by adding onsite medical personnel to their hold rooms—even where those court orders do not explicitly state that onsite medical care is required. In *Barco Mercado v. Noem*, the United States District Court for the Southern District of New York issued a preliminary injunction that required ERO New York to ensure immigrants in its hold rooms had the right "to request and be provided without charge with professional services of licensed medical personnel between the hours of 7 a.m. and 9:30 p.m. and, in case of emergency, during all other periods"—a provision materially identical to the one in this Court's injunction. *See Barco Mercado v. Noem*, No. 1:25-cv-06568-LAK, ECF No. 97, ¶ 2(f) (S.D.N.Y. Sept. 17, 2025). In response to this requirement, the Deputy Field Office Director for ERO New York averred that "[m]edical personnel from the ICE Health Service Corps ('IHSC') are assigned

---

*Arpaio*, 48 F. Supp. 3d 1318, 1340 (D. Ariz. 2014).

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

to the 26 Federal Plaza ERO Field Office. . . . IHSC staff are available daily from 7:00 a.m. until 9:30 p.m. . . . *There is at least one contracted IHSC medical personnel on the premises of 26 Federal Plaza at all times of the day and night*." Hatton Decl., Ex. 14, Declaration of William Joyce, *Barco Mercado*, ECF No. 123, ¶ 22 (emphasis added). On September 24, 2026, the district court issued a permanent injunction solidifying the requirement to have onsite medical personnel at the ICE hold room in New York. *See Barco Mercado*, ECF No. 187 at p. 3.

Similarly, in *Gonzalez v. Noem*, the United States District Court for the Northern District of Illinois issued a Temporary Restraining Order that required ICE to "provide each Detainee with prescribed medication that was within Detainee's possession when arrested, along with any prescribed medications dropped off by family members or the Detainee's counsel for the use of the Detainee," and to "provide any storage requirements for medications" at the ERO hold room in Broadview, Illinois. *See Gonzalez v. Noem*, No. 25 C 13323, 2025 WL 3170784, at *1 (N.D. Ill. Nov. 5, 2025). One month later, DHS and ICE approved a contract requisition "to add a registered nurse at the ICE office in Broadview, IL." *See* Hatton Decl., Ex. 30 at 1. ICE's Chicago Field Office also formulated a Statement of Work for the new "Processing Center Nurse," which included responsibilities such as conducting "intake health screenings and physical assessments for new arrivals," to "administer medications, immunizations, and treatments as prescribed," and to "provide urgent care." *See id.*, Ex. 31. Among ERO offices subject to federal court orders, Defendants are uniquely recalcitrant regarding onsite medical care.

During the status conference on December 22, 2025, the Court told Defendants that "[u]nder the terms of the order there does need to be an availability of someone who could begin treatment . . . you have to have someone there on site to initially manage that." Status Conf. Tr. At 44. An injunction is clear and unambiguous when its contours are explained in a subsequent hearing. *See UV RML NL Assets LLC v. Coulter Ventures, LLC*, No. 2:21-cv-04913-VAP-ASx, 2021 WL 6882160, at *2 (C.D. Cal. Dec. 15, 2021) ("[T]he Court does not find that the preliminary injunction in this case is ambiguous or unclear. . . . Defendant already raised this question at the hearing . . . . The Court explained to Defendant that 'what you're describing is something that would be banned under this *injunction*.'").

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

**2. Defendants Refuse to Provide Onsite Medical Screenings, and Their Substandard Screenings Put Class Members at Unnecessary Risk**

Medical screening done over video is insufficient to identify and begin necessary treatment of medical issues. Nurses from the ICE Health Services Corps (IHSC) conduct initial medical screenings over video and do not conduct any *physical* assessment of Class Members, overlooking vital information about patients' symptoms and medical needs. Of the eight IHSC nurses providing screenings at 630 Sansome, seven are not licensed to practice in California, contrary to the California Telemedicine statute and rules for RN Tele-nursing. *See* Hatton Decl., Ex. 15, Expert Witness Report of Jeffrey E. Keller, M.D. (Sept. 19, 2026) ("Keller Report"), at 12. No medical personnel are onsite to provide access to medications for chronic issues, nor does anyone onsite take vitals or monitor essential indicators of medical risk, such as *blood* sugar readings for diabetic individuals. According to Plaintiffs' medical expert, "[p]roviding an on-site medical professional does not automatically provide adequate medical care to detainees, but it is a necessary component of providing adequate care – the failure to have an on-site medical professional at Sansome necessarily means the medical care there cannot possibly meet the Standard of Care." *Id.* at 27.

IHSC nurses conduct video screenings with their cameras turned off; Class Members cannot see them and often do not know who they are talking to. *See, e.g.*, Hatton Decl., Ex. 16, Declaration of Miguel Gonzalez Almanza ("Gonzalez Almanza Decl.") ¶ 14 ("I never saw or spoke with anyone who identified themselves as a nurse or medical professional."); Ex. 17, Declaration of Cruz Ixcotoyac Bacilio ("Ixcotoyac Bacilio Decl.") ¶ 6, ("I could not see the face of the person on the screen because the screen was dark the entire time, and I do not know who that person was."); Hatton Decl., Ex. 18, Declaration of Korrinne Yurick Gosain ("Yurick Decl.") ¶ 10 ("[T]he healthcare provider's camera remained off, and the provider's view of the patient was limited to the chest up."). Instead, the only people physically in the room during medical screenings are ICE agents. *See, e.g.*, Hatton Decl., Ex. 19, Declaration of Juan Carlos Gines-Hernandez ("Gines-Hernandez Decl.") ¶ 2 ("I had a video call with a nurse, with three ICE agents present."); Hatton Decl., Ex. 20, Declaration of Marvin Dick Godoy Calderon ("Godoy Calderon

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Decl.") ¶ 3 ("I had a video call with someone, with two ICE agents present."). The presence of ICE agents without any medical professional present impedes honest and effective conversations with medical personnel. *See* Keller Report at 12.

In-person visual assessment is essential to an adequate medical screening; without it, nurses have an incomplete picture of a Class Member's medical risks and often ignore their immediate medical needs. *See* Keller Report at 6 ("It is, of course, not possible to do an adequate physical examination virtually using an iPhone or laptop screen."), 15; Yurick Decl. ¶ 11 ("The healthcare provider was unable to perform key components of an in-person assessment . . . . These limitations significantly restricted the ability to accurately assess the patient's functional status, medical frailty, and overall clinical condition."). Indeed, in issuing its Preliminary Injunction, this Court cited the problematic fact that "ICE performs no medical intakes, evaluations, or screenings, even when a detainee is 'visibly unwell.'" *See* PI Order at 12–13. But telehealth screenings at 630 Sansome still result in dangerous detentions, even when onsite officers can see that Class Members are visibly unwell. *See* Hatton Decl., Ex. 21, Declaration of P.F. Gonzalez Montes de Oca ("Montes de Oca Decl.") ¶ 15 ("I heard ICE officer Garcia on the sixth floor say that he knew it wasn't right to detain my client because he was visibly ill, but it happened anyway because the nurse had said it was okay."). Upon reviewing medical intake forms, Plaintiffs' expert found that "[t]elehealth nurses at Sansome repeatedly cleared patients for detention without physical examination, even where the facts indicated further physical examination was necessary . . . . Not performing a physical examination on these patients violated the standard of care." Keller Report at 17. Examples of Class Members cleared for detention without any physical examination include an individual reporting chest pain, an individual who was ill with a fever and sore throat, an individual with an ear infection, an individual with *an* [redacted] on his groin, an individual with a [redacted] and an individual coughing up blood. *Id*. at 16.

Nurses appearing over video cannot observe the seriousness of Class Members' symptoms and do not take their reports of pain seriously, resulting in failure to adequately treat medical issues raised during intake. One Class Member explained, "[w]hile I was at 630 Sansome, I was in extreme pain, as I have a hernia on my abdomen . . . . The hernia is visible as a large bulge on my

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

stomach." Ixcotoyac Bacilio Decl. ¶ 5. However, he explained: "I mentioned my hernia to the person on the screen and showed it to them, but that person did not ask any follow-up questions, examine me, or offer me any treatment." *Id.* ¶ 9. Another Class Member reported being violently arrested by ICE before being taken to 630 Sansome, resulting in injuries to his knee, back, head, and collarbone. *See* Godoy Calderon Decl. ¶¶ 1–2. He explained that he spoke with an unidentified person on a video screen who "did not perform any physical examination, nor did he examine my back, knees, head, or collarbone, despite my knees being red and bloody under my jeans." *Id.* ¶ 5. When the class member *mentioned* the injuries, he said the person on the screen "ignored my report and continued moving on with the questions." *Id.* ¶ 4.

Another Class Member explained that "before the call connected, I vomited blood. No one physically examined me after I threw up." Hatton Decl., Ex. 22, Declaration of Jose Rivas Cruz ("Rivas Cruz Decl.") ¶ 6. He also described that his "stomach was in extreme pain." *Id.* When the nurse appeared over video, the Class Member explained, "I told her I had anxiety, that I had gastritis, and that I had just vomited blood. . . . She did not offer me any treatment for my gastritis or for my having just vomited blood." *Id.* ¶ 7. The only in-person response the Class Member received after vomiting blood was an ICE agent that "*pushed* a trash can toward [him] with his foot." *Id.* ¶ 6.

In addition to visual assessment, an initial medical screening must include a set of vital signs. Keller Report at 5–6. "Vital signs are *so* named because they are *vital* in assessing patient well-being. . . . Not measuring vital signs at Sansome violates the standard of care." *Id.* at 13 (emphasis in original). Because there are no personnel with medical training onsite at 630 Sansome, Class Members do not have their vital signs taken. *See, e.g.,* Gines-Hernandez Decl. ¶ 4; Gonzalez Almanza Decl. ¶ 13. Moreover, Class Members with chronic needs like diabetes do not receive proper in-person monitoring. *See, e.g.* Hatton Decl., Ex. 23, Declaration of Ramiro Lucero Lopez ("Lucero Lopez Decl.") ¶ 13 ("The officers did not take my blood sugar, my blood pressure, or any other vitals that I'm aware of."); Gonzalez Almanza Decl. ¶ 17 ("No one checked my blood glucose levels while I was at 630 Sansome, and I could not check the levels myself because ICE agents had taken away my test strips that I usually carry with me."); *see also* Keller

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Report at 13–14 (discussing intake forms of diabetic Class Members that do not show blood glucose checks). "Not checking a blood glucose in diabetic *patients* at Intake, especially those on insulin, violates the Standard of Care . . . It also increases the medical risk for bad outcomes in diabetic patients, even when detained for 12 hours or less." *Id*.

Defendants' failure to provide onsite *medical* providers not only violates the Court's clear requirements, but it risks Class Members' safety due to incomplete medical screenings. These screenings are done primarily by out-of-state nurses, in a non-private setting, without basic vitals or other physical measurements of health. Under these conditions, "the failure to provide an on-site medical professional violates the Standard of Care." *Id*. at 26.

### 3. Defendants Fail to Provide Medical Care Upon Request

In addition to initial medical screenings, the Preliminary Injunction requires that Defendants "[p]rovide prompt access to medical care when requested by a Detention Class member," including "access to the services of licensed medical personnel." PI Order at 50. While Defendants' policies outline the right to request medical care, they do not provide any information on *how* requests should be made, or to whom. *See* Hatton Decl., Ex. 7 at 30. The policies do not outline what should happen when a Class Member *requests* care; this guidance is especially important because there is no medical equipment or medical provider onsite to provide medical care.

Without medical personnel onsite to receive medical requests, Class Members can only direct their requests to ICE agents, who are not accessible. Lucero Lopez Decl. ¶¶ 7, 20 ("When my blood sugar is rising I feel sick . . . I felt dizzy and had a headache while detained at 630 Sansome, but I could not talk to the ICE officers because the room was closed and I was apart from them."). Reporting to ICE agents rather than onsite medical care providers "will deter many from reporting important medical problems, increasing the risk to people detained at Sansome." Keller Report at 26. And as a practical matter, medical issues are ignored. *See, e.g.* Ixcotoyac Bacilio Decl. ¶ 11 ("While I was at 630 Sansome, I did not receive any medical attention."); Rivas Cruz Decl. ¶ 6 ("The ICE agent just looked at me until after I was finished vomiting"); Godoy Calderon Decl. ¶¶ 5, 8 ("I also told [the screener] that five days earlier, the left side of my face had

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

gone numb and my eye kept blinking, and that it had been getting worse in the day leading up to the detention, but he did not ask any follow-up questions").

Without medical personnel onsite or policies governing on-request medical care, Detention Class Members are put at unnecessary risk. As Dr. Keller explained: "Without the back up of a medical professional onsite, the Detention Officers are in the position of making medical decisions themselves, for example, whether to give a patient complaining of chest pain Tylenol or to call an ambulance. They are not trained to do this. The lack of onsite medical professionals markedly increases the risk of an adverse medical event." *Id*. at 20.

**4. Defendants Deprive Class Members of Medication Access**

The Preliminary Injunction requires that Defendants "[p]rovide prompt access to over-the-counter pain medication and, for any Detention Class member with a prescription for medication, the right to possess, receive, and retain their prescribed medication on their person at all times, consistent with the prescription." PI Order at *50*. In direct violation of the PI Order, ICE agents *take away* prescription medications from Class Members. *See* Gonzalez Almanza Decl. ¶¶ 12, 18 ("ICE officers at 630 Sansome not only took away my prescription medications, but they also took my glucose testing strips and small pinprick needle that I use to test my glucose levels. They did not tell me what they were doing with my medications . . . . I was not told whether I could access my medications or ask about them."); Lucero Lopez Decl. ¶ 14 ("They let me take my morning medications . . . but then the ICE officers took the medicine back."). Upon reviewing records from 630 Sansome, Dr. Keller concluded that use of untrained ICE officers to dispense medication—without policies or procedures, Medication Administration Records, quality assurance, or oversight from a medical professional— "significantly increases the risk of medication administration errors, which can (and do) lead to patient harm." Keller Report at 23. More fundamentally, Defendants' use of ICE officers to administer medication violates the PI's requirement that Class Members be *allowed* to keep prescription medications with them.

630 Sansome officials do not provide medication to individuals with chronic conditions. *See, e.g.*, Gines-Hernandez Decl. ¶ 3 ("I told [the nurse] that I experience severe allergies . . . to the point that my throat closes up at times. I said that I needed access to my prescribed allergy

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

medication . . . . The nurse told me that they would not be able to give the medication to me."); Rivas Cruz Decl. ¶¶ 7, 17 ("I told her I take medication for my gastritis. She did not offer me any treatment . . . . Without this medication, I experience burning in my stomach and vomiting almost every morning."); Yurick Decl. ¶ 15 ("I also told the screener and the ICE agents that the patient takes several prescription medications, including at least six daily medications. I . . . informed them that the patient had not taken his medications that day. I was told that they would not provide medications at 630 Sansome"). Nor do ICE officials at 630 Sansome consistently offer over-the-counter pain medication. *See* Ixcotoyac Bacilio Decl. ¶ 11 ("Although I asked for pain medication, 630 Sansome officials did not acknowledge my requests."); Godoy Calderon Decl. ¶¶ 7–8 ("No one offered me any medication or first aid supplies for my injuries[.]").

Defendants' failure to provide medications for chronic conditions violates the PI's requirement that Defendants "begin necessary treatment" for individuals with "physical illness or injury." PI Order at 50. Moreover, "[t]he [medical] Standard of Care is to continue chronic care medications whenever possible without interruption, a process called 'bridging.'" Keller Report at 17. To achieve this, transient and short-term detention centers like 630 Sansome usually do three things: (1) keep commonly-prescribed medications on hand (referred to as "stat meds"), (2) set up access to an on-call medical practitioner to prescribe medications, and (3) maintain a contract with a local pharmacy. *Id.* at 17–18. However, there is "no evidence that Sansome has such a system. As a result, almost all chronic care medications are not continued, putting patients at unnecessary medical risk, even when detained for 12 hours or less." *Id.* at 18. Medication bridging is feasible in ICE Hold Rooms; indeed, the recently-issued permanent injunction in *Barco Mercado* requires that medical screenings "[p]rovide continued access to previously prescribed medication" and that detainees "[h]ave the same prescription immediately made available to them to keep in their possession after being prescribed such medication by ICE medical personnel." *See Barco Mercado*, ECF No. 187 at p. 4.

**5. Defendants Fail to Conduct Adequate Communicable Disease Screenings**

The Preliminary Injunction requires that medical screenings are sufficient to "recognize,

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

segregate, and treat those with communicable diseases." PI Order at 50. Defendants' medical screenings do none of this: their nurses fail to recognize communicable diseases even where Class Members give positive answers, *see* Keller Report at 19–20 ("Patients 333, 345, 389, 397, and 555 all gave positive answers to TB screening questions and yet were housed anyway"), and they fail to segregate or treat disease even where its presence is confirmed. *See* Keller Report at 19–20 (noting two individuals with confirmed Tuberculosis who were cleared for hold room detention).

Of the "potentially communicable diseases that could be spread to other detainees in detention units[,] [o]ne of the most important of these is tuberculosis." Keller Report at 5. Yet "Sansome is not screening properly for Tuberculosis," and "has no Policy to guide the IHSC RNs or Detention Officers about TB screening." *Id*. at 19–20. And while "[o]ther communicable diseases and infestations that must be identified at Intake include COVID-19 and lice," *see id*. at 5, Defendants have no policy for COVID-19 testing either. Failure to properly screen for disease during intake violates the PI and poses a real threat of a public health crisis once Class Members are transferred to long-term immigration detention. Indeed, in the past three months, two different government agencies have raised concerns over instances of Tuberculosis in long-term immigration detention populations due to insufficient screening.[2]

### 6. Defendants Have Made No Attempt to Comply with the Court's Order Requiring Medically-Necessary Diets, Mental Health Care, and Disability Accommodations

As described in Background Section B, Defendants admit they have no mental health or disability accommodations policies or practices in place at 630 Sansome. Class Members with mental health issues are often detained at 630 Sansome, and Defendants' failure to comply with

[2] *See* Hatton Decl., Ex. 24, Colorado Dept. of Public Health, Public Health Order 26-02 at 1 (explaining the department "has learned that an individual who was in custody at the Aurora ICE Processing Center has tested positive for active tuberculosis. Based on this information . . . . it is imperative that state and local public health authorities conduct a disease control investigation."); Hatton Decl., Ex. 25, Government Accountability Office, Immigration Detention Report on ICE Facility in El Paso, Texas at 17 ("The contractor had been using tuberculosis symptom questionnaires—rather than administering the required skin tests—for detained noncitizens at intake. As a result, in November 2025, a detained noncitizen with tuberculosis was housed with the general population.").

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

the Preliminary Injunction puts them at risk. *See* Keller Report at 19 (diagnosed schizophrenia, no medication); 15, (suicidal ideation); and Hatton Decl., Ex. 26 at 217–18 ([redacted]). For instance, Dr. Keller observed that one Class Member—who reported having significant mental health issues such as anxiety, paranoia, bipolar disorder, and post-traumatic stress disorder (PTSD)—was recorded by the telehealth nurse as not taking any medications that would "cause [him] to feel unwell if [he] stopped suddenly." Keller Report at 19. But in fact the patient was taking medications for major depression, bipolar disorder, and schizophrenia, and was "at risk to deteriorate if his medications [were] suddenly stopped." *Id.* For another Class Member, the telehealth nurse did not record any information about his mental health or the name of his medications, although he was taking three mental health medications. *Id*. at 15. Dr. Keller explains that "[m]ental health patients commonly lack insight into their need for medications," and to "comply with the Standard of Care, Sansome needs policies that identify what mental health conditions require immediate medication bridging and in-person observation of the patient." *Id*. at 19. One Class Member—[redacted]—was not provided any mental health care and was held at Sansome for hours without observation, treatment, or transfer to a hospital. *See* Keller Report at 15; Hatton Decl., Ex. 27. Her experience "shows that detention officers will sometimes not take patients to the ER even when told to do so by a medical professional," Keller Report at 26, and highlights the need for mental health policies at Sansome. *Id.* at 19.

Similarly, 630 Sansome has no policies on disability accommodations, negatively impacting Class Members' ability to communicate with medical and correctional personnel. *See, e.g.*, Hatton Decl., Ex. 26 at 155–56 ([redacted]), 201–02 ([redacted]); *see also* Lucero Lopez Decl. ¶¶ 15–16 ("The ICE officers did not ask about my vision and did not offer anything to help me see, even though I am nearly blind. . . . with my vision problems[,] I need things to be read and explained to me.").

Defendants also do not accommodate Class Members with medically-necessary diets, in violation of the Preliminary Injunction. "Many patients arriving at detention centers have special

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

diets that are critically important, such as people with celiac disease (severe gluten sensitivity) or people with food allergies." Keller Report at 5. The frozen meals ICE keeps at 630 Sansome are insufficient for this purpose. *See id.*at 14. Moreover, dietary arrangements must be made for Class Members who require food to keep their blood sugar stable or need food with their medication. *See id*. at 14–15. ICE does not make arrangements for people with sensitive medical issues to be fed during transport. *See* Lucero Lopez Decl. ¶¶ 7, 21 ("[M]y blood sugar is not controlled . . . . during the [8 hour] trip to California City I did not have food."). For Class Members with medical conditions affecting their stomach, ICE simply deprives them of food. *See* Rivas Cruz Decl. ¶¶ 6–7, 11 ("630 Sansome officials did not respond to my requests for food. In total, I did not eat or drink anything for approximately 24 hours").

**B. Defendants Continuously Violate the Court's Order Regarding Language Translation and a One-Hour Notice of Rights**

The Preliminary Injunction requires that Defendants provide Class Members with a written notice of their rights under the PI in English or Spanish within one hour of their arrival. PI Order at 51. If Class Members do not speak Spanish, the PI requires that Defendants provide oral translation of the one-hour notice. *Id.* Defendants must provide similar translation for the process for requesting medical attention. *Id.*

Defendants have provided no information suggesting that Class Members are advised of their rights under the PI within one hour of arrival, and some Class Members do not receive notice of their rights under the PI at any point. *See* Gonzalez Almanza Decl. ¶¶ 18–19 ("I was not informed I had the right to ask for medical care at 630 Sansome. I was not told whether I could access my medications or ask about them . . . . I was not given a toothbrush, soap, or any other hygiene items. No one told me I was allowed to have these things."); Gines-Hernandez Decl. ¶ 7 ("No one informed me verbally that I could request medical supplies, medication, phone calls, or hygiene items, or that I could receive medication from loved ones. They also did not tell me anything about my rights under the preliminary injunction.").

Defendants have Class Members sign an [redacted] form, which is translated into Spanish in some instances. The document acknowledges that a Class Member has

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

received the ICE/ERO National Detainee Handbook, which is not specific to 630 Sansome, as well as an [redacted] about the process for requesting medical attention and over-the-counter medicine. *See* Hatton Decl., Ex. 28, Blank Advisal Form. However, this document does not suggest that the *underlying* materials—if any—have been translated, and often Class Members feel pressured to sign the advisal form even when the accompanying materials have not been translated. *See* Gines-Hernandez Decl. ¶ 6 ("I did not understand the English documents and did not receive a translation . . . . One ICE agent spoke a bit of Spanish and told me that I had to sign the documents and that it was not optional."); Lucero Lopez Decl. ¶ 16 ("It's possible I signed something, but I would not have been able to see it or understand it without it being explained to me. I do not remember this happening[.]").

For Class Members who do not speak English or Spanish, ICE offers no written materials whatsoever. Individuals who speak languages other than English or Spanish—such as Mandarin, Arabic, Punjabi, Turkish, Vietnamese, Lao, Hindi, Russian, Portuguese, Thai, Nepali, and Burmese—have been detained at 630 Sansome. *See* Hatton Decl., Ex. 29. But Defendants offer no written materials in any of these languages, and there are no records of Defendants providing translation to these Class Members regarding their rights under the PI. *See supra,* Background Section B. Furthermore, many of these individuals appear not to have received translation during their medical screening. *Compare* Hatton Decl., Ex. 29 *with* Ex. 26 (medical intake forms with no translation noted).

### C. Defendants Continuously Violate the Court's Order Regarding Provision of Hygiene Items

The Preliminary Injunction requires that Defendants provide hygiene items to Class Members to be kept on their person. PI Order at 50–51. In violation of the PI Order, ICE does not hygiene items to Class Members detained at 630 Sansome. *See* Godoy Calderon Decl. ¶ 12 ("I did not receive any hygiene supplies such as a toothbrush, toothpaste, or soap."); Gines-Hernandez Decl. ¶ 11 ("I did not receive any hygiene supplies such as a toothbrush, toothpaste, or soap."); Lucero Lopez Decl. ¶ 18 ("I did not have a shower or change of clothes there. I was not able to brush my teeth."); Gonzalez Almanza Decl. ¶ 19 ("I was not given clean clothes. I was not given a

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

toothbrush, soap, or any other hygiene items."). ICE also subjects Class Members to inhumane and unhygienic conditions as they are transferred from 630 Sansome to long-term detention. *See* Ixcotoyac Bacilio Decl. ¶ 14 ("I had to urinate on the floor of the van because ICE would not stop or let me out to use a restroom. Other people being transported in the van with me also were not allowed to use the restroom and had to urinate inside the van.").

## II. This Court Should Find Defendants in Violation of the Preliminary Injunction, Set Tiered Deadlines for Compliance, and Order Periodic Compliance Reporting

Plaintiffs ask the Court to do what it has inherent authority to do: enforce the order it entered more than nine months ago. *See Shillitani*, 384 U.S. at 370; 28 U.S.C. § 1651(a). That relief has three components — a finding that Defendants are in violation, a schedule by which they must purge violations, and reporting sufficient to permit the Court and Plaintiffs to verify the violations have been remedied. Should Defendants fail to remedy their violations within sixty days, Plaintiffs seek a status conference to schedule contempt proceedings.

### A. The Court Should Find Defendants in Violation on the Present Record.

The record supports finding that Defendants have violated the PI Order. Plaintiffs have submitted declarations from six Class Members, a medical advocate who has witnessed medical screening at 630 Sansome firsthand, and the expert report of Dr. Jeffrey Keller. Such evidence constitutes "prima facie evidence that class members continue to suffer harm as Defendants delay their compliance with the Court's order." *Armstrong*, 857 F. Supp. 2d at 950–51. Moreover, Defendants have failed to provide documentary evidence on key compliance issues. *See supra,* Background Section B. A finding of violation is not a finding of contempt, and the Court need not reach contempt to order compliance. *See Armstrong*, 857 F. Supp. 2d at 950–52 (granting motion to enforce and ordering additional remedial measures while declining to hold defendants in contempt).

### B. The Court Should Order Compliance on a Tiered Schedule

Setting a deadline by which an enjoined party must come into compliance is the ordinary exercise of a district court's remedial discretion. *See, e.g.*, *Stone*, 968 F.2d at 854–55; *Armstrong*, 857 F. Supp. 2d at 950–52 (issuing nine-point enforcement order with deadlines). Most of what

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

the Preliminary Injunction requires can be—and should have been—implemented immediately, including distributing hygiene supplies, providing a translated notice of rights within one hour of arrival, and permitting Class Members to keep prescribed medications on their person. Plaintiffs therefore request that the Court order Defendants to comply with PI Nos. 6, 8, 9, 12, and 13 within fourteen days, as outlined in the concurrently-filed Proposed Order. *See* PI Order at 50–51.

Plaintiffs propose that Defendants be given sixty days to staff licensed medical professional onsite at 630 Sansome, in compliance with PI Nos. 5 and 7—a period that affords Defendants every reasonable opportunity to purge, and that is generous in light of Defendants' actions in New York and Chicago. *See* PI Order at 50; *see supra,* Section (I)(A)(1).

### C. The Court Should Order Periodic Compliance Reporting

A compliance deadline is meaningless without a mechanism to verify compliance. That is particularly true here, where Class Members are held in transient detention, face challenges to reach counsel while in temporary custody at 630 Sansome, and are in no position to document their own treatment. The absence of any reporting requirement is precisely why the parties have spent nine months disputing facts that should be a matter of record.

Other district courts have ordered periodic reporting to enforce preliminary relief in ICE hold rooms. *D.N.N. v. Liggins*, No. 1:25-cv-01613-JRR, ECF No. 231 (requiring biweekly reports from the Field Office Director for the Baltimore Hold Room while the PI Order remains in effect) (D. Md. Sept. 28, 2026); *Gonzalez v. Noem*, No. 25 C 13323, ECF No. 163 ("going forward, footage from all ten identified cameras will be produced on a weekly basis") (N.D. Ill., Feb, 13, 2026). This authority is well established. *Mullen*, 828 F.2d at 543; *Suquamish Indian Tribe*, 901 F.2d at 775. Defendants should be ordered to serve biweekly compliance reports on Class Counsel as outlined in the concurrently-filed Proposed Order. Each report should be accompanied by a declaration from the San Francisco Field Office Director. *See D.N.N.*, ECF No. 231 at p. 1; *Coal. on Homelessness*, 2024 WL 3669475, at *7.

### D. Plaintiffs Request a Status Conference and Reserve Their Right to Seek Contempt, Sanctions, and Fees

Plaintiffs request a status conference after a sixty-day curative period. Should there be

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

outstanding disputes regarding PI compliance at the status conference, Plaintiffs reserve the right to request that this Court to consider appropriate consequences, including but not limited to an order to show cause why Defendants should not be held in civil contempt; coercive and compensatory sanctions; a court-appointed monitor to report on compliance; and an award of attorneys' fees and costs under 28 U.S.C. § 2412. Plaintiffs also request that the Court order a joint status report in advance of any status conference, as outlined in the Proposed Order.

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court issue an order enforcing the Preliminary Injunction, issue compliance deadlines, order compliance reporting, and schedule a status conference, consistent with the Proposed Order.

DATED: October 1, 2026

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA

By: */S/ Marissa Hatton*

MARISSA HATTON
ANDREW NTIM
JORDAN WELLS
NISHA KASHYAP
Attorneys for Plaintiffs

DATED: October 1, 2026

CARECEN SF

By: */S/ Laura Victoria Sanchez*

LAURA VICTORIA SANCHEZ
TALA BERARDI HARTSOUGH
Attorneys for Plaintiffs

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

DATED: October 1, 2026

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA

By: */S/ Neil K. Sawhney*
NEIL K. SAWHNEY
ADRIANA HERRERA
Attorneys for Plaintiffs

DATED: October 1, 2026

COBLENTZ PATCH DUFFY & BASS LLP

By: */S/ Mark L. Hejinian*
MARK L. HEJINIAN
MARCIA V. VALENTE
DAVID C. BEACH
CHARMAINE G. YU
EVAN G. CAMPBELL
DARIEN LO
Attorneys for Plaintiffs

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

**ATTESTATION**

I, Mark L. Hejinian, am the ECF user whose identification and password are being used to file the foregoing document. In compliance with LR 5-1(i)(3), I hereby attest that all parties have concurred in this filing.

DATED: October 1, 2026 COBLENTZ PATCH DUFFY & BASS LLP

By: */s/ Mark L. Hejinian*
MARK L. HEJINIAN
Attorneys for Plaintiffs

008561.0134 4911-8596-2960.11