CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
KENNETH BRAKEBILL (CABN 196696)
Chief, Civil Division
WILLIAM SKEWES-COX (DCBN 1780431)
Special Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7066
William.skewes-cox@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CARMEN ARACELY PABLO SEQUEN, YULISA ALVARADO AMBROCIO, MARTIN HERNANDEZ TORRES, and LIGIA GARCIA,

Plaintiffs-Petitioners,

v.

SERGIO ALBARRAN, MARCOS CHARLES, THOMAS GILES, MONICA BURKE, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, TODD M. LYONS, SIRCE E. OWEN, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION AND REVIEW, UNITED STATES OF AMERICA,

Defendants-Respondents.

CASE NO. 25-cv-06487-PCP

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE**

Date: November 5, 2026
Time: 10:00 a.m.
Courtroom: Courtroom 8 – 4th Floor

Honorable P. Casey Pitts
United States District Judge

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

BACKGROUND ..... 2

A. The Preliminary Injunction ..... 2

B. The December 22, 2025, Status Conference ..... 3

C. Defendants' Screening Practice ..... 4

D. Plaintiffs' Motion to Enforce ..... 5

LEGAL STANDARD ..... 5

ARGUMENT ..... 6

I. DEFENDANTS' MEDICAL INTAKE SCREENING DOES NOT VIOLATE THE PRELIMINARY INJUNCTION AND IS MEDICALLY APPROPRIATE GIVEN THE OPERATIONAL POSTURE OF 630 SANSOME ..... 6

II. THE PRELIMINARY INJUNCTION DOES NOT REQUIRE AN ON-SITE MEDICAL PROFESSIONAL. ..... 8

A. The Preliminary Injunction Describes Who Conducts the Screening, But Not Where That Person Must Physically Be. ..... 8

B. The Preliminary Injunction Purposely Left Defendants With Significant Discretion Regarding the Exact Manner of Conducting the Medical Screening. ..... 10

C. The Screening Must be Judge Against the Preliminary Injunction, not Plaintiffs' Expert's Standard of Care. ..... 10

D. Plaintiffs' Authorities Show That Courts Write On-Site Requirements Into Their Orders. ..... 11

E. The Court's Remark at the Status Conference Did Not Add the Term. ..... 13

F. The "Spirit Of The Injunction" Does Not Supply The Missing Term. ..... 14

III. A MOTION TO ENFORCE CANNOT ADD TERMS TO THE PRELIMINARY INJUNCTION. ..... 15

A. Enforcement Reaches Only What the Order Already Requires. ..... 15

B. Plaintiffs' Proposed Order Is A New Injunction. ..... 16

C. New Or Modified Relief Requires Notice, A Record, And the Showing for a Preliminary Injunction. ..... 17

IV. DEFENDANTS ARE OTHERWISE IN COMPLIANCE WITH THE PRELIMINARY INJUNCTION AND AMENABLE TO ONGOING OUT-OF-COURT SETTLEMENT OF DISPUTES ........ 18

A. Defendants Have Procedures in Place to Provide Medical Care Upon Request ........ 18

B. Defendants Do Not Deprive Class Members of Access to Medication ........ 19

C. Defendants Screen for Communicable Diseases ........ 20

D. Defendants' Procedures Address Medically-Necessary Diets, Mental Health Care, and Disability Accommodations ........ 20

E. Defendants Provide Access to Hygiene Items ........ 21

F. Defendants Provide Notice to Detainees of their Rights Under the Preliminary Injunction ........ 21

CONCLUSION ........ 22

## TABLE OF AUTHORITIES

Cases

*Armstrong v. Brown*,
732 F.3d 955 (9th Cir. 2013) .......... 16
*Armstrong v. Brown*,
857 F. Supp. 2d 919 (N.D. Cal. 2012) .......... 16
*Balla v. Idaho StateBoard of Corrections*,
869 F.2d 461 (9th Cir. 1989) .......... 11
*Bates v. Johnson*,
901 F.2d 1424 (7th Cir. 1990) .......... 13, 14
*Bell v. Wolfish*,
441 U.S. 520 (1979) .......... 17
*Clark v. Coye*,
60 F.3d 600 (9th Cir. 1995) .......... 5, 13, 15
*Cunningham v. DavidSpecial Commitment Center*,
158 F.3d 1035 (9th Cir. 1998) .......... 15
*Doe v. Kelly*,
878 F.3d 710 (9th Cir. 2017) .......... 10
*Epic Games, Inc. v. Apple Inc.*,
161 F.4th 1162 (9th Cir. 2025) .......... 6, 13, 14, 15
*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .......... 17
*Gates v. Shinn*,
98 F.3d 463 (9th Cir. 1996) .......... 5, 11, 13, 15
*Graves v. Arpaio*,
48 F. Supp. 3d 1318 (D. Ariz. 2014) .......... 11, 12
Heartland Reg'l Med. Ctr. v. Leavitt,
415 F.3d 24 (D.C. Cir. 2005) .......... 15
*Hoptowit v. Ray*,
682 F.2d 1237 (9th Cir. 1982) .......... 10, 17, 20, 21
*Jensen v. Thornell*,
825 F. Supp. 3d 949 (D. Ariz. 2026) .......... 13
*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) .......... 17
*Sandin v. Conner*,
515 U.S. 472 (1995) .......... 10
*Schmidt v. Lessard*,
414 U.S. 473 (1974) .......... 5
*Sharp v. Weston*,
233 F.3d 1166 (9th Cir. 2000) .......... 17
*Stone v. City & Cnty. of S.F.*,
968 F.2d 850 (9th Cir. 1992) .......... 5
*Taggart v. Lorenzen*,
587 U.S. 554 (2019) .......... 6, 15
Terminal R.R. Ass'n of St. Louis v. United States,
266 U.S. 17 (1924) .......... 5, 6
*UV RML NL Assets LLC v. Coulter Ventures, LLC*,
No. 2:21-cv-04913-VAP-ASx, 2021 WL 6882160 (C.D. Cal. Dec. 15, 2021) .......... 14
*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*,
689 F.2d 885 (9th Cir. 1982) .......... 5, 14
*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 17, 19

## INTRODUCTION

The Court's preliminary injunction counseled that "the Ninth Circuit has warned district courts against micromanaging the executive branch's administration of detention facilities and has instructed district courts to ensure that agencies retain some flexibility." Dkt. No. 138 at 48 n.127. Plaintiffs now move the Court to do what the Ninth Circuit explicitly said *not* to do: micromanage Defendants' administration of 630 Sansome and revoke all flexibility Defendants have in implementing the preliminary injunction. To that end, Plaintiffs have submitted a sweeping and exceedingly detailed proposed order containing sixteen additional provisions not found in the Court's preliminary injunction.

The new additional relief Plaintiffs seek is procedurally inappropriate in the context of a motion to enforce. It also fails on the merits.

The thrust of Plaintiffs' motion to enforce is that Defendants have violated the preliminary injunction by conducting the required basic medical screening with nurses via telehealth. Plaintiffs claim the preliminary injunction requires that the medical professional conduct the medical screening *onsite*. But Plaintiffs make no argument that the actual text of the preliminary injunction contains any onsite language. Instead, Plaintiffs point to equivocal language from the Court at a December 2025 status conference. Plaintiffs argue that the Court's comments at the status conference supply the term that is indisputably missing in the text of the preliminary injunction.

Plaintiffs' argument fails to meet the legal standard for a motion to enforce. Precedent is clear that Plaintiffs bear the burden by clear and convincing evidence to establish a violation of clear language from the preliminary injunction. Even if Defendants were to concede *some* ambiguity arising from the status conference comments regarding whether the medical professional must be on site, all ambiguities must be resolved in favor of Defendants as the party who is subject to the injunction. Defendants have otherwise acted reasonably and in good faith in implementing the current medical screening procedures that the preliminary injunction actually does require. Accordingly, Plaintiffs' motion to find Defendants have violated the preliminary injunction by not having an onsite medical professional must fail.

Plaintiffs also advance other secondary arguments that Defendants have violated other provisions of the preliminary injunction. Defendants again respectfully disagree. However, Defendants

acknowledge that there is room to meet and confer about these other alleged violations. Though Defendants concede there is a genuine impasse between the parties regarding whether the preliminary injunction requires an onsite medical professional, the other alleged violations were brought to Defendants recent attention for the first time in the context of this motion to enforce. The parties met and conferred about these allegations shortly prior to Plaintiffs' filing of the motion to enforce, but any additional meeting and conferring to reach an out-of-court resolution of these additional issues has been paralyzed by the need to address this pending motion to enforce. Having now submitted their opposition to Plaintiffs' motion to enforce, Defendants intend to renew the meet and confer process with Plaintiffs in the hopes of seeking mutual resolution ahead of the scheduled November 5, 2026, hearing on Plaintiffs' motion to enforce. Since the implementation of the preliminary injunction, the meet and confer process between the parties has borne fruit and Defendants remain committed to working with Plaintiffs so that 630 Sansome can operate in a safe, effective, and constitutionally sufficient manner.

## BACKGROUND

### A. The Preliminary Injunction

On November 25, 2025, the Court issued a Preliminary Injunction "concerning the conditions of confinement relating to sleep, hygiene, and medical care at 630 Sansome." Dkt. No. 138 at 49. The Court ordered thirteen measures:

> (1) Provide members of the provisionally certified Detention Class ("Detention Class members") a bed, including a mattress and clean bedding (blanket, sheet, and pillow), and provide additional blankets when requested, **for any individual held overnight or for more than 12 hours**;
>
> (2) Provide Detention Class members **held overnight or for more than 12 hours** sufficient space to sleep, without having to sleep in a toilet or bathroom area;
>
> (3) Dim lights in the hold room between 9 p.m. and 7 a.m.;
>
> (4) Maintain hold rooms at comfortable temperatures;
>
> (5) Conduct a basic medical screening by a medical professional on each Detention Class member prior to placing them in a hold room. Screening will be sufficient to identify and begin necessary treatment of those with mental or physical illness and injury; to provide access to prescription medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to the physically

handicapped;

(6) Provide prompt access to over-the-counter pain medication and, for any Detention Class member with a prescription for medication, the right to possess, receive, and retain their prescribed medication on their person at all times, consistent with the prescription;

(7) Provide prompt access to medical care when requested by a Detention Class member, regardless of the language spoken to make the request, including access to the services of licensed medical personnel, without charge, between the hours of 7 a.m. and 9:30 p.m. In the case of emergencies, respond immediately and provide access to emergency medical care at all times;

(8) Consistent with Directive 11087.2, provide Detention Class members with limited English proficiency with written materials in Spanish outlining the process for requesting medical attention in their primary language. If a Detention Class member is illiterate, or has limited English and Spanish proficiency and speaks a language in which written material has not been translated, Defendants will provide in-person or telephonic oral translation of the process for requesting medical attention;

(9) Provide adequate supplies of hygiene products to each Detention Class member including one bar of soap or equivalent, a toothbrush, toothpaste, a comb or hair brush, a small towel or hygienic wipes, and, for any Hold Room containing any women, feminine hygiene supplies. Individuals must be permitted to keep the provided hygiene products on their person;

(10) Provide any Detention Class member **held overnight** a change of clean clothes, including clean socks and undergarments;

(11) Perform thorough cleaning services in any occupied Hold Rooms performed at least once per day.

(12) Provide written notice in English and Spanish to any Detention Class member in a Hold Room, within one hour of their arrival, informing them of their right to the provisions noted herein;

(13) If a Detention Class member is illiterate or has limited English and Spanish proficiency and speaks a language in which written material (including the notice of rights required in paragraph (12) above) has not been translated, provide in-person or telephonic oral translation, including for all ICE- and facility-related information and communications.

Dkt. No. 138 at 50-51 (emphasis added). As is clear from the emphasized language, some of the preliminary injunction's provisions apply only when a detainee is held for twelve hours or overnight.

### B. The December 22, 2025, Status Conference

On December 22, 2025, "at the parties' request, the Court held a status conference to clarify the scope of several disputed terms." Dkt. No. 161 at 2. At that conference, in the context of a discussion

regarding who counts as a medical professional, the Court said: "under the terms of the order there does need to be an availability of someone who could begin treatment. Perhaps of that first individual identified there's a need for treatment and you have to have someone there on site to initially manage that." Dkt. No. 237-1 at 45.

Following the conference, Defendants sought a stay, arguing that the Court's remarks at the conference had "expanded the existing preliminary injunction or granted new injunctions." Dkt. No. 161 at 4. The Court denied the stay because "The Court did no such thing." *Id.* at 4. Instead, the Court explained it had offered "a clarification of the scope of existing relief; it neither substantively modified that relief nor granted new relief." *Id.* at 4. As for "multiple requests to substantively modify the preliminary injunction, the Court explained that it could do so only pursuant to a properly filed motion." *Id.* at 3.

**C. Defendants' Screening Practice**

ICE closed the hold rooms for two months after the status conference but reopened them by February 2026. Before reopening, Defendants provided Plaintiffs with documentation describing how the facility would operate. In a significant operational change, Defendants made the decision to no longer hold detainees at 630 Sansome for longer than 12 hours nor hold detainees overnight.

In a February 2, 2026, email, Plaintiffs object that ICE's reopening plans "did not contemplate onsite medical providers." Dkt. No. 237-2 at 2-3. Defendants responded that the language of the "Court's order plainly does not require an onsite medical provider." Dkt. No. 237-3 at 9. In a follow-up email on February 9, 2026, Plaintiffs then conceded that "onsite *or other prompt, physical medical care is required*." *Id.* at 5. Since reopening, Defendants have implemented procedures to provide prompt, physical medical care.

In July 2026, Plaintiffs again raised the issue of an onsite medical professional to conduct the medical intake screening. Defendants responded by again pointing that there is no on-site term in the preliminary injunction and that Plaintiffs themselves had previously acknowledged that "onsite or other prompt, physical medical care is required." Dkt. No. 237-13 at 3. In reference to the Court's statements at the December 2025 status conference, Defendants explained that "the availability of facility staff to

call an ambulance or take a detainee to a hospital when so recommended by the medical screener is sufficient to comply with this language from the transcript." *Id.*

**D. Plaintiffs' Motion to Enforce**

Plaintiffs moved to "enforce" the order on October 1, 2026, nearly eight months after operations resumed at 630 Sansome. They ask the Court to find that Defendants have violated the preliminary injunction and to order extensive, burdensome relief. *See* Dkt. No. 238 ("Proposed Order"). Plaintiffs also request a schedule according to which Defendants "must purge violations," *id.*, they ask the Court to "set a schedule for contempt proceedings" if disputes remain, *id.* at 2, and they reserve the right to seek sanctions, a monitor, and fees, *id.* at 22–23.

## LEGAL STANDARD

To prevail on a motion to enforce, a party must establish "by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). Every injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)–(C). "[B]asic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam). So "[i]f an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt." *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996).

Courts apply three rules when interpreting an order against a motion to enforce. First, "a decree will not be expanded by implication or intendment beyond the meaning of its terms when read in the light of the issues and the purpose for which the suit was brought; and the facts found must constitute a plain violation of the decree so read." *Terminal R.R. Ass'n of St. Louis v. United States*, 266 U.S. 17, 29 (1924). Second, plaintiffs "in seeking to enforce the injunction, must show that the injunction clearly forbids a certain type of conduct," and "all ambiguities are resolved in favor of the person subject to the injunction." *See Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995) (quotation and emphasis omitted). Third, a party "should not be held in contempt" if its action "appears to be based on a good faith and reasonable interpretation of [the court's order]." *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*,

689 F.2d 885, 889 (9th Cir. 1982) (quotation omitted); *see Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (civil contempt "should not be resorted to where there is [a] fair ground of doubt as to the wrongfulness of the defendant's conduct" (quotation and emphasis omitted)).

The Ninth Circuit has held that a court may "look to the spirit of the injunction when a litigant applies a dubiously literal interpretation of the injunction, particularly where that interpretation is designed to evade the injunction's goals." *Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1176 (9th Cir. 2025) (quotation omitted), *cert. granted in part*, No. 25-1311 (U.S. June 30, 2026). But *Epic* also admits that "a decree will not be expanded by implication or intendment beyond the meaning of its terms." *Id.* (quoting *Terminal R.R.*, 266 U.S. at 29). Notably, "Whether a court may hold a party in civil contempt based on a violation of an injunction's 'spirit' where the injunction is silent as to the conduct upon which contempt is based, as the Ninth Circuit holds; or, instead, whether a court must ground a finding of civil contempt on the violation of an order that clearly and unambiguously proscribes the precise conduct at issue, as other circuits hold" is the question presented currently before the Supreme Court for resolution. *Apple Inc. v. Epic Games, Inc.*, No. 25-1311 (U.S. June 30, 2026).

## ARGUMENT

### I. DEFENDANTS' MEDICAL INTAKE SCREENING DOES NOT VIOLATE THE PRELIMINARY INJUNCTION AND IS MEDICALLY APPROPRIATE GIVEN THE OPERATIONAL POSTURE OF 630 SANSOME

Defendants' health screening process is designed for the current short-term operations at 630 Sansome Street. The current operational use of the holding cells at 630 Sansome is analogous to a courthouse hold room or a police precinct hold room. It is used for initial processing before transfer to a long-term detention facility. The medical screening enables the nurse to determine whether an alien may remain in a hold room for a limited period, typically just a few hours. Defendants submit their own expert report from the agency's in-house health care subcomponent, ICE Health Service Corps. *See* Declaration Of Deputy Assistant Director Clinical Services Robin N. Hunter Buskey ("Buskey Decl."). The report explains the medical-screening process used before a detention class member is placed in a hold room at 630 Sansome Street.

Aliens processed at 630 Sansome Street are being held there for a limited period of time, no

more than 12 hours before they are transferred to a detention facility, released, or other disposition. *Id.* ¶ 9. Aliens transferred to an ICE detention facility receive that facility's additional medical intake and have access to the medical services available there. *Id.*

In compliance with the Court's preliminary injunction, ICE conducts a health screening by a medical professional on each Detention Class member before placing the alien in a hold room at 630 Sansome Street. *Id.* ¶10. The screening is sufficient to identify and begin necessary treatment for those with mental or physical illness or injury; provide access to prescription medication without interruption; recognize, segregate, and treat those with communicable diseases; provide medically necessary special diets; and recognize and provide necessary services to aliens with physical disabilities. *Id.*

The health screening is performed by a licensed Registered Nurse through live video and audio communication. *Id.* ¶ 11. The Registered Nurse uses the health screening form, which facilitates screening through observation and questions. *Id.* The screening does not include an in-person physical examination. *Id.*

A full in-person medical evaluation appropriate for intake at an ICE detention facility is not required or appropriate for short-term administrative processing at 630 Sansome Street. *Id.* ¶ 12. Unlike a detention facility, 630 Sansome is an office building and does not have the clinical space or resources needed to conduct full in-person medical evaluations. *Id.* Those resources include private examination rooms, secure medical-record systems, hygienic fixtures and procedures for sanitizing between patients, personal protective equipment, medical equipment and supplies, medication storage and administration capabilities, and appropriate isolation areas. *Id.*

The first section of the health screening form is a general medical screening of current or past illnesses, health conditions, and special requirements or needs. *Id.* ¶ 13. It asks about difficulty hearing or seeing; use of a wheelchair, walker, or sleep apnea machine; current medications; whether the alien has medications with them; whether the alien is taking medication or drugs that could cause them to feel unwell if stopped suddenly; food or medication allergies; and whether the alien is currently ill or has pain, a rash or skin lesions, fever, nausea, vomiting, or diarrhea. *Id.*

The second section is a tuberculosis screening. *Id.* ¶ 14. It asks whether the alien has ever been

told that they have tuberculosis and whether they have recently experienced symptoms continuously for more than two weeks, including coughing, coughing up blood, fatigue, weakness, weight loss, loss of appetite, fever, or night sweats. *Id.*

The third section screens for substance use and withdrawal symptoms. *Id.* ¶ 15. It asks whether the alien uses drugs, including marijuana, cocaine, heroin, methamphetamine, or pills; when and where those substances were last used; whether the alien drinks alcohol and how often; when the alien last consumed alcohol; the alien's typical drink of choice and amount consumed; and whether the alien currently experiences, or has previously experienced, alcohol or drug withdrawal symptoms. *Id.*

The fourth section is a female health screening and asks whether they may be pregnant. *Id.* ¶16.

The fifth section is a mental-health screening. *Id.* ¶ 17. It asks whether the alien has current or prior mental-health concerns, is thinking about harming themselves or someone else, or is afraid someone may harm them. *Id.* These questions are derived from the Columbia Suicide Severity Rating Scale. *Id.*

The sixth section records the nurse's physical observations, including the alien's appearance, alertness, ease of movement, breathing, and skin condition. *Id.*

The final section of the health screening form records the nurse's assessment and disposition. *Id.* ¶ 19. The licensed Registered Nurse conducting the screening determines whether the alien is cleared for up to 12 hours in a hold room, requires isolation until medically cleared, or needs other disposition. *Id.* An "Other" disposition may include immediate transport to an emergency room or urgent care facility. *Id.* This determination begins the process of addressing the alien's identified medical needs. *Id.* This is the first step in identifying and addressing medical needs identified during screening. *Id.*

## II. THE PRELIMINARY INJUNCTION DOES NOT REQUIRE AN ON-SITE MEDICAL PROFESSIONAL.

### A. The Preliminary Injunction Describes Who Conducts the Screening, But Not Where That Person Must Physically Be.

Paragraph 5 of the preliminary injunction requires "a basic medical screening by a medical professional on each Detention Class member prior to placing them in a hold room." Dkt. No. 138 at 50. Every element is met when a registered nurse screens a detainee by video before the detainee enters a

hold room, as described above. The Preliminary Injunction requires no more. It does *not* say "on site" or "in person." It does not say where the professional must be licensed; a registered nurse licensed by any State is a "medical professional" and is among "licensed medical personnel." That should settle the matter, especially given Plaintiffs' clear and convincing burden and the required construction of the preliminary injunction in Defendants' favor, as described in this brief's legal standard section.

Plaintiffs attempt to supply the missing term in the paragraph's second sentence, under which the screening must be "sufficient to identify and begin necessary treatment," to "recognize, segregate, and treat those with communicable diseases." *Id.* at 50; *see* Dkt. No. 243 at 13, 21. That sentence states what the screening must be good enough to do. The screening determines if someone requires treatment before entering the hold room.

Paragraph 7 confirms the point. It requires "prompt access to medical care" on request, "including access to the services of licensed medical personnel" during the day, and, "[i]n the case of emergencies," "access to emergency medical care at all times." Dkt. No. 138 at 50. The key word is "access." "Access to emergency medical care" does not reasonably require an emergency room at 630 Sansome; it means that officers summon paramedics or take the detainee to a hospital. "[A]ccess to the services of licensed medical personnel" is no different. A detainee has "access" to the services of licensed medical personnel if ICE takes them to a hospital, emergency room, or a long-term detention facility.

Plaintiffs note that Paragraph 7 tracks paragraph 2(f) of the preliminary injunction entered in *See Barco Mercado v. Noem,* No. 1:25-cv-06568-LAK, ECF No. 97, ¶ 2(f) (S.D.N.Y. Sept. 17, 2025). Dkt. No. 243 at 14. This case is also cited by this Court four times in the Preliminary Injunction. *See* Dkt. No. 138 at 31, 38, 43, 48. Plaintiffs state that the *Barco Mercado* provision is "materially identical to the one in this Court's injunction." Dkt. No. 243 at 14. But the *Barco Mercado* order contains additional language not present in this Court's Preliminary Injunction. Its next subparagraph requires "prompt access to other such prescribed medication from ICE medical personnel, one or more of whom, as necessary for the well being of [detainees], *shall be on the premises of 26 Federal Plaza at all times of the day and night*." *Barco Mercado*, Dkt. No. 97 ¶ 2(g) (emphasis added). This Court's order does not

contain this language. The Court clearly had before it the preliminary injunction in *Barco Mercado* and the Court's decision to include 2(f) while leaving out 2(g) must be ascribed significance.

### B. The Preliminary Injunction Purposely Left Defendants With Significant Discretion Regarding the Exact Manner of Conducting the Medical Screening.

The Court began from the premise that "precedent allows considerable flexibility as to when and how constitutionally adequate medical care is provided." Dkt. No. 138 at 45 (quoting *Doe v. Kelly,* 878 F.3d 710, 722 (9th Cir. 2017)). In *Doe*, the plaintiffs complained that intake screening was "performed by Border Patrol agents, not doctors, nurses, or other specially trained personnel," and that the agency did "not have medical staff on site." 878 F.3d at 717. The district court granted neither request, and the Ninth Circuit affirmed. *Id.* at 713, 725. The cases on which the plaintiffs relied "do not hold that all medical screening must be done by medical professionals," *id.* at 722–23, and Ninth Circuit precedent "does not require that all stages of medical care be provided by trained medical staff," *id.* at 724. Care may be given by referral to "facilities outside the prison if there is reasonably speedy access." *Id.* at 722–23 (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)). And "before directing an agency to retain medical personnel, a court must first evaluate whether the government's proposed plan adequately meets the detainees' medical needs." *Id.* at 724. This Court went further than *Doe* in requiring that a medical professional conduct the screening, and Defendants have complied by implementing a medical screening by nurses. But an order that follows *Doe* should not be read to impose in silence the on-site staffing that *Doe* declined to require.

### C. The Screening Must be Judge Against the Preliminary Injunction, not Plaintiffs' Expert's Standard of Care.

Plaintiffs' reading also relies on the word "sufficient," as interpreted by their expert. The screening is not sufficient, they say, because "the failure to provide an on-site medical professional violates the Standard of Care." Dkt. No. 243 at 19. The Ninth Circuit has twice rejected that way of reading a decree.

In *Balla v. Idaho State Board of Corrections*, an order requiring a "basic" program and "sufficient" numbers of mental-health professionals could not support contempt: "These terms are too

general to be enforced through a contempt motion." 869 F.2d 461, 465 (9th Cir. 1989). In *Gates*, a decree required "appropriate psychiatric screening" and "appropriate psychiatric evaluation and treatment." 98 F.3d at 465. The district court read those words to adopt a "clinical standard of care," held the defendants in contempt for refusing thirteen changes that a mediator and his experts recommended, and ordered the changes made. *Id.* at 465–66. The Ninth Circuit vacated and reversed the district court's contempt order. The disputes "were matters of medical and administrative expertise," on which "reasonable minds can and do differ." *Id.* at 470, 472. The question was "who decides, whose view shall prevail"; and unless the decree was "specific in terms," the district court "would lack the power to decide." *Id.* at 471. *Balla*, the court added, "is not a holding to be avoided by substituting some unspecific words, like 'appropriate,' for others, like 'sufficient.'" *Id.* at 472.

These Ninth Circuit decision are directly on point. Paragraph 5 uses the very words *Balla* held too general—a "basic" screening, "sufficient" to stated ends. Whether screening by video is sufficient to identify illness and begin treatment from a short-term hold room, where Defendants are ready and willing to take detainees to a hospital or call an ambulance, is a question of medical and administrative judgment on which Plaintiffs' expert has one view and the agency's medical service another. The order "itself, not merely [an expert's] subsequent directives, must command" the conduct at issue "or else they cannot be held in contempt of court for failing to provide it." *Gates*, 98 F.3d at 468. As in *Gates*, here reasonable minds demonstrably differ regarding the appropriate level of care at short-term hold room. But that disagreement is not a basis to find Defendants have violated the preliminary injunction.

### D. Plaintiffs' Authorities Show That Courts Write On-Site Requirements Into Their Orders.

Plaintiffs admit that *Graves*, their model decree, "did not explicitly state that medical care needed to be provided onsite." Dkt. No. 243 at 14. They also assert that the orders entered against ICE where onsite medical personnel is now present "do not explicitly state that onsite medical care is required." Dkt. No. 243 at 14. The first statement concedes the point. The second is wrong on the facts.

Plaintiffs note that Paragraph 5 of the preliminary injunction is "virtually identical" to the "receiving screening" paragraph in *Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1340 (D. Ariz. 2014). Dkt. No. 243 at 13. But *Graves* did not read the "receiving screening" paragraph to require that anyone be on

site. Plaintiffs quote *Graves* that "Ready access to care to meet serious medical and mental health needs means that pretrial detainees with serious medical and mental health needs will be *seen face-to-face by a medical or mental health provider*." *Id.* at 1346 (Plaintiffs' emphasis). However, the district court in *Graves* was construing a *different* paragraph – not the one included in this Court's preliminary injunction – which said that detainees in jails lacking services must be transferred "or shall otherwise be provided with appropriate alternative on-site medical services." 48 F. Supp. 3d at 1346. This Court's order has no such paragraph. And when the *Graves* court concluded that more was needed at intake, it did not declare that the existing judgment had required it all along. After a six-day evidentiary hearing, *id.* at 1332, it ordered "additional prospective relief" in a new judgment, *id.* at 1358: that "[a] registered nurse will perform the receiving screening," and that a provider examine seriously ill detainees "within 24 hours after the receiving screening," *id.* at 1359. *Graves* thus shows that an on-site requirement appears in a decree's text when a court means to impose one, and that a party that wants new relief does so not through a motion to enforce.

Plaintiffs use sleight of hand by relying on *Barco Mercado* to argue that this Court's preliminary injunction requires onsite medical professionals. Plaintiffs note that the order in *Barco Mercado* does not "explicitly state that onsite medical care is required," and they quote its paragraph 2(f). Mot. 9. However, they omit paragraph 2(g), which required ICE medical personnel "on the premises of 26 Federal Plaza at all times of the day and night." The ICE declaration that Plaintiffs offer as proof of what ICE does without being told tracks paragraph 2(g) nearly word for word. This establishes that ICE put medical personnel on the premises in New York because the *Barco Mercado* order *explicitly required them to*. *Barco Mercado* does not support finding an onsite requirement in this Court's preliminary injunction, but it does show that ICE is agency that complies with Court orders.

Plaintiffs' other citations also do not support their position. That ICE later chose "to add a registered nurse at the ICE office in Broadview, IL," Dkt. No. 243 at 15, shows what an agency may *decide* to do, not what this Court's preliminary injunction requires. Every ICE office is unique and these decisions are circumstance specific. And *Jensen v. Thornell*, cited by Plaintiffs at Dkt. No. 243 at 14, involved a permanent injunction "jointly crafted by Defendants and Plaintiffs" after "a five-week trial."

825 F. Supp. 3d 949, 952 (D. Ariz. 2026). *Jensen* also involved prisons; not short-term hold rooms. In sum, other cases involving other facilities do not change what this Court's preliminary injunction requires at 630 Sansome.

**E. The Court's Remark at the Status Conference Did Not Add the Term.**

The thrust of Plaintiffs' case specific argument is that on December 22, 2025, the Court modified the preliminary injunction from the bench to add the on-site requirement. Mot. 3, 8, 10. But Plaintiffs are wrong, for four reasons.

*First*, the Court has already said that its remarks that day "neither substantively modified that relief nor granted new relief." Dkt. No. 161 at 4. Requiring onsite medical professionals is certainly a substantive modification. The Court's remarks therefore cannot stand on their own as an additional requirement under the preliminary injunction. The Court's comments at the status conference matter as evidence of what the written order *already required*—which returns the analysis to the actual text of the preliminary injunction.

*Second*, a modification of the preliminary injunction triggers several procedural requirements that have not been met here. Rule 65(d)(1) requires the order itself to describe the acts required "in reasonable detail—and not by referring to the complaint *or other document*." (Emphasis added.) The status conference transcript *is* another document. That is why *Gates* held that a mediator "could have no power to require more than the consent decree did." 98 F.3d at 468. It is why *Clark* thought it dispositive that the district court had needed to explain its own injunction: "The very fact that the magistrate judge felt compelled to issue an order interpreting his injunction belies the suggestion that the injunction on its face clearly prohibited" the conduct. 60 F.3d at 604. *Epic* is not to the contrary. A court may consult other materials "to interpret the plain terms of the Injunction," but *not* to expand by implication or intendment. 161 F.4th at 1177; s*ee also Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990) ("Oral statements are not injunctions.").

*Third*, the remark does not say what plaintiffs take it to say. As they quote it, the Court referred to "an availability of someone who could begin treatment" and to "someone there on site to initially manage that." It did not say that the two must be the same person, or that either must be a clinician

stationed in the building. Medical personnel at a local hospital or emergency room fulfill the language regarding “an availability of someone who could begin treatment.” Similarly, officers who act on the nurse’s directions and call paramedics when told to are “someone there on site to initially manage” a detainee who needs care. Defendants read the Court’s remarks that way – especially in light of the Court’s order denying the stay pending appeal – and were transparent with Plaintiffs about Defendants’ interpretation when reopening the facility with this understanding.

*Fourth*, plaintiffs fault defendants for not seeking a modification. *Id.* at 3. But the Court’s invitation was conditional: the government should “come back and propose a modification” if screening by a medical professional proved “administratively unworkable.” *Id.* From Defendants point of view, it has proven workable. A party that complies with the text of an order has no need for modification. The party who wants the order to require more must ask, and Plaintiffs—told in February how defendants read the order—waited eight months until October and then filed the wrong motion.

Plaintiffs’ rely on an unpublished order in which, as they quote it, a court found its injunction not “ambiguous or unclear” where it had told the defendant at a hearing that particular conduct “would be banned under this injunction.” Dkt. No. 243 at 15 (quoting *UV RML NL Assets LLC v. Coulter Ventures, LLC*, No. 2:21-cv-04913-VAP-ASx, 2021 WL 6882160, at *2 (C.D. Cal. Dec. 15, 2021)). That is not what happened at the December 2025 status conference. The Court did not say that a telehealth screening by a nurse “would be banned” under the preliminary injunction.

**F. The “Spirit Of The Injunction” Does Not Supply The Missing Term.**

Nor can plaintiffs prevail by pointing to the “spirit” of the injunction. *Epic* stated that a court may “look to the spirit of the injunction when a litigant applies a dubiously literal interpretation of the injunction, particularly where that interpretation is designed to evade the injunction's goals.” 161 F.4th at 1176 (quotation omitted). Defendants have done nothing of the kind. The order requires a basic medical screening by a medical professional and Defendants have implemented it, not evaded it.

At a minimum, Defendants’ reading is “a good faith and reasonable interpretation” of the order, *Vertex*, 689 F.2d at 889 (quotation omitted), and such a reading based on “[g]ood faith, when coupled with an objectively reasonable interpretation of a court's order, can be enough to avoid a contempt

finding." *Epic*, 161 F.4th at 1178. Defendants announced their implementation of the preliminary injunction before reopening and have applied it transparently since. Regardless of Plaintiffs disagreement with the current medical screening process, there is at least a "fair ground of doubt" that it is not wrong under the preliminary injunction. *Taggart*, 587 U.S. at 561 (quotation and emphasis omitted).

## III. A MOTION TO ENFORCE CANNOT ADD TERMS TO THE PRELIMINARY INJUNCTION.

### A. Enforcement Reaches Only What the Order Already Requires.

Precedent is clear that a motion to enforce can only enforce what an order already requires. *Clark* is on point. The plaintiffs there moved for contempt on the ground that a new state law "undermined the remedial purpose" of an injunction. 60 F.3d at 603. The magistrate judge "decline[d] to find at this time that the defendant is in contempt" but issued an order "to ensure that the express provisions of the judgment are complied with." *Id.* The Ninth Circuit reversed. "Because the existing injunction did not clearly prohibit" the conduct, "the district court's order must be considered either a modification of its previous injunction or the issuance of a new injunction." *Id.* at 605. And "[w]hatever label is attached to the order," it could not issue without a "judicial determination of whether the prohibited conduct … actually violated federal law." *Id. Clark* rebuffs Plaintiffs' suggestion that the Court avoid a contempt finding and simply "order compliance." Dkt. No. 243 at 26. Whatever the motion or relief is called, the question is whether the order already requires an onsite medical professional. If it does not, the relief is a modification or a new injunction, and the showing for one must be made through different court process.

*Clark* is not the only case. In *Gates*, the district court reasoned that "a remedial order following a contempt finding may include new requirements to serve the original intent of the consent decree," and that the new requirements could be enforced "even had a contempt finding not been made." 98 F.3d at 466. The Ninth Circuit vacated the order because it "impos[ed] sanctions and additional requirements." *Id.* at 472. In *Cunningham v. David Special Commitment Center*, an "enforcement order" entered for a new resident was held a modification because, though it implemented the injunction's purpose "[i]n the most general sense," it added "an entirely new set of obligations." 158 F.3d 1035, 1037 (9th Cir. 1998). *Accord Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) ("Success on a motion to

enforce a judgment gets a plaintiff only 'the relief to which [the plaintiff] is entitled under [its] original action and the judgment entered therein.'").

Plaintiffs' own authority follows this rule. *Armstrong v. Brown* enforced an order that already required a plan, which the defendants had agreed to and then declined to carry out: "Defendants do not dispute that they have not disseminated a plan as required by the Amended Order." 857 F. Supp. 2d 919, 951 (N.D. Cal. 2012), *aff'd*, 732 F.3d 955 (9th Cir. 2013). The plaintiffs there sought only "to require Defendants to carry out the revised plan to which Defendants had previously agreed." *Id.* at 950. Defendants here have never agreed to have medical personnel on site at 630 Sansome.

**B. Plaintiffs' Proposed Order Is A New Injunction.**

By that measure, plaintiffs' proposed order is not enforcement. Paragraph 5 of the Preliminary Injunction requires a "basic medical screening by a medical professional." The proposed order would require a clinician "on the premises" fourteen and a half hours a day, "licensed in California," with "sufficient licensure to conduct intake health screenings and physical assessments," "to provide urgent care," and "to administer medications, immunizations, and treatments." Proposed Order ¶ 8. It would require a second, on-call practitioner able to prescribe (¶ 9); "sufficient medical equipment onsite at 630 Sansome to conduct physical examinations and provide urgent care" (¶ 11); Medication Administration Records (¶ 13); stores of special-diet food (¶ 4); and written policies on tuberculosis and COVID-19, disability, mental health, and continuity of medication (¶¶ 5–7, 12). The Preliminary Injunction names several of these subjects as ends that a screening must be sufficient to serve. It does not require the staff, equipment, records, stores, or written policies that plaintiffs now list.

The source of these terms is not the order. It is the report of plaintiffs' retained expert, who opines that on-site staffing is "a necessary component of providing adequate care" under "the Standard of Care." Mot. 11. As shown in Part I.D, a general term does not incorporate an expert's standard. The proposed order confirms as much by its verbs: defendants are to "develop and implement" new policies, to "obtain" and store new supplies, and to engage new staff. Proposed Order ¶¶ 4–8. These new terms betray what Plaintiffs actually seek: a new preliminary injunction; not an order to comply the current one.

### C. New Or Modified Relief Requires Notice, A Record, And the Showing for a Preliminary Injunction.

The Court told the parties in December how to seek what plaintiffs now seek: it could "substantively modify the preliminary injunction" "only pursuant to a properly filed motion." Dkt. No. 161 at 3. Plaintiffs have not filed that motion.

The modification of the preliminary injunction is not a formality. A preliminary injunction may issue "only on notice to the adverse party," Fed. R. Civ. P. 65(a)(1), and the court "must … state the findings and conclusions that support its action," Fed. R. Civ. P. 52(a)(2). "A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). Whether a change warrants revision "should be guided by the same criteria that govern the issuance of a preliminary injunction." *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) (per curiam); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And where the relief is mandatory, the movant "must establish that the law and facts clearly favor her position." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (emphasis omitted). An order to require on site medical personnel and to install medical equipment at 630 Sansome is mandatory; it does not restore the status quo.

On the merits, Plaintiffs would have to show that the Constitution requires medical professionals on the premises of a short-term hold room, not that their expert prefers them. Professional standards "simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Bell v. Wolfish*, 441 U.S. 520, 543–44 n.27 (1979). The Ninth Circuit has held it "error for the district judge to constitutionalize the standards of the American Medical Association," *Hoptowit*, 682 F.2d at 1253, and has reversed an order to hire in-house physicians because the district court had not "first determined that [the State's] approach could not meet the constitutional minimum," *id.* at 1254.

The present record could not support such relief. It consists of plaintiffs' declarations and a retained expert's report which defendants have not had the chance to test by deposition or in Court. The

facts have also changed. The Court found that ICE "routinely holds detainees at 630 Sansome overnight or for more than 12 hours." Dkt. No. 138 at 40. Plaintiffs' own expert now acknowledges that detainees are held "for 12 hours or less." Dkt. No. 243 at 18, 21. None of Plaintiffs' declarant claim an overnight stay or one lasting more than twelve hours. In fact, Plaintiffs' declarants describe being held for only six hours. Dkt. No. 237-17 at 2; 237-21 at 2; 237-22 at 2; 237-23 at 3. It is doubtful that the Constitution requires a resident clinician for stays of that length, when a nurse screens each arrival and Defendants have procedures to take detainees to hospitals or immediate transfer. No motion has put it before the Court. Moreover, given the level of micromanaging that Plaintiffs seek in their proposed order, it is unlikely their proposed new relief is even available to them regardless of the procedural path they may take.

## IV. DEFENDANTS ARE OTHERWISE IN COMPLIANCE WITH THE PRELIMINARY INJUNCTION AND AMENABLE TO ONGOING OUT-OF-COURT SETTLEMENT OF DISPUTES

This motion to enforce was the first time Defendants were informed of many of the remaining issues raised in the motion to enforce. Plaintiffs and Defendants have remained in constant contact during the pendency of this litigation. Defendants acknowledge that the parties have reached a veritable impasse regarding the issue of onsite medical personnel and understand Plaintiffs' decision to bring that disagreement to the Court. However, the parties have otherwise reached solutions to address a number of issues through the meet and confer process. For example, the parties have reached agreements regarding attorney access, the provision of phone calls, and increased notice provided to detainees upon arrival. Defendants anticipate that at least some of these additional issues raised by Plaintiffs for the first time in the context of this motion to enforce could be addressed and resolved without seeking the intervention of the Court. Regrettably, Plaintiffs proceeded directly to raising these issues in the motion to enforce without allowing for the meet and confer process to play out.

### A. Defendants Have Procedures in Place to Provide Medical Care Upon Request

Defendants have procedures in place to provide medical care upon request. Paragraph 7 of the Preliminary Injunction orders Defendants to "Provide prompt access to medical care when requested by a Detention Class member, regardless of the language spoken to make the request, including access to

the services of licensed medical personnel, without charge, between the hours of 7 a.m. and 9:30 p.m. In the case of emergencies, respond immediately and provide access to emergency medical care at all times." As disclosed to Plaintiffs, "If a detainee needs prompt medical care, they will either be sent to a local hospital or to a long-term ICE detention facility where there is comprehensive medical care. If a detainee is experiencing a medical emergency, we will call an ambulance." *See* Defendants' Response to Plaintiffs' First Set of Interrogatories at 5. This procedure complies with the preliminary injunction.

Plaintiffs' submitted declarations claim that no medical care was given at 630 Sansome, *see* Dkt. 243 at 20-21, but is unclear that any of the claimed conditions required immediate medical attention, immediate transport to a hospital or the calling of an ambulance. In any event, following transfer, these declarants have access to medical care at the long-term detention facilities.

**B. Defendants Do Not Deprive Class Members of Access to Medication**

Defendants have a variety of over-the-counter medications available upon request and provide detainees with their prescription medications as medically required. *See* Kaskanlian Declaration, Exh. E. For example, detainees have long been permitted to maintain their prescription inhales on their persons. Dkt. No. 237-1 at 27. In response to the issue of safety concerns raised by universal on-person possession of prescription medication by detainees, the Court recommended that the parties "engage in further meet and confer with plaintiffs' counsel on this issue." *Id.* at 28. At least since the undersigned counsel took over this case, there has been no further meet and confer with Plaintiffs on this issue.

One of Plaintiff's declarants claims that he was not allowed to keep his needles on him to test his glucose, *see* Dkt. No. 243 at 20, but Defendants' policies permit a detainee to have access to his glucose testing kits as needed. Though he may not keep the needles on him in the holding cell for obvious safety reasons, especially if he is not the only detainee in the holding cell, he would have maintained access to them upon request. Defendants policies permit him to receive them back temporarily to test his blood glucose. Another of Plaintiff's declarant claims that ICE officers took his medicine but he acknowledges that he was allowed to take his morning medication. Dkt. No. 237-23 at 3. This indicates that detainees maintain access to their prescription medication while at 630 Sansome.

The preliminary injunction in *Barco Mercado* is instructive on this point. It requires that

detainees be permitted to keep their inhalers in their possession, but otherwise only requires "prompt access" to other forms of prescribed mediation. *Barco Mercado*, Dkt. No. 97 ¶ 2(g). *Barco Mercado* thus offers the workable compromise that respects detainees need to take their prescription medication while also deferring to the safety concerns that arise from permitting unfettered possession in a custodial environment to prescription medication.

### C. Defendants Screen for Communicable Diseases

Defendants' medical screening has multiple questions directed at screening for communicable diseases. Answers to these questions are annotated on the medical intake form that follows detainees as they arrive at the long-term detention facilities. Plaintiffs acknowledge this in their motion. *See* Dkt. No. 243 at 21-22. Appropriate care and testing may then be carried out in accordance with the medical care provided at the long-term detention facilities.

Plaintiffs motion notes that five patients gave positive answers to tuberculosis screening questions, Dkt. No. 243 at 21, but then do not address what subsequent care those detainees were provided at a long-term detention facility. Plaintiffs motion also makes the claim that "two individuals with confirmed Tuberculosis who were cleared for hold room detention." *Id*. at 22. However, Plaintiffs misrepresent what their own expert's report states. Their expert report actually states that two detainees "answered yes to the question 'Have you *ever* been told you have Tuberculosis?'" Plaintiffs' Exh. 15 at 20 (emphasis added). Answering "yes" to this question does not establish that the two detainees had "confirmed" tuberculosis. And again, Plaintiffs do not address what medical attention those two detainees received at their long-term detention facility.

### D. Defendants' Procedures Address Medically-Necessary Diets, Mental Health Care, and Disability Accommodations

The medical screening is sufficient to capture both mental health and disability issues. These issues are annotated on the form and addressed, when not constituting an emergency, at the long-term detention facility that has the medical equipment and personnel capable of meeting detainees' needs.

Defendants acknowledge one case where a detainee was not cleared for the hold room due to her mental health condition and that she remained at 630 Sansome, but not in a holding cell, for hours when she otherwise should have been sent to a hospital. Dkt. No. 243 at 23. Defendants self-reported this

particular violation to Plaintiffs. Defendants also took remedial measures in response on their own initiative, including sending out a broadcast email to local Enforcement and Removal Operations reminding them that when a detainee is not cleared for a hold cell, the detainee needs to be taken either to a hospital immediately or immediately transferred to the long-term detention facility where they can promptly receive the appropriate care. *See* Plaintiff's Exh. 27.

Plaintiffs are also wrong about the lack of medical necessary diets. Defendants have meals available for all detainees, including vegetarian, vegan, and gluten-free options. *See* Kaskanlian Declaration, Exh. C. Plaintiffs provide detainees with water and juice, the latter of which can aid detainees in keeping their blood sugar stable. *See id.*; Dkt. No. 243 at 23.

### E. Defendants Provide Access to Hygiene Items

Upon request, Defendants provide detainees with access to a comprehensive assortment of hygiene items in line with the requirements of the preliminary injunction. Defendants have changes of clothes, toothbrush, soap, and toothpaste. *See* Kaskanlian Declaration, Exh. D. It is unclear from the declarations submitted by Plaintiffs whether any of the detainees requested the items they said they were deprived of.[1]

The disagreement between the parties appears to center around the precise meaning of the word "provide." Defendants have reasonably and in good faith interpreted "provide" to require that the hygiene items be on hand and available upon request. They are. Plaintiffs interpret "provide" to require that Defendants affirmatively hand over each and every named item upon arrival to the hold room area. This ambiguity does not support a finding of violating the preliminary injunction. Nevertheless, Defendants are open to meeting and conferring to potentially reach a mutually acceptable resolution on this dispute.

### F. Defendants Provide Notice to Detainees of their Rights Under the Preliminary Injunction

Upon arriving to the sixth floor at 630 Sansome, detainees are served with notice of their rights

---

[1] One of Plaintiffs' declarants alleges that he had to urinate on the floor of an ICE transport van. Dkt. No. 236 at 26. Plaintiffs do not relate this claim to a provision of the preliminary injunction.

under the preliminary injunction. Plaintiffs acknowledge that detainees receive notice, including of the ICE/ERO National Detainee Handbook and are informed about the process for requesting medical attention and over-the-counter medicine. Dkt. No. 243 at 24-25. Detainees then sign the form acknowledging that they have received notice. *Id*. These forms are written in English and Spanish and Defendants have translation services available for the speakers of other languages. These translation services are also available during the medical screening, as acknowledged by one of Plaintiffs' declarants. *See* Dkt. No. 237-17 at 2. Notice of detainees' rights under the preliminary injunction are also posted on the walls of the intake and holding cells. *See* Kaskanlian Declaration, Exh. B. And again, Defendants are open to meeting and conferring to reach a mutually acceptable resolution on this dispute regarding the extent of notice. The parties have previously reached agreements to provide additional notice.

## CONCLUSION

In light of the foregoing, Defendants respectfully request that the Court deny Plaintiffs' motion to enforce.

DATED: October 15, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ William Skewes-Cox*
WILLIAM SKEWES-COX
Special Assistant United States Attorney

*Attorneys for Defendants*